## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CAMBRIDGE RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> EQT CORPORATION, STEVEN T. SCHLOTTERBECK, ROBERT J. MCNALLY, DAVID L. PORGES, JIMMI SUE SMITH, JAMES E. ROHR, VICKY A. BAILEY, PHILIP G. BEHRMAN, KENNETH M. BURKE, A. BRAY CARY, JR., MARGARET K. DORMAN, STEPHEN A. THORINGTON, LEE T. TODD, JR., CHRISTINE J. TORETTI, DANIEL J. RICE IV, and ROBERT F. VAGT, <br><br> Defendants. | Civ. A. No. <br><br> <u>CLASS ACTION</u> <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>JURY TRIAL DEMANDED</u> <br><br> **ECF CASE** |

Plaintiff Cambridge Retirement System ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of (a) regulatory filings made by EQT Corporation ("EQT" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued by and disseminated by the Company; (c) analyst reports concerning the Company; (d) transcripts of EQT's investor conference calls; and (e) other public information regarding the Company.

## I.      INTRODUCTION

1.      Plaintiff brings this federal securities class action (the "Action") against EQT and certain of the Company's senior executives under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 on behalf of all investors who

purchased EQT's common stock between June 19, 2017 and October 24, 2018, inclusive (the "Class Period"). Plaintiff also brings claims under Section 14(a) of the Exchange Act and SEC Rule 14a-9 on behalf of shareholders of EQT and Rice Energy Inc. ("Rice") who held EQT or Rice shares as of the record dates of September 25, 2017, and September 21, 2017, respectively, and were entitled to vote at an EQT or Rice special meeting on November 9, 2017 with respect to EQT's acquisition of Rice, which closed on November 13, 2017 (the "Acquisition"). Plaintiff also brings claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of all persons who purchased or otherwise acquired EQT common stock in exchange for their shares of Rice common stock in the Acquisition.

2.      EQT is a natural-gas-production company whose primary operations are in the Appalachian Basin and throughout Pennsylvania, West Virginia, and Ohio. The Company is the largest producer of natural gas in the United States based on average daily sales volumes, with proved reserves of 21.8 trillion cubic feet equivalents (Tcfe) of natural gas in the Appalachian region (primarily in the Marcellus shale basin) as of February 14, 2019.

3.      On the morning of June 19, 2017, the Company announced that EQT had entered into an agreement to acquire rival gas producer Rice for total consideration of $6.7 billion. EQT's President and Chief Executive Officer ("CEO"), Defendant Steven T. Schlotterbeck ("Schlotterbeck"), touted the benefits of the proposed merger, stating that "Rice has built an outstanding company with an acreage footprint that is largely contiguous to our existing acreage, which will provide substantial synergies and make this transaction significantly accretive in the first year." According to Schlotterbeck, the overlap in the companies' operations would enable EQT to "drive higher capital efficiency through longer laterals" by drilling laterally (as opposed to more traditional vertical well drilling) through the contiguous EQT and Rice drilling sites.

Specifically, EQT executives represented that the "contiguous" nature of the two companies' existing acreage would allow EQT to achieve "a 50% increase in average lateral lengths." As a result, the Company told EQT shareholders the Acquisition would result in $2.5 billion in synergies, including $100 million in cost savings in 2018 alone.

4.      On July 3, 2017, activist investor JANA Partners LLC ("JANA") disclosed that it had acquired a nearly 6% equity stake in the Company. In several letters following this disclosure, JANA claimed that the Rice merger synergies were "grossly exaggerated," and according to JANA's expert analysis, "it would be impossible for EQT to support its claimed synergy drilling plan" as there were "simply not enough undrilled contiguous acreage blocks to enable such a dramatic improvement in lateral length." According to JANA, the maps EQT used to tout the claimed synergy benefits were "blatantly deceptive," as many of the purportedly contiguous tracts on those maps were not actually contiguous. Moreover, many of the intervening properties between these purportedly contiguous tracts were controlled by other operators and could not be used without substantial costs.

5.      In the face of these objections, EQT repeatedly denied JANA's assertions about the contiguity of the parcels and the realizable synergies and reassured investors of the merits of the Acquisition, and the Company's and Rice's shareholders approved the Acquisition. After the Acquisition closed in November 2017, the Company continued to tout the "significant operational synergies" of the merger that would purportedly allow EQT to become "one of the lowest-cost operators in the United States."

6.      On March 15, 2018, just five months after the Acquisition closed, EQT announced the sudden and unexpected resignation of CEO Schlotterbeck, who the Company claimed left for personal reasons. In fact, while Schlotterbeck said the resignation was about a "plain vanilla

disagreement between me and board," EQT issued a statement claiming that he resigned because he was "unsatisfied with the amount of his compensation."

7.      Then, on October 25, 2018, the Company reported surprisingly bad third-quarter financial results caused by a staggering increase in total costs, which were $586.2 million higher than in the same period of the prior year. Moreover, the Company disclosed that its estimated capital expenditures for well development in 2018 would increase by $300 million, to $2.5 billion, as a result of "inefficiencies resulting from higher activity levels, the learning curve on ultra-long horizontal wells, and service cost increases." As a result, the Company reduced its full-year forecast for 2018. These disclosures revealed that the Company's prior statements about the Acquisition's synergies had been false and misleading.

8.      On this news, EQT shares fell 13%, dropping from a close of $40.46 per share on October 24, 2018 to $35.34 on October 25, 2018, erasing nearly $700 million in shareholder value in a single day. Over the next several days, EQT shares fell to as low as $31.00 per share—less than half what the Company was worth when the Acquisition closed in November 2017. (These per-share prices are not adjusted for the effects of the subsequent spinoff of 80% of EQT's midstream business, Equitrans Midstream Corporation, to EQT's shareholders on November 13, 2018.)

## II.      JURISDICTION AND VENUE

9.      The claims asserted in this Action arise under Sections 10(b), 14(a), and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78n(a), and 78t(a)), SEC Rules 10b-5 and 14a-9 (17 C.F.R. §§ 240.10b-5 and 240.14a-9), and Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o).

10.     This Court has jurisdiction over this Action under 28 U.S.C. §§ 1331 and 1337, Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v).

11.     Venue is proper in this District under 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)), and Section 22 of the Securities Act (15 U.S.C. § 77v(a)), because EQT maintains offices in this District and many of the acts giving rise to the violations complained of in this Action, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District.

12.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

13.     Plaintiff Cambridge Retirement System is a contributory retirement system for active and retired employees of the City of Cambridge, Massachusetts, the Cambridge Housing Authority, the Cambridge Public Health Commission, and the Cambridge Redevelopment Authority. As of December 31, 2018, Plaintiff manages approximately $1.3 billion in assets on behalf of approximately six thousand participants. As shown in the attached certification, Plaintiff purchased shares of EQT stock during the Class Period; held shares of EQT stock on September 25, 2017, the record date for EQT shareholders to vote on the Acquisition; held Rice stock on November 13, 2017, the closing date of the Acquisition, and acquired EQT stock in exchange for its Rice stock in the Acquisition; and suffered damages as a result of the violations of the federal

securities laws alleged in this Action. Plaintiff also held shares of Rice stock on September 21, 2017, the record date for Rice shareholders to vote on the Acquisition.

14.     Defendant EQT is a Pennsylvania corporation headquartered at 25 Liberty Avenue, Suite 1700, Pittsburgh, Pennsylvania, that calls itself the largest natural-gas producer in the United States.

15.     Defendant Steven T. Schlotterbeck joined EQT in 2010 and was EQT's President and CEO from March 1, 2017, until March 15, 2018, when his resignation from all of his positions as an officer and director of the Company, effective the day before, was publicly announced. Schlotterbeck signed the Registration Statement (defined below) for the Acquisition, as well as EQT's annual report on Form 10-K for the year ended December 31, 2017.

16.     Defendant Robert J. McNally ("McNally") was EQT's Senior Vice President and Chief Financial Officer from March 2016 to November 2018. McNally signed the Registration Statement for the Acquisition, as well as EQT's annual report on Form 10-K for the year ended December 31, 2017, and its quarterly reports on Form 10-Q for the three months ended March 31, 2018, and June 30, 2018. McNally became EQT's President and CEO on November 12, 2018, in connection with EQT's separation of its midstream business from its upstream business, distribution of the midstream business to Equitrans Midstream Corporation, and distribution of 80.1% of the latter's stock to EQT's shareholders.

17.     Defendant David L. Porges ("Porges") was EQT's Chairman and CEO from 2011 through February 2017, its Executive Chairman from March 2017 through February 2018, and its Chairman from March 1, 2018, to March 14, 2018, when he replaced Defendant Schlotterbeck under the titles of Interim President and CEO. Porges signed the Registration Statement for the Acquisition, as well as EQT's annual report on Form 10-K for the year ended December 31, 2017,

and its quarterly reports on Form 10-Q for the three months ended March 31, 2018, and June 30, 2018.

18.     Defendants Schlotterbeck, McNally, and Porges are collectively referred to in this complaint as the "Officer Defendants." The Officer Defendants, because of their positions with the Company, possessed the power and authority to control the contents of EQT's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. The Officer Defendants were provided with copies of the Company's reports and press releases alleged in this complaint to be misleading before, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their position and access to material non-public information available to them, the Officer Defendants knew that the adverse facts and omissions specified in this complaint had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and misleading.

## IV.     DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS ABOUT THE ACQUISITION

### A.     Announcement of the Acquisition

19.     On the morning of June 19, 2017, EQT announced that it had agreed to acquire Rice in a transaction that valued Rice at $6.7 billion. Under the terms of the Acquisition, Rice shareholders would receive 0.37 of a share of EQT common stock and $5.30 in cash in exchange for each share of Rice common stock they held (other than shares of Rice common stock held by EQT or certain of its subsidiaries, shares held by Rice in treasury, or shares for which appraisal was properly demanded under Delaware law). The Acquisition consideration amounted to $5.4 billion in EQT stock and $1.3 billion in cash.

20.     In EQT's press release announcing the Acquisition on the morning of June 19, 2017, Defendant Schlotterbeck was quoted as saying:

> Since the beginning of 2016, we have added more than 485,000 acres to our development portfolio and have achieved significant scale in the core of the Marcellus. We will now shift our focus from acquisitions to integration as we work to drive higher capital efficiency through longer laterals; reduce per unit operating costs through operational and G&A synergies; improve our sales portfolio by expanding access to premium markets; and deliver increased value to our shareholders.

21.     The press release also stated:

> As the vast majority of the acquired acreage is contiguous with EQT's existing acreage position, EQT anticipates a 50% increase in average lateral lengths for future wells located in Greene and Washington Counties in Pennsylvania. This same land synergy also complements the infrastructure footprint of EQT Midstream Partners, LP (NYSE: EQM), where growth opportunities are expected through drop-downs and additional organic projects. Already a leading producer in the Appalachian Basin, this acquisition will make EQT the largest natural gas producer in the United States.

22.     The press release also described EQT as "a leader in the use of advanced horizontal drilling technology—designed to minimize the potential impact of drilling-related activities and reduce the overall environmental footprint."

23.     Also on June 19, 2017, EQT held an investor conference call during which management discussed slides about the merger that were made available on the Company's website and filed publicly with the SEC. The slides stated that the "Transaction Rationale" was "Significant contiguous acreage and resulting synergies" and included a map depicting the two companies' purportedly contiguous natural-gas fields:



**Transaction Rationale**
*Significant contiguous acreage and resulting synergies*



- **Sizable Transaction of High-Quality Core Acreage**
  - EQT becomes the largest U.S. Natural Gas producer
  - Pro forma combined full-year 2017E production of 1.3 Tcfe
  - Overall PV synergies $2.5 B
  - Immediately accretive to cash flow per share in excess of 20% in 2018 and 30% in 2019
    - 2018 expense synergies at least $100 MM
  - EQT's consolidation goals are largely met
    - Focus moves to integration and realizing higher returns through longer laterals and lower operating cost structure
    - Continue tactical acquisitions of fill-in acreage to extend laterals

24.     The slides also stated that there would be "Consolidation Benefits" because "Rice's PA Marcellus position is contiguous with EQT's SW PA acreage," and that the "Synergy Potential" and "Present value of economic savings pro forma for Rice acquisition" included $1.9 billion of "capital efficiencies" and $0.6 billion of general-and-administrative expense savings, for $2.5 billion of "total synergies."

25.     During the conference call, Defendant Schlotterbeck touted the contiguity of EQT's and Rice's natural-gas fields and the resulting cost savings:

> [W]e are very excited about today's announcement, as the Rice acreage and midstream assets are a perfect complement to EQT's existing footprint.
>
> ***
>
> As you know, there is significant improvement in returns on invested capital by extending lateral lengths. Our consolidation focus has been on assets that are contiguous with our core Marcellus acreage position. As you can see on the map, Rice's acreage is as good a fit as any asset in our core development area.
>
> As a result of the transaction, EQT becomes the largest natural gas producer in the US, with 2017 pro forma production of 1.3 Tcfe. There are tremendous operating and capital synergies, which are estimated to have a present value of $2.5 billion.

In the first full year, we estimate operational savings of $100 million, and model cash flow per share accretion in excess of 20 percent, increasing to 30 percent in year two.

The transaction meets our consolidations targets, and we will immediately move to integrating our acquired assets, realizing higher returns through longer laterals. Filling in holes and extending laterals will continue to be part of the development plan, and you should model about $100 to $200 million per year for these tactical fill-ins.

Moving to slide seven and some of the consolidation benefits, this transaction is driven by our strategy to significantly improve returns on invested capital and capture capital and operational synergies, driven by a 50 percent increase in lateral length in Greene and Washington Counties. By extending laterals from 8,000 to 12,000 feet, the well returns will increase from 50 percent to 70 percent at a $3.00 NYMEX gas price.

\*\*\*

Now on slide eight, as I already discussed, the fit of the two companies' assets provide tremendous synergies, estimated at $2.5 billion.

Then moving to slide nine, as we've discussed in the past, longer laterals drive returns. Assuming a $3.00 NYMEX, or $2.50 local price, the returns improve from 52 percent to 70 percent in Pennsylvania. And put another way, the PV-10 per well improves from $5.3 million to $9 million, a dramatic 70 percent increase in present value.

\*\*\*

The contiguous nature of acquisitions provide tremendous operational and capital synergies, as well as providing significant organic growth opportunities for EQM and EQGP.

26.     In response to an analyst's question, Defendant Schlotterbeck said:

[T]he synergies from this acquisition are really focused in Greene and Washington Counties, where we have very significant overlap in amongst the best acreage in the Marcellus play. So, I think it's likely that you will see a strong capital allocation to those areas where we can drill the 12,000 plus foot laterals and earn the highest returns.

27.     In response to another analyst's question, Defendant Schlotterbeck said:

[W]hen you put this acreage together, not only can you drill longer laterals but you can drill larger pads. So—and that's what we've been doing.

And both of those—it doesn't really say this is our history on here, but when we developed it, it was really—the 5,500 foot laterals and five well pads is where we were a few years ago. And then last year we were averaging six well pads and 6,000 foot—feet. And then after some of the recent consolidation, we were at eight wells and 8,000 feet. And now, with the Rice transaction, we expect to be able to average the 12 well pads and 12,000 feet in the Greene and Washington area.

So, that's kind of why those numbers were chosen. But they do—they go hand in hand, that as you consolidate, you get the benefit of both more wells per pad and longer laterals.

28.     Also on June 19, 2017, Defendant Schlotterbeck sent an email about the Acquisition to all EQT employees. The email, which was also publicly filed with the SEC, stated: "The Rice acquisition will deliver significant operational synergies and help to reduce our per unit costs. Rice's acreage is contiguous to our existing acreage position and will allow us to extend our drilling laterals to provide operational efficiencies, improve well economics, and deliver stronger returns."

29.     The statements quoted in ¶¶ 20-28 were materially false and misleading because most of the acreage to be acquired in the Acquisition was not contiguous with EQT's previously held acreage, and because the purported longer lateral wells were not feasible because of intervening third-party parcels or prior drilling by EQT, Rice, or third parties.

**B.      Filing of the Registration Statement and Joint Proxy Seeking Approval of the Merger**

30.     In connection with the Acquisition, Defendants filed with the SEC a combined registration statement on Form S-4, prospectus ("Prospectus") and joint proxy statement/prospectus ("Proxy") (together, the "Registration Statement") on July 27, 2017, which was amended on September 8, 2017, and September 29, 2017, and was declared effective by the SEC on October 12, 2017.

31.     The Registration Statement, which described the Acquisition, stated that both EQT's and Rice's boards of directors had approved the Acquisition and recommended to the

shareholders of the respective companies that they approve the Acquisition at special shareholder meetings.

32.     The Registration Statement included materially false and misleading statements about the Acquisition, including that "[m]embers of the EQT board and management noted [at a meeting on April 19, 2017] that Rice represented a uniquely compelling acquisition opportunity given the synergies that would likely result from the contiguous and complementary nature of Rice's asset base with EQT's."

33.     The Registration Statement also stated:

*Significant Synergies.* In addition to the strategic rationale and the ability to participate in unlocking value embedded within Rice, EQT expects that its shareholders will derive a substantial benefit from the significant synergies attributable to the transaction. The EQT board believes that the merger will create capital efficiencies and operational cost savings and synergies through conducting EQT's and Rice's operations as part of a combined enterprise, including synergies resulting from:

• the opportunity to optimize the combined company's upstream and midstream standalone portfolios by applying each company's best practices across the contiguous and complimentary [sic] acreage positions;

• the opportunity for a significant increase in the average lateral lengths of future Marcellus wells, reducing well costs on a per horizontal foot basis and increasing the present value of development; [and]

• the expectation of meaningfully reduced lease operating expense per unit through more efficient development, including an increase in wells per pad, an increase in company net horizontal feet through coordinated development plan eliminating drainage effects, a reduction in rig and frac fleet move times, coordinated produced water handling and improved cycle times through concentrated execution . . . .

34.     The statements quoted in ¶¶ 32-33 were materially false and misleading because most of the acreage to be acquired in the Acquisition was not contiguous with EQT's previously held acreage, and because the purported longer lateral wells were not feasible because of intervening third-party parcels or prior drilling by EQT, Rice, or third parties.

35.    In numerous communications after the filing of the Registration Statement and before the shareholder vote and the closing of the Acquisition, Defendants repeated the representations contained in the Registration Statement and referred investors to the Registration Statement when soliciting shareholder approval for the Acquisition.

**C.    JANA's Criticisms of the Acquisition, EQT's False Denials, and the Closing of the Acquisition**

36.    On July 5, 2017, JANA, which owned approximately 6% of EQT's stock, sent a letter to EQT's board opposing the Acquisition and publicly filed the letter with the SEC. Among other things, JANA wrote that "EQT's calculation of the $2.5 billion of synergies created by the transaction appears highly questionable, and we estimate that the actual synergies could fall short by $1.3 billion, or over 50%."

37.    EQT denied JANA's assertions about the Acquisition. For example, on July 27, 2017, EQT gave an analyst presentation, which was publicly filed with the SEC, in which it reiterated its statement that the Acquisition would provide $2.5 billion of synergies, republished the map showing purportedly contiguous properties that it had issued on June 19, 2017, as discussed in ¶ 23, and stated that "Capital Efficiencies" would be achieved because "[c]ontiguous acreage leads to: longer laterals [and] fewer wells" and because of "[l]ower surface costs."

38.    On July 31, 2017, JANA sent another letter to EQT's board opposing the Acquisition and filed the letter publicly with the SEC. Among other things, JANA wrote: "[T]he only actual synergy that would be generated by a Rice acquisition comes from longer lateral lengths that are facilitated by the transaction. Looking at the abutting acreage, we believe such acreage would only facilitate a fraction of the increase in lateral well length (and thus a fraction of the savings from the reduction in total wells drilled) cited to justify this transaction."

39.    On August 14, 2017, JANA sent a letter to EQT's board and publicly filed the letter

with the SEC. In this letter, JANA argued that EQT's management had an inappropriate incentive to push the Acquisition regardless of whether it was beneficial for EQT shareholders because management's incentive compensation was based in large part on natural-gas-production growth, which could be achieved by any means including acquisitions and was not measured on a per-share basis, so that stock-for-stock acquisitions like the Acquisition of Rice would increase management's compensation regardless of whether they benefited shareholders on a per-share basis.

40.     On September 11, 2017, JANA filed preliminary proxy materials with the SEC opposing the Acquisition. Among other things, JANA's proxy materials stated that whereas EQT had stated that the Acquisition would produce $2.5 billion of synergies, "we estimate that the actual synergies could fall short by at least $1.3 billion . . . ."

41.     On September 13, 2017, EQT announced that production volume acquired in the Acquisition would not be included in calculating management's executive compensation. EQT also announced that the Company would establish a board committee immediately upon closing of the Acquisition to evaluate options for addressing a "sum-of-the-parts" discount criticized by JANA.

42.     On September 20, 2017, JANA sent another letter to EQT's board and publicly filed the letter with the SEC. JANA provided further details about why it believed EQT's claimed synergies from the Acquisition were overstated:

> With the help of a leading petroleum engineering firm with extensive experience in the Appalachian basin and experienced industry operators, we have identified and mapped out every existing and potential future well location on the combined company's acreage based upon publicly-available data, assuming 750 foot spacing in Washington County and, even more generously, 500 foot spacing in Greene County. Based on this work, we believe it would be impossible for EQT to support its claimed synergy drilling plan of 1,200 wells with 12,000 feet in average lateral length. While the over-simplified maps provided in EQT's presentations make the

synergy claims seem plausible, a detailed analysis reveals that much of the acreage actually consists of hundreds of disjointed blocks that are not properly depicted in management's map. Moreover, many of the larger blocks of adjacent acres (that in theory would enable longer laterals) have already been drilled out at least on one side. There is simply not enough undrilled contiguous acreage blocks to enable such a dramatic improvement in lateral length over what can be accomplished by each company on a standalone basis.

Based on our analysis, we believe a combination with Rice would only modestly increase average lateral lengths by less than 1,000 feet, not the 4,000 feet increase claimed by EQT. This modest increase in lateral length would result in approximately $300 million in pre-tax capital savings on a net present value basis, not the $1.9 billion EQT has claimed.

43. On October 16, 2017, EQT publicly responded to JANA's criticisms in a press release that was publicly filed with the SEC:

JANA has suggested that EQT's presentation of the combined Rice-EQT acreage map is misleading, and that the existence of non-contiguous acreage contained within the pro-forma footprint of the combined Company implies that stated operational synergies from the transaction are not achievable. This is emphatically not the case.

EQT has been operating in the Appalachian Basin for nearly 130 years, has drilled more than 2,500 horizontal wells, and has drilled the longest lateral in the Marcellus (to-date) at 17,400 feet. It is standard industry practice to manage any non-contiguous acreage requirements through well path adjustments, smaller bolt-on acquisitions, and tactical fill-ins, all of which are part of our current development plan at an estimated cost of up to $200 million annually. In addition, there are often small-scale acreage trades between operators that are used to fill in gaps. Each of these methods are routinely employed by EQT and other Appalachian operators to build their respective development programs. Given the multitude of legacy natural gas leases across Appalachia, it is commonplace for small acreage plots to exist given the historical ownership of land in the region.

The combined Rice-EQT acreage profile was evaluated thoroughly and carefully, and based on our development plan, which includes the cost of tactical fill-ins, the Company is confident it will achieve the $2.5 billion in synergies that it has identified. For JANA to suggest that this acreage acquisition strategy, which is standard for Appalachian operators, is inconsistent with achieving the anticipated benefits of the transaction is highly misleading and inaccurate.

44. On October 19, 2017, EQT issued proxy materials stating that "Rice has an outstanding footprint that is largely contiguous to our existing acreage position and complements

our pipeline infrastructure systems." The materials also said that the Acquisition offered "IMPROVED UPSTREAM RETURNS, DRIVEN BY THE CONSOLIDATION OF COMPLEMENTARY ACREAGE POSITIONS" and that "[d]evelopment of adjacent acreage leads to longer laterals and improves overall economics."

45.     On October 23, 2017, JANA filed proxy materials with the SEC opposing the Acquisition, criticizing EQT's rationale for the Acquisition, and asserting, among other things, that EQT's published map purporting to show significant contiguous acreage resulting from the Acquisition was false and misleading and that due to minimal contiguous undrilled acreage, likely drilling synergies were only approximately $300 million, well below EQT's claim of $1.9 billion.

46.     On October 23, 2017, EQT again publicly responded to JANA's criticisms. EQT gave an analyst presentation, which was publicly filed with the SEC, in which it reiterated its statement that the Acquisition would provide $2.5 billion of synergies, republished the map showing purportedly contiguous properties that it had issued on June 19, 2017, as discussed in ¶ 23, and stated that "Capital Efficiencies" would be achieved because "[c]ontiguous acreage leads to: longer laterals (12,000 feet) [and] fewer wells" and because of "[l]ower surface costs."

47.     On an investor and analyst conference call on October 23, 2017, Defendant Schlotterbeck also purported to refute JANA's criticisms:

> [S]ince we are now two weeks away from the vote deadline, I do want to emphasize once again the merits of the Rice transaction. The primary driver of success in our industry is being the low cost producer, and the most impactful way to drive per unit cost lower is through longer laterals.
>
> Establishing a dominant footprint of highly contiguous acreage that allows for sustained long lateral development is a real competitive advantage. This is what the Rice transaction creates for us. Our competitors may be able to replicate things, like new drilling technology or new drilling techniques, but they can't replicate an acreage position that supports 12,000 foot laterals in the core of the Marcellus.

48.     In response to an analyst's question, Defendant Schlotterbeck said that EQT expected to do even better than the 12,000 foot lateral wells it had previously told investors it would achieve and would do so immediately after the Acquisition closed:

> In the acquisition area where we said we're going to average 12,000-foot laterals, we expect to be able to come right out of the gate in 2018 and average at least 12,700 feet in that area. So in terms of delivering on the synergies, we're going to be able to start demonstrating that from day one. So we're pretty excited that the more we work the maps and get the data incorporated as we plan for the integration, our ability to deliver on that, our confidence in that, keeps going up. So we're going to come out of gate at 12,700 at least and probably go up from there.

49.     In response to another analyst's question about "your confidence around the 12,000 number on a pro forma basis," Schlotterbeck said: "Well, extremely confident." He reiterated that EQT was "going to come out of the gate above the average" and further stated that the Acquisition would give EQT control of 212,000 of the 370,000 acres in Greene County, of which only 75,000 had been developed, "[s]o there is lots of remaining inventory acreage, tremendous amount of resource in place, so very, very confident in our ability to deliver on that synergy."

50.     The statements quoted in ¶¶ 37, 43-44, and 46-49 were materially false and misleading because most of the acreage to be acquired in the Acquisition was not contiguous with EQT's previously held acreage, and because the purported longer lateral wells were not feasible because of intervening third-party parcels or prior drilling by EQT, Rice, or third parties.

51.     On October 26, 2017, JANA publicly responded to EQT's statements of three days earlier. Among other things, JANA asserted that "[a]ctual acreage consists of fragmented blocks rather than large swaths of land" and that EQT's claimed lateral extension consisted almost entirely of "acreage trades and infill leasing, which EQT could pursue on a standalone basis."

52.     As discussed above, after JANA filed proxy solicitation materials in an attempt to defeat the Acquisition at the special meeting of stockholders, EQT agreed to revise the management-compensation scheme that JANA had criticized as providing inappropriate

incentives for management based on the Acquisition and to accelerate consideration of possible transactions to address the "sum-of-the-parts" undervaluation that JANA argued affected the Company's stock price. JANA responded to these concessions by withdrawing its proxy materials, while still stating that it would vote against the Acquisition. On November 9, 2017, majorities of EQT and Rice shareholders voted in favor of the Acquisition, which closed that day.

## V.   DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS FOLLOWING THE ACQUISITION

53.   On February 15, 2018, EQT filed its annual report on Form 10-K for the year ended December 31, 2017, which was signed by Defendants Schlotterbeck, McNally, and Porges and included certifications by Defendants Schlotterbeck and McNally under the Sarbanes-Oxley Act that the report was accurate and complete. The Form 10-K included false and misleading statements about the purported benefits of the Acquisition. For example, the Form 10-K stated:

> Following the Rice Merger, the Company has significant acreage scale in the core of the Marcellus which will allow EQT to drill considerably longer laterals, realize operational efficiencies and improve overall returns. EQT believes that it is a technology leader in horizontal drilling and completion in the Appalachian Basin and continues to improve its operations through the use of new technology. Development of multi-well pads in conjunction with longer laterals, well spacing, and completion techniques allows EQT to maximize recoveries per acre while reducing the overall environmental surface footprint of the Company's drilling operations.

54.   The Form 10-K also contained a "Risk Factor" about the Acquisition:

> **We may not achieve the intended benefits of the acquisition of Rice and the acquisition may disrupt our current plans or operations.**
>
> There can be no assurance that we will be able to successfully integrate Rice's assets or otherwise realize the expected benefits of the acquisition of Rice. In addition, our business may be negatively impacted if we are unable to effectively manage our expanded operations going forward. The integration has required and will continue to require significant time and focus from management and could disrupt current plans and operations, which could delay the achievement of our strategic objectives. (Emphasis in original.)

55.     The statements quoted in ¶¶ 53-54 were materially false and misleading because most of the acreage acquired in the Acquisition was not contiguous with EQT's previously held acreage, and because the purported longer lateral wells were not feasible because of intervening third-party parcels or prior drilling by EQT, Rice, or third parties. The purported "Risk Factor" was materially false or misleading for the additional reason that it was entirely generic, could apply to any corporate acquisition, and disclosed none of the material integration difficulties that had already occurred, including EQT's inability to achieve cost-savings, longer lateral wells, or other operational efficiencies from the Acquisition.

56.     On April 26, 2018, the Company filed a quarterly report on Form 10-Q for the three months ended March 31, 2018, which was signed by Defendant McNally and included Sarbanes-Oxley certifications of the report's completeness and accuracy by Defendants McNally and Porges. The Form 10-Q included materially false and misleading statements about the impact of the Acquisition, including: "Upon the closing of the Rice Merger, the Company's consolidation goals were largely met and the Company plans to focus on integrating the Rice assets and realizing higher returns through longer laterals and achieving an even lower operating cost structure." The Form 10-Q also stated that there had been no material change in the "Risk Factor" concerning the Acquisition previously disclosed in the 2017 Form 10-K.

57.     On April 27, 2018, the Company filed its proxy statement for its 2018 annual meeting. The proxy statement included a letter to shareholders from Defendant Porges, in which he wrote: "We have the largest contiguous acreage footprint in the best natural gas basin in the world and to take advantage of this opportunity, we must continue managing expenses, reducing

waste, and making good business decisions so that every capital dollar invested is used effectively."

58.     The April 26, 2018 Form 10-Q's and April 27, 2018 proxy statement's statements discussed in ¶¶ 56-57 were materially false and misleading for the reasons discussed in ¶ 55.

59.     On July 26, 2018, the Company filed a quarterly report on Form 10-Q for the three months ended June 30, 2018, which was signed by Defendant McNally and included Sarbanes-Oxley certifications of the report's completeness and accuracy by Defendants McNally and Porges. The Form 10-Q included materially false and misleading statements about the impact of the Acquisition, including: "Upon the closing of the Rice Merger, the Company's consolidation goals were largely met and the Company plans to focus on integrating the Rice assets and realizing higher returns through longer laterals and achieving an even lower operating cost structure." The Form 10-Q also stated that there had been no material change in the "Risk Factor" concerning the Acquisition previously disclosed in the 2017 Form 10-K.

60.     The July 26, 2018 Form 10-Q's statements discussed in ¶ 59 were materially false and misleading for the reasons discussed in ¶ 55.

## VI.    THE TRUTH ABOUT THE ACQUISITION IS REVEALED

61.     The truth about the Acquisition was revealed on October 25, 2018, when the Company disclosed shockingly bad financial results for the three months ended September 30, 2018. Among other things, the Company's earnings press release issued that day stated that "[e]stimated well development capital expenditures for 2018 increased by $300 million to $2.5 billion. This was driven by inefficiencies resulting from higher activity levels, the learning curve on ultra-long laterals and service cost increases." The Company reported a quarterly net loss

attributable to EQT of $40 million, compared with quarterly net income attributable to EQT of $23 million in the prior year's third quarter.

62.    During an investor and analyst conference call on October 25, 2018, Erin Centofanti, EQT's Executive Vice President, Production, stated that the Company was increasing its well-development capital expenditures for 2018 by $300 million or 14% based on costs that "represent primarily onetime events that were driven by pace of activity, ultra-long lateral learning curve and some service cost increases." She further stated that "as we progress up the learning curve on the ultra-long laterals, meaning those laterals that are between 15,000 and 20,000 feet, early well costs are heavily influenced by trying new techniques and adjusting operating practices as problems occur." She admitted that EQT had yet "to drill longer laterals at the cost profile we originally anticipated."

63.    Also on the October 25, 2018 call, incoming CEO McNally acknowledged that the Company had not lived up to its prior statements about the Acquisition:

> We do understand that this quarter's operational update is a disappointment to shareholders. It certainly is a disappointment to me and this team as we underperformed our asset base in 2018. As the incoming CEO, I'm committed to reshaping our culture to one that's focused on capital efficiency and per share returns as opposed to purely chasing volume targets.

64.    In response to an analyst's question, McNally elaborated on EQT's failure to achieve the long laterals that it had previously touted:

> On the lateral lengths, with the Rice acquisition, we all of a sudden have found ourselves with a land position that gave us the opportunity to go from, on average, of 8,000-foot laterals to almost 14,000 feet. But mixed in there were quite a number of laterals that were between 15,000 and 20,000 feet, many in the kind of 18,500 range, and which present a whole new set of challenges, stretching rigs to their— the limit of their capabilities. And in hindsight, we probably tried to drill too many of those ultra-long laterals. In 2018, I think that there is potential upside in drilling those longer than 15,000-foot laterals, but we need to do it at a more measured pace so that we can incorporate the learnings into the next well as opposed to having multiple ultra-long laterals going at once. So I think what you'll see from us and what's baked into our 2019 thinking so far is that the majority of the wells that

we've drilled will be more like 12,000 to 15,000 feet, and that the ones that are beyond 15,000 feet we'll take a much more measured view of. And we will work out many of the issues and be able to extend the laterals, but the blocking-and-tackling drilling will likely be less than 15,000-foot laterals.

65.     In response to an analyst's question about the $300 million increase in 2018 capital expenses for wells, McNally said:

[A]bout half of the costs were inefficiencies from running so many rigs, so many frac crews, the logistics issues that came with that, about half of that is tied to those inefficiencies. And then a portion is increased service costs that we saw during that period that have now abated and 1/4 or so is from the—of the cost is from the problem wells in the ultra-long laterals.

64.     In response to another analyst's question, McNally acknowledged that costs per well foot were much higher than reflected in the Company's prior statements to investors: "On a per foot basis, 2018 is going to be significantly higher than what we expected. It's going to be over $1,000 of lateral foot versus more like $900 or $915 is what we would have expected."

66.     On this news, EQT shares fell 13%, dropping from a close of $40.46 per share on October 24, 2018 to $35.34 on October 25, 2018, erasing nearly $700 million in shareholder value in a single day. Over the next several days, EQT shares fell to as low as $31.00 per share—less than half what the Company was worth when the Acquisition closed in November 2017. (These per-share prices are not adjusted for the effects of the subsequent spinoff of 80% of EQT's midstream business, Equitrans Midstream Corporation, to EQT's shareholders on November 13, 2018.)

67.     Additional revelations since the end of the Class Period further demonstrate that Defendants' statements about the Acquisition during the Class Period were false when made. In response to repeated disappointing financial results by EQT, two of the founders of Rice (not including Defendant Daniel J. Rice IV, identified below in ¶ 107) have publicly criticized EQT and engaged in a proxy contest for control of the Company. Among other things, these two Rice

founders have stated publicly that in November 2018, they privately told EQT that "[w]ell costs imply no merger synergies," but EQT made no meaningful response.

68.     In response to the two Rice founders' criticisms, EQT has publicly stated that EQT has a much larger asset base and geographical footprint than Rice did at the time of the Acquisition. For example, McNally stated on an investor and analyst call on January 22, 2019:

> Obviously EQT's 2019 operating plan should not be predicated on Rice Energy's well costs for wells turned in line during the first half of 2017, especially considering that those wells were turned in line in a small geographic area and utilized 100% pipeline-delivered freshwater. This is not repeatable, given EQT's geographic footprint, infrastructure and water dynamics.

69.     Thus, EQT has now contradicted its own statements during the Class Period that the two companies' contiguous acreage was the key advantage of the Acquisition.

## VII.   LOSS CAUSATION

70.     During the Class Period, as detailed in this complaint, Defendants made materially false and misleading statements and omissions, including statements regarding the Acquisition, and engaged in a scheme to deceive the market. This artificially inflated the price of EQT common stock and operated as a fraud or deceit on the Class. Later, when Defendants' prior misrepresentations and risks concealed by the fraudulent conduct alleged in this complaint materialized and were disclosed to the market on October 25, 2018, the price of EQT common stock fell precipitously. As a result of their acquisition of EQT common stock during the Class Period and Defendants' material misstatements and omissions, Plaintiff and other members of the Class (defined below) suffered economic loss, i.e., damages, under the federal securities laws.

## VIII.  CLASS ACTION ALLEGATIONS

71.     Plaintiff brings this action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of (i) all persons who purchased the common stock of EQT during the Class Period and were damaged thereby; (ii) all EQT shareholders who held EQT shares as of the

record date of September 25, 2017 and were entitled to vote with respect to the Acquisition at the November 9, 2017 special meeting of EQT shareholders and were damaged thereby; (iii) all Rice shareholders who held Rice shares as of the record date of September 21, 2017 and were entitled to vote with respect to the Acquisition at the November 9, 2017 special meeting of Rice shareholders and were damaged thereby; and (iv) all persons who purchased or otherwise acquired the common stock of EQT in exchange for their shares of common stock of Rice in connection with the Acquisition and were damaged thereby (the "Class"). Excluded from the Class are Defendants, directors and officers of EQT, and their families and affiliates.

72.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of April 1, 2019, EQT had approximately 255 million shares of stock outstanding, owned by many thousands of investors.

73.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions that may affect individual Class members include:

(a)    Whether Defendants violated the Securities Act and the Exchange Act;

(b)    Whether Defendants omitted and misrepresented material facts;

(c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether Defendants knew or recklessly disregarded that their statements and omissions were false and misleading;

(e)    Whether the price of EQT common stock was artificially inflated;

(f)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)     The extent of damages sustained by Class members and the appropriate measure of damages.

74.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

75.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class-action securities litigation. Plaintiff has no interests that conflict with those of the Class.

76.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## IX.     INAPPLICABILITY OF STATUTORY SAFE HARBOR

77.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements described in this complaint. Many of the specific statements described in this complaint were not identified as "forward-looking" when made. To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described in this complaint, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false or misleading, or the forward-looking statement was authorized or approved by an executive officer of EQT who knew that the statement was false or misleading when made.

25

## X.      PRESUMPTION OF RELIANCE

78.     At all relevant times, the market for EQT's common stock was an efficient market for the following reasons, among others:

(a)     EQT stock met the requirements for listing and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)     EQT filed periodic public reports with the SEC and the New York Stock Exchange;

(c)     As a "well-known seasoned issuer," as defined by SEC Rule 405, EQT was eligible to and did register securities for public offerings on Form S-3;

(d)     EQT regularly publicly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e)     EQT was followed by securities analysts employed by numerous major brokerage firms, who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

79.     As a result of the foregoing, the market for EQT securities promptly digested current information regarding EQT from all publicly available sources and reflected that information in the price of EQT stock. Under these circumstances, all purchasers of EQT common stock during the Class Period suffered similar injury through their purchase of EQT common stock at artificially inflated prices, and the presumption of reliance applies.

80.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding EQT's business operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Acquisition, as alleged above, that requirement is satisfied here.

## XI.     CAUSES OF ACTION

### CLAIMS UNDER SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5

81.     The claims alleged in this complaint under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, sound in fraud and are based on knowing or reckless misconduct by EQT and the Officer Defendants. These claims are independent of all other claims asserted in this complaint, and the allegations of fraud pertaining to the claims under Section 10(b) of the Exchange Act and SEC Rule 10b-5 do not apply in any way to the other claims for relief asserted in this complaint.

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against EQT and the Officer Defendants (Schlotterbeck, McNally, and Porges)**

82.     Plaintiff repeats, incorporates, and realleges every allegation above as if fully alleged in this count.

83.     During the Class Period, EQT and the Officer Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did (i)

deceive the investing public, including Plaintiff and other Class members, as alleged in this complaint; and (ii) cause Plaintiff and other members of the Class to purchase EQT common stock at artificially inflated prices.

84.     EQT and the Officer Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for EQT common stock in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

85.     EQT and the Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

86.     During the Class Period, EQT and the Officer Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that the statements contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

87.     EQT and the Officer Defendants had actual knowledge of the misrepresentations and omissions of material fact alleged in this complaint, or recklessly disregarded the true facts that were available to them. These Defendants engaged in this misconduct to conceal EQT's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

88.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for EQT common stock. Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for EQT common stock had been artificially inflated by EQT and the Officer Defendants' fraudulent course of conduct.

89.     As a direct and proximate result of EQT and the Officer Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

90.     By virtue of the foregoing, EQT and the Officer Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

**COUNT II**

**For Violations of Section 20(a) of the Exchange Act Against the
Officer Defendants (Schlotterbeck, McNally, and Porges)**

91.     Plaintiff repeats, incorporates, and realleges every allegation above as if fully alleged in this count.

92.     As alleged above, EQT violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by its acts and omissions as alleged in this complaint.

93.     The Officer Defendants acted as controlling persons of EQT within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). By virtue of their high-level positions, participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and intimate knowledge of the Company's actual performance, and their power to control public statements about EQT, the Officer Defendants had the power and ability to control the actions of EQT and its employees. By reason of this conduct, the Officer Defendants are liable under Section 20(a) of the Exchange Act.

**CLAIMS UNDER SECTION 14(a) OF THE EXCHANGE ACT AND SEC RULE 14a-9 AND UNDER SECTIONS 11, 12(a)(2), AND 15 OF THE SECURITIES ACT**

94.     The claims alleged below under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, are not based on any allegations of knowing or reckless misconduct by any Defendant. These claims do not allege, and do not sound in, fraud, and Plaintiff specifically disclaims any reference to or reliance upon allegations of fraud in these non-fraud claims under Section 14(a) and Rule 14a-9.

95.     The claims alleged below under Sections 11, 12(a)(2), and 15 of the Securities Act are brought on behalf of persons who purchased or otherwise acquired common stock of EQT in exchange for their shares of common stock of Rice in the Acquisition. The Securities Act claims are based solely on strict liability and negligence and are not based on any knowing or reckless conduct by or on behalf of any Defendant—i.e., they do not allege, and do not sound in, fraud— and Plaintiff specifically disclaims any allegations of fraud, scienter or recklessness in these non- fraud claims.

## ADDITIONAL PARTIES

96.     In addition to Defendants EQT, Schlotterbeck, McNally, and Porges, the following Defendants are named in Plaintiff's claims under Section 14(a) of the Exchange Act, Rule 14a-9, and Sections 11, 12, and 15 of the Securities Act.

97.     Defendant Jimmi Sue Smith was EQT's Chief Accounting Officer at the time of the Acquisition and signed the Registration Statement. Smith became EQT's Senior Vice President and CFO on November 12, 2018, in connection with EQT's separation of its midstream business from its upstream business, distribution of the midstream business to Equitrans Midstream Corporation, and distribution of 80.1% of the latter's stock to EQT's shareholders.

98.     Defendant James E. Rohr was a director of EQT since 1996 and signed the

Registration Statement.

99.     Defendant Vicky A. Bailey was a director of EQT since 2004 and signed the Registration Statement.

100.    Defendant Philip G. Behrman was a director of EQT since 2008 and signed the Registration Statement.

101.    Defendant Kenneth M. Burke was a director of EQT since 2012 and signed the Registration Statement.

102.    Defendant A. Bray Cary, Jr. was a director of EQT since 2008 and signed the Registration Statement.

103.    Defendant Margaret K. Dorman was a director of EQT since 2012 and signed the Registration Statement.

104.    Defendant Stephen A. Thorington was a director of EQT since 2010 and signed the Registration Statement.

105.    Defendant Lee T. Todd, Jr. was a director of EQT since 2003 and signed the Registration Statement.

106.    Defendant Christine J. Toretti was a director of EQT since 2015 and signed the Registration Statement.

107.    Defendant Daniel J. Rice IV was the CEO of Rice and was named in the Registration Statement, with his written consent, as a person who would become a director of EQT

upon the closing of the Acquisition. He became a director of EQT upon the closing of the Acquisition.

108.    Defendant Robert F. Vagt was a director of Rice and was named in the Registration Statement, with his written consent, as a person who would become a director of EQT upon the closing of the Acquisition. He became a director of EQT upon the closing of the Acquisition.

109.    The Defendants identified in ¶¶ 97-108 are referred to below as the "Signer Defendants."

### COUNT III

**For Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 Against EQT, the Officer Defendants, and the Signer Defendants (together, the "Proxy Defendants") on Behalf of EQT Shareholders Who Were Entitled to Vote on the Acquisition**

110.    Plaintiff repeats, incorporates, and realleges every allegation above as if fully alleged in this count only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiff or members of the Class. Section 14(a) of the Exchange Act and SEC Rule 14a-9 prohibit making material misstatements and omissions in soliciting any proxy. For the purposes of this Section 14(a) claim, Plaintiff does not allege that any Defendant acted with fraudulent intent, which is not an element of a claim under Section 14(a) of the Exchange Act. This count is predicated upon the Proxy Defendants' liability for making false and materially misleading statements in connection with soliciting EQT shareholders' approval of the Acquisition.

111.    The misstatements and omissions alleged in ¶¶ 32-35 above were material. The Proxy Defendants made or were responsible for making the misstatements and omissions. Through their negligence in issuing the Proxy containing material misstatements and omissions, the Proxy Defendants failed to disclose to EQT shareholders who held shares as of the record date of September 25, 2017, and were entitled to vote with respect to the Acquisition at the November 9,

32

2017 special meeting of EQT shareholders all material facts necessary for shareholders to cast a fully informed vote with respect to the Acquisition.

112.    Plaintiff and other EQT shareholders have been injured by the material misstatements and omissions contained in the Proxy.

113.    Plaintiff and other members of the Class are entitled to recover damages to compensate them for all damages resulting from the acts and omissions of the Proxy Defendants in violation of Section 14(a) of the Exchange Act.

114.    Less than one year has elapsed from the time Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time this complaint was filed, and less than three years have elapsed from Defendants' last culpable act or omission.

**COUNT IV**

**For Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 Against the Proxy Defendants on Behalf of Rice Shareholders Who Were Entitled to Vote on the Acquisition**

115.    Plaintiff repeats, incorporates, and realleges every allegation above as if fully alleged in this count only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiff or members of the Class. Section 14(a) of the Exchange Act and SEC Rule 14a-9 prohibit making material misstatements and omissions in soliciting any proxy. For the purposes of this Section 14(a) claim, Plaintiff does not allege that any Defendant acted with fraudulent intent, which is not an element of a claim under Section 14(a) of the Exchange Act. This count is predicated upon the Proxy Defendants' liability for making false and materially misleading statements in connection with soliciting Rice shareholders' approval of the Acquisition.

116.    The misstatements and omissions alleged in ¶¶ 32-35 above were material. The Proxy Defendants made or were responsible for making the misstatements and omissions. Through

their negligence in issuing the Proxy containing material misstatements and omissions, the Proxy Defendants failed to disclose to Rice shareholders who held shares as of the record date of September 21, 2017, and were entitled to vote with respect to the Acquisition at the November 9, 2017 special meeting of Rice shareholders all material facts necessary for shareholders to cast a fully informed vote with respect to the Acquisition.

117.    Plaintiff and other Rice shareholders have been injured by the material misstatements and omissions contained in the Proxy.

118.    Plaintiff and other members of the Class are entitled to recover damages to compensate them for all damages resulting from the acts and omissions of the Proxy Defendants in violation of Section 14(a) of the Exchange Act.

119.    Less than one year has elapsed from the time Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time this complaint was filed, and less than three years have elapsed from Defendants' last culpable act or omission.

**COUNT V**

**For Violations of Section 20(a) of the Exchange Act Against the Officer Defendants**

120.    Plaintiff repeats, incorporates, and realleges every allegation above as if fully alleged in this count only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiff or members of the Class.

121.    As alleged above, EQT violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by its acts and omissions as alleged in this complaint.

122.    The Officer Defendants acted as controlling persons of EQT within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). By virtue of their high-level positions, participation in and awareness of the Company's operations, direct involvement in the day-to-day

operations of the Company, and intimate knowledge of the Company's actual performance, and power to control public statements about EQT, the Officer Defendants had the power and ability to control the actions of EQT and its employees. By reason of this conduct, the Officer Defendants are liable under Section 20(a) of the Exchange Act.

## COUNT VI

### For Violations of Section 11 of the Securities Act Against EQT, the Officer Defendants, and the Signer Defendants

123.    This Cause of Action is brought by Plaintiff under Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all persons who purchased or otherwise acquired the common stock of EQT in exchange for their shares of the common stock of Rice pursuant to the Registration Statement.

124.    Plaintiff repeats, incorporates, and realleges every allegation above as if fully alleged in this count only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiff or members of the Class. For the purposes of this Section 11 claim, Plaintiff does not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a claim under Section 11 of the Securities Act. This Cause of Action is predicated upon Defendants' liability for making false and materially misleading statements in the Registration Statement.

125.    The Registration Statement was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated in it.

126.    EQT is the registrant for the shares issued and distributed to the Class members in the Acquisition. The Defendants named in this count were responsible for the contents and dissemination of the Registration Statement.

127.    At a minimum, as the issuer of the shares, EQT is strictly liable to Plaintiff and the Class for the Registration Statement's material misstatements and omissions.

128.    None of the Defendants named in this count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

129.    By reason of the conduct alleged in this count, each of these Defendants violated Section 11 of the Securities Act.

130.    Plaintiff and the Class exchanged their shares of Rice common stock for EQT common stock in the Acquisition and pursuant to the Registration Statement.

131.    Plaintiff and the Class have sustained damages. The value of EQT common stock has declined substantially after the Acquisition and after the issuance and dissemination of the materially misleading Registration Statement.

132.    At the time of their acquisition of EQT common stock, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged in this count.

133.    Less than one year elapsed from the time that Plaintiff discovered, or reasonably could have discovered, the facts upon which this complaint is based to the time that Plaintiff filed

this action. Less than three years has elapsed between the time that the securities upon which this count is brought were offered to the public and the time Plaintiff filed this action.

## COUNT VII

### For Violations of Section 12(a)(2) of the Securities Act Against EQT

134.    Plaintiff repeats, incorporates, and realleges every allegation above as if fully alleged in this count only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiff or members of the Class.

135.    This count is brought under Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2). By means of the defective Prospectus and as otherwise detailed in this complaint, EQT promoted and sold, for the benefit of itself and its associates, EQT common stock to Plaintiff and other members of the Class.

136.    The Prospectus contained untrue statements of material fact and concealed and failed to disclose material facts, as detailed above. EQT owed Plaintiff and other members of the Class who purchased or otherwise acquired EQT common stock pursuant to the Prospectus a duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that the statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained in the Prospectus not misleading. EQT, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the prospectus as alleged above. Plaintiff and the other members of the Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time they purchased or otherwise acquired EQT common stock.

137.    By reason of the conduct alleged in this count, EQT violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of this violation, Plaintiff and the other members of the Class who exchanged Rice common stock for EQT common stock in the

Acquisition pursuant to the Prospectus sustained substantial damages in connection with those acquisitions. Accordingly, Plaintiff and the other members of the Class who hold the common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their shares to EQT. Class members who have sold their EQT common stock acquired by them in the Acquisition seek damages to the extent permitted by law.

138.    Less than one year elapsed from the time that Plaintiff discovered, or reasonably could have discovered, the facts upon which this count is based to the time that Plaintiff filed this action. Less than three years has elapsed between the time that the securities upon which this count is brought were purchased or otherwise acquired by members of the Class and the time Plaintiff filed this action.

## COUNT VIII

### For Violations of Section 15 of the Securities Act Against the Officer Defendants

139.    Plaintiff repeats, incorporates, and realleges every allegation above as if fully alleged in this count only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiff or members of the Class.

140.    This count is brought under Section 15 of the Securities Act, 15 U.S.C. § 77o, against the Officer Defendants. This count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 15, and any implication of fraud or fraudulent intent is expressly disclaimed.

141.    The Officer Defendants each were control persons of EQT by virtue of their positions as senior executive officers of EQT at the time of the Acquisition. The Officer Defendants each had a series of direct and indirect business and personal relationships with other directors and officers and major shareholders of EQT.

142.    By reason of the conduct alleged in this count, these Defendants violated Section 15 of the Securities Act, and Plaintiff and the other members of the Class have suffered harm as a result.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.      Awarding any equitable, injunctive, or other further relief that the Court may deem just and proper.

## XIII.    JURY DEMAND

Plaintiff demands a trial by jury.

Dated: June 25, 2019

**WEISS BURKARDT KRAMER LLC**
M. Janet Burkardt, Esquire
PA. I.D. #85582
Jocelyn P. Kramer, Esquire
PA I.D. #93153
Victor Kustra, Esquire
PA. I.D. #324934
445 Fort Pitt Boulevard, Suite 503
Pittsburgh, PA 15219
Telephone:  (412) 391-9890
Facsimile:  (412) 391-9685
jburkardt@wbklegal.com
jkramer@wbklegal.com
vkustra@wbklegal.com

**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
Gerald H. Silk
Avi Josefson
Michael D. Blatchley
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
jerry@blbglaw.com
avi@blbglaw.com
michaelb@blbglaw.com

*Counsel for Plaintiff Cambridge Retirement System*