# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF PENNSYLVANIA

*In re EQT Corporation Securities Litigation*

Master File No. 2:19-cv-00754-MPK

CLASS ACTION

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

JURY TRIAL DEMANDED

**ECF CASE**

**WEISS BURKARDT KRAMER LLC**
M. Janet Burkardt (PA I.D. #85582)
Jocelyn P. Kramer (PA I.D. #93153)
Victor Kustra (PA I.D. #324934)
445 Fort Pitt Boulevard, Suite 503
Pittsburgh, PA 15219
Tel: (412) 391-9890

*Liaison Counsel for Lead Plaintiffs and the Class*

**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
Salvatore J. Graziano (admitted *pro hac vice*)
Adam H. Wierzbowski (admitted *pro hac vice*)
Jai K. Chandrasekhar (admitted *pro hac vice*)
Brenna Nelinson (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400

**COHEN MILSTEIN SELLERS &
   TOLL PLLC**
Steven J. Toll (admitted *pro hac vice*)
S. Douglas Bunch (admitted *pro hac vice*)
Susan G. Taylor (admitted *pro hac vice*)
Megan K. Kistler (admitted *pro hac vice*)
1100 New York Avenue, N.W., Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600

Christina D. Saler
Three Logan Square
1717 Arch St.
Suite 3610
Philadelphia, PA 19103
Tel: (267) 479-5700

*Co-Lead Counsel for Lead Plaintiffs and the Class*

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................ 1

II.     JURISDICTION AND VENUE .................................................................. 9

III.    PARTIES ................................................................................................... 10

        A.      Plaintiffs ........................................................................................ 10

        B.      Defendants .................................................................................... 11

                1.      EQT ...................................................................................... 11

                2.      The Officer Defendants........................................................ 12

IV.     EQT'S BUSINESS IS HYDRAULIC FRACTURING.............................. 14

V.      SECURITIES-FRAUD ALLEGATIONS .................................................. 17

        A.      EQT Covets Rice's Natural-Gas Acreage...................................... 17

        B.      EQT Touts a Merger with Rice by Falsely Claiming It Would Generate
                $2.5 Billion in Synergies at 1,200 New Drilling Locations and
                Significantly Reduce Operating Costs ............................................ 18

        C.      EQT Files the Registration Statement and Joint Proxy Seeking Approval
                of the Merger.................................................................................. 23

        D.      Achieving 1,200 Drilling Locations at an Average of 12,000 Lateral Feet
                Was Impossible .............................................................................. 24

                1.      EQT Shows Investors a Materially Misleading Acreage Map ................ 26

                2.      EQT and Rice's Combined Acreage Cannot Fit 1,200 Wells of
                        12,000-Foot Average Lateral Length.................................... 27

                3.      Schlotterbeck Bases His $2.5 Billion Synergy Claim on
                        Impossible-to-Achieve Assumptions..................................... 30

                4.      EQT Experiences Numerous Pre-Merger Well Collapses........................ 32

                5.      EQT Experiences Significant Safety Violations...................... 34

                6.      EQT Refuses Recommendations to Modify Its Drilling Practices to
                        Address Issues Specific to Longer Laterals ............................. 36

        E.      JANA Criticizes the Acquisition, and Defendants Repeatedly Deny
                JANA's Assertions and Mislead EQT and Rice Investors into Approving
                the Acquisition ............................................................................... 40

F. EQT Utterly Fails to Achieve the Claimed Drilling Synergies ............................ 51

G. EQT Internally Notes *After the Acquisition* That It Needed a Plan to Achieve Long Laterals on Multi-Well Pads ........................................... 56

H. EQT Understates Its Actual Well Costs.................................................................. 58

 1. EQT Omits Costs from Its Development-Cost Guidance to Investors ................................................................................. 60

 2. EQT Capitalizes All of Its Produced-Water Costs to Reduce Its Reported Operating Expenses ................................................. 63

I. Defendants' Materially False and Misleading Statements and Omissions ........... 66

 1. False and Misleading Statements and Omissions Before the Rice Acquisition ................................................................................ 66

 2. Filing of the Registration Statement and Joint Proxy Seeking Approval of the Merger ........................................................... 73

 3. JANA's Criticisms of the Acquisition, EQT's False Denials, and the Closing of the Acquisition .................................................. 80

 4. Defendants' False and Misleading Statements and Omissions After the Acquisition ............................................................................. 97

 5. Defendants' Misstatements of EQT's Financial Results ....................... 115

 6. Defendants' Misstatements of EQT's Financial Guidance.................... 119

 7. Defendants' Omissions of Material Fact .............................................. 123

J. The Truth About the Acquisition Is Partially Revealed...................................... 124

K. The Rice Team's 2019 Proxy Fight for EQT Further Reveals EQT's Failures........................................................................................................... 127

L. Loss Causation .................................................................................................. 137

M. Additional Scienter Allegations ........................................................................ 142

 1. The Officer Defendants Knew or Had Access to Facts Contradicting Their Public Statements .................................................. 142

 2. Defendants Repeatedly Falsely Denied JANA's Criticisms of EQT's Claimed Synergies and Well Numbers and Admittedly "Cartoonish" Acreage Map.................................................................. 143

3.     EQT and the Officer Defendants Had a Motive to Artificially Inflate EQT's Share Price Because They Used EQT's Stock as Merger Consideration ........................................................................... 146

4.     Natural Gas Drilling Is EQT's Core Operation, and the Rice Acquisition Was EQT's Central Focus During the Class Period .......... 147

5.     EQT Headquarters Constantly Received Real-Time Updates on the Status of Its Drilling Operations Through its On-Site Personnel and Data Collection Systems ...................................................................... 148

6.     Shortly After Claiming Unbridled Successes, Defendants Admitted EQT's Failure to Drill Longer Laterals .................................................. 151

7.     The Rice Team's Descriptions of the Officer Defendants' Misconduct Support a Strong Inference of Their Scienter .................... 153

8.     Defendant Schlotterbeck's Resignation Supports a Strong Inference of Scienter ...................................................................................... 153

9.     Defendant Porges's Disappearance from Public CEO Duties Supports a Strong Inference of His Scienter ............................................ 158

10.    Defendant Porges Engaged in Unusual and Suspicious Insider Trading .................................................................................................... 159

11.    Defendant Schlosser's Resignation Supports a Strong Inference of His Scienter ............................................................................................ 161

12.    EQT Credited McNally, Schlotterbeck, and Schlosser with Obtaining Shareholder Approval for the Rice Acquisition.................... 162

13.    McNally Admitted That Problems Arose in the First Half of 2018, Which Were Contrary to His Claims to Investors .................................. 163

14.    The Officer Defendants Had a Specific Motive to Make False Statements About the Acquisition Because the Acquisition Would Have Significantly Boosted Their Incentive Compensation – Until JANA's Public Pressure Forced Them to Give It Up ............................ 164

N.    Inapplicability of the Statutory Safe Harbor ....................................................... 170

O.    Presumption of Reliance ..................................................................................... 170

COUNT I ............................................................................................................................ 172

COUNT II ........................................................................................................................... 173

COUNT III.......................................................................................................................... 175

VI.   VIOLATIONS OF SECTION 14(a) OF THE EXCHANGE ACT AND
SECTIONS 11, 12(a)(2), AND 15 OF THE SECURITIES ACT .................................. 175

    A.   The Signer Defendants .......................................................................... 176

    B.   Background to the Acquisition .......................................................... 179

    C.   The Registration Statement Contains Material Misstatements and Omits to
Disclose Material Facts ...................................................................... 180

    D.   Documents Incorporated by Reference into the Registration Statement
Contain Material Misstatements and Omit to Disclose Material Facts ............. 193

    E.   Other Proxy Solicitations Contain Material Misstatements and Omit to
Disclose Material Facts ...................................................................... 197

    F.   Post-Acquisition Revelations .............................................................. 201

    G.   Loss Causation Under Section 14(a) of the Exchange Act ................................ 202

COUNT IV ......................................................................................................... 204

COUNT V .......................................................................................................... 205

COUNT VI ......................................................................................................... 206

COUNT VII ....................................................................................................... 207

COUNT VIII ...................................................................................................... 208

COUNT IX ......................................................................................................... 210

VII.   CLASS-ACTION ALLEGATIONS ................................................... 211

VIII.   PRAYER FOR RELIEF ....................................................................... 212

IX.   JURY DEMAND ...................................................................................... 213

Court-appointed Lead Plaintiffs the Government of Guam Retirement Fund ("Guam") and the Northeast Carpenters Annuity Fund and the Northeast Carpenters Pension Fund (collectively, "Northeast Carpenters," and collectively with Guam, "Lead Plaintiffs"), and Plaintiff Cambridge Retirement System ("Cambridge") (collectively with Guam and Northeast Carpenters, "Plaintiffs"), by and through their counsel, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of (i) regulatory filings made by EQT Corporation ("EQT" or the "Company") and Rice Energy Inc. ("Rice") with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases and media reports issued by, disseminated by, or concerning the Company and Rice; (iii) analyst reports concerning the Company and Rice; (iv) transcripts of EQT's and Rice's investor conference calls; (v) interviews of former EQT and Rice employees; and (vi) other public information regarding the Company and Rice.

## I.   INTRODUCTION

1.      Plaintiffs bring this federal securities class action (the "Action") against EQT and certain of the Company's current and former senior executives and directors under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 on behalf of all investors who purchased EQT's common stock between June 19, 2017 and June 17, 2019, inclusive (the "Class Period"). Plaintiff Cambridge also brings claims under Section 14(a) of the Exchange Act and SEC Rule 14a-9 on behalf of shareholders of EQT and Rice who held EQT or Rice shares as of the record dates of September 25, 2017, and September 21, 2017, respectively, and were entitled to vote at an EQT or Rice special meeting on November 9, 2017 with respect to EQT's acquisition of Rice, which closed on November 13, 2017 (the "Acquisition"), and Lead Plaintiff Northeast Carpenters asserts these Section 14(a) claims on

behalf of the relevant shareholders of EQT. Plaintiff Cambridge also brings claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of all persons who acquired EQT common stock in exchange for their shares of Rice common stock in the Acquisition.

2.      EQT is a natural-gas-production company whose primary operations are in the Appalachian Basin and throughout Pennsylvania, West Virginia, and Ohio. The Company claims to be the largest producer of natural gas in the United States based on average daily sales volume.

3.      On the morning of June 19, 2017, the Company announced that it had entered into an agreement to acquire rival gas producer Rice for $6.7 billion. EQT's President and Chief Executive Officer ("CEO") at the time, Defendant Steven T. Schlotterbeck ("Schlotterbeck"), justified the proposed merger to EQT and Rice shareholders based on the claimed synergies[1] the merger would generate. Schlotterbeck stated that "Rice has built an outstanding company with an acreage footprint that is largely contiguous to our existing acreage, **which will provide substantial synergies** and make this transaction **significantly accretive in the first year**."[2]

4.      According to Schlotterbeck, the overlap in the companies' operations would enable EQT to "drive higher capital efficiency through longer laterals" by drilling laterally through the contiguous EQT and Rice drilling sites. Specifically, EQT executives represented that combining the two companies' existing acreage would allow EQT to achieve "a 50% increase in average lateral lengths" from 8,000 feet to 12,000 feet. As a result, the Company told EQT and Rice shareholders the Acquisition would result in $2.5 billion in synergies, including $100 million in cost savings in 2018 alone.

---

[1] A synergy is the benefit derived from the combined value and performance of two companies exceeding the sum of the separate individual parts.

[2] Unless otherwise indicated, all emphasis in quotations in this Complaint is added.

5.     Defendants' statements to investors were knowingly or recklessly false when made. EQT and the Officer Defendants hid from the investing public material information about EQT's abject inability to achieve the claimed synergies; that EQT was unable to lower its skyrocketing costs; that serious problems with EQT's ultra-long lateral drilling operations plagued the Company (including grave safety hazards and collapsed wells); and that EQT resorted to accounting manipulation and the capitalizing of costs (that needed to be expensed) in order to misstate the Company's financial results and prospects. For example, according to discussions with a former Rice, and then former EQT employee, Schlotterbeck was personally responsible for the underlying (and impossible-to-achieve) assumption on which EQT based its synergy claims—that EQT would achieve economies of scale by drilling significantly more wells per drilling site and thereby reduce the number of well sites from 199 to 99.  As the former employee related, Schlotterbeck also personally directed EQT's Assistant Controller to assume that the midstream infrastructure to serve the combined companies' wells would cost only $1 billion, even though the assumed number of wells was impossibly low and the actual cost was $400–$500 million higher.

6.     In addition, at least two of EQT's ultra-long lateral wells drilled before the Acquisition collapsed and this critical fact was never disclosed to investors who were voting on the transaction; EQT, at significant cost, had to drill and redrill many wells up to three times; and the drill bits got stuck in a vast number of EQT's wells—facts all undercutting Defendants' claimed synergies. EQT's Vice President of Drilling and Completions (who reported to the C-suite), its Drilling Team Lead, and its Director of Engineering received reports in spring and summer 2017 about necessary design changes for drilling longer lateral wells, but EQT refused to implement the necessary changes. EQT also deliberately falsified mandatory Formation Integrity

3

Tests and filed false reports about the tests with state regulators on the orders of the Vice President of Drilling and Completions.

7.     EQT became aware of further information contradicting its public statements before the Acquisition closed, but the Company continued to repeat the same false and misleading statements. For example, a former Rice Project Manager stated that Rice members of an EQT-Rice integration team told EQT before the Acquisition closed that EQT's stated synergies were unachievable, but Schlotterbeck rejected the Rice efforts.

8.     On July 3, 2017, investor JANA Partners LLC ("JANA") disclosed that it had acquired a nearly 6% equity stake in the Company and that it opposed the Acquisition and EQT's stated bases for it. In several public letters following this disclosure, JANA claimed that the purported synergies from the Acquisition were "grossly exaggerated," and, according to JANA's expert analysis, "it would be impossible for EQT to support its claimed synergy drilling plan" as there were "simply not enough *undrilled* contiguous acreage blocks to enable such a dramatic improvement in lateral length." According to JANA, the maps EQT used to tout the claimed synergy benefits were "blatantly deceptive," as many of the intervening properties between EQT's and Rice's tracts were controlled by other operators and could not be used without substantial costs.

9.     In the face of these criticisms, EQT repeatedly denied JANA's assertions about the claimed increase in the number of longer-length wells and the realizable synergies, and reassured investors of the merits of the Acquisition. EQT also repeatedly claimed that, as part of the Acquisition, the Company would adopt Rice's drilling and operational best practices and thereby reduce costs and achieve the claimed synergies. As a result of these materially false and misleading

statements to investors, EQT's stock price increased sharply. On November 9, 2017, the Company's and Rice's shareholders approved the Acquisition.

10. After the Acquisition closed in November 2017, the Company and its senior executives continued to tout the "significant operational synergies" of the merger, which would purportedly allow EQT to become "one of the lowest-cost operators in the United States." More specifically:

- On February 15, 2018, Officer Defendant David Schlosser (then EQT Senior Vice President and President, Exploration and Production) claimed that "*we are combining best practices and have already captured value,*" "we have set new footage records by *combining the data, experience and practices of both companies,*" and "development cost continued to improve as we lengthened laterals";

- On EQT's February 15, 2018 earnings call, Schlotterbeck claimed that "*we've hit the ground running and have started capturing the various synergies related to the transaction,*" and EQT is "*ahead of schedule for achieving our capital synergies*" and is experiencing "*a pretty dramatic acceleration of those synergies*"; and

- On April 26, 2018, Officer Defendant Robert McNally (then EQT Senior Vice President and Chief Financial Officer ("CFO")) stated that "we're going to *exceed the $1.9 billion of capital and PV'ed synergies by a reasonable amount, several hundred million dollars*" and "we're well on track to deliver and exceed those synergies."[3]

11. The reality was starkly different. At the same time that EQT made these representations to investors, EQT hid from investors that it (i) experienced serious problems with drilling and completing its wells, including losing large numbers of expensive drilling assemblies when wells collapsed; (ii) understated its drastically rising costs; (iii) made inaccurate financial reports because it capitalized costs that it was required to expense; and (iv) failed to achieve the synergies it had claimed as justification for the Acquisition.

---

[3] "PV'ed" means discounted to present value.

12.     On March 15, 2018, just four months after the Acquisition closed, EQT announced the sudden and unexpected resignation of CEO Schlotterbeck, and claimed that Schlotterbeck resigned because he was "unsatisfied with the amount of his compensation."

13.     Then, on October 25, 2018, the Company shocked the market by reporting sharply negative third-quarter financial results caused by an increase in total costs, which were $586.2 million higher than in the same period of the prior year. The Company disclosed that its estimated capital expenditures for well development in 2018 would increase by $300 million, to $2.5 billion, as a result of "inefficiencies resulting from higher activity levels, the learning curve on ultra-long laterals, and service cost increases," which had in fact arisen during the first half of the year. As a result, the Company reduced its full-year forecast for 2018. These disclosures partially revealed that the Company's prior statements about the Acquisition's synergies had been materially false and misleading at the time they were made.

14.     On this news, EQT shares fell 13%, dropping from a close of $40.46 per share on October 24, 2018 to $35.34 on October 25, 2018, erasing nearly $700 million in shareholder value in a single day. Over the next several days in response to this newly-disclosed information, EQT shares fell to as low as $31.00 per share—less than half what the Company was worth when the Acquisition closed in November 2017.[4]

15.     Nonetheless, EQT continued to falsely claim to investors that it was on track to achieve the claimed synergies, and failed to disclose that it was in fact experiencing significant problems and delays in drilling its wells, that it was significantly understating its capital expenses by omitting certain costs from its budget, and that it was capitalizing costs that it was required to

---

[4] These actual per-share prices are not adjusted for the effects of the subsequent spinoff of 80% of EQT's midstream business, Equitrans Midstream Corporation, to EQT's shareholders on November 13, 2018.

expense under Generally Accepted Accounting Principles ("GAAP") and Internal Revenue Service regulations.

16.     Indeed, contrary to its misrepresentations to investors, and as detailed by numerous former EQT employees, EQT had refused to adopt industry best practices and had not adopted Rice's superior planning and drilling techniques or cost-cutting measures. As a result, EQT was not properly equipped to drill the number and length of wells it had previously claimed to investors.

17.     EQT's total failure to achieve the claimed synergies severely weakened the business and made it a prime target to be taken over by two of the founders of Rice (brothers Toby and Derek Rice). Indeed, starting in December 2018, armed with internal EQT intelligence showing EQT's abject inability and failure to generate the claimed synergies, Toby and Derek Rice and their executive team (the "Rice Team") launched their own proxy battle to take over the combined EQT-Rice entity.[5] Upon the Rice Team's disclosures of specific new and never-before-disclosed, adverse material facts about the true state of EQT, EQT's trading prices fell even further.

18.     Specifically, on February 5, 2019, the Rice Team released a public presentation and hosted an investor call that discussed in detail the Rice Team's plan to transform EQT. As Reuters reported, the Rice presentation "proposed appointing Toby Rice, former chief operating officer for Rice Energy, as EQT's new chief executive, and revamping its board" and discussed how "EQT's average Marcellus well cost for a 12,000-foot lateral was $1,250 per foot in 2018, while Rice, before its merger with EQT, averaged $790 per foot for wells with laterals reaching 8,800 in the same region."

---

[5] A third brother, Rice CEO Daniel Rice, joined EQT's Board when the Acquisition closed and was nominated by both EQT's incumbent management and the Rice Team during the 2018–2019 proxy contest.

19.     The Rice Team's February 2019 presentation also emphasized that EQT had been understating its well costs, disclosed that EQT had "***erroneously adjusted***" its well costs "downwards" in an attempt to "normalize costs," and stated that "EQT costs could be $125-$250/ft higher when including capitalized costs, pad and facilities, etc."

20.     In response to the February 5, 2019 disclosures, EQT's stock price fell 3.5% that day. Reuters reported that the Rice Team had discussed during its presentation that "EQT has historically '***erroneously adjusted downwards***' its well costs" and that "shares of EQT were down" in mid-morning trading in response to the disclosures.

21.     Then, on June 17, 2019 after the market closed, the Rice Team filed lengthy and detailed proxy materials with the SEC that included a presentation that one press report described as "***the investor relations equivalent of a cluster bomb***." The Rice Team's presentation disclosed that (i) EQT failed to achieve the benefits of the Acquisition; (ii) EQT did not seek and had not achieved the synergies and cost savings that were the purported rationale of the Acquisition; (iii) EQT terminated nearly every Rice executive and leader after telling the market that EQT would seek to retain key Rice executives; (iv) EQT was excluding more than $300 million in costs it capitalized from its well costs; and (v) EQT leadership "lacks credibility and has misled shareholders."

22.     Specifically, the Rice Team's June 17, 2019 presentation disclosed that (i) "EQT has failed to acknowledge its inability to achieve 90%+ of the merger synergies"; (ii) EQT uses "***Misleading math***" to exclude "***more than $300 million in costs*** it capitalizes from its well costs"; (iii) the EQT leadership "***lacks credibility and has misled shareholders***"; and (iv) EQT "***consistently misled shareholders***," including through EQT's claim during the second quarter of

2018 that EQT was achieving the synergies from the Acquisition when, in fact, in the third quarter of 2018, EQT disclosed the $300 million capital expense miss and 5% production volume miss.

23.     On the morning of June 18, 2019, the Rice Team issued a press release concerning its June 17 investor presentation. In response to the dissemination of this news and as the market began to digest the Rice Team's nearly 190-page presentation, EQT's stock price declined throughout the day on June 18. On June 19, 2019, the market continued to digest the new information disclosed in the Rice Team's investor presentation. EQT's stock price fell 5% that day, dropping from $15.96 on June 18 to $15.06 on June 19, lower than EQT's closing price of $15.85 on June 17.

24.     By this Complaint, Plaintiffs bring two different sets of claims on behalf of purchasers of EQT's and Rice's securities during the Class Period. Counts I, II, and III assert securities-fraud and insider-trading and related control-person claims under Sections 10(b), 20A, and 20(a) of the Exchange Act and SEC Rule 10b-5 against EQT and the Officer Defendants (defined below). Counts IV, V, and VI assert proxy-misstatement and related control-person claims under Sections 14(a) and 20(a) of the Exchange Act. Counts VII, VIII, and IX assert strict-liability, negligence, and control-person causes of action against those Defendants who are statutorily responsible under Sections 11, 12(a)(2) and 15 of the Securities Act for materially untrue statements and misleading omissions in the prospectus and registration statement (and documents incorporated by reference in the registration statement) for the Acquisition.

## II.     JURISDICTION AND VENUE

25.     The claims asserted in this Action arise under Sections 10(b), 20A, 14(a), and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t-1, 78n(a), and 78t(a)), SEC Rules 10b-5 and 14a-9

(17 C.F.R. §§ 240.10b-5 and 240.14a-9), and Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77*l*, and 77o).

26.     This Court has jurisdiction over this Action under 28 U.S.C. §§ 1331 and 1337, Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v).

27.     Venue is proper in this District under 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)), and Section 22 of the Securities Act (15 U.S.C. § 77v(a)), because EQT maintains offices in this District and many of the acts giving rise to the violations complained of in this Action, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District.

28.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A.   Plaintiffs

29.     Lead Plaintiff Guam is a defined benefit pension plan that provides annuities and other benefits to its members who complete a prescribed number of years in government service. Guam maintains over $2 billion in net assets held in trust for pension benefits. As shown in the attached Certification, Guam purchased shares of EQT common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Action.

30.     Lead Plaintiffs Northeast Carpenters are pension and benefit funds that operate on behalf of construction professionals in the Northeast. Northeast Carpenters manage approximately $2 billion in assets on behalf of over 17,000 participants. As shown in the attached Certification,

Northeast Carpenters purchased shares of EQT common stock during the Class Period; held shares of EQT stock on September 25, 2017, the record date for EQT shareholders to vote on the Acquisition; and suffered damages as a result of the violations of the federal securities laws alleged in this Action.

31.     Plaintiff Cambridge Retirement System is a contributory retirement system for active and retired employees of the City of Cambridge, Massachusetts, the Cambridge Housing Authority, the Cambridge Public Health Commission, and the Cambridge Redevelopment Authority. Cambridge manages approximately $1.3 billion in assets on behalf of approximately 6,000 participants. As shown in the attached Certification, Cambridge purchased shares of EQT stock during the Class Period; held shares of EQT stock on September 25, 2017, the record date for EQT shareholders to vote on the Acquisition; held shares of Rice stock on September 21, 2017, the record date for Rice shareholders to vote on the Acquisition; held Rice stock on November 13, 2017, the closing date of the Acquisition, and acquired EQT stock in exchange for its Rice stock in the Acquisition; and suffered damages as a result of the violations of the federal securities laws alleged in this Action.

32.     Lead Plaintiffs, together with Cambridge, are collectively referred to as "Plaintiffs."

**B.     Defendants**

**1.     EQT**

33.     Defendant EQT is a Pennsylvania corporation headquartered at 25 Liberty Avenue, Suite 1700, Pittsburgh, Pennsylvania, and is a producer of natural gas. During the Class Period, EQT common stock traded on the New York Stock Exchange, an efficient market, under the ticker symbol "EQT." At approximately halfway through the Class Period, on July 26, 2018, EQT had more than 264 million common shares outstanding.

## 2.     The Officer Defendants

34.     Defendant Steven T. Schlotterbeck joined EQT in 2002 and was EQT's President and CEO from March 1, 2017, until March 14, 2018, when EQT announced his resignation from all of his positions as an officer and director of the Company, effective the day before. Schlotterbeck signed the Registration Statement (defined below) for the Acquisition, as well as EQT's annual report on Form 10-K for the year ended December 31, 2017, and made other materially false and misleading statements to investors. Schlotterbeck also signed a certification filed as part of EQT's annual report on Form 10-K for the year ended December 31, 2017, claiming that the report did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" and that the financial statements in the reports "fairly present[ed] in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

35.     Defendant Robert J. McNally ("McNally") was EQT's Senior Vice President and CFO from March 2016 to November 2018. McNally signed the Registration Statement for the Acquisition, as well as EQT's annual reports on Form 10-K for the years ended December 31, 2017 and 2018, and its quarterly reports on Form 10-Q for the three months ended March 31, 2018, June 30, 2018, and September 30, 2018. McNally also signed certifications filed as part of these quarterly and annual reports and EQT's quarterly report on Form 10-Q for the three months ended March 31, 2019, claiming that the reports did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" and that the financial statements in the reports "fairly present[ed] in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in [each] report." McNally became

EQT's President and CEO on November 12, 2018, in connection with EQT's separation of its midstream business from its upstream business, distribution of the midstream business to Equitrans Midstream Corporation, and distribution of 80.1% of the latter's stock to EQT's shareholders.

36.     Defendant David L. Porges ("Porges") was EQT's Chairman and CEO from 2011 through February 2017, its Executive Chairman from March 2017 through February 2018, and its Chairman from March 1, 2018, to March 14, 2018, when he replaced Defendant Schlotterbeck under the titles of Interim President and CEO until November 12, 2018, when he was replaced by McNally. Porges signed the Registration Statement for the Acquisition, as well as EQT's annual report on Form 10-K for the year ended December 31, 2017. Porges also signed certifications filed as part of EQT's quarterly reports on Form 10-Q for the three months ended March 31, 2018, June 30, 2018, and September 30, 2018, claiming that the reports did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" and that the financial statements in the reports "fairly present[ed] in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in [each] report."

37.     Defendant David E. Schlosser, Jr. ("Schlosser") was EQT's Senior Vice President and President, Exploration and Production, from March 2017 through October 24, 2018, when he resigned from EQT.

38.     Defendants Schlotterbeck, McNally, Porges and Schlosser are collectively referred to in this complaint as the "Officer Defendants." The Officer Defendants, because of their positions with the Company, possessed the power and authority to control the contents of EQT's reports to the SEC and investors, press releases, and presentations to securities analysts, money and portfolio

13

managers, and institutional investors. The Officer Defendants were provided with copies of the Company's reports and press releases alleged in this complaint to be misleading before, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material nonpublic information available to them, the Officer Defendants knew that the adverse facts and omissions specified in this complaint had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and misleading.

## IV.   **EQT'S BUSINESS IS HYDRAULIC FRACTURING**

39.     EQT describes itself as the largest producer of natural gas in the United States. It has operations in Pennsylvania, West Virginia, and Ohio and develops natural gas assets in the core of the Appalachian Basin. In western Pennsylvania, EQT drills and completes natural-gas wells through the process of hydraulic fracturing in the Marcellus Shale deposit.[6]

40.     EQT's harvest of shale gas involves the three-step process of (i) drilling a well, (ii) "completing" the well, and (iii) hydraulic fracturing (or "fracking") of the shale deposits.

41.     ***Drilling the Well***. Once an operator identifies a natural-gas deposit in shale, the operator drills a hole through the bottom of a freshwater aquifer. The drilled hole—also called a "wellbore"[7]—is drilled using a water-based mud system, which protects freshwater aquifers while flushing the "cuttings" (the loose rocks and sediment) to the surface to be discarded. Drilling continues vertically down to the "kick-off" point, which is the spot where the hole is drilled at an increasing angle until the drilling takes place horizontally (or "laterally").

---

[6] The Marcellus Shale deposit is a Middle Devonian age unit of sedimentary rock found in eastern North America. Named for a distinctive outcrop near the village of Marcellus, New York, it extends throughout much of the Appalachian Basin.

[7] Schlumberger Oilfield Glossary, *available at* https://www.glossary.oilfield.slb.com/en/Terms/w/ wellbore.aspx.

42.     The drilling end of the drill rig is an assembly of drill pipe and sophisticated drilling instruments called the bottomhole assembly, or "BHA."[8] The BHA is attached to the bottom of a long string of interconnected pipe called the drill string, which can reach lengths up to 30,000 feet.

43.     Once the operator reaches the target (or "terminal") length of the well, it inserts protective casing throughout the length of the wellbore, cements the casing, and releases the drilling rig.

44.     *Completion*. The completion phase begins with the installation of a valve at the surface of the well. "Perforating guns" are then lowered into the horizontal section of the well and fired to create small holes through the sides of the well and into the surrounding rock.

45.     *Hydraulic Fracturing (or "Fracking")*. The operator then pumps more than one million gallons of water, sand, and chemicals at high pressure into the well as far as 10,000 feet below the surface and into the holes in the rock created by the perforation phase. This process fractures the rock and releases the hydrocarbons stored within it.

46.     An operator then installs the permanent well head and the oil or gas inside the well flows up and out of the well. The below graphic shows the fracturing process in the Marcellus Shale deposit:

---

[8] Meet the Bottomhole Assembly, *available at* https://drillingmatters.iadc.org/meet-the-bottomhole-assembly/.



Graphic by Al Granberg

47.   Along with the natural-gas flow out of the well, a significant amount of the water, sand, and chemicals that the well operator originally pumped into the well flows back out of the well. This water, called "produced water," is contaminated with chemicals, and, as a result, the well operator must take careful and costly measures to dispose of it.

48.   The drilling and fracking of natural-gas wells is a cost-intensive process that requires significant capital investment, planning, and coordination. To maximize profits, it is critically important, particularly when natural-gas prices periodically decline, that a natural-gas producer have strict cost-saving processes in place and use state-of-the-art development and planning tools.

16

49.     Gas companies also seek to achieve economies of scale by planning and drilling multiple wells on a single "pad," which is the area cleared for a drilling rig to work on a plot of land designated for natural-gas extraction.

## V.     SECURITIES-FRAUD ALLEGATIONS

### A.     EQT Covets Rice's Natural-Gas Acreage

50.     EQT's natural-gas reserves were critical to investors trying to determine EQT's cost of business moving forward. Accordingly, particularly important are independent audits of EQT's reserve estimates. Based on these audits, from 2016 to 2019, EQT engaged in a cumulative negative revision of its reported net reserves that was greater than those of nearly all of its Appalachian peers and amounted to roughly a quarter of EQT's total undeveloped reserves reported during that period.

51.     The divergence between EQT's reserve estimates and that of its independent auditor (Ryder Scott) grew over the period from 2014 to 2018. In 2014, Ryder Scott objected to EQT's figures, and EQT was forced to revise its estimates. Thereafter, in 2015 and 2016, Ryder Scott suggested that although EQT's estimates were acceptable, they were not directly in line with Ryder Scott's. In 2017 and 2018, Ryder Scott warned EQT that "[i]n certain cases, there was more than an [sic] acceptable variance between EQT's estimates and our estimates."

52.     Accordingly, before the start of the Class Period in June 2017, EQT examined ways to expand its natural-gas drilling acreage and increase its production volume and control over the southwestern Pennsylvania Marcellus shale basin. Among the other competing natural-gas producers in the area at the time was Rice, a comparatively new entrant to the field with a reputation for planning and drilling wells using technology-based, cost-efficient methods.

53.     Indeed, in 2017, there was ongoing consolidation in the natural-gas production industry, and few opportunities remained available to EQT to merge with other producers. EQT recognized that if Rice were to merge with a third party, it would materially limit the remaining scope of strategic consolidation opportunities available for EQT to pursue. With less area available for longer laterals, and the industry shifting to a new phase of operations, EQT was concerned about not missing a critical merger opportunity.

54.     An acquisition of Rice would also generate significant personal financial benefits for EQT executives because EQT's incentive compensation was based on the Company's annual production sales volume growth. To achieve the maximum payout under EQT's incentive compensation scheme, the Officer Defendants needed to achieve at least ***25%*** growth in compound annual production sales volume. But EQT's projected production growth without Rice for 2015 through 2018 was only 16.6%, and its projected growth for 2016 through 2019 was only 14.7%. A Rice acquisition would immediately make up for this shortfall, boosting production growth for these periods to approximately 37% and 36% merely by combining the two companies. This would increase EQT management's potential compensation by approximately ***$50 million***.

**B.      EQT Touts a Merger with Rice by Falsely Claiming It Would Generate $2.5 Billion in Synergies at 1,200 New Drilling Locations and Significantly Reduce Operating Costs**

55.     On the morning of June 19, 2017, EQT announced that it had agreed to acquire Rice in a transaction that valued Rice at $6.7 billion. Under the terms of the Acquisition, Rice shareholders would receive 0.37 of a share of EQT common stock and $5.30 in cash in exchange for each share of Rice common stock they held (other than shares of Rice common stock held by EQT or certain of its subsidiaries, shares held by Rice in treasury, or shares for which appraisal was properly demanded under Delaware law). The Acquisition consideration amounted to $5.4 billion in EQT stock and $1.3 billion in cash.

56.     In EQT's press release announcing the Acquisition on June 19, 2017, Defendant Schlotterbeck touted how the Rice Acquisition would reduce operating costs and increase synergies:

> Since the beginning of 2016, we have added more than 485,000 acres to our development portfolio and have achieved significant scale in the core of the Marcellus. We will now shift our focus from acquisitions to integration as we work to drive higher capital efficiency through longer laterals; reduce per unit operating costs through operational and G&A synergies; improve our sales portfolio by expanding access to premium markets; and deliver increased value to our shareholders.

57.     Schlotterbeck's claimed justification for EQT's acquisition of Rice was that, by combining EQT's and Rice's contiguous acreage, EQT could drill natural-gas wells with longer laterals. EQT claimed this would generate cost savings and synergies amounting to at least $2.5 billion from the economies of scale that would result from drilling longer wells from the same well pads.

58.     Specifically, EQT's June 19, 2017 press release claimed that acquiring Rice would dramatically increase EQT's average lateral well length, which would generate the claimed cost-savings and synergies: "As the vast majority of the acquired acreage is contiguous with EQT's existing acreage position, ***EQT anticipates a 50% increase in average lateral lengths for future wells located in Greene and Washington Counties in Pennsylvania***."

59.     The press release also described EQT as "a leader in the use of advanced horizontal drilling technology—designed to minimize the potential impact of drilling-related activities and reduce the overall environmental footprint."

60.     Also on June 19, 2017, EQT held an investor conference call during which management presented slides about the Acquisition that EQT made available on the Company's website and filed publicly with the SEC. The slides stated that the "Transaction Rationale" for EQT's Acquisition of Rice was the "Significant contiguous acreage and resulting synergies," and

included a map that purported to depict the two companies' contiguous and internally continuous
natural-gas fields:



61. EQT's June 19, 2017 slide presentation also stated that there would be
"Consolidation Benefits" from the merger because "Rice's PA Marcellus position is contiguous
with EQT's SW PA acreage," and that the "Synergy Potential" and "Present value of economic
savings pro forma for [the] Rice acquisition" included $1.9 billion of "capital efficiencies" and
$0.6 billion of general-and-administrative expense savings, for $2.5 billion of "total synergies."

62. During the June 19, 2017 conference call, Defendant Schlotterbeck touted the
supposed complementarity of EQT's and Rice's natural-gas fields and the purported cost savings
that the merger would generate:

> [W]e are very excited about today's announcement, as the Rice acreage and
> midstream assets are a perfect complement to EQT's existing footprint.
>
> ***
>
> As you know, there [is] significant improvement in returns on invested capital by
> extending lateral lengths. Our consolidation focus has been on assets that are

contiguous with our core Marcellus acreage position. As you can see on **the map**, Rice's acreage is as good a fit as any asset in our core development area.

As a result of the transaction, EQT becomes the largest natural gas producer in the US, with 2017 pro forma production of 1.3 Tcfe [trillion cubic feet of gas equivalent]. ***There are tremendous operating and capital synergies, which are estimated to have a present value of $2.5 billion. In the first full year, we estimate operational savings of $100 million***, and model cash flow per share accretion in excess of 20 percent, increasing to 30 percent in year two.

The transaction meets our consolidations targets, ***and we will immediately move to integrating our acquired assets, realizing higher returns through longer laterals***.

*** ** ***

Moving to slide seven and some of the consolidation benefits, this transaction is driven by our strategy to significantly improve returns on invested capital and capture capital and operational synergies, ***driven by a 50 percent increase in lateral length in Greene and Washington Counties. By extending laterals from 8,000 to 12,000 feet, the well returns will increase from 50 percent to 70 percent at a $3.00 NYMEX gas price***.

*** ** ***

Now on slide eight, as I already discussed, ***the fit of the two companies' assets provide tremendous synergies, estimated at $2.5 billion***.

Then moving to slide nine, as we've discussed in the past, longer laterals drive returns. Assuming a $3.00 NYMEX, or $2.50 local price, the returns improve from 52 percent to 70 percent in Pennsylvania. And ***put another way, the PV-10 per well improves from $5.3 million to $9 million, a dramatic 70 percent increase in present value***.[9]

*** ** ***

The contiguous nature of acquisitions provide ***tremendous operational and capital synergies***, as well as providing significant organic growth opportunities for EQM and EQGP.

63.     On the June 19, 2017 earnings call, in response to an analyst's question about

EQT's development plans and whether EQT would accelerate the development of Rice's assets,

Defendant Schlotterbeck responded:

---

[9] PV-10 is the present value of estimated future oil and gas reserves net of estimated direct expenses and discounted at an annual discount rate of 10%.

[T]he synergies from this acquisition are really focused in Greene and Washington Counties, where we have very significant overlap in amongst the best acreage in the Marcellus play. So, I think *it's likely that you will see a strong capital allocation to those areas where we can drill the 12,000 plus foot laterals and earn the highest returns*.

64.     In response to another analyst's question about why EQT's presentation was showing 12,000-foot laterals on a 12-well pad, Defendant Schlotterbeck said:

[W]hen you put this acreage together, *not only can you drill longer laterals but you can drill larger pads*, so—and that's what we've been doing.

And both of those—it doesn't really say this is our history on here, but when we developed it, it was really—the 5,500-foot laterals and 5-well pads is where we were a few years ago. And then last year we were averaging 6-well pads and 6,000-foot—feet. And then after some of the recent consolidation, we were at 8 wells and 8,000 feet. And *now, with the Rice transaction, we expect to be able to average the 12-well pads and 12,000 feet in the Greene and Washington area*.

So, that's kind of why those numbers were chosen. But they do—they go hand in hand, that as you consolidate, you get the benefit of both more wells per pad and longer laterals.

65.     Also on June 19, 2017, Defendant Schlotterbeck sent an email about the Acquisition to all EQT employees. The email, which EQT also publicly filed with the SEC, stated: "The Rice acquisition will deliver significant operational synergies and *help to reduce our per unit costs*. Rice's acreage is contiguous to our existing acreage position and will allow us to extend our drilling laterals to provide operational efficiencies, improve well economics, and deliver stronger returns."

66.     Defendants' claims that EQT would realize $2.5 billion in synergies and cost savings from the Acquisition, including by drilling 1,200 wells at an average lateral length of 12,000 feet, were materially false and misleading. As discussed in Section V.D. below, EQT achieving $2.5 billion in synergies, and drilling 1,200 wells with an average of 12,000 lateral feet, was impossible because (i) there is simply not enough combined previously-undrilled EQT and Rice acreage to drill 1,200 wells with an average of 12,000 lateral feet; (ii) EQT based its $2.5

billion synergy calculation on reducing the number of well pads from 199 to 99, which was not possible; (iii) when EQT had tried to drill the ultra-long laterals required to boost EQT's average lateral length to 12,000 feet, a significant number of them collapsed; (iv) EQT refused to adopt the operational best practices necessary to drill extra-long laterals; and (v) EQT materially understated its well costs to investors.

### C.  EQT Files the Registration Statement and Joint Proxy Seeking Approval of the Merger

67.     On July 27, 2017, in connection with the Acquisition, Defendants filed with the SEC a combined registration statement on Form S-4, prospectus ("Prospectus") and joint proxy statement/prospectus ("Proxy") (together, the "Registration Statement"), which EQT amended on September 8, 2017 and September 29, 2017, and which the SEC declared effective on October 12, 2017.

68.     The Registration Statement, which described the Acquisition, stated that both EQT's and Rice's boards of directors had approved the Acquisition and recommended to the shareholders of the respective companies that they approve the Acquisition at special shareholder meetings.

69.     The Registration Statement included materially false and misleading statements about the Acquisition, including that "[m]embers of the EQT board and management noted [at a meeting on April 19, 2017] that Rice represented a uniquely compelling acquisition opportunity given the synergies that would likely result from the contiguous and complementary nature of Rice's asset base with EQT's."

70.     The Registration Statement claimed that:

As a result of the merger and the operational synergies described in more detail below, EQT's inventory in Washington and Greene Counties, Pennsylvania, two of the highest productivity counties in the Appalachian Basin, will improve in both scale and profitability—*increasing from approximately 775 undeveloped*

***locations with an average of 8,000' lateral to approximately 1,200 undeveloped
drilling locations with an average of 12,000' lateral***.

71.     The Registration Statement further stated:

*Significant Synergies.* In addition to the strategic rationale and the ability to
participate in unlocking value embedded within Rice, EQT expects that its
shareholders will derive a substantial benefit from the significant synergies
attributable to the transaction. The EQT board believes that the merger will create
capital efficiencies and operational cost savings and synergies through conducting
EQT's and Rice's operations as part of a combined enterprise, including synergies
resulting from:

- the opportunity to optimize the combined company's upstream and
  midstream standalone portfolios by ***applying each company's best
  practices across the contiguous and complimentary [sic] acreage
  positions***;

- ***the opportunity for a significant increase in the average lateral lengths of
  future Marcellus wells, reducing well costs on a per horizontal foot basis
  and increasing the present value of development***; [and]

- the expectation of meaningfully reduced lease operating expense per unit
  through more efficient development, including an increase in wells per pad,
  an increase in company net horizontal feet through coordinated
  development plan eliminating drainage effects, a reduction in rig and frac
  fleet move times, coordinated produced water handling and improved cycle
  times through concentrated execution . . . .

72.     The statements quoted in ¶¶ 69-71 were materially false and misleading because
achieving the claimed synergies and well numbers was impossible given the actual available
undrilled acreage.

**D.      Achieving 1,200 Drilling Locations at an Average of 12,000 Lateral Feet Was
          Impossible**

73.     As discussed in detail in Section V.E. below, JANA publicly stated that EQT's
claimed well numbers and lengths, and cost savings from the Acquisition, were impossible. Yet,
even when JANA confronted EQT with contrary facts that called into question the claimed
synergies from the Acquisition, Defendants repeatedly expressed unbridled confidence that EQT's

Acquisition of Rice would lead to not only $2.5 billion, but up to $7.5 billion, in synergies because, through the Acquisition, EQT would increase its average lateral length. For example:

- On June 19, 2017, EQT and Schlotterbeck claimed (i) $2.5 billion in synergies from the Acquisition; (ii) $100 million in operational savings in the first year; and (iii) an average of 12-well pads and 12,000-foot lateral wells;

- On July 5, 2017, JANA wrote to EQT that its claim of $2.5 billion in synergies was "highly questionable";

- EQT's July 27, 2017 Registration Statement claimed that its inventory "will improve in both scale and profitability," by increasing to "approximately 1,200 undeveloped drilling locations with an average of 12,000' lateral";

- Also on July 27, 2017, EQT contradicted JANA's assertion that the claimed $2.5 billion of synergies was "highly questionable" by asserting that "contiguous acreage leads to longer laterals [and] fewer wells" and "we expect Marcellus wells in Greene and Washington counties to average at least 12,000 feet"; Schlotterbeck added that he was "confident" in achieving the $2.5 billion in synergies and that "$2.5 billion is a conservative estimate," and EQT claimed that the total synergies would be ***$7.5 billion***;

- On July 31, 2017, August 14, 2017, September 11, 2017, and September 20, 2017, JANA further contradicted EQT's claims and challenged the Acquisition;

- On October 16, 2017, EQT stated that JANA's criticism of EQT's claims about the Acquisition—that the "stated operational synergies from the transaction are not achievable"—was "***emphatically not the case***" and "the Company is confident it will achieve the $2.5 billion in synergies that it has identified"; and

- EQT's analyst presentations on October 23, 2017, December 13, 2017, and February 15, 2018 all claimed that, at "Full Development," EQT would achieve, in one example, "8 new wells with ***16,200 ft average lateral length***," resulting in "305% increase in lateral length and 37% decrease in cost per ft."

74.    But EQT's purported justifications for its proposed merger with Rice were fictions. Defendants' repeated claims that, post-merger, EQT would capture capital and operational synergies by increasing its drilling capability to 1,200 undeveloped drilling locations with average 12,000-foot laterals were knowingly false when made, or, at a minimum, severely reckless, based on the actual geography of EQT's and Rice's properties and their drilling history.

1.     **EQT Shows Investors a Materially Misleading Acreage Map**

75.     As an initial matter, EQT used a materially misleading map of the combined Rice

and EQT acreage to convince EQT and Rice shareholders that the proposed merger merited their

approval. Below, the left panel is the portion of EQT's map from its June 19, 2017 investor

presentation that shows the Rice and EQT acreages in western Pennsylvania. Plaintiffs have added

a red outline to the map to show the outer reaches of the purported combined EQT and Rice acreage

in Greene and Washington Counties in western Pennsylvania. According to EQT, the purple

acreage was "Rice Acreage" and the yellow acreage was "EQT Acreage." The center panel is just

the red outlined area by itself.

  

76.     Plaintiffs have obtained and analyzed detailed maps and prior drilling data as of

July 2017 showing EQT's and Rice's properties and the natural-gas wells that they had already

drilled on them. Plaintiffs obtained these maps and data from Pennsylvania state records, including

real-estate records, drilling permits, and filings by natural-gas companies reporting their actual

drilled wells, and from private services that assemble and organize information from the public

records. The right panel above is the same outlined red area, but with the actual combined EQT

and Rice acreage in blue. As the numerous white gaps shown in the right panel demonstrate, EQT's

representation on the left—that EQT's and Rice's combined acreage would form a seamless,

internally continuous acreage that spanned the full area—misstated the actual nature of EQT's and Rice's acreages.

        2.     **EQT and Rice's Combined Acreage Cannot Fit 1,200 Wells of 12,000-Foot Average Lateral Length**

77.     To determine how many wells EQT could drill on the combined EQT and Rice acreage, based on the information available to EQT in July 2017, Plaintiffs prepared a detailed map showing all of the acreage in Greene and Washington Counties where EQT and Rice had drilling rights as of July 31, 2017, including leases from all known acquisitions by both companies. Plaintiffs then marked all previously-drilled wells in those counties as of that time on the map by marking the surface and bottom hole locations and the drilling trajectories representing actual drilled well paths. Plaintiffs then marked the acreage that was already producing natural gas through these wells—the proved developed producing wells. Where a publicly-filed permit appeared to exceed the length of the actual drilled well, only the acreage whose gas would be produced by the actual drilled well was marked as already in production.

78.     Acreage that was already in production would not be available for additional drilling in the Marcellus because its natural gas was already being tapped. Below is a depiction of the well acreage that EQT or Rice had already drilled in yellow:



79.     Plaintiffs then marked the potential additional wells that could be drilled in the combined EQT and Rice acreage that was not already in production. To determine what additional wells were feasible, Plaintiffs assumed a minimum lateral well length of 6,000 feet and a maximum lateral well length of 16,000 feet.[10] The maximum length of 16,000 feet is an assumption that is generous to EQT because it is exceedingly difficult to drill wells beyond 15,000 lateral feet.

80.     The additional wells (i.e., above the proved developed producing wells) were assumed to extend to the limit of EQT and Rice's combined acreage. Where a well of a lateral length within the assumed parameters was possible using third-party acreage of no more than 15% of the total length, the well was assumed to be feasible, based on EQT's public statements that it would use land swaps or leases to acquire necessary third-party acreage where the combined companies' properties were not directly contiguous.

81.     Based on this analysis, Plaintiffs, in consultation with an oil and gas industry expert, calculated that only *519 wells* with lateral lengths ranging from 6,064 feet to 16,000 feet, an average lateral length of 11,465 feet, and a total lateral length of 5,950,335 feet were feasible. Accordingly, Defendants' public statements overstated the feasible wells by more than 100%, in terms of both number of wells and total lateral length.

82.     In addition, even if Plaintiffs were to expand the range of well lengths at the bottom end of the range, to span from 4,000 lateral feet to 16,000 lateral feet, EQT would only be able to

---

[10] Plaintiffs assumed lateral spacing of 750 feet between the wells. Two wells with lateral spacing between them that is narrower than 750 feet draw on the same portion of the natural-gas reservoir, reducing both wells' productivity. Moreover, by January 22, 2019, EQT acknowledged to investors that lateral spacing of 1,000 feet was ideal, which makes 750-foot spacing generous to EQT. That day, Defendant McNally admitted, "[W]e believe 1,000 feet to be the optimal well spacing"; "[w]e've been trending towards wider spacing *over the last several years*"; "Average spacing in our Pennsylvania Marcellus area averaged *840 feet in 2018* and is planned for *880 feet in 2019*"; and "We believe we will get to an average of around 1,000-foot spacing over the next couple of years."

drill **819 wells** in Washington and Greene Counties, and the average length of those wells would decrease to 9,648 lateral feet.[11]

83.     Thus, even using assumptions that are highly favorable to Defendants, EQT's public statements substantially overstated both the number of wells and the total lateral length of wells that were feasible in the combined EQT and Rice acreage based on the then-known facts about the geography and drilling history of that acreage. As a result, and as discussed more fully below, EQT's claimed "significantly improve[d] returns on invested capital and capture capital and operational synergies" were materially overstated.

84.     Achieving EQT's claimed 1,200 wells with an average lateral length of 12,000 feet and 750-foot spacing would require perfectly contiguous, and perfectly internally continuous, Rice and EQT acreage that would need to look like the blue rectangle in the following diagram. This is, of course, **not** how the actual combined Rice and EQT acreage existed:



---

[11] Both of these analyses are generous to EQT because they do not reduce their totals to take into account any insurmountable problems that EQT would encounter with the undrilled acreage, including the existence of fault lines, existing mines, dense metropolitan areas, and rugged terrain (where drilling would be exceedingly difficult, risky, or prohibited).

### 3.    Schlotterbeck Bases His $2.5 Billion Synergy Claim on Impossible-to-Achieve Assumptions

85.    EQT's and Defendant Schlotterbeck's repeated claims that EQT's merger with Rice would generate $2.5 billion in synergies were knowingly or recklessly false when made because they were based on impossible assumptions that lacked any basis in fact.

86.    As former Rice and EQT employees[12] reported, it was impossible for EQT to achieve the synergies it claimed through its merger with Rice. Since Rice had already optimized the number of wells it could place on each well pad, it was simply not possible for EQT to further shrink the number of well pads and still drill the number of wells EQT claimed.

87.    FE 1 was a Project Controls Manager and Project Manager at Rice from before the start of the Class Period and stayed on at EQT until May 2018. He was responsible for cost-control estimation of future expenses, system design, and oversight for Rice Midstream Partners ("RMP") assets before the merger. FE 1 also advised on "Project Redhawk," which was EQT's project to prepare for the spin-off of Equitrans (EQT's midstream business) into its own company.

88.    As part of his consulting on Project Redhawk, EQT granted FE 1 access to the financial model that EQT used during its acquisition of Rice. According to FE 1, EQT's analysis to generate synergies from its Rice merger was based on the assumption that EQT would drill laterals to extremely long lengths and significantly reduce the number of well pads it needed to construct.

89.    Specifically, FE 1 stated that the EQT team responsible for the economics that formed the basis for the Acquisition, and later for Redhawk, simply assumed they could cut the number of well pads in half, which FE 1 stated was "physically impossible." FE 1 stated that the

---

[12] Former employees and consultants ("FEs") are identified in this Complaint by number (FE 1, FE 2, etc.). Regardless of gender, all FEs are described in the masculine.

financial model *assumed a decrease from 199 drilling locations to 99 drilling locations*, but "there was *no rationale* that that was going to work."

90.    According to FE 1, before the Acquisition, Rice employees knew internally that Rice had already optimized the well-pad locations that Rice was using for Greene and Washington Counties. Therefore, the chance of achieving significant synergies through Rice's merger with EQT by further reducing the number of pad locations by, for example, more than 10–20%, was simply not possible. In FE 1's words, "there was no way to do this," "it could not be done" and it was "impossible."

91.    FE 1 stated that EQT's Assistant Controller at the time told him that the new plan post-Acquisition was to use $1 billion to build the midstream infrastructure necessary to gather EQT's wells in the theoretical operating schedule and finance plan long term. FE 1 told the Assistant Controller that there was no possible way that the number of locations was correct and that the cost of the project was *low by $400–$500 million*.[13] The Assistant Controller responded that Schlotterbeck had told him that they would use the $1 billion number based on the number of well-pad locations. Accordingly, FE 1 understood that the number of well-pad locations came from Schlotterbeck, and that EQT's budget number was based on it. It was FE 1's understanding that the Assistant Controller was sitting with Schlotterbeck when Schlotterbeck told him what number to use. FE 1 stated that, per Schlotterbeck, the number of well pads was not adjustable.

92.    FE 1 added that, before the close of the Acquisition, Rice planning and midstream personnel regularly discussed how Rice's numbers indicated it was not possible to achieve the stated synergies. Before the merger, EQT and Rice formed an integration team to bring the two

---

[13] FE 1 also communicated this concern to the Manager of Gas Systems Planning at EQT from before the Class Period through the present and to an EQT Vice President, Gas Systems Planning, at EQT from before the Class Period through 2018.

organizations together. However, that team lasted only approximately one month and fell apart in July or August 2017, in part due to the Rice members of the team questioning how the stated synergies were even possible to achieve. As FE 1 stated, there were discussions back and forth that EQT's assumptions were vastly different from Rice's.

93.     FE 1 added that, in August 2017, there were significant disagreements between Toby Rice (then Rice's President and Chief Operating Officer) and Daniel Rice (then Rice's CEO) on the one hand, and Schlotterbeck on the other, about how to salvage the disagreements among the members of the integration team. Toby and Daniel Rice were trying to convince EQT that the value of Rice was in the people and processes but EQT disagreed. Indeed, much later, on February 5, 2019, Toby Rice said publicly, "During the merger, we approached them [EQT] and explained our plans, and *they were ignored*."

94.     From the time EQT announced the Acquisition through December 2017 or January 2018, FE 1's view was that the models and data that EQT used to calculate EQT's valuation (the long-term value of the enterprise and its asset value) were "*way off and egregiously so.*" Before the Acquisition, FE 1 said that Rice had provided EQT with Rice's targets going forward to help EQT make its calculations, but EQT "didn't heed" the information and EQT's estimates were not based on available data. FE 1 understood that the numbers had been run to make the merger work, not to determine whether the merger would work. FE 1 believed that EQT told investors whatever it had to in order to finalize the Rice deal.

### 4.     EQT Experiences Numerous Pre-Merger Well Collapses

95.     EQT's claimed synergies were also unachievable because the Company (i) lacked the necessary expertise to drill extra-long laterals, and (ii) repeatedly experienced well collapses at ultra-long lateral lengths, yet refused to adopt industry best practices or learn from Rice's cost-efficient drilling methods.

32

96.     Regarding EQT's ability to drill the extra-long lateral wells, FE 2[14] said that EQT was not capable of drilling those laterals, that it did not follow industry standards and did not use industry best practices, and that "it was just a horrible mess." Similarly, FE 3[15] stated that "EQT was not capable of capitalizing on the merger" because "they had not had a successful drilling program at all," and EQT was not performing standard practices that would have helped their program.

97.     More specifically:

- FE 2 stated that before the Rice acquisition, EQT tried to drill three 18,000 foot-plus lateral wells but *the first two collapsed* when EQT tried to pull the drill string out of the holes; and

- FE 2 attributed the collapses to EQT being driven by a need to drill quickly and reduce costs. FE 2 stated, "They didn't have the expertise [to drill the long laterals], and when info[rmation] was brought to their attention, they ignored it. They were told it wasn't going to work at 18,000 plus feet unless they changed their ways. They were told by [another drill leader] and I that they'd have hole collapses, lose circulation, and other events."

98.     FE 3 similarly stated that EQT drilled its wells quickly, but then would not be able to pull the drill out of the hole. With a majority of the wells EQT drilled, EQT would get stuck trying to pull back out of the hole. EQT did not spend adequate time ensuring that the hole was clean but instead focused on getting to the bottom as fast as it could. As a result, the cuttings built up in front of the pipe, and EQT could not get out. Getting stuck like this could lead to numerous problems, from causing days of delays to requiring EQT to redrill. FE 3 witnessed both things occur during his time there.

---

[14] FE 2 was a Drill Team Lead at EQT in Pennsylvania from before the start of the Class Period until November 2017. EQT hired him to help the Company drill longer laterals given his experience drilling similar laterals.

[15] FE 3 worked for EQT from before the start of the Class Period through November 2017 as a Drilling Engineering Supervisor in Pittsburgh. His team was responsible for planning all of EQT's wells that were drilled during his tenure at EQT.

99.     According to FE 3, while drilling, EQT also ran into three or four of its own wells, which is something FE 3 had never seen happen in his career, because a company should know where its own wells are. This happened because EQT was worried about speed and nothing else.

### 5.     EQT Experiences Significant Safety Violations

100.     EQT's inability to achieve the claimed synergies is further demonstrated by its repeated violations of safety and regulatory protocols. Indeed, EQT's drilling methods created significant safety hazards.

101.     According to FE 2, in 2016 and 2017, EQT falsified Formation Integrity Tests ("FITs"), which test the strength of the well casing to ensure that there is no leaking. FE 2 stated that submitting false documents to the state is punishable by up to two years in prison.

102.     FITs are a crucial step in the well-drilling process. FITs are primarily conducted to test the strength and integrity of the well casing to ensure there is no leaking. However, FITs are also used to: assess the optimum mud weights for drilling future sections; minimize risk of loss of circulation in drilling trouble zones; determine whether planned casing running speeds would destabilize the wellbore; and reduce the risk of inducing a fracture during cementing operations. Thus, FIT results are used to determine casing depths, well control options, formation fracture pressures, and fluid weight limitations. Information obtained from a properly conducted FIT is used not only throughout the life of the tested well, but also for drilling any future wells nearby.

103.     A properly conducted FIT requires that there be fluid in the well hole and that the operator purge all of the air from the hole when the test is performed. However, EQT simply closed the valve and put pressure up against the hole, which did not provide an accurate reading. FE 2 stated that EQT knowingly decided to conduct the tests in this manner, and that Brad Maddox (former EQT Vice President of Drilling & Completions from July 2009 through August 2019, who reported to EQT's C-Suite) signed off on the tests as if EQT had performed them according to

industry standards. FE 2 said that "the director of drilling [Maddox] ordered them to do it," and this issue "was brought to senior leadership's attention."

104.    FE 2 stated that if an operator falsifies the tests, it will not know what pressure the well will actually withstand, which could result in an underground blowout, polluting the surrounding freshwater zone, or even burning down the rig. However, Maddox did not think the tests were worth EQT's time and wanted to save money. According to FE 2, Maddox was caught when someone challenged him on performing a FIT with air in the hole. FE 2 stated that Maddox signed the regulatory paperwork and submitted it to the state after changing the information in EQT's well data system, WellView, to try to cover it up.

105.    FE 4, who had been an accountant at Rice from before the start of the Class Period to 2017, and then an accountant at EQT from 2017 to 2018, also stated that EQT had broken multiple state laws. Specifically, EQT was supposed to have fully cemented casing. However, EQT drilled through two mine voids and did not have the proper casing, which would negatively impact the surrounding water.

106.    According to FE 3, both FE 3 and FE 2 brought up blatant safety hazards at EQT to Brian Morel (then EQT Director of Engineering),[16] Maddox, and others, but the hazards were

---

[16] Morel was previously a BP drilling engineer and a member of the team that designed the Macondo well on BP's Deepwater Horizon oil rig – the site of the largest offshore spill in U.S. history. After Morel was subpoenaed to testify before a joint Coast Guard and Bureau of Ocean Energy Management panel about his involvement in the spill, his attorney appeared at the panel and asserted Morel's Fifth Amendment privilege against self-incrimination. *See* https://www.c-span.org/video/?c4608631/user-clip-brian-morel-invokes. Emails from the time of the design of the Deepwater Horizon well show that Morel emailed a Halliburton executive that they planned to use only six centralizers in the well. Centralizers are devices that help ensure that components of casings are properly cemented and create a proper seal. The executive responded that they should use 21 centralizers. Morel replied, "it's too late to get any more product on the rig, our only option is to rearrange placement of these centralizers." The executive also recommended circulating the drilling mud from the bottom of the well all the way up to the surface to remove air pockets and debris which can contaminate the cement, writing in an email, "at least circulate one bottoms up

glossed over. This included setting a rig over a producing well. Fortunately, EQT moved the rig off the well because just days later, the well had a leak. If the leak had happened while the rig was over the well, it was highly likely it would have caused an explosion.

107.    Similarly, according to FE 3, on a separate occasion, there was a gas leak on a rig and every person on the rig passed out because of it. Since there had been a leak around the well head, when the people went down into a confined space, they passed out. Because EQT did not have OSHA regulations in place, one person would go down and pass out; then another went down and passed out, and so on. In total, four or five people passed out. As a result, if a truck driver had not happened to have found them, at least some of the people would have died. FE 3, who had been in the oil and gas industry for 15 years, stated that EQT was "***the most dangerous place I have ever worked***."

### 6.    EQT Refuses Recommendations to Modify Its Drilling Practices to Address Issues Specific to Longer Laterals

108.    As another purported justification for the Acquisition, EQT and Schlotterbeck repeatedly claimed during the Class Period that, through the Acquisition, EQT would achieve billions of dollars in synergies as a result of applying EQT's and Rice's "best practices" to achieve capital efficiencies and operational cost savings. For example:

- On June 19, 2017, Schlotterbeck claimed that EQT would achieve $2.5 billion in synergies because EQT "***will capture operational efficiencies through sharing of technical data and best practices***, rig allocation, pad sites, water, access roads, etc.";

---

on the well before doing a cement job." Despite this recommendation, BP cycled only 261 barrels (41.5 m$^3$) of mud, a fraction of the total mud used in the well. As discussed in more detail below, following the Acquisition, EQT also inexplicably ceased circulating drilling mud, which led to EQT losing several drill head assemblies in its wells.

- EQT's July 27, 2017 Registration Statement stated that the merger would create capital efficiencies and operational cost savings from "***applying each firm's best practices***";

- Also on July 27, 2017, Schlotterbeck emphasized that EQT would "***increas[e] well recoveries by combining EQT and Rice's best drilling and completion techniques***";

- EQT's analyst presentations on October 23, 2017, December 13, 2017, February 15, 2018, March 28, 2018, April 26, 2018, May 29, 2018, August 6, 2018, and September 4, 2018, claimed that the Acquisition would bring "***Drilling and completion best practices***" synergies of $2.5 billion with potential total synergy upside of $7.5 billion; and

- On November 6, 2017, Institutional Shareholder Services ("ISS") published a Proxy Alert to investors. In it, ISS wrote that EQT "***Management states that*** the merger with RICE and ***the adoption of best practices in the upstream business developed by [RICE] would create one of the lowest cost producers in the sector and allow the company to increase the longevity of its assets***."

109.    Before the Acquisition, EQT experienced serious problems in drilling the extra-long laterals that would supposedly serve as the basis for the Company's claimed synergies. EQT was also repeatedly warned that drilling ultra-long lateral wells involved a steep learning curve that would require significant modification to its drilling methods.

110.    However, contrary to its contemporaneous public statements quoted above, EQT knowingly, or with severe recklessness, disregarded those warnings and red flags and refused to adopt the best practices suggested by its own employees, former Rice employees, and paid consultants.

111.    ***First***, according to FE 5,[17] EQT had experienced several problems with drilling longer laterals, including losing the drill head assembly inside the well. FE 5 explained that if this happens, the drilling company has to start the drilling over, and that this happened frequently at EQT once EQT started trying to drill more challenging lengths.

---

[17] FE 5 was a Drilling Engineer at EQT from before the start of the Class Period to November 2017.

112.     In spring 2017, in preparation for EQT starting to drill longer laterals, FE 5 gave a presentation to the drilling team, including Morel, Maddox, and David Elkin (EQT Senior Vice President of Asset Optimization through 2018). During the presentation, FE 5 discussed the points that would be more challenging about drilling longer laterals and recommended design changes for the wells, changes to the mud program, changes to piping, and possible changes to the wellhead.

113.     **Second**, after EQT experienced collapses of longer lateral wells, FE 2 explained to Maddox that EQT was experiencing breakout in the lower formations—i.e., the shape of the wellbore was widening more than it should, which leads to well collapses. FE 2 and another former employee (FE 3) brought this to Maddox's attention, and his reaction was to laugh at them.

114.     Notwithstanding EQT's public statements that EQT "will capture operational efficiencies through sharing of technical data and best practices, rig allocation, pad sites, water, access roads, etc.," FE 2 stated that it was not abnormal when he first started at EQT for there to be wellbore collapses, but that **the frequency increased dramatically** when EQT started to drill longer and longer laterals.

115.     In July or August 2017, following repeated failures, FE 2 gave a presentation to Maddox, Morel, and George Davis (EQT Drilling Team Lead) explaining why the borehole kept collapsing at longer depths, but they dismissed him. According to FE 2, EQT was experiencing numerous technical issues, mostly as a result of drilling too quickly. He said that EQT "wanted to run through [the drill of laterals] at jackrabbit speed but you can't do at 16,000 [feet] what you do at 12,000. You have to be more cautious. They wanted to be a superstar. They wanted to just hit home runs. But you can't do that." FE 2 stated that the decisions were being made by a small group of individuals, led by Defendant Schlosser.

116.    The result of the borehole collapses was that EQT would cut off the drill assembly, leave it in the ground, and redrill the lateral. However, EQT incurred significant extra costs as a result. According to FE 2, EQT "did all of these cowboy things," and EQT "would just drill, and if it got stuck, they would just break it off and redrill."

117.    FE 2 stated that EQT did not have the expertise to drill the kinds of laterals it was representing it could. EQT was told that its methods were never going to work at more than 18,000 feet unless it changed its ways. But, after his presentation, FE 2 was "told to shut up" by Morel and Maddox. Although FE 2 had presented information in July or August 2017 that *EQT would not be able to successfully drill the longer laterals without taking several corrective steps*, EQT decided it was just going to continue its current drilling practices, which resulted in even more collapses.

118.    According to FE 2, numerous articles discuss how drilling past 16,000 feet (which is included within the definition of Extended Reach Drilling ("ERD")) is a "different animal" and requires an operator to monitor various factors, such as friction factors, much more closely.[18] However, EQT embarked on ERD as if there was no meaningful difference between drilling 10,000 feet versus 16,000 feet.

119.    *Third*, FE 2 stated that, in September 2017, after FE 2's presentation, EQT brought in consultants from K&M Technologies to help train EQT on how to drill longer laterals during a

---

[18] The Schlumberger Oilfield Glossary defines "Extended Reach Drilling" as a term first coined in 1980 to describe "drilling directional wells in which the drilled horizontal reach (HR) attained at total depth (TD) exceeded the true vertical depth (TVD) by a factor greater than or equal to two. *Extended-reach drilling (ERD) is particularly challenging for directional drilling and requires specialized planning to execute well construction*." https://www.glossary.oilfield.slb.com/en/ Terms/e/ extended_reach_drilling.aspx. As the Glossary adds, "Since the term was coined, the scope of extended-reach drilling has broadened and the definition, which is now more flexible, includes deep wells with horizontal distance-to-depth, or H:V, ratios less than two." *Id.*

two-day course. FE 2 and the other senior drilling leadership (including Davis and Maddox) attended these presentations. K&M explained to EQT what the Company needed to do in order to be successful and efficient at drilling longer laterals. FE 2 stated that K&M confirmed many of the points on which he had presented. However, during a break when the K&M consultant was out of the room, Maddox told everyone "We're not doing that," and EQT senior management ignored K&M's recommendations. FE 2 stated that "as soon as they [K&M] walked out the door, George Davis and Bradley Maddox said it was a bunch of bullshit, and they weren't going to do it like that."

120. **Fourth**, as Toby Rice later disclosed to investors in February 2019 (*see infra* Section V.K.), the Rice brothers engaged in repeated efforts to reform EQT's business and drilling practices, but EQT refused those efforts every time. In Toby Rice's words: "Following the announcement of the Rice-EQT merger, we spent 5 months with EQT management, laying out the blueprint that led to Rice's operational success: Our people, technology and planning. ***Ignoring this, EQT decided to move forward with their internal systems and without critical personnel who are responsible for Rice's success***."

### E.    JANA Criticizes the Acquisition, and Defendants Repeatedly Deny JANA's Assertions and Mislead EQT and Rice Investors into Approving the Acquisition

121. As mentioned above, before the closing of EQT's merger with Rice, outside EQT investor JANA opposed the Acquisition and questions EQT's stated bases for it.  JANA claimed that the Rice merger synergies claimed by EQT were "grossly exaggerated," and, according to JANA's expert analysis, "it would be impossible for EQT to support its claimed synergy drilling plan" as there were "simply not enough ***undrilled*** contiguous acreage blocks to enable such a dramatic improvement in lateral length." According to JANA, the maps EQT used to tout the claimed synergy benefits were "blatantly deceptive," as many of the intervening properties

40

between EQT's and Rice's tracts were controlled by other operators and could not be used without substantial costs. As discussed below, because EQT hid from investors the above facts about how it was impossible for EQT to actually achieve the claimed synergies, and because the Officer Defendants—including most notably Defendant Schlotterbeck—vigorously denied JANA's assertions, EQT was able to stave off JANA's campaign to stop the EQT-Rice merger and mislead EQT and Rice investors into approving the Acquisition.

122.    On July 5, 2017, JANA, which owned approximately 6% of EQT's stock, began its public efforts to stop the Acquisition when it sent a letter to EQT's Board opposing the Acquisition and filed the letter with the SEC. Among other things, JANA wrote that "EQT's calculation of the $2.5 billion of synergies created by the transaction appears highly questionable, and we estimate that the actual synergies could fall short by $1.3 billion, or over 50%." JANA also wrote that EQT could instead unlock significant value by separating its midstream business from its upstream business because the value of its respective parts was greater than its current value (i.e., the "sum-of-the-parts" discount). In that regard, JANA's July 5, 2017 letter claimed it was "astounded" by the news that EQT was pursuing the Rice Acquisition "rather than pursuing substantial and certain value creation through a separation."

123.    At the time, many investors shared JANA's concern about the sum-of-the-parts discount but did not believe its criticisms of EQT's claimed synergies. For example, on July 5, 2017, RBC Capital Markets expressed skepticism over JANA's letter to the EQT Board and reported that JANA's "effort to stop the acquisition will be challenging." As RBC Capital Markets wrote: "In our view, the acquisition provides long-term strategic value and management will be proactive in addressing the upstream/midstream simplification." The report further stated that the

"acquisition is the right deal for EQT long-term. . . . Importantly, the ability to extend lateral lengths in the Appalachian sweet-spot provides top tier economic returns."

124.    EQT also denied JANA's assertions about the Acquisition. For example, on July 27, 2017, EQT gave an analyst presentation, which EQT publicly filed with the SEC, in which it reiterated its statement that the Acquisition would provide $2.5 billion of synergies, republished the map showing purportedly contiguous properties that it had first published on June 19, 2017, as discussed in ¶ 75, and stated that "Capital Efficiencies" would be achieved because "[c]ontiguous acreage leads to: [l]onger laterals [and] [f]ewer wells" and because of "[l]ower surface costs." EQT also claimed that the top end of the synergies could be as much as $7.5 billion.

125.    That same day, several analysts expressed public support for EQT's position on the claimed synergies and the merits of EQT's merger with Rice, demonstrating that EQT's express denials of JANA's specific criticisms were misleading the market:

- BMO Capital Markets reported that "EQT provided additional detail around upstream synergies from the Rice acquisition, with capital efficiency savings of $200mm in 2018 and $350mm in 2019–2027, combined with G&A savings of $100mm per annum through 2027. On a pre-tax basis, *this supports the $2.5Bn synergies previously disclosed*, while several upside synergies were newly highlighted";

- Cowen and Company reported that EQT "offered more clarity regarding its projected synergy assumptions with RICE *which should alleviate any concerns regarding the benefits of the transaction in our view*";

- JP Morgan reported that "what is more important for the stock is the Rice merger and management is making the case that *the $2.5 billion synergy target reflects relatively low hanging fruit* as they have cited a blue-sky synergy target of up to $7.5 billion, including midstream synergies. In our view, . . . *updated thoughts on synergies make the case for the Rice merger even stronger* (and consistent with our recently published view that Rice would upgrade EQT's upstream business)"; and

- Wells Fargo Securities reported that "the strategic and financial case for the acquisition remains strong and *outweighs the concerns raised* and we remain solidly supportive of the transaction."

126.    The next day, on July 28, 2017, JP Morgan reported that "***EQT management made a powerful case for the Rice merger***, outlining its strong confidence in its $2.5 billion synergy estimate and other blue-sky synergies that could reach up to $7.5 billion."

127.    On July 31, 2017, JANA sent another letter to EQT's Board opposing the Acquisition and filed the letter publicly with the SEC. Among other things, JANA wrote: "[T]he only actual synergy that would be generated by a Rice acquisition comes from longer lateral lengths that are facilitated by the transaction. Looking at the abutting acreage, we believe such acreage would only facilitate ***a fraction of the increase in lateral well length*** (and thus a fraction of the savings from the reduction in total wells drilled) cited to justify this transaction."

128.    On August 14, 2017, JANA again sent a letter to EQT's Board and publicly filed the letter with the SEC. In this letter, JANA argued that EQT's management had an inappropriate incentive to push the Acquisition regardless of whether it was beneficial to EQT shareholders because management's incentive compensation was based in large part on natural-gas production growth, which could be achieved by any means including acquisitions and was not measured on a per-share basis, so that stock-for-stock acquisitions like the Acquisition of Rice would increase management's compensation regardless of whether they benefited shareholders on a per-share basis.

129.    The same day, contrary to JANA's specific criticisms, RBC Capital Markets reported that "***we think the Rice acquisition is likely to close because the market has sufficient confidence in EQT's baseline synergy estimates***."

130.    On September 11, 2017, JANA filed preliminary proxy materials with the SEC further opposing the Acquisition. Among other things, JANA's proxy materials concluded that,

whereas EQT had stated that the Acquisition would produce $2.5 billion of synergies, "we estimate that the actual synergies could fall short by at least $1.3 billion . . . ."

131.   On September 13, 2017, EQT drastically modified its incentive-compensation structure in order to save the Acquisition and rebut JANA's criticisms, as it announced that production volume acquired in the Acquisition would not be included in calculating management's executive compensation. EQT also announced that the Company would establish a Board committee immediately upon closing of the Acquisition to evaluate options for addressing the "sum-of-the-parts" discount criticized by JANA.

132.   The next day, September 14, 2017, RBC Capital Markets reported that "EQT continues to proactively take measures in the ongoing 'saga' regarding [JANA's] push to stop its acquisition of Rice Energy. We think its latest announcement to accelerate the Sum-Of-The-Parts (SOTP) discount and management incentive compensation *should be more than ample to secure the needed shareholder votes* and address Jana's concerns."

133.   On September 20, 2017, JANA sent another letter to EQT's Board and publicly filed the letter with the SEC. JANA provided further details about why it believed EQT's claimed synergies from the Acquisition were overstated:

> With the help of a leading petroleum engineering firm with extensive experience in the Appalachian basin and experienced industry operators, we have identified and mapped out every existing and potential future well location on the combined company's acreage based upon publicly-available data, assuming 750 foot spacing in Washington County and, even more generously, 500 foot spacing in Greene County. Based on this work, we believe it would be *impossible* for EQT to support its claimed synergy drilling plan of 1,200 wells with 12,000 feet in average lateral length. While the over-simplified maps provided in EQT's presentations make the synergy claims seem plausible, a detailed analysis reveals that much of the acreage actually consists of hundreds of disjointed blocks that are not properly depicted in management's map. Moreover, many of the larger blocks of adjacent acres (that in theory would enable longer laterals) have already been drilled out at least on one side. There is simply not enough undrilled contiguous acreage blocks to enable such a dramatic improvement in lateral length over what can be accomplished by each

company on a standalone basis.

Based on our analysis, we believe a combination with Rice would only modestly increase average lateral lengths by less than 1,000 feet, not the 4,000 feet increase claimed by EQT. This modest increase in lateral length would result in approximately $300 million in pre-tax capital savings on a net present value basis, not the $1.9 billion EQT has claimed.

134.    On October 16, 2017, EQT publicly responded to JANA's criticisms in a press release that EQT filed with the SEC. In the press release, EQT "emphatically" denied JANA's points about the combined EQT and Rice acreage:

JANA has suggested that EQT's presentation of the combined Rice-EQT acreage map is misleading, and that the existence of non-contiguous acreage contained within the pro-forma footprint of the combined Company implies that stated operational synergies from the transaction are not achievable. ***This is emphatically not the case***.

EQT has been operating in the Appalachian Basin for nearly 130 years, has drilled more than 2,500 horizontal wells, and has drilled the longest lateral in the Marcellus (to-date) at 17,400 feet. It is standard industry practice to manage any non-contiguous acreage requirements through well path adjustments, smaller bolt-on acquisitions, and tactical fill-ins, all of which are part of our current development plan at an estimated cost of up to $200 million annually. In addition, there are often small-scale acreage trades between operators that are used to fill in gaps. Each of these methods are routinely employed by EQT and other Appalachian operators to build their respective development programs. Given the multitude of legacy natural gas leases across Appalachia, it is commonplace for small acreage plots to exist given the historical ownership of land in the region.

The combined Rice-EQT acreage profile was evaluated thoroughly and carefully, and ***based on our development plan, which includes the cost of tactical fill-ins, the Company is confident it will achieve the $2.5 billion in synergies that it has identified***. For JANA to suggest that this acreage acquisition strategy, which is standard for Appalachian operators, is inconsistent with achieving the anticipated benefits of the transaction is highly misleading and inaccurate.

135.    On October 17, 2017, RBC Capital Markets reported that after the market close on October 16, 2017, "EQT issued a statement in response to [JANA] reiterating the benefits of the Rice transaction, criticizing recent statements by JANA, and urging shareholders to vote in favor of the Rice acquisition."

136.   On October 19, 2017, EQT issued proxy materials stating that "Rice has an outstanding footprint that is largely contiguous to our existing acreage position and complements our pipeline infrastructure systems." The materials also said that the Acquisition offered "IMPROVED UPSTREAM RETURNS, DRIVEN BY THE CONSOLIDATION OF COMPLEMENTARY ACREAGE POSITIONS," and that "[d]evelopment of adjacent acreage leads to longer laterals and improves overall economics."

137.   JANA filed additional proxy materials with the SEC dated October 23, 2017 opposing the Acquisition, criticizing EQT's rationale for the Acquisition, and asserting, among other things, that EQT's published map purporting to show significant contiguous acreage resulting from the Acquisition was false and misleading and that due to minimal contiguous undrilled acreage, likely drilling synergies were only approximately $300 million, well below EQT's claim of $2.5 billion.

138.   On October 23, 2017, EQT again publicly responded to JANA's criticisms. EQT gave an analyst presentation, which EQT publicly filed with the SEC, in which it reiterated its statement that the Acquisition would provide $2.5 billion of synergies, republished the map showing purportedly contiguous properties that it had issued on June 19, 2017, as discussed in ¶ 75, and stated that "Capital Efficiencies" would be achieved because "[c]ontiguous acreage leads to: [l]onger laterals (12,000 feet) [and] [f]ewer wells" and because of "[l]ower surface costs."

139.   EQT's October 23, 2017 presentation also included quotes from research analysts who accepted the truth of EQT's claims that the merger with Rice would yield significant benefits:

## Research Analysts See Value of Transaction

"Investors cited the **high-grading of EQT's acreage position in the core and the potential of EQT to "walk and chew gum"** (i.e., balance growth and FCF generation) as chief factors why they are supportive of the transaction...**Overwhelming majority of investor participants believe the EQT-RICE merger should be ratified**: 84% of the survey participants believe that the pro forma EQT-RICE entity could deliver more shareholder value than EQT on a standalone."

*- JP Morgan, 2-Oct-2017*

"Our proprietary analysis shows a post-merger EQT sum of the parts valuation at $86/sh using a $50 WTI/$3 Henry Hub price deck...**The strategic value of acquiring RICE is almost universally accepted by investors and industry peers.**"

*- Cowen, 10-Oct-2017*

"**We view the transaction positively** given significant overlap of high quality core acreage that should drive **what EQT management estimates to be $2.5 billion in synergies** as a combined entity.... With the business model shifting... to more moderate growth with free cash... **EQT is better positioned post this transaction in our view.**"

*- Wells Fargo, 19-Jun-2017*

"While the upstream synergies of EQT/RICE are significant, **the larger takeaway here is the benefits of scale and strategic alternatives the transaction offers**... There are a number of equity-positive potential outcomes.. with management highlighting the opportunity to unlock the persistent SOTP discount..."

*- Evercore ISI, 20-Jun-2017."*

140.    The below stock-price chart from EQT's October 23, 2017 presentation also demonstrated that the market accepted EQT's claimed bases for the transaction because, since the announcement of the merger, EQT's stock-price increase (8%) exceeded the returns of both the S&P 500 Index (5%) and EQT's peer average (-3%):



**Positive Market Reaction to Deal**
*EQT Outperformed Peers and Market Since Merger Announcement*

141.    On an investor and analyst conference call on October 26, 2017, Defendant

Schlotterbeck denied JANA's criticisms and played the role of EQT's main cheerleader in support

of the Acquisition:

> [S]ince we are now two weeks away from the vote deadline, I do want to emphasize
> once again the merits of the Rice transaction. The primary driver of success in our
> industry is being the low cost producer, and the most impactful way to drive per
> unit cost lower is through longer laterals.
>
> Establishing a dominant footprint of highly contiguous acreage that allows for
> sustained long lateral development is a real competitive advantage. This is what the
> Rice transaction creates for us. Our competitors may be able to replicate things, like
> new drilling technology or new drilling techniques, but *they can't replicate an
> acreage position that supports 12,000 foot laterals in the core of the Marcellus*.

142.    In response to an analyst's question, Defendant Schlotterbeck said that EQT

expected to do even better than the 12,000-foot lateral wells it had previously told investors it

would achieve, and would do so immediately after the Acquisition closed:

> In the acquisition area where we said we're going to average 12,000-foot laterals,
> *we expect to be able to come right out of the gate in 2018 and average at least
> 12,700 feet in that area. So in terms of delivering on the synergies, we're going
> to be able to start demonstrating that from day one*. So we're pretty excited that
> the more we work the maps and get the data incorporated as we plan for the
> integration, our ability to deliver on that, our confidence in that, keeps going up. *So
> we're going to come out of gate at 12,700 at least and probably go up from there*.

143.    In response to another analyst's question about "your confidence around the 12,000

number on a pro forma basis," Schlotterbeck said: "Well, extremely confident." He reiterated that

EQT was "going to come out of the gate above the average" and further stated that "there's lots of

remaining inventory acreage. Tremendous amount of resource in place. So *very, very confident in

our ability to deliver on that synergy*."

144.    On October 26, 2017, JANA publicly responded to EQT's statements of three days

earlier. Among other things, JANA asserted that "[a]ctual acreage consists of fragmented blocks

rather than large swaths of land" and that EQT's claimed lateral extension consisted almost entirely

of "acreage trades and infill leasing, which EQT could pursue on a standalone basis."

145.    The October 26, 2017 JANA presentation also included this rebuttal to EQT's

claimed drilling synergies:



146.    In the EQT slide that JANA included in its presentation, the "Full Development"

of EQT's plan depended on EQT having "8 new wells with *16,200* average lateral length," but

EQT knew that it repeatedly had trouble drilling wells in excess of 15,000 feet.

147.    JANA's October 26, 2017 presentation also pointed out that EQT had estimated

that the merger with Rice would result in 1,200 wells with an average lateral length of 12,000 feet.

However, as JANA's October 26, 2017 presentation added: "Based on the work of our industry

experts, we estimate that combining EQT and RICE's acreage would *only enable ~100 border-crossing wells of 12,000 feet or more*, 1,100 fewer than claimed by EQT."

148.    As discussed above, after JANA filed proxy-solicitation materials in an attempt to defeat the Acquisition at the special meeting of stockholders, EQT agreed to revise the management-compensation scheme that JANA had criticized as providing inappropriate incentives for management based on the Acquisition, and to accelerate consideration of possible transactions to address the "sum-of-the-parts" undervaluation that JANA argued affected the Company's stock price. JANA responded to these concessions by withdrawing its proxy materials, while still stating that it would vote against the Acquisition. JANA's withdrawal of its proxy materials indicated to the market that its principal concerns in connection with the Acquisition were with executive compensation and its desire for EQT to unlock value by spinning off the midstream business.

149.    Just as it misled investors about the supposed benefits and synergies of the Rice Acquisition, EQT also successfully misled proxy-advisory firms Institutional Shareholder Services ("ISS") and Glass Lewis & Co. ("Glass Lewis"). In the fall of 2017, based on EQT's heavy promotion of the Acquisition, both ISS and Glass Lewis issued reports in support of the Acquisition.

150.    For example, in a November 6, 2017 proxy report, ISS concluded that "support for the transaction is warranted." The ISS proxy alert summarized and rejected JANA's criticism of the Acquisition, and instead echoed the points that EQT was making publicly (as well as directly to ISS) in support of the Acquisition. The ISS proxy alert specifically stated that the Acquisition "has industrial logic" and that "the combined company will be able to drill longer average laterals,

which will drive capex savings. In total, the board has guided $4.4 billion dollars in synergies over 10 years, with a present value of $2.5 billion."

151.    An October 29, 2017 Glass Lewis proxy report expressed similar support for the Acquisition. Specifically, the report stated that "[t]he transaction would expand EQT's core net acreage position by approximately 39% . . . and expand its portfolio of undeveloped locations by approximately 37% . . ." Glass Lewis went on to state that "EQT expects that the transaction would generate base synergies with an estimated present value of $2.5 billion, including $0.6 billion of general and administrative . . . cost synergies and $1.9 billion of projected capital efficiencies" and "EQT estimates that it will be able to extend average well laterals by 50%, from 8,000 feet to 12,000 feet, in Greene and Washington Counties in Pennsylvania." The Glass Lewis report concluded that "we see no reason to doubt the strategic rationale for the proposed transaction, which is supported by compelling industry logic and opportunities to achieve meaningful synergies and economies of scale . . . ." Glass Lewis concluded, "The combined company would have greater scale with a more attractive asset base and acreage footprint, providing opportunities to achieve meaningful capital efficiencies and operating synergies . . . ."

152.    On November 9, 2017, majorities of EQT and Rice shareholders voted in favor of the Acquisition, which closed on November 13, 2017.

**F.      EQT Utterly Fails to Achieve the Claimed Drilling Synergies**

153.    Due to EQT's inability to drill, and inexperience with drilling, ultra-long laterals in a consistent and cost-efficient manner, as well as the "impossible" assumptions upon which its claimed synergies were based, EQT was unable to drill ultra-long laterals in a cost-efficient manner or to achieve the claimed synergies after the Acquisition closed.

154.    EQT and the Officer Defendants recklessly disregarded the clear obstacles and red flags that prevented EQT from achieving the stated synergies and pushed ahead with baseless

51

claims that EQT would be able to generate synergies not only for many years in the future but also "right out of the gate." On October 26, 2017, to respond to JANA's criticisms and curry favor with investors and build support for the Acquisition, Schlotterbeck claimed that "we expect to be able to *come right out of the gate in 2018* and average at least 12,700 feet"; "[s]o in terms of delivering on the synergies, *we're going to be able to start demonstrating that from day one*"; and "*[s]o we're going to come out of gate at 12,700 at least and probably go up from there*."

155.    However, contrary to EQT's claims that it would begin to generate synergies "right out of the gate" and "from day one," EQT was unable to do so because, in order to drill wells across the newly combined EQT and Rice acreage, EQT needed to apply for and obtain permits for those wells:

- It takes approximately 4–5 months to obtain a permit for a well. Therefore, as of the merger closing date, EQT had wells that were permitted that did not yet incorporate the Rice acreage, and vice versa. Therefore, for at least the first 4–5 months after the Acquisition, EQT was drilling wells that either EQT or Rice had already permitted but that did not incorporate the claimed synergies. EQT then had to obtain permits that incorporated the acreage for both companies; and

- FE 6[19] stated that EQT was struggling to obtain permits for the extended-length laterals, and therefore, post-merger, instead of drilling the longer laterals, EQT was drilling the same wells as before. FE 6 said that permitting was the biggest issue for drilling these longer laterals and that he still stays in touch with people at EQT and knows that EQT has still not obtained the permits.

156.    After the Acquisition, EQT and the Officer Defendants repeatedly claimed that the Acquisition was exceeding expectations, and they stated that EQT was "on track" to achieve and exceed the synergies they had claimed would result from the Acquisition. For example:

- On February 15, 2018, Defendant Schlosser claimed that (i) "We have hit the ground running with our increased lateral lengths"; (ii) "in 2018, our Pennsylvania

---

[19] FE 6 is a former EQT Senior Drilling Supervisor from before the start of the Class Period through May 2018.

Marcellus spuds[20] are expected to average over 13,600 feet," which is "*1,000 foot [sic] longer than what we announced in December and is a direct result of collaboration between land professionals from both companies*"; (iii) "In fact, 60% of our Marcellus wells in Pennsylvania will be comprised of wells that share legacy EQT and Rice acreage"; (iv) "On the operational . . . front, we are combining best practices and have already captured value"; and (v) "On the drilling side, we have set new footage records by combining the data, experience and practices of both companies, more specifically related to rotary steerable systems and drill pipe rotation.";

- On EQT's February 15, 2018 earnings call, Schlotterbeck added that (i) "*we've hit the ground running and have started capturing the various synergies related to the transaction*"; (ii) "we currently expect to average 13,600-foot laterals in Southwestern Pennsylvania Marcellus acreage, which is 1,600 feet or 13% longer than we anticipated when the deal was first announced," which "*places us ahead of schedule for achieving our capital synergies*"; and (iii) "I'm pleased to say that our G&A savings began on day 1";

- Also on February 15, 2018, Schlotterbeck claimed that EQT was "*at or a little bit ahead of the plan that delivered on that [G&A] synergy*." McNally added, "Yes, what we had said was we expected about $100 million of annual G&A savings or overhead savings" and "we think that number is going to be more like $110 million or maybe a little more than that for 2018." And, with respect to the claim of 12,000-foot laterals, Schlotterbeck said, "we now expect to average 13,600 feet," which is a "*pretty dramatic acceleration of those synergies,*" and McNally said that the present value of the synergies was "several hundred million dollars higher"; and

- On EQT's April 26, 2018 earnings call, Defendant McNally claimed that EQT was still "on track" to deliver its synergies, stating that "what we thought when we announced the transaction was that we would see lateral lengths improve from approximately 8,000 foot [sic] in Greene and Washington Counties to 12,000," and now EQT's "current estimates are that we'll be at 13,600 feet for 2018, and it will improve beyond that," "[a]nd so we expect that *we're going to exceed the $1.9 billion of capital and PV'ed synergies by a reasonable amount*, several hundred million dollars," and "I'd say that *we're well on track to deliver and exceed those synergies*."

157.    In truth, EQT was nowhere near achieving or exceeding its claimed synergies, and Defendants made all of the above claims knowing, or recklessly disregarding, that they were materially false and misleading. Directly contrary to the above assertions, and as Defendants

---

[20] "Spud" means the start of drilling a new well. www.glossary.oilfield.slb.com/en/Terms/s/spud.aspx.

admitted just months later, in October 2018, the Acquisition was proceeding catastrophically, EQT experienced significant cost overruns and serious problems in drilling ultra-long laterals, and EQT refused to adopt Rice's best practices, instead choosing to stick to its own outdated and ineffective methods.

158.    According to FE 6, the merger progressed "terribl[y]." When asked if the merger produced capital efficiencies and operational cost savings as EQT claimed, FE 6 responded "*absolutely not*" and stated that EQT's costs instead increased dramatically. FE 6 stated that, as soon as the merger occurred, "things got a lot worse," and "it was like we didn't have a plan." EQT was trying to task employees with achieving the $2.5 billion in savings, but when EQT took over Rice, "we completely lost our minds" and started doing things that were "freaking crazy." As a result, the costs started to increase. The claimed synergies were based on EQT drilling longer lateral lengths on the properties that EQT had joined with Rice's, but "*we were failing miserably on drilling these longer laterals*."

159.    Likewise, FE 7 stated that "the big issue [with the Acquisition], where it all seemed to fail, was *the technical capabilities to drill the long laterals*." FE 7[21] said that EQT did not have the expertise to drill wells that were as long as they needed to be in order to take advantage of the Acquisition. FE 7 reported that EQT had a 33% failure rate when trying to drill the casing in the ground at anything over 15,000 feet.

160.    More specifically:

- FE 3 heard from employees still at EQT that EQT's "cowboy" attitude only increased after the Acquisition. FE 3 heard that approximately two months after he left the Company in late 2017, EQT had 12 drilling rigs running, and *10 of them were literally stuck*. This issue could result in anything from a day-long delay to a permanent issue that results in needing to cut the pipe;

---

[21] FE 7 was a Geologist at EQT from before the start of the Class Period through January 2019.

- FE 2 stated that he knows from speaking with friends at EQT that ***the Company has lost 10 or 11 drill assemblies in wells as a result of well collapses***, which often result in the need to redrill entire laterals, which cost approximately $600,000 each. If the drill pipe is left in the hole when it collapses, it could cost the Company $1–$3 million. He stated that this was a common issue after the Acquisition and would account for most of EQT's capital-expense overages;

- According to FE 7, EQT drilled laterals beyond 15,000 feet, but had a ***33% failure rate***, and those failed wells had to be drilled again because of major issues. EQT would lose the drills and would have to redrill the wells multiple times;

- According to FE 7, the bore hole would collapse on EQT at total depth, and EQT would not be able to get the production casing in the ground. As a result, EQT would need to redrill the bore all over again, and EQT was drilling some of the same laterals up to three times. According to FE 7, this was the result of a lack of technical know-how and capability and EQT was pushing industry limits; and

- FE 7 added that many of EQT's cost overruns were due to EQT's inability to drill extra-long laterals.

161.   FE 6 stated that EQT had problems removing the drill pipe from its wells because EQT's operational changes included changing the amount of circulating time EQT was performing at the end of the laterals.

162.   A drilling rig's circulation system ensures that the correct fluids reach the correct parts of the drilling system.[22] It consists of several components and, together, they deliver drilling fluids into the wellbore throughout the drilling process. Drilling fluids, which operators call "mud," serve a number of purposes. First, as the operator pumps the fluid through the drill bit, it provides the hydraulic energy to operate the drill bit and other downhole tools. In so doing, the fluid also serves to cool and lubricate the drill bit. As the bit drills the well, it grinds the solid rock into rubble called "cuttings." Second, the circulating drilling fluid carries these cuttings from the bottom of the well to the surface. Without the fluid to bring them to the surface, these cuttings

---

[22] *See, e.g.*, Meet the Circulating System, *available at* https://drillingmatters.iadc.org/meet-the-circulating-system/.

collect in the wellbore, interfere with efficient drilling, and can trap the drill bit. Third, the circulating fluid is important to ensure that the new wellbore retains its shape and does not collapse.

163.   Numerous FEs attributed EQT's lost drill assemblies to EQT's inexplicable decision to stop, reduce, or modify its fluid circulation in the wells. For example:

- FE 6 stated that EQT changed its circulating rate, which had an adverse effect because, with this change, EQT could not get the drill pipe out of the well hole. FE 6 raised his concerns about the circulation rate to Maddox, but EQT "just kept doubling down on" its strategy;

- FE 6 further stated that much of the increase in EQT's service costs in 2018 had to do with the rotary steering tools that EQT lost in 2018 due to the circulating-time change and poor drilling practices. He believes that EQT lost seven or eight such tools, which would be $7–8 million;

- According to FE 8,[23] after the merger, EQT had to redrill its wells "very frequently." Similar to FE 6's accounts, FE 8 stated that EQT's bottom hole assemblies were getting stuck because EQT asked the drilling company, Baker Hughes, to stop circulation while they were pulling the drill string out. According to FE 8, each BHA cost approximately $750,000; and

- FE 9[24] stated that a friend of his at EQT had told him that an EQT superintendent (Brian Mau) had given the instruction to stop circulating a well, and that, as a result, solids started to collect around the tools in the well and the tools got stuck. EQT tried for days to extract the tools but it was going to be very expensive to get them out. FE 9 stated that an operator should never want to stop circulating the fluid when the tool is in the lateral and pulling out of a hole because when an operator stops, the sand and other material goes static and piles up on the tool.

**G.   EQT Internally Notes *After the Acquisition* That It Needed a Plan to Achieve Long Laterals on Multi-Well Pads**

164.   Despite the problems EQT experienced internally, the Officer Defendants continued their misleadingly rosy public descriptions of the Company's operations and its supposed achievement of capital and operational synergies. For instance, on July 26, 2018, during

---

[23] FE 8 is a Geologist who worked at EQT from before the start of the Class Period to April 2019.
[24] FE 9 was a consultant at EQT from March 2018 to September 2018.

EQT's second-quarter 2018 earnings conference call, Defendant Schlosser claimed that EQT was generating synergies in line with its prior claims:

> ***We continue to realize capital synergies from the Rice acquisition as we develop our large contiguous acreage position***. In our Southwestern Pennsylvania [core], our 2018 drilling program is now expected to deliver an average lateral length of 14,200 feet, which is 55% higher than our 2017 Southwestern Pennsylvania average prior to the Rice acquisition. . . .
>
> ***On an activity level, the second quarter was the highest in EQT history, with the company operating as many as 15 rigs and 12 frac crews***. This resulted in nearly 680,000 feet-of-pay being fracked, which is 55% higher than our previous record. On the drilling side, we have already drilled as much footage in the first half of 2018 as we did in the full year 2017.

165.   From the outside, the Acquisition appeared to be an unbridled success. But Schlosser spoke of EQT's purported drilling successes and left out the abject failures. He made no mention of the lost drilling assemblies, the increasing costs that were evident since at least the first quarter of 2018, and the steep learning curve EQT was trying (but failing) to climb on the drilling of ultra-long laterals. As an executive directly involved with EQT's operations, Schlosser knew of, or recklessly disregarded, that EQT experienced those significant problems.

166.   Indeed, in that same month, July 2018, EQT internally noted the serious difficulties it faced in developing "long laterals on multi-well pads" and internally acknowledged that it was not meeting that challenge. As a result, EQT requested assistance from a third-party operations-management consulting firm on how to "develop a plan for consistent and efficient supply chain and logistics management." EQT's request for proposal, which EQT did not publicly disclose, admitted to the following shortcomings in EQT's business, which EQT executives hid from investors during the Class Period:



167.   Contrary to EQT's prior claims to investors that it had the ability to capitalize on synergies "right out of the gate," the July 2018 request for proposal described how EQT operated in a "siloed" manner, with "***little consideration given to overall efficiency***"; how its model "caused significant nonproductive time and expense" and "increase[d] the likelihood of both safety and environmental incidents"; and how EQT "***may not currently have the right skill sets internally to effectuate this undertaking***."

### H.   EQT Understates Its Actual Well Costs

168.   EQT experienced, and hid from investors, dramatically rising operating expenses. As FE 4 reported, the merger was absolutely not a good move and did not produce capital efficiencies and operational cost savings as EQT claimed it would.

169.   According to FE 4, the merger combined the two key natural-gas companies in the area into EQT—the one that had zero understanding of what its costs should be and therefore overpaid for services. Following the Acquisition, with Rice out of the equation and EQT willing to pay whatever a vendor demanded, EQT inflated all of the costs in the area. As a result, EQT

drove out service-company competition, and the companies working for EQT could charge whatever they wanted.

170.    To hide EQT's actual increasing costs, Defendants repeatedly reported understated Lease Operating Expenses and development-cost guidance that failed to include the actual increased costs that EQT experienced from its drilling failures and inefficient cost structure, which EQT began to incur by at least the first quarter of 2018.

171.    Indeed, in contrast to Rice, EQT's production costs were extremely high:

- FE 1 saw both Rice and EQT G&A (General & Administrative) budgets and both payroll budgets, and "it was mind-blowing how different the cost structure was" between the two companies. Rice's costs were approximately 35–40% of EQT's G&A and personnel costs; and

- FE 3 stated that EQT was basically taking Rice's Authorizations for Expenditure numbers ("AFEs") and drilling successes and assuming that if Rice could drill a well for $10 million, for example, EQT could automatically do it for $10 million. However, if EQT did not adopt Rice's key lessons on how to drill and complete its wells, which it did not, *it would never do it for that cost*. According to FE 3, it was common knowledge that EQT was not adopting those lessons from Rice.

172.    Indeed, there were complications in how the merger progressed mainly related to the operations, and EQT was an old company that was set in its ways and change was difficult.

173.    Specifically, EQT had a significant increase in service costs that began *at the latest in the first quarter of 2018* that were well above what EQT had budgeted or planned for, and there were discussions about how costs were on the rise. The increase in service costs caused EQT not to achieve the dollar amount of synergies it had forecasted.

174.    As newly-appointed Executive Vice President of Production Erin Centofanti admitted during EQT's *third quarter* October 25, 2018 earnings call, purported "weather events" and "midstream delays" that occurred in the "*first quarter*" disrupted the Company's schedule and caused increased capital expenditures. Centofanti also admitted, while failing to disclose that EQT had also lost several costly drilling assemblies, that "*The first 6 months of 2018* represented a

tight market for Appalachian frac crews, resulting in higher pricing" and "[t]he same phenomenon was present in our water hauling operations, where increased demand for trucks, a shortage of qualified drivers and new safety requirements for all haulers increased water hauling costs." These increased costs were present "*the first 6 months of 2018*," but EQT only disclosed them in the third quarter of 2018, at the same time EQT belatedly raised its 2018 well development capital expenditure amount by *$300 million*.

175.    According to FE 6, all of EQT's costs of drilling are tracked in EQT's WellView system. The Company personnel who sit on the rigs fill out the costs in WellView each day, and everyone at the corporate office and all employees had access to WellView. Executives received reports on the costs on a daily basis. Every rig's report was distributed to everyone on the distribution list, which included FE 6, all of the executives (including the CEO and CFO), all of the drilling-team members, all of the planning personnel, and everyone involved in the well from land to construction. The CEO and CFO were therefore aware that costs were increasing.

### 1.    EQT Omits Costs from Its Development-Cost Guidance to Investors

176.    To make it seem that EQT was achieving the claimed synergies from the Rice merger and otherwise misstate the Company's true financial condition, EQT removed certain costs from its projected development costs when it reported them to shareholders in its analyst presentations.

177.    During the Class Period, EQT reported in its analyst presentations a line item for 2018 guidance for its "development costs." This amount was typically $0.40–0.42 per Mcfe (one thousand cubic feet equivalent calculated by converting one barrel of oil or natural-gas liquids to six Mcf of natural gas). EQT based its development-cost guidance on its authorizations for expenditures ("AFEs"), which were its internal authorizations for the costs to build its wells. For example, according to the February 15, 2018 reserves audit letter from EQT's Petroleum

60

Consultants (Ryder Scott Company), filed with the SEC with EQT's 2017 Form 10-K: "Development costs furnished by EQT are based on authorizations for expenditure for the proposed work or actual costs for similar projects. The development costs furnished by EQT were accepted as factual data and reviewed by us for their reasonableness; however, we have not conducted an independent verification of the data used by EQT."

178.   EQT understated its development costs communicated to investors by omitting specific costs that exceeded an internal threshold set by David Elkin, former EQT Senior Vice President of Asset Optimization from 2017 through 2018. FE 10[25] (who held responsibilities related to EQT's budget and AFEs for the Operations group) stated that EQT "lied in the budget" and that "investor reports weren't updated to reflect what we knew." He stated that when he gave Elkin a drilling budget, Elkin came back to him and said EQT had only $400 million for drilling, and that, in order to make that work with the costs that FE 10 had, FE 10 needed to remove the costs of intermediate casing, gyroscopes, and mine-void operations.

179.   In reality, EQT's wells still included intermediate casing, gyroscopes, and mine-void operations. But, to meet the top-down, $400 million budget, EQT cut the cost of those items from its budget, its AFEs, and its reported development-cost guidance. This artificially reduced EQT's projected development costs and overstated the current state of EQT's business and its financial prospects.

180.   FE 10 further stated that "we kept not updating the investor numbers," and he was "pretty sure" he had an email where he asked if EQT should have at least updated the reported water-related numbers. FE 10 stated that he told EQT employees to "fluff," or increase their budgets for 2019, to match reality and to make up for how EQT had lowballed Wall Street the

---

[25] FE 10 was an Engineer at EQT from before the start of the Class Period to January 2019.

prior year. In the words of FE 10: "for the 2019 budget I directed everyone to fluff everything *after the cutting they did the year before*." FE 10 also described an email from Defendant Schlosser (EQT's President of the Operating Group, who reported directly to the CEO) who opposed any increase in the stated budget and threatened people's jobs if EQT "fluffed the budget." In other words, FE 10 tried to have EQT right-size their numbers, which Schlosser resisted.

181.    FE 2 also stated that EQT left items out of its AFEs to keep the AFE amounts below a certain level. For example, EQT would not consider location cost (i.e., the cost to build the well pad) as part of the AFE, but at all other companies where FE 2 had worked, the operators did. At EQT, although as much as 30% of AFE costs are made up of the cost of constructing the well pad, location costs were instead classified somewhere else, usually as civil construction. FE 2 said, "*It was a shell game*. It was just moving the shell around to say the well cost $2.2 million when it actually cost $2.9 million."

182.    FE 4 stated that, by contrast, *Rice* used to wrap up all of its pad-construction costs and road-maintenance costs into the pad cost and the actual cost of the well, and all of those costs were allocated to the well.

183.    FE 2 also stated that it was standard industry practice for an operator to perform after-action reviews of its AFEs in order to adjust upward or downward the cost of drilling its wells based on the actual results in a prior period, but that EQT never did that while he was there. At EQT, there was no supplementary reporting attached to AFEs or look-backs to determine what the well actually cost versus its projection. He said that, at EQT, "They were just spending money like it was going out of style." In other places where FE 2 had worked, if the operator had to spend more than 10% over the AFE, it would draft a supplement explaining the overspend, but that never

happened at EQT while FE 2 was there. Maddox would tell FE 2, "We're here to drill wells. We're not here counting money. I'm a driller not a banker."

2.     **EQT Capitalizes All of Its Produced-Water Costs to Reduce Its Reported Operating Expenses**

184.     In an effort to make it appear that EQT was achieving the claimed synergies from the Acquisition and misstate the true financial condition of the Company, EQT capitalized rather than expensed the cost of treatment and disposing of all its produced water.

185.     As discussed above, produced water is the water that comes back out of the well along with the natural gas. The treatment and disposal of produced water is a material cost for well development and operations. The produced water is contaminated both by the chemicals the drilling company used to hydraulically fracture the shale and by the chemical properties of the formation underground. This produced water is expensive for the operator to treat and dispose of.

186.     Disposed produced water should not be capitalized as an asset. The Financial Accounting Standards Board ("FASB"), which sets the standards for Generally Accepted Accounting Principles ("GAAP"), states that assets deliver a probable future economic benefit as a result of past transactions or events.[26] In a business enterprise, the future economic benefit eventually results in net cash inflows to the enterprise.[27] On the other hand, expenses are outflows or other "using up" of assets, such as cash, from delivering or producing goods or rendering services.[28] Expenses represent actual or expected cash outflows that have occurred or will eventuate as a result of ongoing major or central operations.[29]

---

[26] FASB Statement of Concepts ("FASCON") No. 6, *Elements of Financial Statements*, ¶ 25.

[27] *Id.* at ¶ 28.

[28] *Id.* at ¶ 80.

[29] *Id.* at ¶ 81.

187.    On April 25, 2019, EQT filed a first-quarter 2019 earnings update entitled "EQT Corporation: New Company, New Leadership, New Focus" that drew a distinction between "Produced water, recycled" (which EQT claimed it capitalized) and "Produced water, disposed" (which EQT claimed it expensed as "LOE" or "Lease Operating Expenses"):

| Where is the cost? | Metric |
|---|---|
| Fresh water - capitalized | $/ft. |
| Produced water, recycled – capitalized | $/ft. |
| Produced water, disposed – expensed | LOE |

As EQT acknowledged, disposed produced water will not be reused and should accordingly be expensed. But, EQT improperly capitalized all produced water.

188.    According to FE 4, *Rice* used to handle the accounting for its water use such that any water that went into the frac was considered a capital expenditure, and ***any water that came out of the well was treated as a Lease Operating Expense***, or the cost incurred by an operator to keep production flowing after the initial costs of drilling and completing a well are incurred.

189.    FASB Accounting Standards Codification ("ASC") 932, *Extractive Activities – Oil and Gas*, describes "production" as lifting the crude oil and natural gas to the surface, extracting saleable hydrocarbons, in the solid, liquid, or gaseous state from oil sands, shale, coalbeds, or other nonrenewable natural resources that are intended to be upgraded into synthetic oil or gas, gathering, treating field processing, and field storage.[30] Production costs therefore include the cost for treating and disposing of produced water. Production costs are to be expensed and not

---

[30] ASC 932-10-20.

capitalized. ASC 932 specifically states that production costs, amongst other costs, should be ***deducted from*** revenues (i.e., recorded as an expense) to determine the results of operations.[31]

190.    In addition, according to the Internal Revenue Service's Oil and Gas Handbook, salt water disposal costs (i.e., the costs of disposing of produced water) are "Lease Operating Expenses," and not Capital Expenditures. Accordingly, for tax purposes, the costs of disposed produced water should be expensed and not capitalized. However, since at least the second quarter of 2018, to reduce the Company's stated operating expenses, EQT capitalized the costs of ***all*** of its produced water.

191.    FE 10 stated that, at EQT, "we were told there would be no cost increases on completions services," and the water department told him that the cost of water was approximately $2–$3 per barrel, but the actual amount came in at around $6–$12 per barrel, which was "the real overspend."[32] As a result, EQT decided to ***capitalize ALL produced water*** because EQT would otherwise "blow their opex [operating expense] budget." As a result, EQT decided to "put it in capital." FE 10 has "been ***worried*** about this since Q2 of 2018."

192.    Not surprisingly, during EQT's July 26, 2018 earnings conference call, an analyst pressed Schlosser on the fact that EQT reported Lease Operating Expenses that were ***lower*** than the analyst had expected. In response, Schlosser hid from investors that he himself had asked EQT employees to artificially deflate EQT's operating expenses:

> **Analyst**: ***LOE seemed to come in a good bit during the second quarter. Anything to highlight there?***

---

[31] ASC 932-235-50-26.

[32] In a typical well, an operator will use approximately 1,200–1,500 gallons of water per lateral foot, and there are 42 gallons of water per barrel. As a result, a 12,000-foot lateral well will typically use approximately 342,860 to 428,570 barrels of water. An average $7 difference between EQT's reported water cost per barrel versus its actual cost per barrel would thus amount to an approximately $2.4 million to $3 million understatement of capital expenses for a single well.

| Schlosser: | What—I mean—come in **lower than you expected**? Is that what you're saying? |
|---|---|
| **Analyst**: | Yes. |
| **Schlosser**: | ***Nothing to say other than the first quarter, maybe was a little on the high side because of weather*** and in the second quarter, it didn't have those kind of impacts. |

193.    Schlosser's statements quoted in ¶ 192 were materially false and misleading because he claimed that there was "[n]othing to say" about why Lease Operating Expenses were lower than the analyst expected, attributed the unexpectedly low reported operating expenses to purported "weather" impacts that were present in the ***first quarter*** and not the second, and failed to disclose to investors that he had instructed EQT employees to understate EQT's operating expenses.

194.    According to FE 11,[33] the $300 million development capital expenditures increase that EQT disclosed on October 25, 2018 resulted from EQT's Water group, which had not captured its costs correctly; and the negative financial results announced in October 2018 were ***tied to the accounting error***.

195.    Jade Morel, Brian Morel's wife, was Director of Water Operations at EQT from January 2016 through April 2018, and EQT laid off Jade and Brian Morel in fall 2019.

## I.    Defendants' Materially False and Misleading Statements and Omissions

### 1.    False and Misleading Statements and Omissions Before the Rice Acquisition

196.    On June 19, 2017, EQT issued a press release, which it also filed as an exhibit to a Form 8-K that day. The June 19, 2017 press release stated:

> This transaction brings together two of the top Marcellus and Utica producers to form a natural gas operating position that will be unmatched in the industry. ***Rice***

---

[33] FE 11 was a Senior Drilling Engineer and Drilling Superintendent at EQT from before the start of the Class Period to September 2019.

*has built an outstanding company with an acreage footprint that is largely contiguous to our existing acreage, which will provide substantial synergies and make this transaction significantly accretive in the first year, said Steve Schlotterbeck, EQT's president and chief executive officer.*

Since the beginning of 2016, we have added more than 485,000 acres to our development portfolio and have achieved significant scale in the core of the Marcellus. *We will now shift our focus from acquisitions to integration as we work to drive higher capital efficiency through longer laterals; reduce per unit operating costs through operational and G&A synergies*; improve our sales portfolio by expanding access to premium markets; *and deliver increased value to our shareholders, continued Schlotterbeck.*

Daniel J. Rice IV, chief executive officer, Rice Energy, stated, Natural gas is the key to a cleaner energy world; and the combination of Rice and EQT—two of the United States' largest, lowest-cost, and most responsible natural gas producers—creates an unparalleled leader in shale gas development that will benefit the environment and our shareholders for many decades to come.

*As the vast majority of the acquired acreage is contiguous with EQT's existing acreage position, EQT anticipates a 50% increase in average lateral lengths for future wells located in Greene and Washington Counties in Pennsylvania.*

197.    The June 19, 2017 press release also stated that "***EQT continues to be a leader in the use of advanced horizontal drilling technology*** – designed to minimize the potential impact of drilling-related activities and reduce the overall environmental footprint."

198.    The quoted statements in ¶¶ 196-97 from EQT's June 19, 2017 press release were materially false and misleading because (i) EQT had experienced numerous undisclosed well collapses when it attempted to drill ultra-long lateral wells; (ii) EQT lacked the expertise to drill ultra-long lateral wells and repeatedly refused to follow industry best practices on how to do so; and (iii) EQT operated in a "siloed" fashion, with "little consideration given to overall efficiency," EQT's model "increase[d] the likelihood of both safety and environmental incidents," and EQT lacked "the right skill sets internally to effectuate th[e] undertaking" of drilling "long laterals on multi-well pads."

199.    EQT and the Officer Defendants knew or recklessly disregarded that these statements were false and misleading when the statements were made. In particular, and in addition to the foregoing allegations, (i) the Officer Defendants received daily tracking reports on EQT's drilling costs and therefore knew or recklessly disregarded that EQT had had significant difficulties in efficiently drilling longer laterals by spring 2017; and (ii) EQT and the Officer Defendants knew or recklessly disregarded warnings from their own employees that drilling longer laterals would involve a steep learning curve that would require EQT to significantly modify its own methods.

200.    Also on June 19, 2017, EQT held an investor conference call during which EQT executives discussed an EQT investor presentation about the proposed merger, which EQT made available on the Company's website and filed publicly with the SEC as an exhibit to its Form 8-K that day. The investor presentation stated that the "Transaction Rationale" for EQT's Acquisition of Rice was "Significant contiguous acreage **and resulting synergies**." The presentation also included a map that depicted the two companies' natural-gas fields as lacking any significant parcels between the fields that belonged to third parties and that would thus need to be acquired or leased, and the presentation claimed that EQT would experience "Overall PV [Present Value] synergies [of] $2.5 B":



201.    EQT's acreage map in the above slide was materially false and misleading because it depicted the two companies' natural-gas fields as lacking any significant parcels between the fields that belonged to third parties and that would thus need to be acquired or leased.

202.    EQT's June 19, 2017 presentation incorporated by reference in the Registration Statement also stated that *the "Synergy Potential" and "Present value of economic savings pro forma for [the] Rice acquisition" included $1.9 billion of "capital efficiencies" and $0.6 billion of general-and-administrative expense savings, for $2.5 billion of "total synergies."* The presentation further stated that *EQT would "[b]egin to realize capital, operational and administrative efficiencies" in 2018 and would "[f]ully realize synergies" in 2019*.

203.    In addition, statements quoted in ¶¶ 200 and 202 that EQT would experience "Overall PV [Present Value] synergies [of] $2.5 B" and would achieve the synergies starting in 2018 and fully in 2019 were materially false and misleading because (i) the claimed synergies were based on the impossible-to-achieve assumption that a combined EQT and Rice entity could reduce the number of well pads from 199 to 99; (ii) EQT had experienced numerous undisclosed well collapses when it attempted to drill ultra-long lateral wells; (iii) EQT lacked the expertise to drill ultra-long lateral wells and repeatedly refused to follow industry best practices on how to do so; (iv) EQT operated in a "siloed" fashion, with "little consideration given to overall efficiency," EQT's model "increase[d] the likelihood of both safety and environmental incidents," and EQT lacked "the right skill sets internally to effectuate th[e] undertaking" of drilling "long laterals on multi-well pads"; and (v) EQT understated its actual well costs.

204.    EQT and the Officer Defendants knew or recklessly disregarded that these statements were false and misleading when the statements were made. In particular, and in addition to the foregoing allegations, (i) the Officer Defendants received daily tracking reports on EQT's

drilling costs showing that EQT had had significant difficulties in efficiently drilling longer laterals by spring 2017; and (ii) EQT and the Officer Defendants received warnings from their own employees that drilling longer laterals would involve a steep learning curve that would require EQT to significantly modify its own methods.

205. EQT's June 19, 2017 presentation also stated that there would be "Consolidation Benefits" from the Acquisition because "***Rice's PA Marcellus position is contiguous with EQT's SW PA acreage***":



206. EQT's June 19, 2017 presentation also stated that by enabling the combined companies to drill 12 wells per pad with a 12,000-foot average lateral length, the Acquisition would provide "dramatically increasing returns":

207.   The statements quoted in ¶¶ 205-206 about EQT's ability to drill 1,200 wells averaging 12,000 lateral feet and the resulting claimed financial benefits were materially false and misleading because, as explained in detail in ¶¶ 77-84, it was impossible to drill that many wells or that average lateral length, and these claims were overstated by approximately 100% in terms of both number of wells and lateral length, based on the then-existing facts about EQT and Rice acreage's geography and the prior drilling on that acreage. EQT's statements quoted in ¶ 205 about "Sharing of technical data and best practices" and "Additional infrastructure and optimization benefits" from "rig allocation, pad sites, water, access roads, etc." were materially false and misleading because EQT had no intention of adopting Rice's superior practices for drilling, completing, and operating wells and repeatedly rejected recommendations from its own employees and Rice.

208.   During EQT's June 19, 2017 conference call with investors, Defendant Schlotterbeck also touted the claimed cost savings and synergies that would result from merging EQT's and Rice's natural-gas fields and operations:

> ***There are tremendous operating and capital synergies, which are estimated to have a present value of $2.5 billion. In the first full year, we estimate operational savings of $100 million***, and model cash flow per share accretion in excess of 20 percent, increasing to 30 percent in year two.

> The transaction meets our consolidation targets, and we will ***immediately*** move to integrating our acquired assets, ***realizing higher returns through longer laterals***.

> Moving to slide seven and some of the consolidation benefits, ***this transaction is driven by our strategy to significantly improve returns on invested capital and capture capital and operational synergies, driven by a 50 percent increase in lateral length in Greene and Washington Counties. By extending laterals from 8,000 to 12,000 feet, the well returns will increase from 50 percent to 70 percent at a $3.00 NYMEX gas price***.

> We also will capture operational efficiencies through ***sharing of technical data and best practices, rig allocation, pad sites, water, access roads***, et cetera.

***

Now on slide eight, as I already discussed, the fit of the two companies' assets provide[s] tremendous synergies, estimated at *$2.5 billion*.

Then moving to slide nine, as we've discussed in the past, longer laterals drive returns. Assuming a $3.00 NYMEX, or $2.50 local price, the returns improve from 52 percent to 70 percent in Pennsylvania. And put another way, the PV-10 per well improves from $5.3 million to $9 million, a dramatic 70 percent increase in present value.

209.    Schlotterbeck's statements quoted in ¶ 208 concerning EQT's claimed $2.5 billion in synergies, EQT's ability to achieve operational savings in the first year of $100 million, EQT's ability to realize higher returns through longer laterals, and EQT's ability to increase its average lateral length to 12,000 feet in Washington and Greene Counties were materially false and misleading for the reasons explained in ¶¶ 203 and 207 above. In addition, Schlotterbeck's statements quoted in ¶ 208 concerning EQT's claimed ability to "immediately" realize "higher returns through longer laterals" following the merger were materially false and misleading because EQT lacked the permits and expertise necessary to "immediately" drill longer laterals on combined EQT and Rice acreage. Further, Schlotterbeck's statement that EQT "will capture operational efficiencies through sharing of technical data and best practices, rig allocation, pad sites, water, access roads" was materially false and misleading because EQT had no intention of adopting industry best practices to drill longer lateral wells, and repeatedly rejected advice from its own employees, and Rice employees and executives.

210.    EQT and the Officer Defendants knew or recklessly disregarded that these statements were false and misleading when the statements were made. In particular, and in addition to the foregoing allegations, (i) the Officer Defendants received daily tracking reports on EQT's drilling costs showing that EQT had had significant difficulties in efficiently drilling longer laterals; and (ii) EQT and the Officer Defendants received warnings from their own employees

that drilling longer laterals would involve a steep learning curve that would require EQT to significantly modify its own methods.

211.     In response to an analyst's question during the June 19, 2017 investor call about why EQT's presentation was showing different returns based on different pad sizes, including 12,000-foot laterals with 12-well pads, Defendant Schlotterbeck said:

> [W]hen you put this acreage together, **not only can you drill longer laterals but you can drill larger pads**. So—and that's what we've been doing.
>
> And both of those—it doesn't really say this is our history on here, but when we developed it, it was really—the 5,500 foot laterals and five well pads is where we were a few years ago. And then last year we were averaging six well pads and 6,000 foot—feet. And then after some of the recent consolidation, we were at eight wells and 8,000 feet. And **now, with the Rice transaction, we expect to be able to average the 12 well pads and 12,000 feet in the Greene and Washington area**.
>
> So, that's kind of why those numbers were chosen. But they do—they go hand in hand, that as you consolidate, you get the benefit of both more wells per pad and longer laterals.

212.     Schlotterbeck's statements quoted in ¶ 211 concerning EQT's purported ability to achieve the claimed synergies based on 12-well pads and an average of 12,000-foot laterals were materially false and misleading when made, because EQT lacked the capability to drill 12-well pads and an average of 12,000-foot laterals in a cost-effective manner, including for the reasons alleged in ¶¶ 203 and 207 above.

213.     Defendant Schlotterbeck knew or recklessly disregarded that these statements were false and misleading when the statements were made for the reasons identified *supra* in ¶ 210.

### 2.     Filing of the Registration Statement and Joint Proxy Seeking Approval of the Merger

214.     In connection with the Acquisition, Defendants filed the Registration Statement, Prospectus and Proxy with the SEC on July 27, 2017. EQT amended the Registration Statement

on September 8, 2017, and September 29, 2017, and the SEC declared it effective on October 12, 2017.

215.    The Registration Statement, which described the Acquisition, stated that both EQT's and Rice's boards of directors had approved the Acquisition and recommended to the shareholders of the respective companies that they approve the Acquisition at special shareholder meetings.

216.    The Registration Statement included materially false and misleading statements about the Acquisition, including the following:

> As part of its upstream consolidation strategy, EQT closely monitors and evaluates the activities of other industry participants in the southwestern Appalachian Basin, including strategic transactions undertaken by such participants. In this regard, EQT has noted an accelerating trend of industry-wide consolidation in the Appalachian Basin, including the acquisition by Vantage Energy ("Vantage") in May 2016 of certain Marcellus and Utica assets of Alpha Natural Resources for $339.5 million (the "Alpha Acquisition") and Rice's acquisition of Vantage announced in September 2016 for $2.7 billion (the "Vantage Acquisition"). Prior to the transactions, EQT had viewed Vantage, Rice and Alpha's Marcellus and Utica assets as key potential acquisition targets.

> Following the Alpha Acquisition and the Vantage Acquisition, EQT's view was that the number of remaining consolidation opportunities in EQT's core areas had narrowed considerably, with *Rice having materially expanded its footprint in EQT's core operating area, thereby becoming a uniquely attractive and complementary potential business combination for EQT. Among other potential synergies, EQT noted the opportunity such a combination could create for a significant increase in the average lateral lengths of future Marcellus wells, more efficient development given the companies' significant contiguity, and a variety of cost savings in both the upstream and midstream businesses.*

> EQT also reached the conclusion that, in light of the scarcity of remaining potential consolidation opportunities and *the unique synergy opportunities presented by a potential combination with Rice*, a combination of Rice with a third party would materially limit the remaining scope of strategic consolidation opportunities available for EQT to pursue in its core areas, which in turn could cause EQT's cost structure to become less competitive relative to other industry participants with more consolidated positions.

217.    The Registration Statement also stated that "[m]embers of the EQT board and management noted [at a meeting on April 19, 2017] that Rice represented a uniquely compelling acquisition opportunity given *the synergies that would likely result from the contiguous and complementary nature of Rice's asset base with EQT's*."

218.    The Registration Statement also stated that "Barclays [Rice's financial advisor in the Acquisition] advised [the Rice Board] that, in [Barclays'] judgment, it was unlikely that any counterparty could make a proposal that would be superior to EQT's proposal in light of *the uniquely attractive synergies and industrial logic inherent in a combination with EQT, which made the EQT shares a highly attractive acquisition currency*."

219.    The Registration Statement claimed that:

- . . . As a result of the merger and the operational synergies described in more detail below, EQT's inventory in Washington and Greene Counties, Pennsylvania, two of the highest productivity counties in the Appalachian Basin, will improve in both scale and profitability—*increasing from approximately 775 undeveloped locations with an average of 8,000' lateral to approximately 1,200 undeveloped drilling locations with an average of 12,000' lateral*. EQT expects to focus its development efforts substantially in these locations in the near term to differentiate the combined company from its Appalachian peers, with returns per well anticipated to increase from 52% to 70% at a $3.00/Mcf NYMEX natural gas price.

- *The combined company will represent one of the lowest cost, highest margin operators in the United States*, with an anticipated investment grade credit rating, allowing for continued industry-leading value creation even in a lower-for-longer commodity price environment.

- As a result, through the consummation of the merger, EQT expects to position itself as one of the few, if not the only, large-cap, investment grade independent exploration and production companies capable of significant near and long-term production growth from its existing asset base. *EQT anticipates this production growth will be achieved with significantly improved profitability given the capital, operational and administrative efficiencies expected in connection with the merger, including the ability for the combined company to achieve the same pro-forma feet-of-pay developed with 20% fewer Pennsylvania wells in 2018 and 35% fewer Pennsylvania wells in 2019 than would have been the case for EQT on a standalone basis. Given the flexibility created by becoming the lowest-cost*

75

*natural gas operator, EQT expects to have the ability to return value to shareholders across commodity cycles, and is targeting cash flow breakeven for the combined company in 2019 with a plan to provide meaningful cash returns to shareholders in 2020 and beyond.*

220.   The Registration Statement also stated:

*Significant Synergies.* In addition to the strategic rationale and the ability to participate in unlocking value embedded within Rice, EQT expects that its shareholders will derive a substantial benefit from the significant synergies attributable to the transaction. The EQT board believes that the merger will create capital efficiencies and operational cost savings and synergies through conducting EQT's and Rice's operations as part of a combined enterprise, including synergies resulting from:

- the opportunity to optimize the combined company's upstream and midstream standalone portfolios by *applying each company's best practices across the contiguous and complimentary [sic] acreage positions*;

- *the opportunity for a significant increase in the average lateral lengths of future Marcellus wells, reducing well costs on a per horizontal foot basis and increasing the present value of development*;

- *the expectation of meaningfully reduced lease operating expense per unit through more efficient development, including an increase in wells per pad, an increase in company net horizontal feet through coordinated development plan eliminating drainage effects, a reduction in rig and frac fleet move times, coordinated produced water handling and improved cycle times through concentrated execution;*

- *overhead savings through elimination of duplicative corporate and public company costs;*

- *leveraging of the respective best practices, data and technological capabilities of each of Rice and EQT, including potential for improved well design to achieve greater returns on the combined acreage position; [and]*

- *an increase in the amount and percentage of organic leasing opportunities that can be valued as leases that expand the potential lateral length of planned development . . . .*

*As a result of the synergies detailed above, EQT expects that the transaction will be significantly accretive to EQT shareholders in the first year following closing.*

221.    The Registration Statement also touted the purported "Benefits of a Combination with EQT":

The Rice board determined that the merger with EQT provided the best alternative for maximizing stockholder value. In coming to this determination, the Rice board analyzed a number of factors, including the following:

- ***The combined operational positions would allow for significant operational synergies given the contiguous nature of the companies' acreage positions in Washington and Greene Counties, Pennsylvania***, which Rice believes are the two most economic counties in the Southwestern Pennsylvania dry gas core of the Marcellus Shale. These operational synergies would be geographically unique to a combination with EQT versus any of the other operators in the region and are expected to include:

- ***The substantial contiguity in the acreage footprints should allow for a significant increase in the average lateral lengths of future Marcellus wells of the combined company, thereby significantly reducing well costs on a per horizontal foot basis and increasing the present value of development***;

- ***In addition, the proximity of operations will allow for more efficient development—including an increase in wells per pad, an increase in company net horizontal feet through coordinated development plan eliminating drainage effects, a reduction in rig and frac fleet move times, coordinated produced water handling and improved cycle times through concentrated execution—which is expected to meaningfully reduce lease operating expenses***;

***

- ***The combination allows for the combined company to leverage within its existing operating areas best practices and technological advances of each of Rice and EQT, including potential for improved well design to achieve greater returns on the combined acreage position; [and]***

- ***The combination increases the amount and percentage of organic leasing opportunities that can be valued as leases that expand the potential lateral length of planned development***. . . .

The combined company would represent an unique investment opportunity both within the Appalachian Basin and in the industry at large.

- The combined company would be a premier North American natural gas company with ***best-in-class acreage positions in the Marcellus*** and Utica

Shales.

***

• The combined company would have high quality, natural gas weighted assets totaling an estimated 75 trillion cubic feet equivalents (Tcfe) in resource potential and **over 727,000 combined net acres in the core of the Marcellus** and Utica Shales; [and]

• **The combined company would be one of the lowest cost, highest margin operators in the country, allowing for continued industry leading value creation even in a lower-for-longer environment**. . . .

222. The Registration Statement also quantified the purported synergies from the

Acquisition by year:

EQT management provided to the EQT board, Rice and Rice's financial advisor certain estimates of the amounts and timing of the cost savings and operational synergies anticipated by EQT management to result from the merger during the calendar year ending December 31, 2018 through the calendar year ending December 31, 2026, which consisted of EQT prepared estimates of annual cost synergies of $100 million (which amount EQT management rounded from, and which amount was not duplicative of, the $93 million of annual corporate general and administrative benefits reflected in the Expected Development and Cost Savings described below) expected to be realized following the closing in 2018 and beyond (such estimated annual cost savings, the "Expected Synergies"). The Expected Synergies also were provided to Citi for its use and reliance in connection with its opinion and related financial analyses described in the section entitled "— Opinion of EQT's Financial Advisor."

EQT management provided to the EQT board certain estimates of the potential strategic implications and financial and operational benefits which EQT management anticipated to result from the mergers during the calendar year ending December 31, 2018 through the calendar year ending December 31, 2026 (collectively, the "Expected Development and Cost Savings"). The Expected Development and Cost Savings also were provided to Citi for its use and reliance in connection with its opinion and related financial analyses. **The Expected Development and Cost Savings included assumptions of (i) development synergies of approximately $333 million in 2018, $448 million in 2019, $283 million in 2020, $244 million in 2021, $379 million in 2022, $371 million in 2023, $406 million in 2024, $33 million in 2025 and $0 in 2026 and (ii) corporate general and administrative benefits per year in 2018–2026 of approximately $93 million.** The assumptions described in the preceding sentence reflected no potential midstream benefits and no benefits attributable to upside potential identified by EQT management that could potentially be achieved from drilling and completion best practices, buying power, marketing optimization, upstream lifting and

78

operating expense optimization, lengthening West Virginia laterals, perpetuity general and administrative savings or accelerated expansion of the Mountain Valley Pipeline.

223.    The statements quoted in ¶¶ 216-22 above, including EQT's claims that it would increase its number of wells "from approximately 775 undeveloped locations with an average of 8,000' lateral to approximately 1,200 undeveloped drilling locations with an average of 12,000' lateral" were materially false and misleading because:

- there is simply not enough combined previously undrilled EQT and Rice acreage to drill 1,200 wells with an average lateral length of 12,000 feet; rather, Plaintiffs' detailed analysis of the exact boundaries of EQT's and Rice's Marcellus acreage and of prior drilling in those areas demonstrates that only *519 wells* with lateral lengths ranging from 6,064 feet to 16,000 feet, an average lateral length of 11,465 feet, and a total lateral length of 5,950,335 feet were feasible, as alleged in detail in ¶¶ 77-84;

- EQT based its claim of $2.5 billion of synergies on reducing the number of well pads from 199 to 99, which was not possible because Rice had already optimized its well-pad locations, making cutting the number of pads in half impossible, as alleged in detail in ¶¶ 86-93;

- when EQT had tried to drill the ultra-long laterals required to boost EQT's average lateral length to 12,000 feet, a significant number of the wells collapsed, as alleged in detail in ¶¶ 96-99;

- EQT did not follow and did not intend to adopt the operational best practices necessary to drill extra-long laterals, as alleged in detail in ¶¶ 108-20;

- EQT's bloated cost structure prevented it from reducing its lease operating expense per unit, as alleged in detail in ¶¶ 176-83; and

- EQT materially understated its lease operating costs by improperly capitalizing operating water costs that should have been expensed under GAAP, as alleged in detail in ¶¶ 184-94.

224.    EQT and the Officer Defendants knew or recklessly disregarded that these statements were false and misleading when the statements were made. In particular, and in addition to the foregoing allegations, (i) the Officer Defendants received daily tracking reports on EQT's drilling costs showing that EQT had had significant difficulties in efficiently drilling longer laterals

by at least summer 2017; (ii) when EQT drilling-team employees tried to persuade EQT to address the challenges in drilling these wells and to adopt best practices, management, including Defendant Schlosser, who led the drilling strategy, ignored the employees; (iii) Defendant Schlotterbeck admitted that the maps purporting to show the combined acreage were over-simplified or "cartoonish"; (iv) Defendants knew or recklessly disregarded that drilling 1,200 wells with an average lateral length of 12,000 feet was not feasible, based on the then-known geography and drilling history of the combined acreage; (v) Rice employees with access to the financial model that EQT used to estimate synergies during the acquisition process told EQT employees that EQT's model made impossible assumptions about costs and well pads; and (vi) Defendant Schlotterbeck chose an impossible-to-achieve reduction in total well-pad locations that resulted in significantly underestimating EQT's development expense.

### 3. JANA's Criticisms of the Acquisition, EQT's False Denials, and the Closing of the Acquisition

225.   On July 5, 2017, JANA, which owned approximately 6% of EQT's stock, sent a letter to EQT's board opposing the Acquisition and publicly filed the letter with the SEC. Among other things, JANA wrote that "EQT's calculation of the $2.5 billion of synergies created by the transaction appears highly questionable, and we estimate that the actual synergies could fall short by $1.3 billion, or over 50%."

226.   EQT denied JANA's assertions about the Acquisition. For example, on July 27, 2017, EQT gave an analyst presentation, which EQT filed publicly with the SEC, in which it reiterated its statement that the Acquisition would generate $2.5 billion of synergies, republished the map showing purportedly contiguous EQT and Rice properties that it had issued on June 19, 2017, as discussed in ¶ 75, and stated that "Capital Efficiencies" would be achieved because

"[c]ontiguous acreage leads to: [l]onger laterals [and] [f]ewer wells" and because of "[l]ower

surface costs."

227.    On EQT's July 27, 2017 conference call with investors, Defendant Schlosser, then

EQT's Senior Vice President and President of Exploration & Production, claimed that "given our

contiguous acreage position of the pending Rice transaction, ***we expect Marcellus wells in Greene***

***and Washington counties to average at least 12,000 feet***."

228.    Also during EQT's July 27, 2017 conference call with investors, Defendant

Schlotterbeck claimed:

> The second most common question has been around synergies. We are confident
> that the PV [Present Value] of the synergies are ***in excess of the $2.5 billion*** laid
> out in the deal announcement. As you will see in our updated slide deck, . . . the
> $2.5 billion only covers categories of synergies, ***$1.9 billion of which are***
> ***efficiencies driven by longer laterals, high-grading the drilling program to drill***
> ***longer laterals first and lower surface costs, including fewer roads, pads, water***
> ***pits and well lines. Those savings are in our control***, and we are forecasting $200
> million in 2018 and $350 million per year for the following 9 years. The other $600
> million is from a reduction of a $100 million of G&A per year discounted for 10
> years. Given the overlap of the businesses and after careful evaluation, ***we believe***
> ***that $2.5 billion is a conservative estimate and are confident in our ability to***
> ***achieve these targets***.
>
> In addition to the quantified synergies, there are significant synergies that are harder
> to quantify. We listed them in our presentation this morning, along with ranges of
> potential value. If you took the high end of the ranges of each category, the
> additional synergies are well in excess of the $2.5 billion that we've already
> quantified. A few examples are: ***increasing well recoveries by combining EQT and***
> ***Rice's best drilling and completion techniques is worth $500 million for every 1%***
> ***increase in EUR [estimated ultimate recovery] per foot***; increased leverage in
> acquiring drilling and fracking services is worth $300 million for every 1%
> improvement in service cost; and G&A savings beyond 10 years is worth
> approximately $500 million.

229.    Also on July 27, 2017, EQT filed with the SEC an analyst presentation, which

included the materially false and misleading acreage map referred to in ¶ 75, and also made the

following statements: "2018 expense synergies $100 MM," "Upstream synergies at least $2.5 B

PV," and "significant upside to synergies." EQT claimed that the "Upstream Benefits" of the

merger included (i) "Significantly improved well returns in Greene & Washington Counties,"
which included an increase in undeveloped locations from "Before transaction: 775 undeveloped
locations with an average of 8,000' lateral" to "After transaction: 1,200 undeveloped locations
with an average of 12,000' lateral"; (ii) "Sharing of technical data and best practices"; and (iii)
"Additional infrastructure and optimization benefits—rig allocation, pad sites, water, access roads,
etc."

230.    EQT's July 27, 2017 analyst presentation also included the slide below on the
"Synergy Potential" of the EQT-Rice merger, which claimed "Base Synergies" of $2.5 billion:



231.    EQT's July 27, 2017 analyst presentation also included the slide below on the
"Upside Synergy Potential" of the EQT-Rice merger, which claimed that the synergy from
"Drilling and completion best practices" was valued at $2.5 billion and that the total synergies
were valued at $7.5 billion:

**Upside Synergy Potential**

| Synergy | Metric | Up to PV ($B)* |
|---|---|---|
| Drilling and completion best practices | EUR improvements of 0 – 5% | $2.5 |
| Buying power | 0 – 5% reduction in capital | $1.4 |
| Marketing optimization | $0.00 - $0.05 / Mcfe improvement in realized price | $1.4 |
| Upstream LOE optimization | $0.00 - $0.03 / Mcfe | $0.8 |
| Lengthen WV laterals | Lengthen inventory by up to 2,000' per well | $0.7 |
| Perpetuity G&A savings | Value realized post-2027 | $0.5 |
| MVP expansion | Accelerated by up to 3 years | $0.2 |
| | **Total** | **$7.5** |
| | | |
| **Other Potential Synergies (unquantified)** | | |
| IDR uplift | EQM growth path extended | |
| Midstream optimization | More efficient capital deployed | |

*Discounted at estimated WACC of 8.4%

14

232.    The statements made by Defendants EQT, Schlosser and Schlotterbeck in ¶¶ 226-31 above concerning EQT's claimed $2.5–$7.5 billion in synergies were materially false and misleading for the reasons explained in ¶ 223 above. In addition, EQT's claim that EQT would increase the number of its undeveloped locations to "1,200 undeveloped locations with an average of 12,000' lateral" was materially false and misleading because, for the reasons explained in ¶ 223 above, it was impossible for EQT to drill 1,200 wells at an average length of 12,000 feet. Further, EQT's claims that it would achieve additional synergies from "increasing well recoveries by combining EQT and Rice's best drilling and completion techniques" or would otherwise adopt Rice's "best practices" were materially false and misleading because EQT repeatedly refused to adopt industry best practices to drill longer lateral wells, including advice from its own employees, and Rice employees and executives.

233.    EQT and the Officer Defendants knew or recklessly disregarded that these statements were false and misleading when the statements were made. In particular, and in addition to the foregoing allegations, (i) the Officer Defendants received daily tracking reports on EQT's

drilling costs showing that EQT had had significant difficulties in efficiently drilling longer laterals during spring and summer 2017; (ii) when EQT drilling team employees tried to persuade EQT to address the challenges in drilling these wells and to adopt best practices, management, including Defendant Schlosser, who led the drilling strategy, ignored the employees; (iii) Defendant Schlotterbeck admitted that the maps purporting to show the combined acreage were over-simplified, or "cartoonish"; (iv) Defendants knew or recklessly disregarded that drilling 1,200 wells with an average lateral length of 12,000 feet was not feasible, based on the then-known geography and drilling history of the combined acreage; (v) Rice employees with access to the financial model that EQT used to estimate synergies during the acquisition process told EQT employees that EQT's model made impossible assumptions about costs and well pads; and (vi) Defendant Schlotterbeck chose an impossible-to-achieve reduction in total well-pad locations that resulted in significantly underestimating EQT's overall development expense.

234.    On July 31, 2017, JANA sent another letter to EQT's board opposing the Acquisition and filed the letter publicly with the SEC. Among other things, JANA wrote: "[T]he only actual synergy that would be generated by a Rice acquisition comes from longer lateral lengths that are facilitated by the transaction. Looking at the abutting acreage, we believe such acreage would only facilitate a ***fraction of the increase*** in lateral well length (and thus a fraction of the savings from the reduction in total wells drilled) cited to justify this transaction."

235.    On September 11, 2017, JANA filed preliminary proxy materials with the SEC opposing the Acquisition. Among other things, JANA's proxy materials stated that whereas EQT had stated that the Acquisition would produce $2.5 billion of synergies, "we estimate that the actual synergies could fall short by at least $1.3 billion . . . ."

236.     On September 20, 2017, JANA sent another letter to EQT's board and publicly

filed the letter with the SEC. JANA provided further details about why it believed EQT's claimed

synergies from the Acquisition were overstated:

> With the help of a leading petroleum engineering firm with extensive experience in
> the Appalachian basin and experienced industry operators, we have identified and
> mapped out every existing and potential future well location on the combined
> company's acreage based upon publicly-available data, assuming 750 foot spacing
> in Washington County and, even more generously, 500 foot spacing in Greene
> County. Based on this work, we believe it would be impossible for EQT to support
> its claimed synergy drilling plan of 1,200 wells with 12,000 feet in average lateral
> length. While the over-simplified maps provided in EQT's presentations make the
> synergy claims seem plausible, a detailed analysis reveals that much of the acreage
> actually consists of hundreds of disjointed blocks that are not properly depicted in
> management's map. Moreover, many of the larger blocks of adjacent acres (that in
> theory would enable longer laterals) have already been drilled out at least on one
> side. There is simply not enough undrilled contiguous acreage blocks to enable such
> a dramatic improvement in lateral length over what can be accomplished by each
> company on a standalone basis.

> Based on our analysis, we believe a combination with Rice would only modestly
> increase average lateral lengths by less than 1,000 feet, not the 4,000 feet increase
> claimed by EQT. This modest increase in lateral length would result in
> approximately $300 million in pre-tax capital savings on a net present value basis,
> not the $1.9 billion EQT has claimed.

237.     On October 16, 2017, EQT responded to JANA's criticisms in a press release that

EQT filed publicly with the SEC:

> JANA has suggested that EQT's presentation of the combined Rice-EQT acreage
> map is misleading, and that the existence of non-contiguous acreage contained
> within the pro-forma footprint of the combined Company implies that stated
> operational synergies from the transaction are not achievable. ***This is emphatically
> not the case***.

> EQT has been operating in the Appalachian Basin for nearly 130 years, has drilled
> more than 2,500 horizontal wells, and has drilled the longest lateral in the Marcellus
> (to-date) at 17,400 feet. It is standard industry practice to manage any non-
> contiguous acreage requirements through well path adjustments, smaller bolt-on
> acquisitions, and tactical fill-ins, all of which are part of our current development
> plan at an estimated cost of up to $200 million annually. In addition, there are often
> small-scale acreage trades between operators that are used to fill in gaps. Each of
> these methods are routinely employed by EQT and other Appalachian operators to
> build their respective development programs. Given the multitude of legacy natural

gas leases across Appalachia, it is commonplace for small acreage plots to exist given the historical ownership of land in the region.

> *The combined Rice-EQT acreage profile was evaluated thoroughly and carefully, and based on our development plan, which includes the cost of tactical fill-ins, the Company is confident it will achieve the $2.5 billion in synergies that it has identified.* For JANA to suggest that this acreage acquisition strategy, which is standard for Appalachian operators, is inconsistent with achieving the anticipated benefits of the transaction is highly misleading and inaccurate.

238.    EQT's statements quoted in ¶ 237, including EQT's "emphatic" denial that the Company could not achieve $2.5 billion in synergies based on 1,200 wells with a total average lateral length of 12,000 feet, were materially false and misleading for the reasons explained in ¶223 above. Indeed, as discussed above, Plaintiffs' analysis of the number of wells EQT could drill on the combined EQT and Rice acreage assumed that, where a well of a lateral length within the assumed parameters was possible using third-party acreage of no more than 15% of the total length, the well was assumed to be feasible, based on EQT's public statements that it would use land swaps or leases to acquire necessary third-party acreage where the combined companies' properties were not directly contiguous. Yet, even given that assumption, EQT's claimed 1,200 wells and 12,000-foot average lateral length were not possible.

239.    EQT and the Officer Defendants knew or recklessly disregarded that these statements were false and misleading when the statements were made. In particular, and in addition to the foregoing allegations, (i) the Officer Defendants received daily tracking reports on EQT's drilling costs showing that EQT had had significant difficulties in efficiently drilling longer laterals; (ii) when EQT drilling team employees tried to persuade EQT to address the challenges in drilling these wells and to adopt best practices, management, including Defendant Schlosser, who led the drilling strategy, ignored the employees, telling one to "shut up"; (iii) in September 2017, the Officer Defendants hired consultants to coach EQT on drilling longer laterals and then immediately rejected their recommendations; (iv) Defendant Schlotterbeck admitted that the maps

purporting to show the combined acreage were over-simplified, or "cartoonish"; (v) Defendants knew or recklessly disregarded that drilling 1,200 wells with an average lateral length of 12,000 feet was not feasible, based on the then-known geography and drilling history of the combined acreage; (vi) Rice employees with access to the financial model that EQT used to estimate synergies during the acquisition process told EQT employees that EQT's model made impossible assumptions about costs and well pads; and (vii) Rice and EQT's integration team fell apart after just a month in summer 2017, after Rice employees determined that EQT's models and data did not support EQT's proffered synergies.

240.    On October 19, 2017, EQT issued proxy materials stating that "Rice has an outstanding footprint that is largely contiguous to our existing acreage position . . . . As a combined entity with Rice, we expect to be well-positioned to capture significant operating efficiencies, improve overall well economics, and deliver stronger returns to shareholders." The materials also said that the Acquisition offered "IMPROVED UPSTREAM RETURNS, DRIVEN BY THE CONSOLIDATION OF COMPLEMENTARY ACREAGE POSITIONS"; that "[d]evelopment of adjacent acreage leads to longer laterals and improves overall economics"; that the Acquisition offered "[a]pplication of best-practice technologies from two leading operators in Appalachia"; and that "[e]nhanced scale and efficiencies will lower the procurement costs of goods and services." The materials further claimed "SIGNIFICANT SYNERGIES IDENTIFIED, ALONG WITH ADDITIONAL LONG-TERM OPPORTUNITIES"; and "Expected expense synergies driven by capital efficiencies and reduction of G&A costs." The materials also claimed that the Company was "Positioned to achieve additional synergies through improved well designs . . . ." and that "Overlapping acreage in core operating area drives synergies potential."

241.    The statements in EQT's October 19, 2017 proxy materials were materially false and misleading for the reasons explained in ¶223 above, including because EQT lacked the capability to achieve the claimed "longer laterals" and improve its "overall economics." EQT and the Officer Defendants knew or recklessly disregarded that these statements were false and misleading when the statements were made for the reasons identified *supra* in ¶ 239.

242.    JANA filed proxy materials with the SEC dated October 23, 2017 opposing the Acquisition, criticizing EQT's rationale for the Acquisition, and asserting, among other things, that EQT's published map of the EQT and Rice acreage resulting from the Acquisition was false and misleading and that due to the actual property locations and existing drilled locations, likely drilling synergies were only approximately $300 million, well below EQT's claim of $2.5 billion.

243.    On October 26, 2017, EQT again publicly responded to JANA's criticisms on an investor and analyst conference call. Defendant Schlotterbeck denied JANA's criticisms:

> [S]ince we are now two weeks away from the vote deadline, I do want to emphasize once again the merits of the Rice transaction. The primary driver of success in our industry is being the low cost producer, and the most impactful way to drive per unit cost lower is through longer laterals.
>
> Establishing a dominant footprint of highly contiguous acreage that allows for sustained long lateral development is a real competitive advantage. This is what the Rice transaction creates for us. Our competitors may be able to replicate things, like new drilling technology or new drilling techniques, but ***they can't replicate an acreage position that supports 12,000 foot laterals in the core of the Marcellus***.

244.    EQT also gave an analyst presentation on October 23, 2017, which EQT filed publicly with the SEC. In the presentation, EQT reiterated its statement that the Acquisition would provide $2.5 billion of synergies, republished the misleading map of EQT's and Rice's properties that it had issued on June 19, 2017, as discussed in ¶ 75, and stated that "Capital Efficiencies" would be achieved because "[c]ontiguous acreage leads to: longer laterals (12,000 [feet]) [and] fewer wells" and because of "[l]ower surface costs." The presentation also stated that "Base

synergies of $2.5 B PV [were] expected with significant upside potential," including "$200 MM capital efficiency in 2018" and "$100 M expense synergies in 2018."

245.    EQT's October 23, 2017 presentation further claimed that the "Combination creates compelling low-cost producer" because it is a "Sizeable transaction of high-quality, core acreage" and specifically "1,200 locations with 12,000 foot average laterals in PA." It also claimed that the "Combination creates significant value for EQT shareholders," including "Base synergies of $2.5 B with additional upside potential of $7.5 B on an NPV basis." The presentation further delineated the "Upstream Benefits" of the merger, including (i) "Significantly improved well returns in Greene & Washington Counties," from "Before transaction: 775 undeveloped locations with an average of 8,000' lateral" to "After transaction: 1,200 undeveloped locations with an average of 12,000' lateral"; (ii) "Sharing of technical data and best practices"; and (iii) "Operational efficiencies—rig utilization, pad sites, water, access roads, etc."

246.    EQT's October 23, 2017 presentation (as well as EQT's December 13, 2017, and February 15, 2018 analyst presentations) included the following slide claiming that the "Total Base Synergies" of the merger were "2.5 billion":



247. EQT's October 23, 2017 presentation (as well as EQT's December 13, 2017, and February 15, 2018 analyst presentations) also included the slide below claiming an additional "Upside Synergy Potential" of $7.5 billion, which included a claimed $2.5 billion in synergies from "Drilling and completion best practices":

## Upside Synergy Potential

| Synergy | Metric | Up to PV ($B)* |
|---|---|---|
| Drilling and completion best practices | EUR improvements of 0 – 5% | $2.5 |
| Buying power | 0 – 5% reduction in capital | $1.4 |
| Marketing optimization | $0.00 - $0.05 / Mcfe improvement in realized price | $1.4 |
| Upstream LOE optimization | $0.00 - $0.03 / Mcfe | $0.8 |
| Lengthen WV laterals | Lengthen inventory by up to 2,000' per well | $0.7 |
| Perpetuity G&A savings | Value realized post-2027 | $0.5 |
| MVP expansion | Accelerated by up to 3 years | $0.2 |
| | **Total** | **$7.5** |

| Other Potential Synergies (unquantified) | |
|---|---|
| IDR uplift | EQM growth path extended |
| Midstream optimization | More efficient capital deployed |

248. EQT's October 23, 2017 presentation (as well as EQT's December 13, 2017 and February 15, 2018 analyst presentations) also included the following slide, which claimed that, at "Full Development," EQT would achieve, in this example, "8 new wells with *16,200 ft average lateral length*":



249.   The statements by Defendants EQT and Schlotterbeck quoted in ¶¶ 244-48 above concerning EQT's claimed $2.5 and $7.5 billion in synergies were materially false and misleading for the reasons explained in ¶¶ 203 and 223 above. In addition, EQT's claim that EQT would increase the number of its undeveloped locations to "1,200 undeveloped locations with an average of 12,000' lateral" was materially false and misleading because, for the reasons explained in ¶¶ 77-84 above, it was impossible for EQT to drill 1,200 wells at an average lateral length of 12,000 feet. Further, EQT's claims that it would achieve additional synergies from adopting Rice's or industry best practices were materially false and misleading because EQT repeatedly refused to adopt industry best practices to drill longer lateral wells, including advice from its own employees, Rice employees and executives, and consultants at K&M. In addition, in the foregoing slide in ¶ 248, the so-called "Full Development" of EQT's plan in its example that depended on EQT having "8 new wells with 16,200 average lateral length" was materially false and misleading because EQT knew that it repeatedly had trouble drilling wells in excess of 15,000 feet.

250.   EQT and the Officer Defendants knew or recklessly disregarded that these statements were false and misleading when the statements were made. In particular, and in addition to the foregoing allegations, (i) the Officer Defendants received daily tracking reports on EQT's drilling costs showing that EQT had had significant difficulties in efficiently drilling longer laterals; (ii) when EQT drilling team employees tried to persuade EQT to address the challenges in drilling these wells and to adopt best practices, management, including Defendant Schlosser, who led the drilling strategy, ignored the employees, telling one to "shut up"; (iii) in September 2017, the Officer Defendants hired consultants to coach EQT on drilling longer laterals and then immediately rejected their recommendations; (iv) Defendant Schlotterbeck admitted that the maps purporting to show the combined acreage were over-simplified, or "cartoonish"; (v) Defendants

91

knew or recklessly disregarded that drilling 1,200 wells with an average lateral length of 12,000 feet was not feasible, based on the then-known geography and drilling history of the combined acreage; (vi) Rice employees with access to the financial model that EQT used to estimate synergies during the acquisition process told EQT employees that EQT's model made impossible assumptions about costs and well pads; and (vii) Rice and EQT's integration team fell apart after just a month in summer 2017, after Rice employees determined that EQT's models and data did not support EQT's proffered synergies.

251.    Also, on October 26, 2017, in response to an analyst's question about EQT's drilling activity for the next year, Defendant Schlotterbeck said that EQT expected to drill even longer wells than the average 12,000-foot lateral wells it had previously told investors it would achieve, and would do so immediately after the Acquisition closed:

> In the acquisition area where we said we're going to average 12,000-foot laterals, **we expect to be able to come right out of the gate in 2018 and average at least 12,700 feet in that area. So in terms of delivering on the synergies, we're going to be able to start demonstrating that from day one**. So we're pretty excited that the more we work the maps and get the data incorporated as we plan for the integration, our ability to deliver on that, our confidence in that, keeps going up. **So we're going to come out of gate at 12,700 at least and probably go up from there.**

252.    In response to an analyst's question about "your confidence around the 12,000 number on a pro forma basis," Schlotterbeck said: "Well, extremely confident" and "high, high confidence." Schlotterbeck reiterated that EQT was "going to come out of the gate above the average" and further stated that the Acquisition would give EQT control of 212,000 of the 370,000 acres in Greene County, of which only 75,000 had been developed, "[s]o there is lots of remaining inventory acreage. Tremendous amount of resource in place. So very, very confident in our ability to deliver on that synergy."

253.    Schlotterbeck's October 26, 2017 statements quoted in ¶¶ 251 and 252 above, that EQT would deliver on the synergies "from day one," that right "out of the gate" EQT would

"average at least 12,700 feet" or be "above the average" in the Acquisition area, and that he was "extremely confident" and had "high, high confidence" in those claims, were materially false and misleading for the reasons explained in ¶ 249 above, including that EQT lacked the necessary permits to begin drilling longer lateral wells "from day one" on the combined acreage resulting from the merger.

254.   EQT and Defendant Schlotterbeck, as well as Defendants Schlosser and McNally, who were at the earnings call, knew or recklessly disregarded that these statements were false and misleading when the statements were made. In particular, and in addition to the foregoing allegations, (i) the Officer Defendants received daily tracking reports on EQT's drilling costs showing that EQT had had significant difficulties in efficiently drilling longer laterals; (ii) when EQT drilling team employees tried to persuade EQT to address the challenges in drilling these wells and to adopt best practices, management, including Defendant Schlosser, who led the drilling strategy, ignored the employees, telling one to "shut up"; (iii) in September 2017, the Officer Defendants hired consultants to coach EQT on drilling longer laterals and then immediately rejected their recommendations; (iv) Defendants knew or recklessly disregarded that drilling 1,200 wells with an average lateral length of 12,000 feet was not feasible, based on the then-known geography and drilling history of the combined acreage; and (v) EQT had not obtained permits for the wells that Defendant Schlotterbeck claimed it would be able to start drilling in less than two weeks.

255.   On EQT's October 26, 2017 conference call, Schlotterbeck also claimed that "There certainly will be best practices from both sides that can be combined to improve recoveries and lower costs." This statement was materially false and misleading because EQT repeatedly

refused to adopt industry best practices to drill longer lateral wells, including advice from its own employees, Rice employees and executives, and consultants at K&M.

256.    On October 26, 2017, JANA publicly responded to EQT's statements of three days earlier. Among other things, JANA asserted that "[a]ctual acreage consists of fragmented blocks rather than large swaths of land" and that EQT's claimed lateral extension consisted almost entirely of "acreage trades and infill leasing, which EQT could pursue on a standalone basis."

257.    The October 26, 2017 JANA presentation also included the rebuttal to EQT's claimed drilling synergies below. Specifically, JANA pointed out that EQT's defense of the Acquisition relied on EQT's acquisition of large swathes of acreage that it could have pursued independently of EQT's merger with Rice:



258.    JANA's October 26, 2017 presentation also pointed out that EQT had estimated that the merger with Rice would result in 1,200 wells with an average lateral length of 12,000 feet. However, as JANA's October 26, 2017 presentation also added: "Based on the work of our industry experts, we estimate that combining EQT and RICE's acreage would *only enable ~100 border-crossing wells of 12,000 feet or more*, 1,100 fewer than claimed by EQT."

259.    On November 6, 2017, Institutional Shareholder Services ("ISS") published a Proxy Alert to EQT's shareholders. In it, ISS wrote that EQT "Management states that the merger with RICE and the adoption of best practices in the upstream business developed by [RICE] would create one of the lowest cost producers in the sector and allow the company to increase the longevity of its assets."

260.    EQT's statement quoted by ISS about adopting Rice's best practices was materially false and misleading because EQT repeatedly refused to adopt industry best practices to drill longer lateral wells, including refusing advice from its own employees, Rice employees and executives, and consultants at K&M.

261.    EQT and the Officer Defendants knew or recklessly disregarded that these statements were false and misleading when the statements were made. In particular, and in addition to the foregoing allegations, (i) Rice employees with access to the financial model that EQT used to estimate synergies during the acquisition process told EQT employees that EQT's model made impossible assumptions about costs and well pads; (ii) Rice and EQT's integration team fell apart after just a month in summer 2017, after Rice employees determined that EQT's models and data did not support EQT's proffered synergies; and (iii) EQT rebuffed Rice's attempts to share its best practices during the Acquisition.

262.    As Toby and Derek Rice's later, June 17, 2019 presentation made clear, EQT's failure to integrate Rice's approach damaged EQT's ability to continue drilling at the same pace that each of Rice and EQT had drilled before the Acquisition:





263.    As the Rice Team noted in its presentation, EQT's combined drilling performance in 2018 was significantly worse than EQT's and Rice's in prior years. Indeed, the bar graph below prepared by Plaintiffs, in consultation with an oil and gas industry expert, shows the drastic decline in EQT's and Rice's total lateral feet drilled in 2018, following EQT's Acquisition of Rice, with the Rice wells in blue and the EQT wells in green.



**4.    Defendants' False and Misleading Statements and Omissions After the Acquisition**

264.    On February 15, 2018, EQT filed its annual report on Form 10-K for the year ended December 31, 2017, which Defendants Schlotterbeck, McNally, and Porges signed. The Form 10-K also included Certifications signed by Defendants Schlotterbeck and McNally under the Sarbanes-Oxley Act that the report was accurate and complete. The Form 10-K included false and misleading statements about the purported benefits of the Acquisition. For example, the Form 10-K stated:

> Following the Rice Merger, the Company has significant acreage scale in the core of the Marcellus which will allow EQT to drill considerably longer laterals, realize operational efficiencies and improve overall returns. ***EQT believes that it is a technology leader in horizontal drilling and completion*** in the Appalachian Basin and ***continues to improve its operations through the use of new technology. Development of multi-well pads in conjunction with longer laterals, well spacing, and completion techniques allows EQT to maximize recoveries per acre*** while reducing the overall environmental surface footprint of the Company's drilling operations.

265. The statements in EQT's February 15, 2018 Form 10-K were materially false and misleading because (i) EQT had experienced numerous undisclosed well collapses when it attempted to drill ultra-long lateral wells; (ii) EQT lacked the expertise to drill ultra-long lateral wells and repeatedly refused to follow industry best practices on how to do so; and (iii) EQT operated in a "siloed" fashion, with "little consideration given to overall efficiency," EQT's model "increase[d] the likelihood of both safety and environmental incidents," and EQT lacked "the right skill sets internally to effectuate th[e] undertaking" of drilling "long laterals on multi-well pads." Moreover, instead of continuing to improve its operations or developing multi-well pads in conjunction with longer laterals, well spacing, and completion techniques, EQT was embarked on an effort to drill as many longer laterals as it could without regard for proper well completion, which resulted in many drill pipes and bottom hole assemblies being trapped underground.

266. EQT and the Officer Defendants knew or recklessly disregarded that these statements were false and misleading when the statements were made. In particular, and in addition to the foregoing allegations, (i) the Officer Defendants received daily tracking reports on EQT's drilling costs showing that EQT had had significant difficulties in efficiently drilling longer laterals and, post-Acquisition, had seen its costs increase dramatically because of its failure to successfully drill longer laterals; (ii) when EQT drilling team employees tried to persuade EQT to address the challenges in drilling these wells and to adopt best practices, management, including Defendant Schlosser, who led the drilling strategy, ignored the employees, telling one to "shut up"; (iii) in September 2017, the Officer Defendants hired consultants to coach EQT on drilling longer laterals and then immediately rejected their recommendations; (iv) Rice and EQT's integration team fell apart after just a month in summer 2017, after with Rice employees determined that EQT's models and data did not support EQT's proffered synergies; and (v) EQT rebuffed Rice's attempts to share

its best practices during the Acquisition, which enabled it to operate with production costs significantly lower than EQT's.

267.    The Form 10-K also contained a "Risk Factor" about the Acquisition:

**We may not achieve the intended benefits of the acquisition of Rice and the acquisition may disrupt our current plans or operations.**

There can be no assurance that we will be able to successfully integrate Rice's assets or otherwise realize the expected benefits of the acquisition of Rice. In addition, our business may be negatively impacted if we are unable to effectively manage our expanded operations going forward. The integration has required and will continue to require significant time and focus from management and could disrupt current plans and operations, which could delay the achievement of our strategic objectives. (Emphasis in original.)

268.    The foregoing Risk Factor was materially false and misleading because EQT was embarked on an effort to drill as many longer laterals as it could without regard for proper well completion, which resulted in many drill pipes and bottom hole assemblies being trapped underground and resulting in EQT incurring significant additional costs. EQT and the Officer Defendants knew or recklessly disregarded that this statement was false and misleading when the statement was made for the reasons identified *supra* in ¶ 266.

269.    On EQT's February 15, 2018 earnings call, Defendant Schlosser commented on EQT's purported integration of the Rice employees and adoption of best practices:

I would now like to provide an update on our overall Rice acquisition efforts. Rice employed an outstanding team of oil and gas professionals, and EQT retained more than 150 of them for our upstream operations. ***The influx of talent has brought fresh ideas and perspectives to help refine processes and implement new technical approaches. We have hit the ground running with our increased lateral lengths***. ***And in 2018, our Pennsylvania Marcellus spuds are expected to average over 13,600 feet***. This is 1,000 foot [sic] longer than what we announced in December and is a direct result of collaboration between land professionals from both companies. In fact, ***60% of our Marcellus wells in Pennsylvania will be comprised of wells that share legacy EQT and Rice acreage***.

On the operational front, ***we are combining best practices and have already captured value***. . . .

99

On the drilling side, we have set new footage records by **combining the data, experience and practices of both companies**, more specifically related to rotary steerable systems and drill pipe rotation. And finally, we've seen promising results from early testing of new concepts around the landing point of our Marcellus laterals. So far, *I am extremely pleased with the progress we have made during just 3 short months, and I look forward to continue to blend best practices, promote innovation and deliver best-in-class economic returns*. . . .

As you would expect, development cost continued to improve as we lengthened laterals.

270.    Schlosser's above statements during EQT's February 15, 2018 earnings call were materially false and misleading for the reasons explained in ¶ 265. In addition, EQT was not combining EQT and Rice's best practices because EQT repeatedly refused to adopt industry best practices to drill longer lateral wells, including refusing advice from its own employees, Rice employees and executives, and consultants at K&M.

271.    EQT and Defendant Schlosser, as well as Defendants Schlotterbeck and McNally, who were at the earnings call, knew or recklessly disregarded that these statements were false and misleading when the statements were made. In particular, and in addition to the foregoing allegations, (i) the Officer Defendants received daily tracking reports on EQT's drilling costs showing that EQT had had significant difficulties in efficiently drilling longer laterals and, post-Acquisition, had seen its costs increase dramatically because of its failure to successfully drill longer laterals; (ii) Defendants knew or recklessly disregarded that drilling 1,200 wells with an average lateral length of 12,000 feet was not feasible, based on the then-known geography and drilling history of the combined acreage; (iii) in September 2017, the Officer Defendants hired consultants to coach EQT on drilling longer laterals and then immediately rejected their recommendations; (iv) Rice and EQT's integration team fell apart after just a month in summer 2017, after Rice employees determined that EQT's models and data did not support EQT's

proffered synergies; and (v) EQT rebuffed Rice's attempts to share its best practices during the Acquisition, which enabled it to operate with production costs significantly lower than EQT's.

272.    On EQT's February 15, 2018 earnings call, Schlotterbeck added:

> Finally, we committed to delivering on our synergy targets established for the Rice acquisition. As you read in our December capital budget news release, ***we've hit the ground running and have started capturing the various synergies*** related to the transaction. As Dave [Schlosser] said, we currently expect to average 13,600-foot laterals in Southwestern Pennsylvania Marcellus acreage, which is 1,600 feet or 13% longer than we anticipated when the deal was first announced. ***This places us ahead of schedule for achieving our capital synergies***. In addition, I'm pleased to say that our G&A savings began on day one. Our integration team had a detailed staffing plan and were able to retain many talented Rice employees while still achieving our staffing targets. As we continue blending the best of 2 cultures, we are confident that the exchange of ideas will result in continuous improvements to our programs and practices.

273.    Schlotterbeck's above statements during EQT's February 15, 2018 earnings call were materially false and misleading for the reasons explained in ¶ 265. In addition, EQT was not "ahead of schedule for achieving [its] capital synergies," and EQT was not combining EQT and Rice's best practices because EQT repeatedly refused to adopt industry best practices to drill longer lateral wells, including refusing advice from its own employees, Rice employees and executives, and consultants at K&M.

274.    EQT and Defendant Schlotterbeck, as well as Defendants Schlosser and McNally, who were at the earnings call, knew or recklessly disregarded that these statements were false and misleading when the statements were made for the reasons identified *supra* in ¶ 271.

275.    Later, during the same February 15, 2018 EQT earnings call, Goldman Sachs analyst Arthur Singer asked EQT to "give us a little bit more color on the synergies plan and implementing the synergies from the Rice transaction over the course of—or over 2018?" Schlotterbeck and McNally responded:

> **Schlotterbeck**:     Yes. So Brian, so we announced 2 primary synergies that drove the deal, one on the G&A side. ***We are at or a little bit***

|  | *ahead of the plan that delivered on that synergy*. So I think the annual savings is going to be a bit better than we anticipated. |
|---|---|
| **McNally**: | Yes, what we had said was we expected about $100 million of annual G&A savings or overhead savings. And we think that number is going to be more like $110 million or maybe a little more than that for 2018. |
| **Schlotterbeck**: | And on the capital savings, the model assumed 12,000-foot laterals in the acquisition area. And *we now expect to average 13,600 feet. So that's a pretty dramatic acceleration of those synergies*. And I don't have the PV benefit of that difference, but it's . . . |
| **McNally**: | *It's several hundred million dollars higher*. |

276. EQT's February 15, 2018 analyst presentation also claimed that in 2018, EQT would "[b]egin to realize capital, operational and administrative synergies," including an "Average PA Marcellus well 13,600 feet vs 12,000 target."

277. EQT's, Schlotterbeck's, and McNally's above statements during EQT's February 15, 2018 earnings call and in EQT's analyst presentation were materially false and misleading for the reasons explained in ¶ 265. EQT was not achieving the synergies it claimed it would pre-merger, nor was it combining EQT's and Rice's best practices because EQT repeatedly refused to adopt industry best practices to drill longer lateral wells, including refusing advice from its own employees, Rice employees and executives, and consultants at K&M.

278. EQT and Defendant Schlotterbeck, as well as Defendants Schlosser and McNally, who were at the earnings call, knew or recklessly disregarded that these statements were false and misleading when the statements were made for the reasons identified *supra* in ¶ 271.

279. On March 28, 2018, EQT issued an analyst presentation that again claimed that the "Base Synergy" from the merger was $2.5 billion, and that an additional $7.5 billion of "Upside Synergy" included $2.5 billion from "Drilling and completion best practices." EQT's claims that

it could achieve the $2.5 to $7.5 billion in synergies, including by incorporating "Drilling and completion best practices," were materially false and misleading when made because (i) the claimed synergies were based on the impossible-to-achieve assumption that a combined EQT and Rice entity could reduce the number of well pads from 199 to 99; (ii) EQT had experienced numerous undisclosed well collapses when it attempted to drill ultra-long lateral wells; (iii) EQT lacked the expertise to drill ultra-long lateral wells and repeatedly refused to follow industry best practices on how to do so; (iv) EQT operated in a "siloed" fashion, with "little consideration given to overall efficiency," EQT's model "increase[d] the likelihood of both safety and environmental incidents," and EQT lacked "the right skill sets internally to effectuate th[e] undertaking" of drilling "long laterals on multi-well pads"; and (v) EQT understated its actual well costs.

280.    EQT and the Officer Defendants knew or recklessly disregarded that these statements were false and misleading when the statements were made. In particular, and in addition to the foregoing allegations, (i) the Officer Defendants received daily tracking reports on EQT's drilling costs showing that EQT had had significant difficulties in efficiently drilling longer laterals and, post-Acquisition, had seen its costs increase dramatically because of its failure to successfully drill longer laterals; (ii) Defendants knew or recklessly disregarded that drilling 1,200 wells with an average lateral length of 12,000 feet was not feasible, based on the then-known geography and drilling history of the combined acreage; (iii) in September 2017, the Officer Defendants hired consultants to coach EQT on drilling longer laterals and then immediately rejected their recommendations; (iv) Rice and EQT's integration team fell apart after just a month in summer 2017, after Rice employees determined that EQT's models and data did not support EQT's proffered synergies; and (v) EQT rebuffed Rice's attempts to share its best practices during the Acquisition, which enabled it to operate with production costs significantly lower than EQT's.

281.     On April 26, 2018, the Company filed a quarterly report on Form 10-Q for the three months ended March 31, 2018. Defendant McNally signed the report, which included Sarbanes-Oxley certifications of the report's completeness and accuracy signed by Defendants McNally and Porges. The Form 10-Q included materially false and misleading statements about the impact of the Acquisition, including: "Upon the closing of the Rice Merger, the Company's consolidation goals were largely met and the Company plans to focus on integrating the Rice assets and realizing higher returns through longer laterals and achieving an even lower operating cost structure." The Form 10-Q also stated that there had been no material change in the "Risk Factor" concerning the Acquisition previously disclosed in the 2017 Form 10-K, quoted in ¶ 267.

282.     The statements in EQT's April 26, 2018 Form 10-Q were materially false and misleading because, rather than largely meeting EQT's consolidation goals and "realizing higher returns through longer laterals and achieving an even lower cost structure," (i) EQT had experienced numerous undisclosed well collapses when it attempted to drill ultra-long lateral wells; (ii) EQT lacked the expertise to drill ultra-long lateral wells and repeatedly refused to follow industry best practices on how to do so; and (iii) EQT operated in a "siloed" fashion, with "little consideration given to overall efficiency," EQT's model "increase[d] the likelihood of both safety and environmental incidents," and EQT lacked "the right skill sets internally to effectuate th[e] undertaking" of drilling "long laterals on multi-well pads." Moreover, instead of continuing to improve its operations or developing multi-well pads in conjunction with longer laterals, well spacing, and completion techniques, EQT was embarked on an effort to drill as many longer laterals as it could without regard for proper well completion, which resulted in many drill pipes and bottom hole assemblies being trapped underground, which increased costs.

283.    EQT and Defendants Porges, McNally, and Schlosser knew or recklessly disregarded that these statements were false and misleading for the reasons identified *supra* in ¶ 280.

284.    On April 26, 2018, EQT held its first-quarter earnings conference call. During the call, Defendant Schlosser discussed the status of EQT's drilling operations:

> Moving on to operations. During the last year, our drilling and engineering group has been developing an idea to manage our horizontal drilling operations in real-time from our offices at EQT Plaza located in downtown Pittsburgh. The thought behind this project was to improve collaboration amongst our technical teams, provide more consistent well results and improve our drilling efficiency. The team tested this idea in the second half of 2017, and we have now fully implemented the process. All of our directional drilling, geosteering and drilling engineering is now done at our real-time operations center, or RTOC, in Pittsburgh. Although in its early stages of implementation, ***this concept is already showing significant returns***. Since implementing the RTOC, ***we have seen a 14% increase in lateral feet drilled per day, and we have increased our percent of formation drilled in target from 93% to 97%. We have also set EQT records for 48-hour footage drilled and a world record bottom hole assembly run***. In addition, on April 12, we set a new record for the longest lateral drilled to date in the Marcellus on our Harbison well in Washington County, PA. This lateral will have a completed length of 18,670 feet and is scheduled for completion in May.

285.    Also on EQT's April 26, 2018 earnings call, Defendant McNally claimed that EQT was still "on track" to deliver its synergies:

> So on the G&A side, it's pretty straightforward. You can look at the G&A numbers that are reported, and what we had estimated prior to the merger was that the present value of the next 10 years' worth of G&A savings would be worth $600 million. We now think we're going to exceed that number by maybe as much as $100 million. So that's gone well. And as a proxy for the capital savings on drilling and completion, probably the best proxy is at lateral lengths. And what we thought when we announced the transaction was that we would see lateral lengths improve from approximately 8,000 foot in Greene and Washington Counties to 12,000. Now our current estimates are that we'll be at 13,600 feet for 2018, and it will improve beyond that. And so ***we expect that we're going to exceed the $1.9 billion of capital and PV'ed synergies by a reasonable amount, several hundred million dollars. So I'd say that we're well on track to deliver and exceed those synergies***.

286.    The foregoing statements in ¶¶ 284-85 by Schlosser and McNally on EQT's April 26, 2018 earnings call quoted were materially false and misleading because, rather than its RTOC

"already showing significant returns," and rather than being "on track to deliver and exceed" EQT's claimed synergies form the merger, (i) EQT had experienced numerous undisclosed well collapses when it attempted to drill ultra-long lateral wells; (ii) EQT lacked the expertise to drill ultra-long lateral wells and repeatedly refused to follow industry best practices on how to do so; and (iii) EQT operated in a "siloed" fashion, with "little consideration given to overall efficiency," EQT's model "increase[d] the likelihood of both safety and environmental incidents," and EQT lacked "the right skill sets internally to effectuate th[e] undertaking" of drilling "long laterals on multi-well pads." Moreover, instead of continuing to improve its operations or developing multi-well pads in conjunction with longer laterals, well spacing, and completion techniques, EQT was embarked on an effort to drill as many longer laterals as it could without regard for proper well completion, which resulted in many drill pipes and bottom hole assemblies being trapped underground, which increased costs.

287.    EQT and Defendant Schlosser, McNally, and Porges (who attended the earnings call) knew or recklessly disregarded that these statements were false and misleading when the statements were made. In particular, and in addition to the foregoing allegations, (i) the Officer Defendants received daily tracking reports on EQT's drilling costs showing that EQT had had significant difficulties in efficiently drilling longer laterals and, post-Acquisition, had seen its costs increase dramatically because of its failure to successfully drill longer laterals; (ii) Defendants knew or recklessly disregarded that drilling 1,200 wells with an average lateral length of 12,000 feet was not feasible, based on the then-known geography and drilling history of the combined acreage; (iii) in September 2017, the Officer Defendants hired consultants to coach EQT on drilling longer laterals and then immediately rejected their recommendations; (iv) Rice and EQT's integration team fell apart after just a month in summer 2017, after Rice employees determined

that EQT's models and data did not support EQT's proffered synergies; and (v) EQT rebuffed Rice's attempts to share its best practices during the Acquisition, which enabled it to operate with production costs significantly lower than EQT's.

288.     EQT's April 26, 2018 analyst presentation included a slide that provided a supposed "Synergy Summary" and claimed a "Base Synergy" of $2.5 billion and an additional "Upside Synergy" of $7.5 billion, which included a claimed $2.5 billion in synergies from "Drilling and completion best practices." These statements were materially false and misleading for the reasons explained in ¶¶ 279 and 286 above, and EQT and Defendants Porges, McNally, and Schlosser knew or recklessly disregarded that these statements were false and misleading for the reasons identified in the preceding paragraph.

289.     EQT's May 29, 2018 analyst presentation also included a slide that provided a supposed "Synergy Summary" and claimed a "Base Synergy" of $2.5 billion, and an additional "Upside Synergy" of $7.5 billion, which included a claimed $2.5 billion in synergies from "Drilling and completion best practices." These statements were materially false and misleading for the reasons explained in ¶¶ 279 and 286 above, and EQT and Defendants Porges, McNally, and Schlosser knew or recklessly disregarded that these statements were false and misleading for the reasons identified in ¶ 287.

290.     On July 26, 2018, the Company filed a quarterly report on Form 10-Q for the quarter ended June 30, 2018. Defendant McNally signed the report, which included Sarbanes-Oxley certifications of the report's completeness and accuracy executed by Defendants McNally and Porges. The Form 10-Q included materially false and misleading statements about the impact of the Acquisition, including: "Upon the closing of the Rice Merger, ***the Company's consolidation goals were largely met*** and the Company plans to focus on integrating the Rice assets and realizing

higher returns through longer laterals and achieving an even lower operating cost structure." The Form 10-Q also stated that there had been no material change in the "Risk Factor" concerning the Acquisition previously disclosed in the 2017 Form 10-K, quoted in ¶ 267.

291.    The July 26, 2018 Form 10-Q's statements discussed in ¶ 290 were materially false and misleading because, rather than largely meeting EQT's consolidation goals and "realizing higher returns through longer laterals and achieving an even lower operating cost structure," (i) EQT had experienced numerous undisclosed well collapses when it attempted to drill ultra-long lateral wells; (ii) EQT lacked the expertise to drill ultra-long lateral wells and repeatedly refused to follow industry best practices on how to do so; and (iii) EQT operated in a "siloed" fashion, with "little consideration given to overall efficiency," EQT's model "increase[d] the likelihood of both safety and environmental incidents," and EQT lacked "the right skill sets internally to effectuate th[e] undertaking" of drilling "long laterals on multi-well pads." Moreover, instead of continuing to improve its operations or developing multi-well pads in conjunction with longer laterals, well spacing, and completion techniques, EQT was embarked on an effort to drill as many longer laterals as it could without regard for proper well completion, which resulted in many drill pipes and bottom hole assemblies being trapped underground, which increased costs.

292.    EQT and Defendants Schlosser, McNally, and Porges knew or recklessly disregarded that these statements were false and misleading when the statements were made. In particular, and in addition to the foregoing allegations, (i) the Officer Defendants received daily tracking reports on EQT's drilling costs showing that EQT had had significant difficulties in efficiently drilling longer laterals and, post-Acquisition, had seen its costs increase dramatically because of its failure to successfully drill longer laterals; (ii) Defendants knew or recklessly disregarded that drilling 1,200 wells with an average lateral length of 12,000 feet was not feasible,

based on the then-known geography and drilling history of the combined acreage; (iii) in

September 2017, the Officer Defendants hired consultants to coach EQT on drilling longer laterals

and then immediately rejected their recommendations; (iv) Rice and EQT's integration team fell

apart after just a month in summer 2017, after Rice employees determined that EQT's models and

data did not support EQT's proffered synergies; (v) EQT rebuffed Rice's attempts to share its best

practices during the Acquisition, which enabled it to operate with production costs significantly

lower than EQT's; and (vi) the Officer Defendants had internally acknowledged that EQT gave

"little consideration to overall efficiency" and might not be able to deliver the synergies they had

promised a year prior.

293. On July 26, 2018, during EQT's second-quarter 2018 earnings conference call,

Defendant Schlosser continued to claim that the Company was generating synergies in line with

its prior claims:

> **We continue to realize capital synergies from the Rice acquisition** as we develop
> our large contiguous acreage position. In our Southwestern Pennsylvania [core],
> our 2018 drilling program is now expected to deliver an average lateral length of
> 14,200 feet, which is 55% higher than our 2017 Southwestern Pennsylvania average
> prior to the Rice acquisition. . . .
>
> **On an activity level, the second quarter was the highest in EQT history, with the
> company operating as many as 15 rigs and 12 frac crews**. This resulted in nearly
> 680,000 feet-of-pay being fracked, which is 55% higher than our previous record.
> On the drilling side, we have already drilled as much footage in the first half of
> 2018 as we did in the full year 2017. . . .
>
> **We expect Q2 to be the high point for CapEx this year and reiterate our full year
> guidance of $2.2 billion for well development**.

294. The statements quoted in ¶ 293 were materially false and misleading because,

rather than continuing to "realize capital synergies from the Rice acquisition" or "operating as

many as 15 rigs and 12 frac crews" with no material issues, and rather than the second quarter

being the "high point" for EQT's capital expenses with $2.2 billion for full-year well-development

guidance, (i) EQT had experienced numerous undisclosed well collapses when it attempted to drill ultra-long lateral wells; (ii) EQT lacked the expertise to drill ultra-long lateral wells and repeatedly refused to follow industry best practices on how to do so; (iii) EQT had already incurred significantly increased costs *in the first and second quarters of 2018* that EQT did not reflect in its reported financial results, which would necessarily increase its capital expenses and well-development costs; and (iv) EQT operated in a "siloed" fashion, with "little consideration given to overall efficiency," EQT's model "increase[d] the likelihood of both safety and environmental incidents," and EQT lacked "the right skill sets internally to effectuate th[e] undertaking" of drilling "long laterals on multi-well pads." Moreover, instead of continuing to improve its operations or developing multi-well pads in conjunction with longer laterals, well spacing, and completion techniques, EQT was embarked on an effort to drill as many longer laterals as it could without regard for proper well completion, which resulted in many drill pipes and bottom hole assemblies being trapped underground, which increased costs.

295.   EQT and Defendants Schlosser and McNally (who was at the earnings call) knew or recklessly disregarded that these statements were false and misleading when the statements were made for the reasons identified *supra* in ¶ 292.

296.   EQT's July 30, 2018 analyst presentation included a slide that provided a supposed "Synergy Summary" and claimed a "Base Synergy" of $2.5 billion and an additional "Upside Synergy" of $7.5 billion, which included a claimed $2.5 billion in synergies from "Drilling and completion best practices." These statements were materially false and misleading for the reasons explained in ¶¶ 279 and 294 above, and EQT and Defendants Schlosser, McNally, and Porges knew or recklessly disregarded that these statements were false and misleading when the statements were made for the reasons identified *supra* in ¶ 292.

297.    EQT's August 6, 2018 analyst presentation also included a slide that provided a supposed "Synergy Summary" and claimed a "Base Synergy" of $2.5 billion, and an additional "Upside Synergy" of $7.5 billion, which included claimed $2.5 billion in synergies from "Drilling and completion best practices." These statements were materially false and misleading for the reasons explained in ¶¶ 279 and 294 above, and EQT and Defendants Schlosser, McNally, and Porges knew or recklessly disregarded that these statements were false and misleading when the statements were made for the reasons identified *supra* in ¶ 292.

298.    On August 9, 2018, EQT announced that Defendant McNally, then CFO of EQT, would assume the role of CEO and President of EQT following the planned separation of its midstream business, filling the vacancy left in the CEO position following the resignation of EQT's prior CEO, Defendant Schlotterbeck, in May 2018. McNally had no prior upstream operational experience.

299.    EQT's September 4, 2018 analyst presentation also included a slide that provided a supposed "Synergy Summary" and claimed a "Base Synergy" of $2.5 billion and an additional "Upside Synergy" of $7.5 billion, which included a claimed $2.5 billion in synergies from "Drilling and completion best practices." These statements were materially false and misleading for the reasons explained in ¶¶ 279 and 294 above, and EQT and Defendants Schlosser, McNally, and Porges knew or recklessly disregarded that these statements were false and misleading when the statements were made for the reasons identified *supra* in ¶ 292.

300.    On October 25, 2018, during EQT's third-quarter 2018 earnings conference call, when EQT disclosed that the "vast majority" of the lengths of its laterals going forward would be "at less than 15,000 feet," an analyst asked Defendant McNally, "specifically on the synergies,

some of those synergies you discussed, does that change now knowing what you know on costs and lateral lengths to what we would have thought, say, 9 months ago?" McNally responded:

> *No, no*. *When we talked through the synergies from Rice, we didn't contemplate wells longer than 14,000 or 15,000 feet*. In fact, if you remember back to the guidance that we gave back in late '17 sometime, what we originally expected to average in 2018 was 12,000-foot laterals.

301.    McNally's statements in the previous paragraph were materially false and misleading because EQT's stated basis for the synergies that its acquisition of Rice would generate was EQT drilling ultra-long laterals (i.e., above 15,000 feet), and any reduction in EQT's assumptions about its ability to drill ultra-long laterals necessarily negatively impacted EQT's ability to achieve the claimed average lateral lengths and the claimed $2.5-$7.5 billion in synergies. McNally's claims to the contrary were materially false and misleading.

302.    EQT and Defendant McNally knew or recklessly disregarded that these statements were false and misleading when the statements were made. In particular, and in addition to the foregoing allegations, Defendant McNally was responsible for issuing guidance on this topic before the Acquisition, as he acknowledged on the call, and on October 23, 2017, EQT issued an investor presentation in which it claimed that its synergies would be achieved, in part, through new wells with 16,200 average lateral length, as discussed *supra* in ¶ 145.

303.    On February 14, 2019, EQT filed its annual report on Form 10-K for the year ended December 31, 2018. The Form 10-K described the Company's "Strategy" following the Rice Acquisition:

> The Company believes the long-term outlook for its business is favorable due to the Company's substantial resource base, financial strength, and its commitment to capital discipline and operational efficiencies. The Company believes the combination of these factors provide it with an opportunity to exploit and develop its acreage and reserves and maximize efficiency through economies of scale. *The Company has a significant contiguous acreage position in the core of the Marcellus and Utica shales which the Company believes will allow it to realize operational efficiencies and improve overall returns. The Company believes that*

***it is a technology leader in horizontal drilling and completion activities in the Appalachian Basin and continues to improve its operations through the use of new technologies and a company-wide focus on efficiency. Development of multi-well pads in conjunction with longer laterals, optimized well spacing, and completion techniques allow the Company to maximize development efficiencies*** while reducing the overall environmental surface footprint of its drilling operations.

304.    The statements in EQT's February 14, 2019 Form 10-K were materially false and misleading because (i) EQT had experienced numerous undisclosed well collapses when it attempted to drill ultra-long lateral wells; (ii) EQT lacked the expertise to drill ultra-long lateral wells and repeatedly refused to follow industry best practices on how to do so; and (iii) EQT operated in a "siloed" fashion, with "little consideration given to overall efficiency," EQT's model "increase[d] the likelihood of both safety and environmental incidents," and EQT lacked "the right skill sets internally to effectuate th[e] undertaking" of drilling "long laterals on multi-well pads." Moreover, instead of continuing to improve its operations or developing multi-well pads in conjunction with longer laterals, well spacing, and completion techniques, EQT was embarked on an effort to drill as many longer laterals as it could without regard for proper well completion, which resulted in many drill pipes and bottom hole assemblies being trapped underground. EQT and Defendant McNally knew or recklessly disregarded that these statements were false and misleading when the statements were made for the reasons identified *supra* in ¶ 292, and because, as discussed *infra* in Section V.K., in November 2018, the Rice Team told EQT that the Acquisition was not delivering any synergies.

305.    The 2018 Form 10-K also included the following "Risk Factor":

**Acquisitions may disrupt our current plans or operations and may not be worth what we pay due to uncertainties in evaluating recoverable reserves and other expected benefits, as well as potential liabilities. We may not achieve the intended benefits of our acquisition of Rice Energy Inc.**

***

On November 13, 2017, we completed the acquisition of Rice Energy Inc. (Rice). There can be no assurance that we will be able to successfully integrate Rice's assets or otherwise realize the expected benefits of the acquisition of Rice. In addition, our business may be negatively impacted if we are unable to effectively manage our expanded operations going forward. The integration has required and will continue to require significant time and focus from management and could disrupt current plans and operations, which could delay the achievement of our strategic objectives.

306.     The foregoing Risk Factor was materially false and misleading because EQT was embarked on an effort to drill as many longer laterals as it could without regard for proper well completion, which resulted in many drill pipes and bottom hole assemblies being trapped underground and resulting in EQT incurring significant additional costs. EQT and Defendant McNally knew or recklessly disregarded that these statements were false or misleading when the statements were made for the reasons identified *supra* in ¶ 292, and because, as discussed *infra* in Section V.K., in November 2018, the Rice Team told EQT that the Acquisition was not delivering any synergies.

307.     On April 25, 2019, the Company filed its quarterly report on Form 10-Q for the three months ended March 31, 2019. The Form 10-Q included a Sarbanes-Oxley certification by Defendant McNally that the report was accurate and complete. The Form 10-Q included the same statement as the 2018 Form 10-K quoted in ¶ 303, which was false and misleading for the reasons discussed in ¶ 304. The Form 10-Q also stated that there had been no material change in the 2018 Form 10-K's "Risk Factor" quoted in ¶ 305, which was false and misleading for the reasons discussed in ¶ 306. EQT and Defendant McNally knew or recklessly disregarded that these statements were false and misleading when the statements were made for the reasons identified *supra* in ¶ 292, and because, as discussed *infra* in Section V.K., in November 2018, the Rice Team told EQT that the Acquisition was not delivering any synergies.

114

### 5.    Defendants' Misstatements of EQT's Financial Results

308.    As noted above (*see* ¶¶ 17-23), Toby and Derek Rice challenged McNally for control of EQT starting in December 2018. On February 5, 2019, the Rice Team filed a public presentation with the SEC and hosted an investor call that discussed the Rice Team's plan to transform EQT. They claimed, among other things, that EQT had "erroneously adjusted" its well costs "downwards" in an attempt to "normalize costs" and that "EQT costs could be $125-$250/ft higher when including capitalized costs, pad and facilities, etc." In addition, on June 17, 2019, the Rice Team filed another presentation with the SEC stating with more specificity that "EQT is excluding more than $300 million in costs it capitalizes from its well costs. . . . EQT is omitting >$300mm of cash costs from all of its operational metrics."

309.    As discussed above, EQT FEs 10 and 11 stated that one of the cash costs that EQT improperly capitalized was the cost of water used during operations. By improperly capitalizing rather than expensing water costs for operations, EQT (i) understated its "Operating expenses— production" and correspondingly overstated its "operating income," "net income," and "earnings per share" in its Statements of Consolidated Operations; and (ii) overstated its "Oil and gas producing properties, successful efforts method" that were included in "Property, Plant and Equipment*"* in its consolidated balance sheets.

310.    In EQT's Form 10-Q for the first quarter of 2018 filed on April 26, 2018, the Company reported the following results for the three months ended March 31, 2018: "Operating expenses—production" of $60,123,000, operating loss of ($1,723,516,000), net loss of ($1,585,994,000), and net loss per share of ($5.99). The Company reported property, plant, and equipment of $27,083,946,000 as of March 31, 2018, but did not separately identify the amount of oil and gas producing properties included in this amount (based on year-end results, substantially all of the property, plant, and equipment are oil and gas producing properties). In

115

EQT's Form 10-Q for the second quarter of 2018 filed on July 26, 2018, the Company reported the following results for the three and six months ended June 30, 2018, respectively: "Operating expenses—production" of $47,881,000 and $106,720,000, operating income of $99,969,000 and an operating loss of $1,623,547,000, net income of $136,346,000 and a net loss of $1,308,633,000, and net income per share of $0.07 and a net loss per share of ($5.92). The Company reported property, plant, and equipment of $27,722,025,000 as of June 30, 2018, but did not separately identify the amount of oil and gas producing properties included in this amount (based on year-end results, substantially all of the property, plant, and equipment are oil and gas producing properties). The Company also reported that it capitalized $24.9 million and $47.5 million of intercompany water-services expenses as development costs in the three and six months ended June 30, 2018, respectively; these amounts do not include third-party water-services expenses that were secretly capitalized.

311.    During EQT's July 26, 2018 earnings conference call, an analyst pressed Schlosser on the fact that EQT reported LOE lower than the analyst had expected. In response, Schlosser hid from investors that he himself had asked EQT employees to artificially underreport EQT's operating expenses:

| | |
|---|---|
| **Analyst**: | LOE seemed to come in a good bit during the second quarter. Anything to highlight there? |
| **Schlosser**: | What—I mean—come in lower than you expected? Is that what you're saying? |
| **Analyst**: | Yes. |
| **Schlosser**: | ***Nothing to say other than the first quarter, maybe was a little on the high side because of weather*** and in the second quarter, it didn't have those kind of impacts. |

312.    Schlosser's statements in ¶ 311 were materially false and misleading because Schlosser claimed there was "Nothing to say" about why Lease Operating Expenses were lower

than expected, attributed the unexpectedly low reported operating expenses to purported "weather" impacts that were present in the *first quarter* and not the second, and failed to disclose to investors that he had instructed his subordinates to understate EQT's operating expenses, including by improperly capitalizing its produced-water expenses.

313.    EQT and Defendants Schlosser and McNally (who was at the earnings call) knew or recklessly disregarded that these statements were false and misleading when the statements were made because, in addition to the foregoing allegations, Defendant Schlosser personally threatened to fire anyone who increased the budget to match reality and directed EQT employees to understate EQT's Lease Operating Expenses, and Defendant McNally, as Chief Financial Officer of EQT, was personally responsible for its budget.

314.    On EQT's October 25, 2018 earnings call, when the Company reported negative third-quarter financial results caused by "inefficiencies resulting from higher activity levels, the learning curve on ultra-long horizontal wells, and service cost increases," EQT also disclosed that Defendant Schlosser, EQT's Senior Vice President and President, Exploration and Production, had resigned; Patrick Keane, EQT's Chief Investor Relations Officer; and Lewis Gardner, EQT's General Counsel and Vice President, External Affairs. EQT announced that it had replaced these executives with their immediate subordinates.

315.    In EQT's Form 10-Q for the third quarter of 2018 filed on October 25, 2018, the Company reported the following results for the three and nine months ended September 30, 2018, respectively: "Operating expenses—production" of $42,751,000 and $149,471,000, operating income of $71,824,000 and an operating loss of ($1,551,723,000), net income of $63,448,000 and a net loss of ($1,245,185,000), and net losses per share of ($0.15) and ($6.12). The Company reported property, plant, and equipment of $28,022,769,000 as of September 30, 2018, but did not

separately identify the amount of oil and gas producing properties included in this amount (based on year-end results, substantially all of the property, plant, and equipment are oil and gas producing properties). The Company also reported that it capitalized $3.2 million and $50.7 million of intercompany water-services expenses as development costs in the three and nine months ended September 30, 2018, respectively; these amounts do not include third-party water-services expenses that were secretly capitalized.

316.    In EQT's Form 10-K for 2018 filed on February 14, 2019, the Company reported the following results for the year ended December 31, 2018: "Operating expenses—production" of $195,775,000, an operating loss of ($2,783,124,000), a net loss of ($2,244,568,000), and net loss per share of ($8.60). The Company reported property, plant, and equipment of $22,148,012,000 as of December 31, 2018, including $21,814,779,000 of "oil and gas producing properties, successful efforts method." The Company also reported that it had total capitalized costs of $21,814,779,000 as of December 31, 2018, but did not specify how much of this was for either intercompany or third-party water services and did not disclose water-service expenses that were improperly capitalized.

317.    In EQT's Form 10-Q for the first quarter of 2019 filed on April 25, 2019, the Company reported the following results for the three months ended March 31, 2019: "Operating expenses—production" of $43,408,000, operating income of $175,456,000, net income of $190,691,000, and net income per share of $0.75. The Company reported property, plant, and equipment of $22,592,376,000 as of March 31, 2019, but did not separately identify the amount of oil and gas producing properties included in this amount (based on year-end results, substantially all of the property, plant, and equipment are oil and gas producing properties). The Company no longer reported any intercompany water services because of the spinoff of those

118

services as part of Equitrans Midstream Corporation; nor did it disclose the amount of third-party water-services expenses that were capitalized.

318.    As a result of the improper capitalization of at least $300 million of operating water costs and other operating costs that should instead have been accounted for as operating expenses, the "Operating expenses—production" amounts quoted in ¶¶ 315-17 were materially understated; the "operating income," "net income," and "earnings per share" amounts quoted in ¶¶ 315-17 were correspondingly materially overstated; and the "Oil and gas producing properties, successful efforts method" and "Property, Plant and Equipment" amounts quoted in ¶¶ 315-17 were materially overstated.

319.    EQT and Defendants Schlosser, McNally, and Porges knew or recklessly disregarded that these statements were false and misleading when the statements were made. In particular, and in addition to the foregoing allegations and the reasons identified *supra* in ¶ 313, (i) Defendants Schlosser, McNally, and Porges received daily tracking reports on EQT's drilling costs and therefore knew or recklessly disregarded exactly how much money EQT was spending each day; (ii) Defendants knew or recklessly disregarded that EQT's operating expenses were well in excess of its budget; and (iii) Defendants knew or recklessly disregarded that employees were ordered to improperly remove certain items, such as well costs and location costs, from EQT's reported development cost guidance.

### 6.    Defendants' Misstatements of EQT's Financial Guidance

320.    EQT's February 15, 2018 analyst presentation claimed that in 2018, EQT would "[b]egin to realize capital, operational and administrative synergies," including "LOE per unit $0.04 less—approximately $62 million savings." It also included 2018 guidance for "LOE, excluding production taxes" of $0.07-$0.09, and for "Development costs" of $0.41-$0.42 /Mcfe

(Mcfe is one thousand cubic feet equivalent, calculated by converting one barrel of oil or natural-gas liquids to six Mcf of natural gas).

321.   The statements in ¶ 320 were materially false and misleading because (i) EQT was understating its Lease Operating Expenses by capitalizing all produced-water expenses; and (ii) EQT was intentionally materially understating its development-cost guidance through the omission of specific costs from its AFEs.

322.   EQT and the Officer Defendants knew or recklessly disregarded that these statements were false and misleading when the statements were made. In particular, and in addition to the foregoing allegations and the reasons identified *supra* in ¶ 313, (i) the Officer Defendants received daily tracking reports on EQT's drilling costs and therefore knew or recklessly disregarded exactly how much money EQT was spending each day; (ii) Defendants knew or recklessly disregarded that EQT's operating expenses were well in excess of its budget; and (iii) Defendants made a decision to capitalize costs of produced water to avoid telling investors that its publicly reported budget for the cost of water was materially inaccurate.

323.   EQT's March 28, 2018 analyst presentation included 2018 guidance for "LOE, excluding production taxes" of $0.07-$0.09, and for "Development costs" of $0.41-$0.43 /Mcfe. These statements were materially false and misleading for the reasons stated in ¶ 321, and EQT and Defendants Porges, McNally, and Schlosser knew or recklessly disregarded that these statements were false and misleading when the statements were made for the reasons identified *supra* in ¶ 322.

324.   EQT's April 26, 2018 analyst presentation claimed that in 2018, EQT would "[b]egin to realize capital, operational and administrative synergies," including "LOE per unit $0.04 less—approximately $62 million savings." It also included 2018 guidance for "LOE,

excluding production taxes" of $0.07-$0.09, and for "Development costs" of $0.41-$0.43 /Mcfe. These statements were materially false and misleading for the reasons stated in ¶ 321, and EQT and Defendants Porges, McNally, and Schlosser knew or recklessly disregarded that these statements were false and misleading when the statements were made for the reasons identified *supra* in ¶ 322.

325.    EQT's May 29, 2018 analyst presentation claimed that in 2018, EQT would "[b]egin to realize capital, operational and administrative synergies," including "LOE per unit $0.04 less—approximately $62 million savings." It also included 2018 guidance for "LOE, excluding production taxes" of $0.07-$0.09, and for "Development costs" of $0.41-$0.43 /Mcfe. These statements were materially false and misleading for the reasons stated in ¶ 321, and EQT and Defendants Porges, McNally, and Schlosser knew or recklessly disregarded that these statements were false and misleading when the statements were made for the reasons identified *supra* in ¶ 322.

326.    EQT's July 30, 2018 analyst presentation claimed that in 2018, EQT would "[b]egin to realize capital, operational and administrative synergies," including "LOE per unit $0.04 less—approximately $62 million savings." It also included 2018 guidance for "LOE, excluding production taxes" of $0.05-$0.07, and for "Development costs" of $0.40-$0.42 /Mcfe. These statements were materially false and misleading for the reasons stated in ¶ 321, and EQT and Defendants Porges, McNally, and Schlosser knew or recklessly disregarded that these statements were false and misleading when the statements were made for the reasons identified *supra* in ¶ 322.

327.    EQT's August 6, 2018 analyst presentation claimed that in 2018, EQT would "Begin to realize capital, operational and administrative synergies," including "LOE per unit $0.04

less—approximately $62 million savings." It also included 2018 guidance for "LOE, excluding production taxes" of $0.05-$0.07, and for "Development costs" of $0.40-$0.42 /Mcfe. These statements were materially false and misleading for the reasons stated in ¶ 321, and EQT and Defendants Porges, McNally, and Schlosser knew or recklessly disregarded that these statements were false and misleading when the statements were made for the reasons identified *supra* in ¶¶ 319 and 322.

328.    EQT's September 4, 2018 analyst presentation included 2018 guidance for "LOE, excluding production taxes" of $0.05-$0.07, and for "Development costs" of $0.40-$0.42 /Mcfe. These statements were materially false and misleading for the reasons stated in ¶ 321, and EQT and Defendants Porges, McNally, and Schlosser knew or recklessly disregarded that these statements were false and misleading when the statements were made for the reasons identified *supra* in ¶ 322.

329.    EQT's October 25, 2018 analyst presentation included 2018 guidance for "LOE, excluding production taxes" of $0.05-$0.07, but omitted the usual line item for "Development costs." The LOE guidance was materially false and misleading because EQT was understating its Lease Operating Expenses by capitalizing all produced-water expenses, and EQT and Defendants Porges, McNally, and Schlosser knew or recklessly disregarded that these statements were false and misleading when the statements were made for the reasons identified *supra* in ¶ 322.

330.    EQT's October 29, 2018 analyst presentation included 2018 guidance for "LOE, excluding production taxes" of $0.05-$0.07, but omitted the usual line item for "Development costs." The LOE guidance was materially false and misleading because EQT was understating its Lease Operating Expenses by capitalizing all produced water expenses, and EQT and Defendants

Porges, McNally, and Schlosser knew or recklessly disregarded that these statements were false and misleading when the statements were made for the reasons identified *supra* in ¶ 322.

### 7. Defendants' Omissions of Material Fact

331. Throughout the Class Period, EQT and the Officer Defendants' public statements omitted material facts that were required to be disclosed under SEC rules or necessary to make their public statements not misleading. Among other things, Defendants failed to disclose the following material facts:

a. EQT experienced numerous undisclosed well collapses when it attempted to drill ultra-long lateral wells both before and after the Acquisition closed;

b. EQT lacked the expertise to drill ultra-long lateral wells and repeatedly refused to follow industry best practices on how to do so, rejecting advice from Rice executives and employees, its own employees, and K&M Technologies consultants both before and after the Acquisition closed;

c. After the Acquisition closed, EQT rushed to drill longer laterals without regard for proper well completion, including failing to pump the correct amount "mud" to clear out cuttings, which resulted in many drill pipes and bottom hole assemblies being trapped underground and caused substantial excess costs and delays;

d. EQT incurred significantly increased drilling and completion costs in the first and second quarters of 2018 that it did not reflect in its reported financial results;

e. EQT understated its Authorizations for Expenditure for wells (which were used to determine both internal cost planning and development costs reported to investors) by excluding costs that would nevertheless have to be incurred to drill and complete the wells, including the costs of intermediate casing, gyroscopes, and mine-void operations;

f. EQT falsified Formation Integrity Tests and filed false reports with the State of Pennsylvania;

g. EQT's public claim of $2.5 billion of synergies was based on reducing the number of well pads from 199 to 99, which was not possible because Rice had already optimized its well-pad locations, making cutting the number of pads in half impossible;

h. According to EQT's own undisclosed July 2018 request for proposal, EQT operated in a "siloed" fashion, with "little consideration given to overall efficiency"; EQT's model "increase[d] the likelihood of both safety and environmental incidents"; and

EQT lacked "the right skill sets internally to effectuate th[e] undertaking" of drilling "long laterals on multi-well pads";

i.    There were numerous third-party parcels in between EQT's and Rice's plots of natural-gas acreage that would make drilling longer laterals across the EQT and Rice plots impossible (or substantially more expensive, in light of required payments to the third parties, than EQT stated publicly);

j.    In many areas where longer laterals might otherwise have been possible across EQT and Rice plots, one or both sides had already been drilled for gas, making the longer laterals impossible;

k.    At the time the Acquisition closed and for many months after the closing, EQT lacked the permits necessary to "immediately" drill longer laterals on combined EQT and Rice acreage, as it told investors it was going to do; and

l.    EQT understated its actual well costs by improperly capitalizing the cost of disposed producing water in violation of GAAP and IRS rules.

## J.    The Truth About the Acquisition Is Partially Revealed

332.    The truth about the Acquisition began to be revealed on October 25, 2018, when the Company disclosed negative financial results for the three months ended September 30, 2018. Among other things, the Company's earnings press release issued that day stated that "[e]stimated well development capital expenditures for 2018 *increased by $300 million* to $2.5 billion. This was driven by inefficiencies resulting from higher activity levels, the learning curve on ultra-long laterals and service cost increases." The Company reported a quarterly net loss attributable to EQT of $40 million, compared with quarterly net income attributable to EQT of $23 million in the prior year's third quarter. Tellingly, the third-quarter Form 10-Q filed on October 25, 2018 did not include the statements about "longer laterals" and "lower operating cost structure" resulting from the Acquisition that were included in the first- and second-quarter 2018 Form 10-Qs, as quoted in ¶¶ 281 and 290.

333.    During an investor and analyst conference call on October 25, 2018, the recently promoted Erin Centofanti, EQT's Executive Vice President, Production (who left EQT just five

months later, effective May 3, 2019), stated that the Company was increasing its well-development capital expenditures for 2018 by $300 million, or 14%, based on costs that "represent primarily onetime events that were driven by pace of activity, ultra-long lateral learning curve and some service cost increases." She further stated that "as we progress up the learning curve on the ultra-long laterals, meaning those laterals that are between 15,000 and 20,000 feet, early well costs are heavily influenced by trying new techniques and adjusting operating practices *as problems occur*." She admitted that ***EQT had yet "to drill longer laterals at the cost profile we originally anticipated*."

334.     Also on the October 25, 2018 call, incoming CEO McNally acknowledged that the Company had not lived up to its prior statements about the Acquisition:

> We do understand that this quarter's operational update is a ***disappointment to shareholders***. It certainly is a disappointment to me and this team as we underperformed our asset base in 2018. As the incoming CEO, I'm committed to reshaping our culture to one that's focused on capital efficiency and per share returns *as opposed to purely chasing volume targets*. . . .
>
> [W]e intend to run at a steady pace, moving towards a manufacturing model where we can deploy capital in the most efficient manner *as opposed to ramping up and down*, which is always very expensive when you're mobing [i.e., mobilizing] and demobing [i.e., de-mobilizing] frac crews or rigs.

335.     In response to an analyst's question, McNally elaborated on EQT's failure to achieve the long laterals that it had previously touted:

> On the lateral lengths, with the Rice acquisition, we all of a sudden have found ourselves with a land position that gave us the opportunity to go from, on average, of 8,000-foot laterals to almost 14,000 feet. But mixed in there were quite a number of laterals that were between 15,000 and 20,000 feet, ***many in the kind of 18,500 range, and which present a whole new set of challenges, stretching rigs to their— the limit of their capabilities. And in hindsight, we probably tried to drill too many of those ultra-long laterals.*** In 2018, I think that there is potential upside in drilling those longer than 15,000-foot laterals, but we need to do it at a more measured pace so that we can incorporate the learnings into the next well as opposed to having multiple ultra-long laterals going at once. So I think what you'll see from us and what's baked into our 2019 thinking so far is that *the majority of the wells that we've drilled will be more like 12,000 to 15,000 feet*, and that the ones that are

beyond 15,000 feet we'll take a much more measured view of. And we will work out many of the issues and be able to extend the laterals, but ***the blocking-and-tackling drilling will likely be less than 15,000-foot laterals***. . . .

[T]he vast majority of the wells that we drill going forward will be at less than 15,000 feet.

Through this disclosure, EQT finally informed the market that it was experiencing problems and challenges in its strategy to pursue ultra-long, 15,000-foot plus lateral wells, which was a significant basis for its pre-Acquisition claims that it could achieve 12,000-foot average lateral lengths and $2.5 billion in synergies.

336.    In response to an analyst's question about the $300 million increase in 2018 capital expenses for wells, McNally said:

[A]bout half of the costs were inefficiencies from running so many rigs, so many frac crews, the logistics issues that came with that, about half of that is tied to those inefficiencies. And then a portion is increased service costs that we saw during that period that have now abated and 1/4 or so is from the—of the cost is from ***the problem wells in the ultra-long laterals***.

337.    In response to another analyst's question, McNally acknowledged that costs per well foot were much higher than reflected in the Company's prior statements to investors: "On a per foot basis, 2018 is going to be significantly higher than what we expected. It's going to be over $1,000 of lateral foot versus more like $900 or $915 is what we would have expected."

338.    On this news, EQT shares fell 13%, dropping from a close of $40.46 per share on October 24, 2018 to $35.34 on October 25, 2018. Over the next several days, EQT shares fell to as low as $31.00 per share—less than half what the Company was worth when the Acquisition closed in November 2017. (These per-share prices are not adjusted for the effects of the subsequent spinoff of 80% of EQT's midstream business, Equitrans Midstream Corporation, to EQT's shareholders on November 13, 2018.)

**K.      The Rice Team's 2019 Proxy Fight for EQT Further Reveals EQT's Failures**

339.     Additional developments further revealed to the market that Defendants' statements before the Acquisition and throughout 2018 about the Acquisition and its benefits were materially false and misleading when made. In response to EQT's repeated disappointing financial and operational results, Toby and Derek Rice publicly criticized EQT and engaged in a proxy contest to take executive control of the Company (which they won).

340.     As discussed further below, the Rice Team repeatedly approached EQT in attempts to convince the Company's management to change its operations and drill its wells more efficiently. The Rice brothers have specifically stated that, in November 2018, they privately told EQT that "[w]ell costs imply *no merger synergies*," but EQT made no meaningful response to that assertion.

341.     On December 10, 2018, the Rice brothers delivered a letter to the EQT Board and released a presentation expressing their view that while they "believe strongly in the potential of EQT's assets . . . a course correction is needed." In the accompanying investor presentation dated December 10, 2018 entitled "Realizing EQT's Potential," the Rice Team stated its view that "EQT's stock price does not reflect the underlying value of its assets," and that the Rice Team was "committed to improving EQT's operations and delivering value for all EQT shareholders." The presentation focused on EQT's stock-price performance and how the Rice Team could bring value to EQT shareholders. Specifically, it presented a general outline of the Rice Team's plan for improving EQT's operations and generating free cash flow per year above EQT's then-current plan.

342.     In response to the Rice Team's criticisms, EQT publicly stated that EQT had a much larger asset base and geographical footprint than Rice did at the time of the Acquisition. For example, McNally stated on an investor call on January 22, 2019:

Obviously, EQT's 2019 operating plan should not be predicated on Rice Energy's well costs for wells turned in line during the first half of 2017, especially given the fact that those wells were located in a small geographic area and utilized 100% pipeline-delivered freshwater. ***This is not repeatable, given EQT's geographic footprint***, infrastructure and produced water dynamics.

343.   On January 22, 2019, McNally admitted:

The fundamental change that we're making here is a move from being driven by volume targets to being driven by capital efficiency. And so to correct the missteps from 2018, that really was a function of running more like a manufacturing operation, running at steady state, six frac crews, seven rigs and ***not trying to jump through hoops to get to volume targets***. And importantly, also being realistic about lateral lengths, right? So now in 2018, we drilled some laterals past 15,000 feet to as much as 20,000 feet. Now we are cutting [off] the majority of our laterals at 15,000 feet.

344.   On February 5, 2019, the Rice Team released another public presentation and hosted an investor call that discussed the Rice Team's plan to transform EQT. As Reuters reported, the presentation "proposed appointing Toby Rice, former chief operating officer for Rice Energy, as EQT's new chief executive, and revamping its board." In addition, "Rice, pointing to its previous strategies, said operations could be improved by altering well designs to include more sand, water and stages per foot."

345.   The Rice Team's February 2019 presentation emphasized that EQT had been understating its actual well costs, claiming that EQT had "erroneously adjusted" them "downwards" in an attempt to "normalize costs" and that "EQT costs could be $125-$250/ft higher when including capitalized costs, pad and facilities, etc.":

- We believe EQT's well costs have been erroneously adjusted downwards in an attempt to normalize costs [1]
- EQT costs could be $125-$250/ft higher when including capitalized costs, pad and facilities, etc.

346.   The Rice Team's presentation also stated that EQT had made no improvements to well costs, and that whereas EQT averaged $1,250 per foot for 12,000-foot Marcellus laterals in

Pennsylvania in 2018, Rice averaged $700 per foot for 11,000-foot laterals. It stated further that EQT's "well costs do not include capitalized overhead/other which elevate EQT well costs by $125/ft in 2019."

347.    The Rice Team also held a conference call at 10:00 a.m. ET on February 5, 2019 to present its plan for EQT. During the call, Toby Rice revealed how EQT had repeatedly refused to adopt Rice's best practices.

> Along with other shareholders, we have watched with concern over what has happened at EQT. We have tried numerous times to help them get moving in the right direction. ***Following the announcement of the Rice-EQT merger, we spent 5 months with EQT management, laying out the blueprint that led to Rice's operational success: Our people, technology and planning. Ignoring this, EQT decided to move forward with their internal systems and without critical personnel who are responsible for Rice's success.*** We were concerned but gave EQT the benefit of the doubt they could deliver the synergies EQT—deliver synergies they promised shareholders. Unfortunately, our concerns have been validated over the last 12 months, and so I offered my assistance to EQT leadership privately but was largely ignored. . . .
>
> EQT has a rich history, which I respect. However, ***with history comes baggage, bureaucratic processes, silos and old systems and dated technology. . . .***
>
> ***At Rice, over 400 workflows were digitized allowing us to capture real data in real time from every corner of the business that powered our analytics platform. This technology still exists within EQT, but it lies dormant and underutilized***.

348.    When asked during the Rice Team's February 5, 2019 conference call about the "timeline" and whether it had been "presented to the EQT board already following their 2019 outlook," Toby Rice responded:

> ***During the merger, we approached them [EQT] and explained our plans, and they were ignored***. After the operational miss [in October 2018], we went to management and explained and offered our help, and we were ignored. Management wasn't going to handle the issue. We went to the Board and presented to the Board, and we were ignored. And . . . now we're presenting to the shareholders because if the management team won't take care of these issues and the Board won't take care of the management team, then shareholders are going to take care.

349.    In response to the February 5, 2019 disclosures, EQT's stock price fell **3.5%**. Analysts and the press immediately reported on the disclosure. Reuters reported that "EQT's average Marcellus well cost for a 12,000-foot lateral was $1,250 per foot in 2018, while Rice, before its merger with EQT, averaged $790 per foot for wells with laterals reaching 8,800 in the same region." Reuters also reported that the Rice Team stated during its presentation that "EQT has historically '***erroneously adjusted downwards***' its well costs" and that "[s]hares of EQT were down 1.4 percent to $19.49 in mid-morning trading on Tuesday."

350.    The same day, RBC Capital Markets reported that the Rice Team "provided more context to reaching a more rapid FCF [free cash flow] generation scenario if placed in the driver's seat." TD Securities Inc. similarly reported that the "former management team of Rice Energy outline its own path forward for EQT. . . . In its simplest form, Rice claims that they . . . are able to operate in a more efficient manner (through better planning, technology and operational management), which will lower capital costs, improve FCF, and ultimately equity value." TD Securities echoed the Rice Team's claim that "well cost on a per foot basis of EQT in 2019 will be $1095/ft (as opposed to EQT's claim of $890/ft). The Rice team aims to bring these costs down to $735/ft., which represents a decrease of 33%."

351.    On February 5, 2019, in response to the Rice Team's presentation and call, EQT generically "disagreed" with the Rice Team's assertions: "We disagree with the analysis put forward by the Rices and look forward to continuing our discussions directly with shareholders," and "EQT remains focused on reducing costs and generating substantial free cash flow to create further value for EQT shareholders." This statement was materially false and misleading because it contradicted the Rice Team's accurate assertions, including that EQT had been erroneously

adjusting downward its well costs, and otherwise failed to disclose the true state of affairs at the Company.

352.   On April 22, 2019, the Rice Team filed a preliminary proxy statement with the SEC criticizing EQT's management and operations. As the April 22 Rice Team materials summarized the public developments to date:

> In 2017, EQT justified the Merger based on delivering $1.9 billion in well cost synergies, $2.5 billion of base synergies and $7.5 billion of potential all-in synergies. The key thesis underpinning the cost synergies possible through the Merger was the opportunity to develop longer laterals, as combining EQT's and Rice Energy's acreage positions would enable longer lateral development that, if done effectively, would result in lower well costs on a per foot basis. EQT's 2018 guidance suggested budgeted well costs of $900 per foot, yet ***EQT's actual results not only failed to achieve their conservative guidance and begin to take advantage of the promised Merger synergies through longer lateral development, but instead produced disastrous results***, including (a) posting a loss of $2.4 billion in 2018, or $8.60 per share, (b) exceeding capital expenditure guidance by over $300 million, (c) falling short of production guidance and (d) repurchasing $500 million of shares of Common Stock less than two months before announcing its capital expenditure overrun and production miss.

353.   On April 25, 2019, EQT filed a first quarter 2019 earnings update entitled "EQT Corporation: New Company, New Leadership, New Focus." In it, EQT claimed that it capitalized the cost of its recycled produced water but that it expensed the cost of its disposed produced water:

| Where is the cost? | Metric |
|---|---|
| Fresh water - capitalized | $/ft. |
| Produced water, recycled – capitalized | $/ft. |
| Produced water, disposed – expensed | LOE |

This was materially false and misleading because EQT had capitalized the costs of all produced water.

354.   On June 17, 2019 after the market close, the Rice Team filed detailed proxy materials with the SEC that disclosed that (i) EQT failed to achieve the benefits of the Acquisition; (ii) EQT did not seek and had not achieved the synergies and cost savings that were the purported

rationale of the Acquisition; (iii) EQT failed to adopt Rice's best practices; (iv) EQT was excluding more than $300 million in costs it capitalized from its well costs; and (v) EQT leadership "lacks credibility and has misled shareholders."[34]

355.    Specifically, in the following slide, the Rice Team detailed how EQT had "Failed to Achieve [the] Benefits of [the] Combination":



356.    As the Rice Team's presentation stated, EQT's failures stood out as unique in the oil and gas industry, with EQT achieving "no synergies" from the merger "other than firing RICE employees":

---

[34] According to FE 11, at least some of the information in the Rice Team's presentations would have had to have come from someone inside EQT. Indeed, EQT alleged that one of its petroleum engineers and software developer provided confidential EQT information to Toby and Derek Rice. *See* Anya Litvak, *With Toby Rice in Charge, What Happens to EQT's Subpoena of His Texts?*, Pittsburgh Post-Gazette (July 23, 2019).

## EQT STANDS ALONE IN FAILING TO ACHIEVE BENEFITS OF CONSOLIDATION

**EQT uses scale as an excuse for higher costs. But, other operators are using consolidation to drive synergies.**

| DATE | BUYER | SELLER | TRANSACTION SIZE | TIME SINCE MERGER | RESULTS |
|------|-------|--------|------------------|-------------------|---------|
| Feb '19 | encana | NEWFIELD | $7.7bn | 4 months | • Eliminated $1mm of costs per well from Newfield levels |
| Feb '19 | CHESAPEAKE ENERGY | WildHorse | $4.9bn | 4 months | • Eliminated $500,000 of costs per well from Wildhorse levels<br>• Heading towards $1mm per well savings |
| Feb '19 | eclipse | BLUE RIDGE | $1.4bn | 3 months | • Reduced well costs by 11% vs standalone companies |
| Nov '18 | DIAMONDBACK | ENERGEN | $9.2bn | 6 months | • Reduced well costs by 10-15% from Energen levels<br>• Initiated $2bn stock buy back |
| July '18 | CONCHO | RSP PERMIAN | $9.5bn | 11 months | • 80% of development now "large-scale projects" |
| Nov '17 | EQT | RICE ENERGY | $8.2bn | 19 months | • **Well costs higher than pre-merger**<br>• **No synergies other than firing RICE employees** |

Source: Company filings. Transaction size includes assumption of net debt.

RICE TEAM

47

357.    Specifically, as the Rice Team set out in their presentation: "EQT's well performance is far below peers," and EQT has "failed to effectively test and innovate on completions and has consistently lagged its peers."

358.    The Rice Team's June 17, 2019 presentation also disclosed that EQT had been "excluding more than $300 million in costs it capitalizes from its well costs," which, as Rice claimed, amounted to "Misleading math":

> **Misleading math.** EQT is **excluding more than $300 million in costs** it capitalizes from its well costs. Goldman Sachs, EQT's financial advisor, has publicly stated EQT is the **highest cost producer.**

359.    Another Rice Team slide from the June 2019 presentation emphasized that EQT's "drilling costs are higher than peers on an apples-to-apples basis" and that:

**EQT is omitting >$300mm of cash costs from all of its operational metrics**

360.    When describing why the EQT leadership "lacks credibility and has misled shareholders," the Rice Team's presentation emphasized that "EQT has missed type curve every

year and by ~20% on average since 2014." A production "type curve" is a representative

production profile of a well for a specific area. That is, if EQT were going to drill a successful well

in an area, a type curve would be the "best representation" of the expected production forecast.

The type curve is typically established by calculating the average production rate of producing

wells for each period. Rice, however, pointed out that EQT had missed that type curve every year

since 2014.

361.    The Rice Team's presentation further discussed how, although EQT's claimed $2.5

billion in synergies "hinged on incorporating best practices," EQT's well productivity was "clearly

not incorporating best practices." As stated in the presentation, "EQT did not incorporate Rice

Energy's well designs or planning into EQT's wells":



362.    The Rice Team's presentation further stated that "EQT Failed to Allocate Capital

to Maximize Shareholder Value," including because EQT's "Strategic Initiative" of "Drilling

Super Long Laterals" was based on an attempt to "put[] 2018 capital budget at risk by drilling as

many 18000' laterals as possible with no experience." This resulted in "massive operational issues" and "cost overruns," as well as approximately $500 million in misallocated capital:

| | | | | |
|---|---|---|---|---|
| **Drilling Super Long Laterals** | 2018 | • Puts 2018 capital budget at risk by drilling as many 18000' laterals as possible with no experience | • Massive operational issues + cost overruns<br>• Misses 2018 guidance on all fronts | **~ $500mm**<br>*McNally as CFO* |

363.    The Rice Team presentation also identified specific ways in which EQT had "consistently misled shareholders." This included EQT's claim during the second quarter of 2018 that the synergies from the Rice deal were being achieved when, in reality, in the third quarter of 2018, EQT disclosed a $300 million capital-expense miss, a 5% production-volume miss, and a $500 million stock buy-back. In addition, EQT's 2019 plan called for the same well costs per foot as before the Acquisition, despite a claimed 50% increase in lateral length:



364.    The "Translation" of that message was that the "Synergies used to justify the Rice Energy merger aren't achievable by this team."

365.    The Rice Team's June 2019 presentation also stated that the problems EQT experienced that led to the October 2018 disclosures and stock price decline were related to events

that occurred in the first half of 2018. In the words of the Rice Team presentation: "October 2018, stock drops 35% after discovering *operational issues that happened in 1H18*."

366.    At the same time that this presentation was released, also after the market close on June 17, 2018, EQT announced preliminary second-quarter 2019 results.

367.    On the morning of June 18, 2019, the Rice Team issued a press release concerning its June 17 investor presentation, discussed above. In response to the dissemination of this news and as the market began to digest the Rice Team's nearly 190-page presentation, EQT's stock price declined throughout the day on June 18.

368.    Also on June 18, 2019, in response to the Rice Team's investor presentation, EQT issued a statement denying the claims in the presentation. EQT stated:

> Nothing in Toby Rice's latest presentation changes the fact that since EQT's new management team was appointed late last year, the Company has: significantly improved EQT's operational efficiency, such that today EQT is a low-cost leader among Appalachian peers; embraced innovative new technologies . . . ; identified $175 million in annual cost reductions; and transformed into a free cash flow machine . . . .

EQT stated further that the Rice Team's "campaign is premised on misleading information and stale arguments that are wholly contradicted by EQT's transformation."

369.    On June 19, 2019, the market continued to digest the new information disclosed in the Rice Team's investor presentation. EQT's stock price fell 5% that day, dropping from $15.96 on June 18 to $15.06 on June 19, lower than EQT's closing price of $15.85 on June 17.

370.    In June 2019, in the midst of the proxy battle between the Rice Team and EQT and immediately before the July shareholder vote, ISS relinquished its support for EQT in favor of the Rice Team. In a detailed June 28, 2019 report, ISS reversed course on its prior confidence in the synergies EQT stated it would achieve from the Acquisition. ISS's report stated that the cost savings and other supposed benefits from the Acquisition had not come to fruition, and that the

EQT Board required substantial change. The ISS report concluded, among other things, that "EQT has underperformed both peers and the index [since the Acquisition]" and this "failure on the part of the legacy team to translate the potential for unique economies of scale as the largest domestic natural gas producer into TSR outperformance *amounts to an abject failure*." ISS concluded that "EQT has failed to fully achieve the RICE transaction synergies communicated to the market prior to the deal . . . ."

371.    On July 9 and 10, 2019, further demonstrating the falsity of Defendants' pre-Acquisition statements misstating EQT's claimed synergies and well-development and operational capabilities, investors voted to give Board and executive control of EQT to the Rice Team. Bringing to a successful conclusion the Rice Team's months-long battle for control of EQT, the Company's investors voted in favor of the Rice Team holding seven of the seats on EQT's 12-member Board, and Toby Rice became EQT's CEO.

### L.    Loss Causation

372.    During the Class Period, as detailed in this complaint, Defendants made materially false and misleading statements and omissions, including statements regarding the Acquisition, and engaged in a scheme to deceive the market. This artificially inflated the price of EQT common stock and operated as a fraud or deceit on the Class. Later, when Defendants' prior misrepresentations and risks concealed by the fraudulent conduct alleged in this complaint materialized and were disclosed to the market starting on October 25, 2018, the price of EQT common stock fell precipitously. As a result of their acquisition of EQT common stock during the Class Period and Defendants' material misstatements and omissions, Plaintiffs and other members of the Class (defined below) suffered economic loss, i.e., damages, under the federal securities laws.

373. Specifically, the artificial inflation in EQT's stock price began to be removed when the conditions and risks misstated and omitted by Defendants began to be partially revealed to the market on October 25, 2018. That day, EQT reported surprisingly bad third-quarter results, including an earnings miss due to a significant increase in total costs, which were $586.2 million higher than in the same period the prior year. The Company disclosed further that its estimated capital expenditures for well development in 2018 would increase by 13.6%—$300 million—to $2.5 billion because of "inefficiencies resulting from higher activity levels, the learning curve on ultra-long horizontal wells, and service cost increases." EQT also reduced its fourth-quarter and full-year production forecast for 2018.

374. In its October 25, 2018 presentation, EQT no longer cited as a key investment highlight its industry-leading cost structure and, less than one year following the close of the Acquisition, removed all reference to the previously anticipated $1.9 billion of well cost synergies, $2.5 billion of base synergies and $7.5 billion of potential all-in synergies attributable to the Acquisition.

375. In response to the October 25, 2018 disclosures, EQT shares dropped nearly 13% on October 25, 2018, from $22.02 per share to $19.24 per share on heavy trading volume of more than 16 million shares traded. The decline in share price continued for the next two days, as the price of EQT common stock fell nearly 8% on October 26, 2018, on heavy trading volume of more than 11.7 million shares traded, and fell nearly 5% on October 29, 2018, on heavy volume of more than 10.3 million shares traded.

376. Analysts focused on EQT's "disappointing capital efficiency." A Jefferies report from October 25, 2018, for example, noted the existence of ***"[s]lower than anticipated integration***

138

*of the RICE acquisition* driving higher capex (inefficiencies from higher activity levels, learnings on longer laterals)."

377.    Analysts also expressed surprise at the miss. Morgan Stanley reported on October 25, 2018 that "EQT raised 2018 capex 14% and cut production 2%, which wasn't anticipated by the Street."

378.    Other analysts reported on EQT's weakened capital efficiency. BMO Capital Markets reported on October 25, 2018 that "EQT increased its well development capex budget to $2.5Bn (vs. $2.2 Bn)" due to "inefficiencies from higher activity levels, learning curve on ultra long laterals, and service cost increases." Credit Suisse similarly reported the same day that EQT's "capital efficiency disappoints due to higher base decline rate and well costs." TD Securities Inc. reported that EQT's "lateral wells in excess of ~15,000 ft ran into numerous operational issues that led to an increased cost per lateral foot. These 'super' long laterals will be deployed more selectively moving forward. Average D&C cost per ft is now expected to average $1,000/ft in 2018, versus prior estimates of ~$900/ft."

379.    Negative analyst commentary continued into the following day. Jefferies reported on October 26, 2018 that it was lowering its price target for EQT "as *RICE synergies appear slower to materialize*." Jefferies reported further that "5% pro-forma growth was well below consensus expectations," and that "[d]ifficulties drilling longer laterals and decreased capital efficiency from running a larger program were two of the causes, as *the company has clearly had issues realizing synergies from the RICE transaction thus far*." Jefferies also questioned EQT's free cash flow projection of $2.1 billion for the subsequent five years, reporting that "[w]e have trouble getting to these numbers, as our model generates ~$870 MM of FCF assuming these prices

($1.35 Bn if we remove our cost inflation assumptions). At the strip, our aggregate FCF falls to ~$170 MM, as we see EQT spending at/near CF in 2021+."

380.    Also in an analyst report published on October 26, 2018, BMO Capital Markets lowered its rating on EQT to "market perform," and reported that "a rebound in the share price is unlikely. Based on preliminary 2019 production/capex guidance, capital efficiency is expected to remain weak, with minimal sequential growth throughout 2019, while we think long-term maintenance capex targets will be difficult to achieve."

381.    Analysts also commented on the market's newfound decreased confidence in EQT's ability to deliver on the synergies. On October 26, 2018, U.S. Capital Advisors wrote that the "market has lost execution confidence and will materially risk outlook. … Net, EQT firmly in penalty box." BMO similarly reported the same day that "we think investors will be skeptical given the significant improvement implied and recent mixed operational performance." Tudor Pickering & Holt reported that "management is now in the penalty box and the market is now in show-me mode as it relates to the equity."

382.    EQT's October 25, 2018 disclosures partially corrected Defendants' prior materially misleading statements and omissions concerning the synergies from the Rice Acquisition.

383.    On February 5, 2019, the Rice Team released a public presentation and hosted an investor call that discussed the Rice Team's plan to transform EQT. As Reuters reported, the Rice presentation "proposed appointing Toby Rice, former chief operating officer for Rice Energy, as EQT's new chief executive, and revamping its board" and discussed how "EQT's average Marcellus well cost for a 12,000-foot lateral was $1,250 per foot in 2018, while Rice, before its merger with EQT, averaged $790 per foot for wells with laterals reaching 8,800 in the same

region." In addition, "Rice, pointing to its previous strategies, said operations could be improved by altering well designs to include more sand, water and stages per foot."

384.    The Rice Team's February 2019 presentation emphasized that EQT had been understating its actual well costs, claiming that EQT had "erroneously adjusted" them "downwards" in an attempt to "normalize costs" and that "EQT costs could be $125-$250/ft higher when including capitalized costs, pad and facilities, etc."

385.    In response to the February 5, 2019 disclosures, EQT's stock price fell *3.5%*. Reuters reported that "EQT's average Marcellus well cost for a 12,000-foot lateral was $1,250 per foot in 2018, while Rice, before its merger with EQT, averaged $790 per foot for wells with laterals reaching 8,800 in the same region." Reuters also reported that the Rice Team stated during its presentation that "EQT has historically '***erroneously adjusted downwards***' its well costs" and that "Shares of EQT were down 1.4 percent to $19.49 in mid-morning trading on Tuesday."

386.    On June 17, 2019 after the market close, the Rice Team filed lengthy and detailed proxy materials with the SEC that disclosed that (i) EQT failed to achieve the benefits of the Acquisition; (ii) EQT did not seek and had not achieved the synergies and cost savings that were the purported rationale of the Acquisition; (iii) EQT terminated nearly every Rice executive and leader after telling the market that EQT would seek to retain key Rice executives; (iv) EQT was excluding more than $300 million in costs it capitalizes from its well costs; and (v) EQT leadership "lacks credibility and has misled shareholders."

387.    On the morning of June 18, 2019, the Rice Team issued a press release concerning its June 17 investor presentation. In response to the dissemination of this news and as the market began to digest the Rice Team's nearly 190-page presentation, EQT's stock price declined throughout the day on June 18. On June 19, 2019, the market continued to digest the new

information disclosed in the Rice Team's investor presentation. EQT's stock price fell 5% that

day, dropping from $15.96 on June 18 to $15.06 on June 19, lower than EQT's closing price of

$15.85 on June 17.

388.    The declines in EQT's stock price were a direct and proximate result of Defendants'

scheme being revealed to investors and to the market. The timing and magnitude of EQT's stock

price declines negate any inference that the economic losses and damages suffered by Plaintiffs

and the other members of the Class were caused by changed market conditions, macroeconomic

factors, or even EQT-specific facts unrelated to Defendants' fraudulent conduct.

### M.    Additional Scienter Allegations

389.    EQT and the Officer Defendants (Schlotterbeck, McNally, Porges and Schlosser)

knowingly or with severe recklessness misrepresented and omitted material facts about the

supposed benefits of the Acquisition, EQT's ability to realize those benefits, and how the

Acquisition was proceeding, and understated EQT's costs.

### 1.    The Officer Defendants Knew or Had Access to Facts Contradicting Their Public Statements

390.    As alleged in detail above, the Officer Defendants knew or had access to facts

contradicting their public statements about the expected synergies and other benefits of the

Acquisition. For example:

a.    Schlotterbeck was personally responsible for the underlying (and impossible-to-achieve) assumption on which EQT based its synergy claims—that EQT would reduce its number of well pads from 199 to 99;

b.    Schlotterbeck personally directed EQT's Assistant Controller to assume that the midstream infrastructure to serve the combined companies' wells would cost only $1 billion, even though the assumed number of wells was unrealistically low and the assumed cost was $400–$500 million too low;

c.    Rice members of an EQT-Rice integration team told EQT before the Acquisition closed that EQT's stated synergies were unachievable, but Schlotterbeck rejected the Rice efforts;

142

    d.    At least two of EQT's ultra-long lateral wells drilled before the Acquisition collapsed, EQT had to redrill many wells as many as three times, and the drill bits got stuck in a vast number of EQT's wells—facts so dire and so integrally tied to the Company's core operations that the only reasonable inference is that they were reported to the Officer Defendants;

    e.    EQT deliberately falsified mandatory FITs and filed false reports about the tests with state regulators on the orders of EQT's Vice President of Drilling and Completions, who reported to the C-suite;

    f.    The Vice President of Drilling and Completions, the Drilling Team Lead, and the Director of Engineering received reports in spring and summer 2017 about necessary design changes for drilling longer lateral wells and about the reasons for the longer wells collapsing, but EQT refused to implement the necessary changes;

    g.    The Vice President of Drilling and Completions and the Drilling Team Lead received recommendations from consultants at K&M Technologies in September 2017 about how to drill longer laterals, but they rejected the recommendations at the direction of "senior management"; and

    h.    After EQT understated its reported capital expenditures and development cost guidance, and after FE 10 tried to have employees increase the Company's budget numbers to return them to normal to reflect reality, Schlosser threatened to fire employees if they did so.

    **2.    Defendants Repeatedly Falsely Denied JANA's Criticisms of EQT's Claimed Synergies and Well Numbers and Admittedly "Cartoonish" Acreage Map**

391.    Each time that JANA, using specific reports and data, challenged the Acquisition and questioned Defendants' representations about the core rationale for the Acquisition, Defendants aggressively denied those statements, doubled down on their version of the facts, and falsely assured the market that JANA was wrong. Defendants' repeated denials of JANA's criticisms of the proposed synergies and well numbers that would supposedly result from the Rice merger support a strong inference of Defendants' fraudulent intent.

392.    For instance, when challenged, Defendants doubled down on the dollar amount of their claimed synergies from the Acquisition and emphatically represented at least $2.5 billion as a baseline of success:

a.   In EQT's June 2017 merger announcement, Defendants touted $2.5 billion in synergies. On July 27, 2017, after JANA asserted that the claimed synergies figure was $1.3 billion too high, Defendant Schlotterbeck told analysts that, "after careful evaluation," $2.5 billion was a "conservative" number and "there was actually an additional $7.5 billion of potential" on top of that.

b.   On the July 27, 2017 call, when an analyst pressed EQT about the synergy calculation being "such a positive, important part" of the merger, Defendant Schlotterbeck responded that although $7.5 billion of synergies on top of the claimed $2.5 billion was "a bit optimistic," he and his colleagues (including Defendant McNally, who was also on the call) "have extremely high confidence that we will get at least" $2.5 billion in synergies.

c.   On October 23, 2017, after JANA asserted that EQT only stood to realize $300 million in drilling synergy, or 15% of the total purported $2.5 billion in synergies (as opposed to the $1.9 billion, or 80% of synergies, that EQT claimed it would achieve), Defendants described the $2.5 billion in synergies as a "base," with "additional upside potential of $7.5 B." Three days later, Defendant Schlotterbeck reiterated his previous statement that $2.5 billion was just a baseline: "We are confident in our ability to deliver the $2.5 billion of base synergy value and also deliver significant value from upside synergies." As set forth above, the claimed $2.5 billion and $7.5 billion in claimed synergies lacked a valid basis in fact.

393.   Also, when challenged, Defendants doubled down on the average lateral length of the wells that EQT could drill post-Acquisition. They publicly held themselves out as knowing precisely how to drill the ultra-long lateral wells that they claimed they would be able to drill post-Acquisition. After JANA questioned Defendants' ability to drill 1,200 wells at 12,000 feet in average length, Defendants brushed aside those doubts by overstating EQT's drilling prowess and claiming that drilling longer lateral wells would be business as usual for EQT:

a.   On EQT's October 26, 2017 earnings call, Schlotterbeck stated that the cost of drilling shorter laterals without Rice was "roughly" the same as drilling 12,000 foot laterals with Rice. He continued: "So that's just part of what we do, and *we do it every day*. . . And [the land department] work[s] every day putting the jigsaw puzzle together. That's what they do. So this is part and parcel of what we do every day, and that won't change with Rice"; and

b.   Also on EQT's October 26, 2017 earnings call, Schlotterbeck doubled down on what Defendants claimed they could achieve from the Acquisition based on EQT's present capabilities: "So in terms of delivering on the synergies, we're going to be able to start demonstrating that from day 1. . . . [W]e're going to come out of the gate at *12,700 at least* and probably go up from there."

144

394.    As alleged in detail above, information provided by former EQT employees supports a strong inference that Defendants knew or recklessly disregarded that their claims about EQT's drilling abilities were untrue. FE 2 reported that in July or August 2017, as EQT's expert on long laterals, he reported to his managers, including Brian Morel, the Director of Engineering, that the Company's attempts to drill longer laterals were failing and that EQT would not be able to drill longer laterals without taking several corrective steps. EQT dismissed FE 2's warnings.

395.    An inference of Defendants' fraudulent intent is also demonstrated by the fact that when Defendants faced doubts about a key justification for the Acquisition—the supposedly "largely contiguous," "very consolidated" acreage of EQT and Rice—they chose to push their version of the truth using a "cartoonish" map that they knew was misleading:

   a.    In materials filed with the SEC on June 19, 2017 and July 27, 2017, Defendants proffered maps to demonstrate the "contiguous" nature of EQT's and Rice's holdings. Defendants knew, however, that the maps did not accurately depict the two companies' acreage. Indeed, on the July 27, 2017 call with analysts, Defendant Schlotterbeck admitted that "[t]hese maps are kind of cartoonish, so you have to be careful about it."

   b.    On September 20, 2017, JANA disputed Defendants' claims of contiguity, describing the same above-described maps as "over-simplified" and concluding that there was not enough undrilled contiguous acreage to achieve the lateral lengths and related cost savings cited by Defendants as the key justification for the Acquisition.

   c.    Despite Defendant Schlotterbeck's prior admission that the maps were "kind of cartoonish," in response to JANA's criticism, Defendants doubled down and declared that it was "***emphatically not the case***" that the map was misleading. Defendants then used the same map in filings with the SEC as supposed proof for their claim that they could drill longer lateral wells with the combined Rice/EQT acreage. Defendants did so even though JANA published a granular map that accurately depicted the gaps in the EQT and Rice acreage, which JANA argued would add significant costs to the merged entity. Defendants' embrace of their admittedly "cartoonish" map, which they knew did not paint a clear picture for investors, supports a strong inference of their knowledge or severe recklessness.

### 3. EQT and the Officer Defendants Had a Motive to Artificially Inflate EQT's Share Price Because They Used EQT's Stock as Merger Consideration

396. The Officer Defendants were motivated to make materially false and misleading statements to investors about the benefits of the Acquisition to artificially inflate EQT's stock price, so that EQT could purchase Rice using EQT's stock as currency. EQT would not have been able to close such a multi-billion-dollar deal with solely cash or debt.

397. As the Registration Statement for the Acquisition stated:

> If the merger is completed, each outstanding share of Rice common stock (with certain exceptions described in the accompanying joint proxy statement/prospectus) will convert into the right to receive 0.37 of a share of EQT common stock and $5.30 in cash, without interest and subject to applicable withholding taxes. ***Although the number of shares of EQT common stock that Rice stockholders will receive is fixed, the market value of the merger consideration will fluctuate with the market price of EQT common stock*** . . . .

The Officer Defendants were thus highly motivated to increase EQT's share price leading up to the November 9, 2017 votes on the Acquisition by EQT and Rice shareholders. This was particularly true with respect to making the Acquisition attractive to the Rice shareholders, who would receive a set amount of EQT shares in the Acquisition, and who would decide whether the value of the EQT shares they would receive in exchange for their Rice shares merited their vote of approval.

398. On Friday, June 16, 2017, the day before EQT announced it would acquire Rice, EQT's shares closed at $58.77. On Monday, June 19, 2017, EQT announced that it would pay for the Acquisition with 0.37 shares of EQT stock for each share of Rice stock plus $5.30 per share. This news caused an 8% drop in EQT's share price that day (which closed at $53.51) and news

reports began with dour proclamations such as "[c]reating a U.S. shale-gas goliath has released some merger-related hot air," which severely jeopardized the closing of the Acquisition.[35]

399.    As alleged above (in Section V.I.), in the days and weeks following that announcement and sharp price decline, the Officer Defendants aggressively touted the Acquisition's supposed benefits to EQT and Rice shareholders through repeated materially false and misleading statements about the Acquisition's purported benefits and EQT's ability to achieve them. Leading up to the Acquisition, those materially false and misleading statements artificially inflated EQT's stock price as it *increased 20.4%*, from $53.52 on June 19, 2017 to close at $64.45 on November 8, 2017, the day before EQT and Rice shareholders voted to approve the Acquisition (with the price closing even higher on November 9, 2017 at $65.91).[36]

### 4.    Natural Gas Drilling Is EQT's Core Operation, and the Rice Acquisition Was EQT's Central Focus During the Class Period

400.    Natural gas drilling is EQT's core operation, with decades of operations, which further supports a strong inference that the Officer Defendants were aware of, or recklessly

---

[35] Lauren Silva Laughlin, *Extra Rice* (June 19, 2017), *available at* https://www.breakingviews.com/ considered-view/eqt-gives-away-too-much-for-rices-wells.

[36] In a further attempt to convince investors of the merits of the Acquisition, the Officer Defendants purchased EQT common stock in the open market in June 2017. On June 21, 2017, two days after EQT announced the Acquisition, McNally purchased 1,500 shares of EQT common stock on the open market for the first time for $50 per share, for a total of $75,000. On June 22, 2017, Schlotterbeck purchased 2,000 shares of EQT common stock for $52.14 per share, for a total of $104,280. The same day, Schlosser purchased 10,000 shares of EQT common stock for $50.96 per share, for a total of $509,600. Defendants Schlotterbeck, Schlosser and McNally's public gestures of faith had their desired effect. When EQT filed Forms 4 with the SEC for Schlosser, McNally, and Schlotterbeck's trades on June 23, 2017, the share price rebounded as analysts began to accept and repeat Defendants' proclamations about the supposed benefits of the Acquisition. These Defendants' trades—made within a day of each other and just days after EQT announced the Rice Acquisition—indicate that they recognized the need to boost EQT's share price to use EQT's stock as currency, and to paint the Acquisition in as positive a light as possible. As discussed below, at the time of these trades, the collective benefits they would have received in incentive compensation as a result of their successfully closing the Acquisition far exceeded the short-term costs of purchasing the shares.

disregarded that, the claimed synergies were impossible to achieve, that the Company was experiencing significant undisclosed difficulties in drilling longer laterals, and that EQT was understating its costs and development cost guidance.

401.    In addition, EQT's Acquisition of Rice was also EQT executives' central focus during the Class Period, including after the Acquisition when they were repeatedly asked by Wall Street analysts whether the merged entity was capitalizing on the previously claimed synergies. This likewise further supports a strong inference that the Officer Defendants were aware of, or recklessly disregarded that EQT was not achieving the claimed synergies or anywhere near "on track" to do so, despite EQT's repeated claims to the contrary.

### 5.    EQT Headquarters Constantly Received Real-Time Updates on the Status of Its Drilling Operations Through its On-Site Personnel and Data Collection Systems

402.    EQT maintains close control over all aspects of the operations at its well pads during all stages from planning through operation of completed wells. First, EQT's land department acquires leases for the desired drilling areas. Then, EQT's construction department builds the necessary access roads and levels the area for the pads, while EQT's drilling and completion department designs the wells, including how they are to be drilled, what vertical and horizontal well paths are to be drilled, what casing is to be used, how they are to be cemented, how they are to be fracked, and what fracking materials are to be used.

403.    EQT then contracts with a drilling company to bring a rig to each pad and do the drilling, which is closely supervised by EQT. Typically, two EQT engineers known as "company men" are on site at each pad at all times working twelve-hour shifts, so that one company man is on duty at all times during the twenty-four-hours-a-day, seven-days-a-week drilling operations. The company men report any significant events to EQT headquarters by email throughout the day, and they electronically file daily reports about the prior twenty-four hours' activity through EQT's

WellView system. Thus, EQT is continuously informed about how many hours of drilling and how many hours of downtime there were every day, as well as how many feet of well were drilled and any significant accidents, repairs, or other events. EQT sets targets and schedules for how many feet are to be drilled in each well and closely monitors drilling progress and downtime. The company men are in constant communication with the drilling contractor personnel on site, as well as other contractors such as directional-drilling specialists. EQT engineers at headquarters known as drilling team leaders each monitor one to three rigs, monitoring their performance, helping with any problems that arise, and visiting each rig weekly or every two or three weeks.

404.    When drilling is done and completion and fracking are undertaken, EQT's completion and fracking departments similarly closely monitor the contractors' work at each site through on-site company men and supervisors at headquarters. Thus, EQT supervises and controls every phase of each well's drilling, completion, and operation and is continuously informed of each well's progress and status.

405.    Not only did EQT closely monitor each step of the drilling process, both EQT and Rice had sophisticated systems that each company used to monitor the status of its wells, which further supports a strong inference of EQT and the Officer Defendants' scienter, and specifically an inference that the Officer Defendants were aware of, or recklessly disregarded that, the claimed synergies were impossible to achieve, that the Company was experiencing significant undisclosed difficulties in drilling longer laterals, and that EQT was understating its costs and development cost guidance.

406.    As discussed above, throughout the Class Period, EQT utilized a system called WellView—a drilling and well operations data management system—to track, among other things, EQT's well performance data and costs of drilling, including, for example, well-pad costs. EQT

personnel working on EQT's rigs filled out the costs in WellView each day. This data was accessible to all EQT employees, including the Officer Defendants. Any EQT employee could log in and view the various cost reports in WellView.

407.    Similarly, during the Acquisition, EQT also acquired a system called Well Analysis Records ("WAR")—Rice's internally developed software application—which Rice had used to monitor, report, and plan usage for all of Rice's assets. Following the Acquisition and throughout the remainder of the Class Period, EQT integrated its own well production and performance data into the WAR program. The WAR system contained a repository of data from across EQT's information systems containing variables for each of the Company's particular assets, including information relating specifically to the completion and performance of natural gas wells in EQT's production portfolio. Specifically, the system contained production, well performance, and completion information available on natural gas wells owned by EQT. WAR also was able to track EQT's natural gas well completions and production in real-time. Because of the high functionality of the WAR program and its ability to optimize asset performance and assess how to effectively drill and complete wells in the future, EQT used WAR as a primary tool on daily, weekly, and monthly bases to plan and execute the drilling and operation of its wells.

408.    That EQT utilized WellView and WAR (two highly sophisticated well data management systems) throughout the Class Period, and that all EQT employees including the Officer Defendants had access to the comprehensive drilling, completion, and production data stored and analyzed in each of these systems, supports a strong inference of EQT and the Officer Defendants' scienter.

6. **Shortly After Claiming Unbridled Successes, Defendants Admitted EQT's Failure to Drill Longer Laterals**

409.     After the Acquisition, Defendants made additional materially false and misleading statements and omissions about EQT's ability to drill longer lateral wells, while they knew or recklessly disregarded numerous facts to the contrary. Defendants' pattern of repeating their pre-merger statements, claiming even greater achievements, and leading investors to believe that all was proceeding according to plan, when the facts showed the opposite, further support a strong inference of their fraudulent intent. For example:

a.     On EQT's April 26, 2018 first quarter earnings call with investors, at which then-CEO Defendant Porges was present, Defendant McNally announced that although EQT originally believed that 12,000 feet would be its average lateral well length, it would in fact be even higher: ***13,600 feet***. Defendant McNally further claimed that EQT was "well on track to deliver and exceed" $1.9 billion in drilling synergies;

b.     On EQT's July 26, 2018 second quarter earnings call, at which Defendant McNally was present, Schlosser further claimed that the 2018 drilling program was then expected to deliver an average lateral length of not 12,000 feet (EQT's 2017 claim), not 13,600 feet (EQT's April 2018 claim), but ***14,200 feet***; and

c.     Also on the July 26, 2018 earnings call, Schlosser falsely claimed, "[w]e continue to realize capital synergies from the Rice acquisition." These statements were premised on the false representation that at the time they were made, Defendants were ***already*** able to cost-efficiently drill 12,000-foot lateral wells, such that the Company would be able to drill ***even longer*** wells and ***save even more money*** in the future.

410.     After EQT repeatedly claimed in early to mid-2018 that it was on track to meet and exceed the claimed synergies and average ***14,200-foot*** laterals, without disclosing a single problem it faced in doing so, EQT admitted just months later (in October 2018) that, in fact, EQT had repeatedly encountered increased costs and significant problems attempting to drill the ultra-long laterals. The abrupt and sharp reversal from the above statements to Defendants' admissions just three months later regarding the harsh "lessons" EQT had learned from the "learning curve" for drilling longer laterals, and the significant cost ***increases*** associated with the Acquisition, further

demonstrate that Defendants made their prior claims about EQT's drilling program knowing, or recklessly disregarding, that the statements were materially false and misleading. Indeed, EQT's cost increases began at least by the first quarter of 2018. But, instead of being honest with investors about the true state of EQT's business, Defendants had repeatedly represented that EQT was on track with its drilling program and saving money.

411.    Similarly, on EQT's July 26, 2018 second quarter earnings call with investors, at which Defendant McNally was present, Schlosser trumpeted that the Company was running 12 frac crews and 15 rigs, the highest activity in EQT history. Defendant McNally listened as Schlosser cited increased activity as a positive marker for the Company and represented that it was making "***significant efficiency gains***." Just three months later, however, McNally admitted that when the Company was running 12 frac crews and 15 rigs, "[t]hat's where we saw the tightness and the costs increased." McNally, as a chief executive who was paid millions of dollars to oversee EQT's finance and accounting departments, had access to information that the Company was experiencing increased costs at the time that this activity was occurring, and by July 2018 at the latest, but did not tell investors.

412.    Defendants' admissions about a "learning curve" and costs caused by the "pace of activity" demonstrate that Defendants knowingly or recklessly persisted in misrepresenting the truth to investors despite possessing information to the contrary. Indeed, on the October 25, 2018 earnings call, EQT's new Executive Vice President of Production, Erin Centofanti, stated that "many of the lessons of drilling ultra-long laterals have been learned and are now incorporated." The "lessons" thus occurred so far in the past that EQT had already experienced the problems, and learned the lessons from them, such that they necessarily occurred during the Class Period.

152

### 7. The Rice Team's Descriptions of the Officer Defendants' Misconduct Support a Strong Inference of Their Scienter

413. In connection with the Rice Team's efforts to regain control of EQT from the Officer Defendants, the Rice Team published lengthy, detailed proxy materials that were based in part on documents and information sourced from within EQT, and which described the Officer Defendants' efforts to mislead investors. For example:

a. The Rice Team's February 2019 presentation emphasized that EQT had been understating its actual well costs, claiming that EQT had "erroneously adjusted" them "downwards" in an attempt to "normalize costs" and that "EQT costs could be $125-$250/ft higher when including capitalized costs, pad and facilities, etc.";

b. The Rice Team's June 17, 2019 presentation stated that: (i) "*EQT has failed to acknowledge its inability to achieve 90%+ of the merger synergies*"; (ii) EQT uses "*Misleading math*" to exclude "more than $300 million in costs it capitalizes from its well costs"; and (iii) *the EQT leadership "lacks credibility and has misled shareholders"* including that "EQT has missed type curve every year and by ~20% on average since 2014";

c. The Rice Team's June 17, 2019 presentation added that EQT's claimed $2.5 billion in synergies "hinged on incorporating best practices" but that EQT's well productivity was "clearly not incorporating best practices," including that "*EQT did not incorporate Rice Energy's well designs or planning into EQT's wells*"; and

d. The Rice Team's June 17, 2019 presentation set forth that *EQT had "consistently misled shareholders,"* including through EQT's claim during the second quarter of 2018 that EQT was achieving the synergies from the Acquisition when, in reality, in the third quarter of 2018, EQT disclosed a $300 million capital expense miss, a 5% production volume miss and a $500 million stock buy-back.

414. These material undisclosed facts further support a strong inference that the Officer Defendants made their materially false and misleading statements to investors knowingly or with reckless disregard for their truth.

### 8. Defendant Schlotterbeck's Resignation Supports a Strong Inference of Scienter

415. On March 15, 2018, EQT abruptly announced that Defendant Schlotterbeck had resigned the prior day, after just one year on the job. According to EQT's Form 8-K making that

disclosure (which was signed by Defendant McNally), Schlotterbeck "stated that he resigned because he was unsatisfied with the amount of his compensation." Defendant Porges became Interim CEO as a result.

416.    On March 16, 2018, according to the *Pittsburgh Post-Gazette*, Schlotterbeck posted a message on the LinkedIn social media site, in which he claimed: "It was just a plain vanilla disagreement between me and board on my value to the corporation."[37] The newspaper article quoted Defendant Schlotterbeck as saying: "My ask was to be paid at the average of EQT's peer group which I thought was very fair given the year we had." The article noted that Schlotterbeck had a two-year non-compete agreement with EQT and that he had just changed his LinkedIn job description to "unemployed."

417.    On April 27, 2018, the public learned more about the compensation package that Schlotterbeck had found so unfair. That day, EQT filed its 2018 proxy statement on Schedule 14A with the SEC, with a foreword from Interim CEO Porges. In the materials, EQT noted that "[c]ertain investors expressed concern regarding the impact the Rice Transaction could have on incentive compensation payouts to our executive officers for 2017." EQT reported that in response, it had "[c]larified that the Rice Transaction would not result in any increased payouts under our incentive compensation programs for 2017 as a result of the Rice Transaction." EQT also stated that it had "modified certain performance metrics used in our 2018 long-term incentive rewards in response to investor input." EQT announced that it would tie "a significant portion" of the executive officers' 2018 long-term incentive awards to "achieving the one- and three-year *synergy commitments* made by the Company in connection with the Rice Transaction."

---

[37] Anya Litvak, *EQT's CEO says he left because of pay dispute*, Pittsburgh Post-Gazette (Mar. 16, 2018), *available at* https://www.post-gazette.com/business/powersource/2018/03/16/eqt-s-ceo-schlotterbeck-left-because-of-disagreement-with-the-board-he-says/stories/201803160148.

418.   The proxy statement also explained that, in response to "input received from shareholders," EQT had imposed another new condition that would financially penalize the Officer Defendants if they did not deliver the synergies they had promised:

> Although the Company's 2018 peer group has been modified to reflect the increased size of the Company following the Rice Transaction and, as a result, target total direct compensation increased over 2017, the value of the 2018 long-term incentive awards (the largest element of target total direct compensation) to the named executive officers is set below market median and is ***automatically reduced if the Company does not achieve its one-year synergy commitments in connection with the Rice Transaction***.

419.   Specifically, EQT announced that the long-term incentive target awards for 2018 would be "subject to a 13.5% reduction in the event that the promised Rice Transaction first-year operating or development synergies are not achieved." EQT explained that "this approach, which favors at-risk compensation that depends upon achieving results and ***intends to avoid a 'windfall' to executives*** solely by virtue of growth of the Company due to the Rice Transaction, ***would properly motivate*** the executives to meet their commitments… ."

420.   According to the proxy materials, before Schlotterbeck resigned, EQT's Compensation Committee offered him "a compensation package comprising a $900,000 salary, $1,008,000 annual short-term incentive target and $7,400,000 long-term incentive award." Defendant Schlotterbeck "rejected that offer." EQT noted that because Defendant Schlotterbeck's resignation was voluntary, he did not receive severance or any other termination-related benefits.

421.   On May 1, 2018, the *Pittsburgh Post-Gazette* reported: "Steve Schlotterbeck turned down a $9.3 million compensation package because the board of EQT Corp. wouldn't give him $10.3 million. So he resigned. Mr. Schlotterbeck understands how that looks. 'It was about compensation but it was never about money,' he said."[38] The article stated that Schlotterbeck "also

---

[38] Anya Litvak, *EQT's former CEO says his compensation dispute wasn't (all) about the money*, Pittsburgh   Post-Gazette   (May   1,   2018),   *available   at*   https://www.post-

forfeited $18.5 million in unvested benefits" by resigning. Schlotterbeck told the newspaper that he was originally offered a package that would have put him at 20% of the median: "'They kept telling me I had a great year,' he said, ***leading the company through a major acquisition of Rice Energy Inc., breaking through investor opposition***. 'I thought I was average,' he said. 'They thought I was in the lowest 20 percent.'"

422.    The Board then offered Schlotterbeck "90 percent of the median compensation paid to CEOs at similar companies." Schlotterbeck apparently did not view that amount as enough to compensate him for his leadership in defeating JANA and acquiring Rice. As Schlotterbeck then knew, because of EQT's about-face and admission that JANA was correct about the executives' original improper motive, the bulk of that compensation package was tied to fulfilling his word and achieving the synergies he claimed the Acquisition would generate. As Schlotterbeck also knew, that was not possible because the synergies were not achievable, as alleged in this Complaint.

423.    On October 25, 2018, when EQT disclosed the truth to investors that it had not achieved Acquisition-related synergies, Defendant McNally admitted that EQT's goal during and immediately after the Acquisition had been the pursuit of higher production volume over efficiency because, he said, EQT's approach going-forward would instead focus on "capital efficiency": "As the incoming CEO, I'm committed to ***reshaping*** our culture to one that's focused on capital efficiency and per share returns ***as opposed to purely chasing volume targets***."

424.    On June 23, 2019, almost exactly two years after EQT announced its planned merger with Rice, Schlotterbeck admitted that the very technological advancements he had touted

---

gazette.com/business/powersource/2018/05/01/EQT-former-CEO-compensation-dispute resigned/stories/201805010034.

at EQT had, over the last decade, been the "weapon of its own suicide" for shale gas companies.[39] That day, Schlotterbeck told a group of petrochemical and gas industry executives:

> **The shale gas revolution has frankly been an unmitigated disaster for any buy-and-hold investor in the shale gas industry** with very few limited exceptions. . . . In fact, I'm not aware of another case of a disruptive technological change that has done so much harm to the industry that created the change. . . . While hundreds of billions of dollars of benefits have accrued to hundreds of millions of people, the amount of shareholder value destruction registers in the hundreds of billions of dollars. . . . The industry is self-destructive. . . . The fact is that every time they put the drill bit to the ground, they erode the value of the billions of dollars of previous investments they have made. . . . **It's frankly no wonder that their equity valuations continue to fall dramatically**. . . .

425.    These statements stand in stark contrast to Schlotterbeck's statements made while he was EQT's CEO and raise a strong inference that he knew or recklessly disregarded that his statements in support of the Acquisition, and EQT's ability to generate billions of dollars in synergies, were materially false and misleading when made. As the article reporting on Schlotterbeck's comments added, "Schlotterbeck is not the first industry insider to ring alarm bells about the shale industry's record of producing vast amounts of gas while burning through far more cash than it can earn by selling that gas" but his comments "come from an individual uniquely positioned to understand how major Marcellus drillers make financial decisions—because he so recently ran a major shale gas drilling firm," EQT.[40]

426.    The article further reported:

[Schlotterbeck] pointed to profit predictions in a "current investor presentation" by a shale driller he did not name but described as one of the eight largest in the Marcellus. That driller, he said, presently predicts it can make a 46 percent internal

---

[39] *See* Sharon Kelly, *Former Shale Gas CEO Says Fracking Revolution Has Been a 'Disaster' For Drillers, Investors*, DESMOG (June 23, 2019), *available at* https://www.desmogblog.com/2019/06/23/former-shale-gas-ceo-says-shale-revolution-has-been-disaster-drillers-investors.

[40] *Id.*

rate of return by drilling their dry gas wells at current gas prices, and 61 percent internal returns from the same wells if gas prices rise 36 percent.

"Economics and common sense will tell you that in a world of abundant similar opportunities, rates of return at that level should not exist," Schlotterbeck said. "And they don't."

"Really indicates to me that *there's a lot of these companies that still don't get it*," he said. "They still think they're gonna earn 40, 50, 60 percent returns on their investment, even after six years now of saying that and getting negative returns."

427.    In Schlotterbeck's words: "Nearly every American has benefited from shale gas, with one big exception . . . the shale gas investors."

428.    Indeed, Defendant Schlotterbeck himself came out in support of the Rice Team's plan to take EQT back over. On March 21, 2019, Schlotterbeck stated: "I fully agree with the Rice plan" and "Change is needed in the EQT boardroom and Toby Rice is a true operator and the best person to help the company capture the full value of the asset base."

### 9.    Defendant Porges's Disappearance from Public CEO Duties Supports a Strong Inference of His Scienter

429.    After Porges became EQT's Interim CEO following Schlotterbeck's March 2018 departure from EQT, Porges strangely did not attend EQT's annual shareholder meeting in June 2018 or its July 26, 2018 investor conference call. As the *Marcellus Drilling News* reported on July 27, 2018, with a picture of Porges above the caption "David Porges - MIA":

> *Something strange is going on at EQT*. Not only did interim CEO David Porges skip the company's recent annual meeting in June (unheard of, see EQT CEO Didn't Show Up for Annual Mtg – CFO Talks of Wild Ride), Porges also skipped yesterday's quarterly analyst phone call to update big investors on the company's performance (equally unheard of). *Once again the heavy lifting fell to Robert McNally, EQT CFO, to be "the guy" sent out front and center to talk about the company*.

430.    As this article reported, by July 2018, Porges had avoided two public appearances where he would have been tasked as EQT's CEO with speaking to investors about the current state of the Company. This was at the critical time after the Acquisition, when EQT's purported

synergies, and general operational and financial performance, were analysts' and investors' central concerns, but when EQT was suffering from numerous drilling failures and increased costs.

## 10. Defendant Porges Engaged in Unusual and Suspicious Insider Trading

431.   Suspicious stock sales by Defendant Porges further support a strong inference of his scienter. Specifically, once Defendants' materially false and misleading statements artificially inflated EQT's share price and the Acquisition closed, Defendant Porges personally profited from that inflation. At the same time that Defendants were knowingly making these materially false and misleading statements to investors concerning the Acquisition, Porges realized substantial financial benefit from his insider sales.

432.   During the Class Period, on November 16, 2017, just days after the Acquisition closed on November 13, 2017, Porges sold 53,760 shares of EQT common stock (approximately 11% of his direct total stock holdings in EQT) in a single transaction, at an average price of $59.14, for a total of approximately $3,179,366.40. The sale price of the shares, $59.14, was nearly the highest that the share price would reach ($60.35 on December 1, 2017) from the date that the Acquisition closed, through the end of the Class Period. The following graph demonstrates that Porges took advantage of the artificial inflation in EQT's stock price by selling just after the Acquisition closed and before the truth was revealed about EQT's abject inability to achieve the claimed synergies:



433.    Defendant Porges's stock sales were suspicious in both timing and amount. This transaction was suspicious in amount because Defendant Porges's profit from the sale was over 1.5 times the total amount that he received in total salary and bonus compensation for 2017. This transaction was also suspicious in timing because not only did Defendant Porges's solitary sale occur only three days after the Acquisition closed, but because during the two years preceding the start of the two-year Class Period, Defendant Porges did not sell a single share of EQT stock. This trading history is depicted in the bar graph below:



434.    Porges also made no open market purchases of EQT stock during the Class Period.

### 11.    Defendant Schlosser's Resignation Supports a Strong Inference of His Scienter

435.    Defendant Schlosser resigned on October 25, 2018—the same day the Company disclosed shockingly negative third-quarter financial results, including a $300 million increase in well development costs as a result of "inefficiencies resulting from higher activity levels, the learning curve on ultra-long horizontal wells, and service cost increases."

436.    These disclosures were in stark contrast to Schlosser's misleadingly rosy claims to investors during the prior several months. Specifically, on February 15, 2018, Schlosser claimed that "we are combining best practices and have already captured value," "we have set new footage records by combining the data, experience and practices of both companies," and "development cost continued to improve as we lengthened laterals." On April 26, 2018, Schlosser claimed that

EQT's plan to oversee the drilling of its wells from a central location in downtown Pittsburgh was "already showing significant returns." And, as late as July 26, 2018, Schlosser claimed "[w]e continue to realize capital synergies from the Rice acquisition as we develop our large contiguous acreage position," "[i]n our Southwestern Pennsylvania [core], our 2018 drilling program is now expected to deliver an average lateral length of 14,200 feet, which is 55% higher than our 2017 Southwestern Pennsylvania average prior to the Rice acquisition" and "[o]n an activity level, the second quarter was the highest in EQT history, with the company operating as many as 15 rigs and 12 frac crews," which "resulted in nearly 680,000 feet-of-pay being fracked, which is 55% higher than our previous record" and "[o]n the drilling side, we have already drilled as much footage in the first half of 2018 as we did in the full year 2017." This contrast supports a strong inference that Schlosser's statements were, at a minimum, made with severe recklessness.

### 12. EQT Credited McNally, Schlotterbeck, and Schlosser with Obtaining Shareholder Approval for the Rice Acquisition

437.     According to Schlotterbeck, he was "[c]redited with developing and successfully executing [EQT's] consolidation strategy" that included EQT's merger with Rice. As EQT's 2018 Proxy Statement stated, Schlotterbeck's "strategic thinking and tactical efforts were pivotal in negotiating, obtaining shareholder approval for, and implementing the Rice Transaction." Likewise, according to the same Proxy, Defendant McNally's "financial analysis, negotiation skills and tactical efforts were critical in obtaining shareholder approval for, and implementing, the Rice Transaction." Similarly, the 2018 EQT Proxy stated that Defendant Schlosser's "leadership on technical production and land matters was critical in advising Mr. Schlotterbeck on the Rice transaction."

438.     On October 23, 2017, EQT filed proxy materials with the SEC wherein Defendants described their "Board process" as "thorough," their due diligence as "comprehensive" and

"extensive," with "careful consideration" involving "various perspectives," and themselves as "[h]ighly [q]ualified and [e]xperienced." As the highest-ranking executives at EQT, Defendants Schlotterbeck, Porges, McNally and Schlosser had access to and control of the Company's due diligence materials.

### 13. McNally Admitted That Problems Arose in the First Half of 2018, Which Were Contrary to His Claims to Investors

439.    Throughout 2018, McNally repeatedly made positive claims to EQT investors about EQT's operations, which were contrary to the reality at the Company, which McNally knowingly or recklessly disregarded. Indeed, the Rice Team's June 2019 presentation stated that EQT's October 2018 disclosure of financial underperformance "was the result of *year-long operational problems that McNally should have known about*" at the times McNally made his contrary statements to investors. The Rice Team added that "In 2018, while McNally was CFO and taking on additional operational roles, *he should have known of the troubled operations and chaos at EQT that led to massive cost overruns*.

440.    The Rice presentation specifically contrasted McNally's statements to investors in the first half of 2018 to the "reality" the Company faced at the time but only later disclosed in October 2018. As the Rice Team highlighted, McNally "has a history of hype followed by disappointment." Specifically, on February 2, 2018, McNally claimed that "All of our directional drilling, geosteering and drilling engineering is now done at our real-time operations center, or RTOC in Pittsburgh. Although in its early stages of implementation, this concept is already showing significant returns." And, on April 26, 2018, McNally claimed that he was "extremely pleased with the progress we have made during just three short months" and that he looked forward to "continue to blend best practices, promote innovation, and deliver best-in-class economic returns." The Rice Team contrasted that with McNally's admissions in October 2018 that "Our

original 2018 development program was designed to have consistent frac and drilling activity throughout the year. However, *first quarter* weather events and midstream delays disrupted that schedule, requiring us to ramp from 9 to 12 frac crews in Q2 to meet our planned volumes. While this work led to a record 94 gross TILs [wells turned in line, or to sales] in Q3, the ramp in frac crews, robust pace, and concentration of activity, all *placed stress on our supply chain, logistics, and pad operations*, increasing our CapEx."

> ### 14. The Officer Defendants Had a Specific Motive to Make False Statements About the Acquisition Because the Acquisition Would Have Significantly Boosted Their Incentive Compensation – Until JANA's Public Pressure Forced Them to Give It Up

441.    Officer Defendants Schlotterbeck, McNally, Porges and Schlosser were among the very highest-ranking executives at EQT and exercised control over, and signed, the Company's public filings with the SEC, and spoke repeatedly to EQT and Rice investors about the synergies of the EQT-Rice merger, EQT's ability to achieve those synergies, and EQT's operations and finances. They therefore had the opportunity to defraud EQT investors.[41]

---

[41] Porges joined EQT as its Senior Vice President and CFO in 1998. Since then, he has served in a number of senior management positions and has been a member of its Board since May 2002. According to EQT, Defendant Porges brings "tremendous knowledge of the Company's operations, culture, and industry to the Board," and his "understanding of the Company's business operations" enables him to "provide unique and valuable perspectives on most issues facing the Company." Porges retired from his role as EQT CEO in February 2017 and he remained Executive Chairman of the Board until Defendant Schlotterbeck abruptly resigned in March 2018, at which point, Porges became interim CEO. Porges served in that role until Defendant McNally took over as CEO in November 2019. Serving as an EQT executive was highly lucrative for Porges, who received the following total compensation from 2015 through 2018: $12.1 million (2015); $9.8 million (2016); $1.8 million (2017); and $1.7 million (2018).

Defendant Schlotterbeck joined EQT in 2000 as the Director of Engineering. In that role, he managed engineering operations, including the selection of tools and technologies for drilling operations throughout the Northeast. From 2002 to 2008, he served as a Senior Vice President, and from 2008 to 2016, he served as President, Exploration and Production, and from 2015 to 2018, he served as President of EQT, and from 2017 to 2018, he served as CEO and President of EQT and CEO of EQT Midstream Partners, EQT GP Holdings LP, and Rice Midstream Partners LP, where he directed all operations, working with other executives to build strategic roadmaps,

442.    They also had a personal financial motive to make false statements to investors about the proposed Acquisition from the start of the Class Period based on EQT's incentive compensation structure until they were forced, on September 13, 2017, in response to JANA's harsh criticisms, to change EQT's incentive compensation structure.

443.    EQT's incentive-compensation scheme had provided the Officer Defendants with massive payouts based simply on increasing its volume of natural-gas production, even if the increase was the result of buying another company rather than enhancing EQT's productivity. This motive to make false statements about the Acquisition's benefits persisted until September 13, 2017, when EQT bowed to pressure from JANA and other investors and pledged not to pay incentive compensation based solely on increased production volume resulting from the Acquisition.

---

growth plans, and business tactics designed to maximize investment returns and increase market share. Schlotterbeck received the following total compensation from 2015 through 2017: $6.3 million (2015); $5.8 million (2016); and $8.2 million (2017).

Defendant McNally joined EQT as Senior Vice President and CFO in March 2016. Before that time, he was the Executive Vice President and CFO of Precision Drilling (a Canadian drilling rig contractor). McNally served as President and CEO of EQT for nine months, from November 2018 through July 2019, when the Rice brothers ousted him after their proxy battle. According to the 2018 EQT Proxy, in 2017 and 2018, Defendant McNally had "responsibility for business development, facilities, information technology, innovation, and procurement in addition to his previous responsibilities for finance, accounting, tax, and internal audit." McNally received the following total compensation from 2016 through 2018: $5.2 million (2016); $4 million (2017); and $5.3 million (2018).

Defendant Schlosser served as Senior Vice President, Engineering and Strategic Planning, EQT Production Company, from March 2012 through September 2014. From October 2014 through February 2017, he served as Executive Vice President, Engineering, Geology and Strategic Planning, EQT Production Company, and from March 2017 through October 2018, he served as EQT's Senior Vice President and President, Exploration and Production. In that role, he provided support for Schlotterbeck and Board members in shareholder engagement activity. Schlosser received the following total compensation in 2017 and 2018: $3.77 million (2017) and $6.98 million (2018). The latter amount included a lump sum payment of approximately $2.58 million in accordance with his separation agreement with the Company and long-term incentive awards that vested when he resigned.

444.    The Officer Defendants were improperly incentivized to pursue the Acquisition because they knew that doing so would significantly increase their compensation. Defendants were thwarted in realizing this personal financial windfall, however, when two months after the Acquisition announcement, JANA exposed their improper motive. This public shaming forced Defendants to acknowledge that their long-standing compensation policy created an improper incentive for them to complete the Acquisition.

445.    On February 17, 2017, when Defendant Porges was CEO and just before Defendant Schlotterbeck assumed that title, EQT filed its 2017 proxy statement with the SEC on Schedule 14A. According to the compensation policy in place at the time that the Officer Defendants decided to acquire Rice, Schlotterbeck's and Porges's total direct compensation was approximately 9% fixed and 91% performance-based, and McNally's was approximately 26% fixed and 74% performance-based.[42] According to EQT's 2018 proxy statement, in 2017, Schlosser's total direct compensation was approximately 14% fixed and 86% performance-based. Therefore, the Officer Defendants' total compensation was heavily dependent on EQT's future performance. This performance, in turn, was based in large part on EQT's volume production growth. As the *Wall Street Journal* observed, EQT's acquisition of Rice "gave it more U.S. natural-gas production by volume than Exxon Mobil Corp."[43]

446.    Under EQT's 2016 long-term incentive program, which covered the period of January 1, 2016 through December 31, 2018 (which, at the time the Officer Defendants decided to acquire Rice, would have included the production volume from Rice's existing wells), 75% of

---

[42] McNally's fixed income for 2016 was skewed because it included a one-time $500,000 signing bonus and approximately $3 million in stock options that he received upon joining the Company.

[43] *See* Christopher M. Matthews, *The Merger That Made a U.S. Gas Giant Is Failing*, The Wall Street Journal (Jan. 13, 2019), *available at* https://www.wsj.com/articles/the-merger-that-made-a-u-s-gas-giant-is-failing-11547380800.

the Officer Defendants' award was based on the 2016 Incentive Performance Share Unit ("PSU")

Program. One of the two stated "performance measures" for that program was "compound annual

production sales volume growth" over the three-year period.[44] This metric, as JANA pointed out

in its August 14, 2017 letter to the EQT Board, could "drive up management compensation simply

by the acquisition of production volume" without considering whether EQT actually achieved any

of the synergies that the executives guaranteed as part of their Acquisition campaign.

447.    The payout opportunity under the PSU Program ranged from no payout if the

Company had negative compound annual production sales volume, to up to three times the target

award if the Company had compound annual production sales volume growth of at least 25% from

2016 through 2018. The grant date fair value of these awards was $4,926,468 for Defendant Porges

(approximately 50% of his total compensation); $2,508,418 for Defendant McNally

(approximately 57% of his total compensation); and $3,047,802 for Defendant Schlotterbeck

(approximately 53% of his total compensation). These amounts did not reflect the maximum

payout (up to three times the target award) that the executives could receive if production volume

grew 25% from 2016 to 2018. In accordance with his ascension to the executive-officer level in

March 2017, Defendant Schlosser received long-term stock awards (including PSUs) totaling

$2,195,427 (approximately 58% of his total compensation).

448.    On August 14, 2017, JANA sent a letter to EQT's Board of Directors in which it

observed:

> EQT's ***perverse compensation structure*** in fact incentivizes management to pursue
> this suboptimal, dilutive acquisition, no matter the cost to EQT shareholders. As
> detailed in EQT's proxy and 10-K filings, management's long-term incentive

---

[44] The other was total shareholder return, as ranked among the comparably measured total
shareholder return of EQT's 2016 industry peer group. In its August 14, 2017 letter, JANA stated,
"production growth is the only variable that is entirely within management's control . . . the TSR
payout structure is largely insensitive to actual share price changes."

compensation (the largest component of total compensation) is significantly influenced by 3-year average production growth. This growth however can be achieved by any means and is not measured on a per share basis, meaning that even value dilutive acquisitions paid for with undervalued stock, like the Rice transaction, can drive up management compensation *simply by the acquisition of production volume*.

449.    JANA explained that, according to EQT's latest proxy statement, EQT's projected production growth *without* Rice for 2015 through 2018 was only 16.6%, and its projected growth for 2016 through 2019 was only 14.7%. To achieve the maximum payout, the Officer Defendants needed at least 25% growth in compound annual production sales volume. According to JANA, "[a] Rice acquisition would immediately make up for this shortfall, boosting production growth for these periods to approximately 37% and 36% merely by combining the two companies, and *without achieving any of management's claimed synergies*." JANA calculated that this would increase EQT management's potential compensation by approximately *$50 million*.

450.    On September 11, 2017, JANA filed proxy materials in which it repeated its findings on the improper incentives created by EQT's compensation policy. JANA pointed out, as it had in its August 14 letter to the Board, that the Acquisition would "increase management compensation by millions of dollars by allowing management to achieve its incentive targets by acquiring production volume regardless of its value to shareholders." JANA also highlighted the fact that EQT had achieved production growth targets through acquisitions in the past (thereby boosting executive compensation) and subsequently failed to achieve any long-lasting shareholder benefits from those acquisitions:

> Prior to the Rice acquisition, since May 2016 the Company has spent approximately $1.6 billion of shareholder capital on acquisitions, 90% of which have been in West Virginia, a state in which the Company recently announced it would curtail drilling just one year after acquiring the acreage after incurring permitting challenges and deeming it unattractive.

451.   Two days later, on September 13, 2017, with the shareholder vote less than two months away, EQT issued a press release announcing that EQT "has confirmed its previous intent to exclude acquired production volume from long-term compensation calculations as related to producing Rice wells as of the transaction closing date."[45] EQT also announced that it would no longer use production volume as a performance metric for long-term compensation and would instead use "efficiency metrics." This "efficiency" consideration was not part of the long-term executive compensation policy when the Officer Defendants decided to acquire Rice. This reversal admitted to the Defendants' improper financial motivations. As the *Pittsburgh Post-Gazette* later reported: "EQT faced stiff opposition from activist investors on its plan to acquire Rice in part because under its previous compensation structure, executives would see a windfall from boosting oil and gas production ***simply by adding Rice's output to EQT's. So EQT decided to remove production growth as a motivator***."[46] The Officer Defendants, however, had already set the wheels in motion on the Acquisition based on those improper motives and necessarily had to see it through just two months later.

452.   The magnitude of the importance of production volume to Defendants' compensation packages, together with Defendants' own admissions, the timing of EQT's announcement that it would not include production volume as a metric going forward, and Defendant Schlotterbeck's acknowledgment that he quit as EQT's CEO because he believed he

---

[45] Despite EQT's vague reference to its "previous intent," there is no record of EQT explicitly declaring that it would not count the Rice wells' production volume toward the Officer Defendants' bonuses ***before*** JANA raised the issue.

[46] Anya Litvak, *EQT's former CEO says his compensation dispute wasn't (all) about the money*, Pittsburgh Post-Gazette (May 1, 2018), *available at* https://www.post-gazette.com/business/powersource/2018/05/01/EQT-former-CEO-compensation-dispute-resigned/stories/201805010034.

deserved more money for breaking through the investor opposition to EQT's Acquisition of Rice, provide an unusual, heightened and personal motive to commit fraud.

### N.   Inapplicability of the Statutory Safe Harbor

453.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements described in this complaint. Many of the specific statements described in this complaint were not identified as "forward-looking" when made. To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described in this complaint, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false or misleading, or the forward-looking statement was authorized or approved by an executive officer of EQT who knew that the statement was false or misleading when made.

### O.   Presumption of Reliance

454.    At all relevant times, the market for EQT's common stock was an efficient market for the following reasons, among others:

> (a)    EQT stock met the requirements for listing and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;
>
> (b)    EQT filed periodic public reports with the SEC and the New York Stock Exchange;
>
> (c)    As a "well-known seasoned issuer," as defined by SEC Rule 405, EQT was eligible to and did register securities for public offerings on Form S-3;
>
> (d)    EQT regularly publicly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire

services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e)     EQT was followed by securities analysts employed by numerous major brokerage firms, who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

455.     As a result of the foregoing, the market for EQT securities promptly digested current information regarding EQT from all publicly available sources and reflected that information in the price of EQT stock. Under these circumstances, all purchasers of EQT common stock during the Class Period suffered similar injury through their purchase of EQT common stock at artificially inflated prices, and the presumption of reliance applies.

456.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding EQT's business operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Acquisition, as alleged above, that requirement is satisfied here.

*     *     *

457.     The claims alleged in this complaint under Sections 10(b) and 20A of the Exchange Act, 15 U.S.C. § 78j(b), 78t-1, and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, sound in fraud and are based on knowing or reckless misconduct by EQT and the Officer Defendants. These claims are independent of all other claims asserted in this complaint, and the allegations of fraud

pertaining to the claims under Sections 10(b) and 20A of the Exchange Act and SEC Rule 10b-5 do not apply in any way to the other claims for relief asserted in this complaint.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
### Against EQT and the Officer Defendants (Schlotterbeck, McNally, Porges and Schlosser)

458.     Plaintiffs repeat, incorporate, and reallege every allegation above as if fully alleged in this Count.

459.     During the Class Period, EQT and the Officer Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did (i) deceive the investing public, including Plaintiffs and other Class members, as alleged in this complaint; and (ii) cause Plaintiffs and other members of the Class to purchase EQT common stock at artificially inflated prices.

460.     EQT and the Officer Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for EQT common stock in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

461.     EQT and the Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

462.     During the Class Period, EQT and the Officer Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that the

statements contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

463.    EQT and the Officer Defendants had actual knowledge of the misrepresentations and omissions of material fact alleged in this complaint, or recklessly disregarded the true facts that were available to them. These Defendants engaged in this misconduct to conceal EQT's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

464.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for EQT common stock. Plaintiffs and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for EQT common stock had been artificially inflated by EQT and the Officer Defendants' fraudulent course of conduct.

465.    As a direct and proximate result of EQT and the Officer Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

466.    By virtue of the foregoing, EQT and the Officer Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

**COUNT II**

**For Violation of Section 20A of the Exchange Act**
**Against Defendant Porges**

467.    Lead Plaintiffs Northeast Carpenters Annuity Fund and Northeast Carpenters Pension Fund repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

468.    As set forth in the paragraphs above and below, Defendant Porges committed underlying violations of Section 10(b) and Rule 10b-5 by selling EQT common stock while in possession of material, nonpublic information about the Company's inability to achieve the claimed synergies. Consequently, he is liable to contemporaneous purchasers of that stock under Section 20A of the Exchange Act.

469.    While EQT's securities traded at artificially inflated and distorted prices, Defendant Porges personally profited by selling 53,760 shares of EQT common stock at a weighted average price of $59.14 on November 16, 2017, while in possession of adverse, material non-public information about EQT, pocketing over $3.17 million in illegal insider trading proceeds.

470.    Under Section 20A of the Exchange Act, "[a]ny person who violates any provision of this title or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class." 15 U.S.C. § 78t-1(a).

471.    Contemporaneously with Defendant Porges' insider sales, Lead Plaintiffs Northeast Carpenters Annuity Fund and Northeast Carpenters Pension Fund purchased a total of 1,765 shares of EQT common stock for a total of more than $104,000 on November 16, 2017.

472.    Lead Plaintiffs Northeast Carpenters Annuity Fund and Northeast Carpenters Pension Fund and other Class members who purchased shares of EQT common stock contemporaneously with Porges' insider sales suffered damages because (i) in reliance on the integrity of the market, they paid artificially inflated prices for those shares as a result of EQT and the Officer Defendants' violations of Sections 10(b) and 20(a) of the Exchange Act; and (ii) they

would not have purchased EQT common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by EQT and the Officer Defendants' false and misleading statements and omissions.

**COUNT III**

**For Violations of Section 20(a) of the Exchange Act**
**Against the Officer Defendants (Schlotterbeck, McNally, Porges and Schlosser)**

473.    Plaintiffs repeat, incorporate, and reallege every allegation above as if fully alleged in this count.

474.    As alleged above, EQT violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by its acts and omissions as alleged in this complaint.

475.    The Officer Defendants acted as controlling persons of EQT within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). By virtue of their high-level positions, participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and intimate knowledge of the Company's actual performance, and their power to control public statements about EQT, the Officer Defendants had the power and ability to control the actions of EQT and its employees. By reason of this conduct, the Officer Defendants are liable under Section 20(a) of the Exchange Act.

## VI.    VIOLATIONS OF SECTION 14(a) OF THE EXCHANGE ACT AND SECTIONS 11, 12(a)(2), AND 15 OF THE SECURITIES ACT

476.    Plaintiffs Northeast Carpenters and Cambridge, collectively, bring the claims in Counts IV and V under Section 14(a) of the Exchange Act and SEC Rule 14a-9 on behalf of shareholders of EQT and Rice who held EQT or Rice shares as of the record dates of September 25, 2017, and September 21, 2017, respectively, and were entitled to vote at an EQT or Rice special meeting on November 9, 2017 with respect to the Acquisition. Plaintiff Cambridge also brings the

175

claims in Counts VII through IX under Sections 11, 12(a)(2), and 15 of the Securities Act on behalf of all persons who acquired EQT common stock in exchange for their shares of Rice common stock in the Acquisition and were damaged thereby.

477.   The Section 14(a) and Sections 11, 12(a)(2), and 15 claims are based solely on negligence or strict liability. They are not based on any knowing or reckless conduct by or on behalf of any Defendant, and Plaintiffs specifically disclaim any allegations of fraud, scienter, or recklessness in these non-fraud claims, except that any challenged statements of opinion or belief made in the Joint Proxy, the documents attached to the Joint Proxy or incorporated by reference in it, the other solicitations described below, the Registration Statement, and the documents incorporated by reference in the Registration Statement are alleged to have been materially misstated statements of opinion or belief when made and at the time the Registration Statement was filed and stockholders voted on the Acquisition.

478.   As alleged below, the basis of Plaintiffs Northeast Carpenters' and Cambridge's Section 14(a) claims is that the Joint Proxy contained misstatements of material fact and omitted to disclose material information required to be disclosed in the Joint Proxy. Likewise, the basis of Plaintiff Cambridge's Securities Act claims is that the Registration Statement and the documents incorporated in it by reference contained misstatements of material fact and omitted to disclose material information required to be disclosed in them.

### A.    The Signer Defendants

479.   In addition to Defendants EQT, Schlotterbeck, McNally, Porges and Schlosser, the following Defendants are named in Plaintiffs' claims under Section 14(a) of the Exchange Act, Rule 14a-9, and Sections 11, 12(a)(2), and 15 of the Securities Act.

480.   Defendant Jimmi Sue Smith was EQT's Chief Accounting Officer at the time of the Acquisition. Smith became EQT's Senior Vice President and CFO on November 12, 2018, in

connection with EQT's separation of its midstream business from its upstream business, distribution of the midstream business to Equitrans Midstream Corporation, and distribution of 80.1% of the latter's stock to EQT's shareholders. Smith signed the Registration Statement (defined in ¶ 76) and permitted her name to be used in solicitations contained in the Registration Statement, which were materially false and misleading and omitted material facts.

481.   Defendant James E. Rohr was a director of EQT since 1996, signed the Registration Statement, and permitted his name to be used in solicitations contained in the Registration Statement, which were materially false and misleading and omitted material facts.

482.   Defendant Vicky A. Bailey was a director of EQT since 2004, signed the Registration Statement, and permitted her name to be used in solicitations contained in the Registration Statement, which were materially false and misleading and omitted material facts.

483.   Defendant Philip G. Behrman was a director of EQT since 2008, signed the Registration Statement, and permitted his name to be used in solicitations contained in the Registration Statement, which were materially false and misleading and omitted material facts.

484.   Defendant Kenneth M. Burke was a director of EQT since 2012, signed the Registration Statement, and permitted his name to be used in solicitations contained in the Registration Statement, which were materially false and misleading and omitted material facts.

485.   Defendant A. Bray Cary, Jr. was a director of EQT since 2008, signed the Registration Statement, and permitted his name to be used in solicitations contained in the Registration Statement, which were materially false and misleading and omitted material facts.

486.   Defendant Margaret K. Dorman was a director of EQT since 2012, signed the Registration Statement, and permitted her name to be used in solicitations contained in the Registration Statement, which were materially false and misleading and omitted material facts.

487. Defendant Stephen A. Thorington was a director of EQT since 2010, signed the Registration Statement, and permitted his name to be used in solicitations contained in the Registration Statement, which were materially false and misleading and omitted material facts.

488. Defendant Lee T. Todd, Jr. was a director of EQT since 2003, signed the Registration Statement, and permitted his name to be used in solicitations contained in the Registration Statement, which were materially false and misleading and omitted material facts.

489. Defendant Christine J. Toretti was a director of EQT since 2015, signed the Registration Statement, and permitted her name to be used in solicitations contained in the Registration Statement, which were materially false and misleading and omitted material facts.

490. Defendant Daniel J. Rice IV was the CEO of Rice, was named in the Registration Statement, with his written consent, as a person who would become a director of EQT upon the closing of the Acquisition, and he permitted his name to be used in solicitations contained in the Registration Statement, which were materially false and misleading and omitted material facts. He became a director of EQT upon the closing of the Acquisition.

491. Defendant Robert F. Vagt was a director of Rice, was named in the Registration Statement, with his written consent, as a person who would become a director of EQT upon the closing of the Acquisition, and he permitted his name to be used in solicitations contained in the Registration Statement, which were materially false and misleading and omitted material facts. He became a director of EQT upon the closing of the Acquisition.

492. The Defendants identified in ¶¶ 480-91 are referred to below as the "Signer Defendants."

### B.      Background to the Acquisition

493.      EQT is a natural-gas-production company whose primary operations are in the Appalachian Basin and throughout Pennsylvania, West Virginia, and Ohio. Rice was a natural-gas-production company whose primary operations were in Pennsylvania.

494.      On the morning of June 19, 2017, the Company announced that EQT had entered into an agreement to acquire Rice for $6.7 billion (including $5.4 billion in EQT stock and $1.3 billion in cash). This Acquisition would make EQT the largest natural-gas producer in the United States. EQT's President and CEO at the time, Defendant Schlotterbeck, justified the proposed merger to EQT and Rice shareholders based on the claimed synergies the merger would generate: "Rice has built an outstanding company with an acreage footprint that is largely contiguous to our existing acreage, *which will provide substantial synergies* and make this transaction *significantly accretive in the first year*."

495.      According to Schlotterbeck, the overlap in the companies' operations would enable EQT to "drive higher capital efficiency through longer laterals" by drilling laterally through the contiguous EQT and Rice drilling sites. EQT represented that the Acquisition would allow EQT to achieve "a 50% increase in average lateral lengths"—from 8,000 feet to 12,000 feet and that the combined company would be able to drill 1,200 wells at this increased average lateral length. EQT also represented that the longer wells would enable the combined company to produce natural gas at a significantly lower cost per unit. As a result, the Company told EQT shareholders that the Acquisition would result in $2.5 billion in synergies, including $100 million in cost savings in 2018 alone.

496.      JANA, an outside EQT investor and holder of 6% of EQT's stock at the time of the announcement of the Acquisition, publicly criticized and opposed the proposed merger, arguing that the two companies' acreage would not enable the combined company to drill nearly as many

wells as Defendants claimed, to achieve the average lateral length they claimed, or to realize the asserted $2.5 billion in synergies. Defendants, however, "emphatically" denied that JANA's criticisms were valid and not only reasserted but increased their claims about the combined companies' ability to drill 1,200 wells at a 12,000-foot *or longer* average lateral length and to realize $2.5 billion *or more* in synergies.

### C. The Registration Statement Contains Material Misstatements and Omits to Disclose Material Facts

497.    In connection with the Acquisition, Defendants filed with the SEC a combined registration statement on Form S-4, prospectus ("Prospectus") and joint proxy statement/prospectus ("Proxy") (together, the "Registration Statement") on July 27, 2017, which EQT amended on September 8, 2017, and September 29, 2017, and which the SEC declared effective on October 12, 2017.

498.    The Registration Statement, which described the Acquisition, stated that both EQT's and Rice's boards of directors had approved the Acquisition and recommended to the shareholders of the respective companies that they approve the Acquisition at special shareholder meetings.

499.    The Registration Statement included materially false and misleading statements about the Acquisition, including the following:

> As part of its upstream consolidation strategy, EQT closely monitors and evaluates the activities of other industry participants in the southwestern Appalachian Basin, including strategic transactions undertaken by such participants. In this regard, EQT has noted an accelerating trend of industry-wide consolidation in the Appalachian Basin, including the acquisition by Vantage Energy ("Vantage") in May 2016 of certain Marcellus and Utica assets of Alpha Natural Resources for $339.5 million (the "Alpha Acquisition") and Rice's acquisition of Vantage announced in September 2016 for $2.7 billion (the "Vantage Acquisition"). Prior to the transactions, EQT had viewed Vantage, Rice and Alpha's Marcellus and Utica assets as key potential acquisition targets.

Following the Alpha Acquisition and the Vantage Acquisition, EQT's view was that the number of remaining consolidation opportunities in EQT's core areas had narrowed considerably, with ***Rice having materially expanded its footprint in EQT's core operating area, thereby becoming a uniquely attractive and complementary potential business combination for EQT. Among other potential synergies, EQT noted the opportunity such a combination could create for a significant increase in the average lateral lengths of future Marcellus wells, more efficient development given the companies' significant contiguity, and a variety of cost savings in both the upstream and midstream businesses.*** EQT also reached the conclusion that, in light of the scarcity of remaining potential consolidation opportunities and ***the unique synergy opportunities presented by a potential combination with Rice***, a combination of Rice with a third party would materially limit the remaining scope of strategic consolidation opportunities available for EQT to pursue in its core areas, which in turn could cause EQT's cost structure to become less competitive relative to other industry participants with more consolidated positions.

500.    The Registration Statement also stated that "[m]embers of the EQT board and management noted [at a meeting on April 19, 2017] that Rice represented a uniquely compelling acquisition opportunity given ***the synergies that would likely result from the contiguous and complementary nature of Rice's asset base with EQT's***."

501.    The Registration Statement also stated that "Barclays [Rice's financial advisor in the Acquisition] advised [the Rice Board] that, in [Barclays'] judgment, it was unlikely that any counterparty could make a proposal that would be superior to EQT's proposal in light of ***the uniquely attractive synergies and industrial logic inherent in a combination with EQT, which made the EQT shares a highly attractive acquisition currency***."

502.    The Registration Statement claimed that:

• . . . As a result of the merger and the operational synergies described in more detail below, EQT's inventory in Washington and Greene Counties, Pennsylvania, two of the highest productivity counties in the Appalachian Basin, will improve in both scale and profitability—***increasing from approximately 775 undeveloped locations with an average of 8,000' lateral to approximately 1,200 undeveloped drilling locations with an average of 12,000' lateral***. EQT expects to focus its development efforts substantially in these locations in the near term to differentiate the combined company from its Appalachian peers, with returns per well anticipated to increase from 52% to 70% at a $3.00/Mcf NYMEX natural gas price.

181

• ***The combined company will represent one of the lowest cost, highest margin operators in the United States***, with an anticipated investment grade credit rating, allowing for continued industry-leading value creation even in a lower-for-longer commodity price environment.

• As a result, through the consummation of the merger, EQT expects to position itself as one of the few, if not the only, large-cap, investment grade independent exploration and production companies capable of significant near and long-term production growth from its existing asset base. ***EQT anticipates this production growth will be achieved with significantly improved profitability given the capital, operational and administrative efficiencies expected in connection with the merger, including the ability for the combined company to achieve the same pro-forma feet-of-pay developed with 20% fewer Pennsylvania wells in 2018 and 35% fewer Pennsylvania wells in 2019 than would have been the case for EQT on a standalone basis. Given the flexibility created by becoming the lowest-cost natural gas operator, EQT expects to have the ability to return value to shareholders across commodity cycles, and is targeting cash flow breakeven for the combined company in 2019 with a plan to provide meaningful cash returns to shareholders in 2020 and beyond.***

503.    The Registration Statement also stated:

*Significant Synergies.* In addition to the strategic rationale and the ability to participate in unlocking value embedded within Rice, EQT expects that its shareholders will derive a substantial benefit from the significant synergies attributable to the transaction. The EQT board believes that the merger will create capital efficiencies and operational cost savings and synergies through conducting EQT's and Rice's operations as part of a combined enterprise, including synergies resulting from:

• the opportunity to optimize the combined company's upstream and midstream standalone portfolios by ***applying each company's best practices across the contiguous and complimentary [sic] acreage positions***;

• ***the opportunity for a significant increase in the average lateral lengths of future Marcellus wells, reducing well costs on a per horizontal foot basis and increasing the present value of development***;

• ***the expectation of meaningfully reduced lease operating expense per unit through more efficient development, including an increase in wells per pad, an increase in company net horizontal feet through coordinated development plan eliminating drainage effects, a reduction in rig and frac fleet move times, coordinated produced water handling and improved cycle times through concentrated execution;***

• ***overhead savings through elimination of duplicative corporate and public company costs;***

182

> • *leveraging of the respective best practices, data and technological capabilities of each of Rice and EQT, including potential for improved well design to achieve greater returns on the combined acreage position; [and]*
>
> • *an increase in the amount and percentage of organic leasing opportunities that can be valued as leases that expand the potential lateral length of planned development . . . .*
>
> *As a result of the synergies detailed above, EQT expects that the transaction will be significantly accretive to EQT shareholders in the first year following closing.*

504.    The Registration Statement also touted the purported "Benefits of a Combination

with EQT":

> The Rice board determined that the merger with EQT provided the best alternative for maximizing stockholder value. In coming to this determination, the Rice board analyzed a number of factors, including the following:
>
> • *The combined operational positions would allow for significant operational synergies given the contiguous nature of the companies' acreage positions in Washington and Greene Counties, Pennsylvania*, which Rice believes are the two most economic counties in the Southwestern Pennsylvania dry gas core of the Marcellus Shale. These operational synergies would be geographically unique to a combination with EQT versus any of the other operators in the region and are expected to include:
>
> • *The substantial contiguity in the acreage footprints should allow for a significant increase in the average lateral lengths of future Marcellus wells of the combined company, thereby significantly reducing well costs on a per horizontal foot basis and increasing the present value of development;*
>
> • *In addition, the proximity of operations will allow for more efficient development—including an increase in wells per pad, an increase in company net horizontal feet through coordinated development plan eliminating drainage effects, a reduction in rig and frac fleet move times, coordinated produced water handling and improved cycle times through concentrated execution—which is expected to meaningfully reduce lease operating expenses*;
>
> ***
>
> • *The combination allows for the combined company to leverage within its existing operating areas best practices and technological advances of each of Rice and EQT, including potential for improved well design to achieve greater returns on the combined acreage position; [and]*

• ***The combination increases the amount and percentage of organic leasing opportunities that can be valued as leases that expand the potential lateral length of planned development***. . . .

The combined company would represent an unique investment opportunity both within the Appalachian Basin and in the industry at large.

• The combined company would be a premier North American natural gas company with ***best-in-class acreage positions in the Marcellus*** and Utica Shales.

\*\*\*

• The combined company would have high quality, natural gas weighted assets totaling an estimated 75 trillion cubic feet equivalents (Tcfe) in resource potential and ***over 727,000 combined net acres in the core of the Marcellus*** and Utica Shales; [and]

• ***The combined company would be one of the lowest cost, highest margin operators in the country, allowing for continued industry leading value creation even in a lower-for-longer environment***. . . .

505.    The Registration Statement also quantified the purported synergies from the

Acquisition by year:

EQT management provided to the EQT board, Rice and Rice's financial advisor certain estimates of the amounts and timing of the cost savings and operational synergies anticipated by EQT management to result from the merger during the calendar year ending December 31, 2018 through the calendar year ending December 31, 2026, which consisted of EQT prepared estimates of annual cost synergies of $100 million (which amount EQT management rounded from, and which amount was not duplicative of, the $93 million of annual corporate general and administrative benefits reflected in the Expected Development and Cost Savings described below) expected to be realized following the closing in 2018 and beyond (such estimated annual cost savings, the "Expected Synergies"). The Expected Synergies also were provided to Citi for its use and reliance in connection with its opinion and related financial analyses described in the section entitled "— Opinion of EQT's Financial Advisor."

EQT management provided to the EQT board certain estimates of the potential strategic implications and financial and operational benefits which EQT management anticipated to result from the mergers during the calendar year ending December 31, 2018 through the calendar year ending December 31, 2026 (collectively, the "Expected Development and Cost Savings"). The Expected Development and Cost Savings also were provided to Citi for its use and reliance in connection with its opinion and related financial analyses. ***The Expected Development and Cost Savings included assumptions of (i) development***

184

*synergies of approximately $333 million in 2018, $448 million in 2019, $283 million in 2020, $244 million in 2021, $379 million in 2022, $371 million in 2023, $406 million in 2024, $33 million in 2025 and $0 in 2026 and (ii) corporate general and administrative benefits per year in 2018-2026 of approximately $93 million.* The assumptions described in the preceding sentence reflected no potential midstream benefits and no benefits attributable to upside potential identified by EQT management that could potentially be achieved from drilling and completion best practices, buying power, marketing optimization, upstream lifting and operating expense optimization, lengthening West Virginia laterals, perpetuity general and administrative savings or accelerated expansion of the Mountain Valley Pipeline.

506.   The statements quoted in ¶¶ 499-505 were false and misleading for a number of reasons.

507.   *First, achieving 1,200 drilling locations at an average lateral length of 12,000 feet was impossible.* Below, the left panel is the portion of EQT's map from its June 19, 2017 investor presentation (which was incorporated by reference in the Registration Statement, as alleged in ¶ 497) that shows the Rice and EQT acreages in western Pennsylvania. Plaintiffs have added a red outline to the map to show the outer boundaries of the claimed EQT and Rice acreage in Greene and Washington Counties in western Pennsylvania. According to EQT, the purple acreage was "Rice Acreage" and the yellow acreage was "EQT Acreage." The center panel is only the red outlined area by itself.

  

508.     Plaintiffs have obtained and analyzed detailed maps and prior drilling data as of July 2017 showing EQT's and Rice's properties and the natural-gas wells that they had already drilled on them. Plaintiffs obtained these maps and data from Pennsylvania state records, including real-estate records, drilling permits, and filings by natural-gas companies reporting their actual drilled wells, and from private services that assemble and organize information from the public records. The right panel above is the same outlined red area, but with the actual combined EQT and Rice acreage in blue. As the numerous white gaps shown in the right panel demonstrate, EQT's representation on the left—that EQT's and Rice's combined acreage would form a seamless, internally continuous acreage that spanned the full area—misstated the nature of EQT's and Rice's acreages.

509.     To determine how many wells EQT could drill on the combined EQT and Rice acreage, based on the information available to EQT in July 2017, Plaintiffs prepared a detailed map showing all of the acreage in Greene and Washington Counties where EQT and Rice had drilling rights as of July 31, 2017, including leases from all known acquisitions by both companies. Plaintiffs then marked all previously drilled wells in those counties as of that time on the map by marking the surface and bottom hole locations and the drilling trajectories representing actual drilled well paths. Plaintiffs then marked the acreage that was already producing natural gas through these wells—the proved developed producing wells.

510.     Where a publicly filed permit appeared to exceed the length of the actual drilled well, only the acreage whose gas would be produced by the actual drilled well was marked as already in production. Acreage that was already in production would not be available for additional drilling in the Marcellus because its natural gas was already being tapped. Below is a depiction of the well acreage that EQT or Rice had already drilled in yellow:

186



511.    Plaintiffs then marked the potential additional wells that could be drilled in the combined EQT and Rice acreage that was not already in production. To determine what additional wells were feasible, Plaintiffs assumed a minimum lateral well length of 6,000 feet and a maximum lateral well length of 16,000 feet.[47] The maximum length of 16,000 feet is an assumption that is generous to EQT because drilling a lateral well in excess of 15,000 feet is exceedingly difficult.

512.    The additional wells (i.e., above the proved developed producing wells) were assumed to extend to the limit of EQT's and Rice's combined acreage. Where a well of a lateral length within the assumed parameters was possible using third-party acreage of no more than 15% of the total length, the well was assumed to be feasible, based on EQT's public statements that it

---

[47] Plaintiffs assumed lateral spacing of 750 feet between the wells. Two wells with lateral spacing between them that is narrower than 750 feet draw on the same portion of the natural-gas reservoir, reducing both wells' productivity. Moreover, by January 22, 2019, EQT acknowledged to investors that lateral spacing of 1,000 feet was ideal, which makes 750-foot spacing generous to EQT. That day, Defendant McNally admitted, "we believe 1,000 feet to be the optimal well spacing"; "[w]e've been trending towards wider spacing *over the last several years*"; "Average spacing in our Pennsylvania Marcellus area averaged ***840 feet in 2018*** and is planned for ***880 feet in 2019***"; and "We believe we will get to an average of around 1,000-foot spacing over the next couple of years."

would use land swaps or leases to acquire necessary third-party acreage where the combined companies' properties were not directly contiguous.

513.    Based on this analysis, Plaintiffs calculated that only **519 wells** with lateral lengths ranging from 6,064 feet to 16,000 feet, an average lateral length of 11,465 feet, and a total lateral length of 5,950,335 feet were feasible. Accordingly, Defendants' public statements overstated the feasible wells by more than 100%, in terms of both number of wells and total lateral length.

514.    In addition, even if Plaintiffs were to expand the range of well lengths at the bottom end of the range, to span from 4,000 lateral feet to 16,000 lateral feet, EQT would only be able to drill **819 wells** in Washington and Greene Counties, and the average length of those wells would decrease to 9,648 lateral feet.[48]

515.    Thus, even using assumptions that are highly favorable to Defendants, EQT's public statements substantially overstated both the number of wells and the total lateral length of wells that were feasible in the combined EQT and Rice acreage based on the then-known facts about the geography and drilling history of that acreage.

516.    Achieving EQT's claimed 1,200 wells with an average lateral length of 12,000 feet and 750-foot spacing would require perfectly contiguous, and perfectly internally continuous, Rice and EQT acreage that would need to look like the blue rectangle in the following diagram. This is, of course, **not** how the actual combined Rice and EQT acreage appeared:

---

[48] Both of these analyses are generous to EQT because they do not reduce their totals to take into account any insurmountable problems that EQT would encounter with the undrilled acreage, including the existence of fault lines, existing mines, dense metropolitan areas and rugged terrain (where drilling would be exceedingly difficult or risky).



517.   ***Second, the asserted $2.5 billion in synergies were based on impossible assumptions that lacked any basis in fact.*** As former Rice and EQT employees reported, Rice had already optimized the number of wells it could place on each well pad, so it was simply not possible for EQT to further shrink the number of well pads and still drill the number of wells EQT claimed.

518.   FE 1 was a Project Controls Manager and Project Manager at Rice from before the start of the Class Period and stayed on at EQT until May 2018. He was responsible for cost control estimation of future expenses, system design, and oversight for Rice Midstream Partners ("RMP") assets prior to the merger. FE 1 also advised on "Project Redhawk," which was EQT's project to prepare for the spin-off of Equitrans (EQT's midstream business) into its own company.

519.   As part of his consulting on Project Redhawk, EQT granted FE 1 access to the financial model that EQT used during the Acquisition. According to FE 1, EQT's analysis to generate synergies from the Acquisition was based on the assumption that EQT would drill laterals to extremely long lengths and significantly reduce the number of well pads it needed to construct.

520.   Specifically, FE 1 stated that the EQT Team responsible for the economics that formed the basis for the Acquisition, and later for Redhawk, assumed they could cut the number of well pads in half, which FE 1 stated was "physically impossible." FE 1 stated that the financial

model *assumed a decrease from 199 drilling locations to 99 drilling locations*, but "there was *no rationale* that that was going to work."

521.    According to FE 1, before the Acquisition, Rice employees knew internally that Rice had already optimized the well-pad locations that Rice was using for Greene and Washington Counties. Therefore, achieving significant synergies through the Acquisition by further reducing the number of pad locations by, for example, more than 10%–20%, was simply not possible. In FE 1's words, "there was no way to do this," "it could not be done," and it was "impossible."

522.    *Third, EQT's claimed synergies were also unachievable because the Company lacked the necessary expertise to drill extra-long laterals and repeatedly experienced well collapses at ultra-long lateral lengths before the Acquisition.*

523.    FE 2[49] said that EQT was not "capable of drilling those [extra-long] laterals," that it "did not follow industry standards" and "did not use industry best practices," and "it was just a horrible mess." Similarly, FE 3[50] stated that "EQT was not capable of capitalizing on the merger" because "they had not had a successful drilling program at all," and EQT was not performing standard practices that would have helped their program. More specifically, FE 2 stated that before the Acquisition, EQT tried to drill three 18,000 foot-plus lateral wells but *the first two collapsed* when EQT tried to pull the drill string out of the holes;

524.    FE 2 attributed the collapses to EQT being driven by a need to drill quickly and reduce costs. FE 2 stated, "They didn't have the expertise [to drill the long laterals] . . . ."

---

[49] FE 2 was a Drill Team Lead at EQT in Pennsylvania from before the start of the Class Period until November 2017. EQT hired him specifically to help the Company drill longer laterals given that he had an extensive career drilling similar laterals.

[50] FE 3 worked for EQT from before the start of the Class Period through November 2017 as a Drilling Engineering Supervisor in Pittsburgh. His team was responsible for planning all of EQT's wells that were drilled during his tenure at EQT.

525.   FE 3 similarly stated that EQT drilled its wells quickly, but then would not be able to pull the drill out of the hole. With a majority of the wells EQT drilled, EQT would get stuck trying to pull back out of the hole. EQT did not spend adequate time ensuring that the hole was clean but instead focused on getting to the bottom as fast as it could. As a result, the cuttings built up in front of the pipe, and EQT could not get out. Getting stuck like this could lead to numerous problems, from causing days of delays to requiring EQT to redrill. FE 3 witnessed both things occur during his time there.

526.   According to FE 3, while drilling, EQT also ran into three or four of its own wells, which is something FE 3 had never seen happen in his career, because a company should know where its own wells are. This happened because EQT was worried about speed and nothing else.

527.   ***Fourth, EQT's incapability to achieve the claimed synergies is further demonstrated by its failure to follow industry best practices.***

528.   According to FE 5, EQT had experienced several problems with drilling longer laterals, including losing the drill head assembly inside the well. FE 5 explained that if this happens, the drilling company has to start the drilling over, and that this happened frequently at EQT once EQT started trying to drill more challenging lengths.

529.   In the spring of 2017, in preparation for EQT starting to drill longer laterals, FE 5 gave a presentation to the drilling team, including Brian Morel (then EQT Director of Engineering), Maddox, and David Elkin (former EQT Senior Vice President of Asset Optimization from 2017 through 2018). During the presentation, FE 5 discussed the points that would be more challenging about drilling longer laterals and recommended design changes for the wells, changes to the mud program, changes to piping, and possible changes to the wellhead.

530.    After EQT experienced collapses of longer lateral wells, FE 2 explained to Maddox that EQT was experiencing breakout in the lower formations—i.e., the shape of the wellbore was widening more than it should, which leads to well collapses. FE 2 and another former employee (FE 3) brought this to Maddox's attention, but Maddox did not act to remedy the problem.

531.    FE 2 stated that it was not abnormal when he first started at EQT for there to be wellbore collapses, but that *the frequency increased dramatically* when EQT started to drill longer and longer laterals.

532.    In July or August 2017, following repeated failures, FE 2 gave a presentation to Maddox, Morel, and George Davis (EQT Drilling Team Lead) providing explanations as to why the borehole kept collapsing at longer depths, but they dismissed him. According to FE 2, there were numerous technical issues that EQT was experiencing, mostly as a result of drilling too quickly. He said EQT "wanted to run through [the drill of laterals] at jackrabbit speed but you can't do at 16,000 what you do at 12,000. You have to be more cautious. They wanted to be a superstar. They wanted to just hit home runs. But you can't do that."

533.    The result of the borehole collapses was that EQT would cut off the drill assembly, leave it in the ground, and redrill the lateral. However, that was incredibly expensive and EQT incurred significant extra costs as a result. According to FE 2, EQT "did all of these cowboy things," and EQT "would just drill and if it got stuck they would just break it off and redrill."

534.    FE 2 stated that EQT did not have the expertise to drill the kinds of laterals it was representing it could. Although FE 2 had presented information in July or August 2017 that *EQT would not be able to successfully drill the longer laterals without taking several corrective steps*, EQT decided it was just going to continue its current drilling practices, which resulted in even more collapses.

535.    According to FE 2, numerous articles discuss how drilling past 16,000 feet (which is included within the definition of Extended Reach Drilling ("ERD")) is a "different animal" and requires an operator to monitor various factors, such as friction factors, much more closely.[51] However, EQT embarked on ERD as if there was no meaningful difference between drilling 10,000 feet versus 16,000 feet.

536.    FE 2 stated that, in September 2017, after FE 2's presentation, EQT brought in consultants from K&M Technologies to help train EQT on how to drill longer laterals during a two-day course. FE 2 and the other senior drilling leadership (including Davis and Maddox) attended these presentations. K&M explained to EQT what the Company needed to do in order to be successful and efficient at drilling longer laterals. FE 2 stated that K&M confirmed many of the points on which he had presented. However, during a break when the K&M consultant was out of the room, Maddox told everyone "We're not doing that," and EQT senior management ignored K&M's recommendations. FE 2 stated that "as soon as they [K&M] walked out [of] the door, George Davis and Bradley Maddox said it was a bunch of bullshit, and they weren't going to do it like that."

**D.      Documents Incorporated by Reference into the Registration Statement Contain Material Misstatements and Omit to Disclose Material Facts**

537.    On June 19, 2017, EQT issued a press release, which it also filed as an exhibit to a Form 8-K that day. The Registration Statement incorporated the entire Form 8-K by reference,

---

[51] The Schlumberger Oilfield Glossary defines "Extended Reach Drilling" as a term first coined in 1980 to describe "drilling directional wells in which the drilled horizontal reach (HR) attained at total depth (TD) exceeded the true vertical depth (TVD) by a factor greater than or equal to two. *Extended-reach drilling (ERD) is particularly challenging for directional drilling and requires specialized planning to execute well construction*." https://www.glossary.oilfield.slb.com/en/Terms/e/ extended_reach_drilling.aspx. As the Glossary adds, "Since the term was coined, the scope of extended-reach drilling has broadened and the definition, which is now more flexible, includes deep wells with horizontal distance-to-depth, or H:V, ratios less than two." *Id*.

stating that it "contain[s] important information about the companies, their respective financial condition and other matters."

538.    The June 19, 2017 press release incorporated by reference in the Registration Statement stated:

> This transaction brings together two of the top Marcellus and Utica producers to form a natural gas operating position that will be unmatched in the industry. ***Rice has built an outstanding company with an acreage footprint that is largely contiguous to our existing acreage, which will provide substantial synergies and make this transaction significantly accretive in the first year, said Steve Schlotterbeck, EQT's president and chief executive officer.***

> Since the beginning of 2016, we have added more than 485,000 acres to our development portfolio and have achieved significant scale in the core of the Marcellus. ***We will now shift our focus from acquisitions to integration as we work to drive higher capital efficiency through longer laterals; reduce per unit operating costs through operational and G&A synergies***; improve our sales portfolio by expanding access to premium markets; ***and deliver increased value to our shareholders, continued Schlotterbeck.***

> ***Daniel J. Rice IV, chief executive officer, Rice Energy, stated,*** Natural gas is the key to a cleaner energy world; and ***the combination of Rice and EQT - two of the United States'*** largest, ***lowest-cost***, and most responsible ***natural gas producers - creates an unparalleled leader in shale gas development*** that will benefit the environment and our shareholders for many decades to come.

> ***As the vast majority of the acquired acreage is contiguous with EQT's existing acreage position, EQT anticipates a 50% increase in average lateral lengths for future wells located in Greene and Washington Counties in Pennsylvania.***

539.    The June 19, 2017 press release incorporated by reference in the Registration Statement also stated that "***EQT continues to be a leader in the use of advanced horizontal drilling technology*** designed to minimize the potential impact of drilling-related activities and reduce the overall environmental footprint."

540.    Also on June 19, 2017, EQT issued an investor presentation, which was also filed as an exhibit to the Form 8-K that day and incorporated by reference in the Registration Statement. The investor presentation stated that the "Transaction Rationale" for EQT's Acquisition of Rice

was the "***Significant contiguous acreage and resulting synergies***," and the presentation included

a map that purported to depict the two companies' contiguous and internally continuous natural-

gas fields:



541.    EQT's June 19, 2017 presentation incorporated by reference in the Registration

Statement also stated that there would be "Consolidation Benefits" from the merger because

"***Rice's PA Marcellus position is contiguous with EQT's SW PA acreage***":

**Upstream Benefits**
- Significantly improved well returns in Greene & Washington Counties
  - Before transaction: 775 undeveloped locations with an average of 8,000' lateral
  - After transaction: 1,200 undeveloped locations with an average of 12,000' lateral
  - Returns per well increase from 52% to 70% at $3.00 NYMEX
- Sharing of technical data and best practices
- Additional infrastructure and optimization benefits – rig allocation, pad sites, water, access roads, etc.

542.    EQT's June 19, 2017 presentation incorporated by reference in the Registration

Statement also stated that by enabling the combined companies to drill 12 wells per pad with a

12,000-foot average lateral length, the Acquisition would provide "dramatically increasing

returns":



543.     EQT's June 19, 2017 presentation incorporated by reference in the Registration Statement also stated that *the "Synergy Potential" and "Present value of economic savings pro forma for [the] Rice acquisition" included $1.9 billion of "capital efficiencies" and $0.6 billion of general-and-administrative expense savings, for $2.5 billion of "total synergies."* The presentation further stated that *EQT would "[b]egin to realize capital, operational and administrative efficiencies" in 2018 and would "[f]ully realize synergies" in 2019*.

544.     The statements quoted in ¶¶ 537-43 were materially false and misleading because, as alleged in detail in ¶¶ 507-36, (i) achieving 1,200 drilling locations at an average lateral length of 12,000 feet was impossible based on the specific geography and prior drilling of EQT's and Rice's acreage; (ii) the asserted $2.5 billion in synergies were based on impossible assumptions that lacked any basis in fact given Rice's prior optimization of the number of wells per pad; (iii) EQT's claimed synergies were unachievable because the Company lacked the necessary expertise to drill extra-long laterals and repeatedly experienced well collapses at ultra-long lateral lengths

before the Acquisition; and (iv) EQT was unable to achieve the claimed synergies because it failed to follow industry best practices.

### E. Other Proxy Solicitations Contain Material Misstatements and Omit to Disclose Material Facts

545. On July 27, 2017, EQT gave an analyst presentation, which EQT publicly filed with the SEC, in which it reiterated its statement that the Acquisition would provide $2.5 billion of synergies, republished the map showing purportedly contiguous properties that it had first published on June 19, 2017, as discussed in ¶¶ 507 and 540, and stated that "Capital Efficiencies" would be achieved because "[c]ontiguous acreage leads to: longer laterals [and] fewer wells" and because of "[l]ower surface costs." On EQT's July 27, 2017 conference call with investors, Defendant Schlosser, then EQT's Senior Vice President and President of Exploration & Production, claimed that "given our contiguous acreage position of the pending Rice transaction, *we expect Marcellus wells in Greene and Washington counties to average at least 12,000 feet*."

Also during EQT's July 27, 2017 conference call with investors, Defendant Schlotterbeck claimed:

> The second most common question has been around synergies. We are confident that the PV [Present Value] of the synergies are *in excess of the $2.5 billion* laid out in the deal announcement. As you will see in our updated slide deck, . . . the $2.5 billion only covers categories of synergies, *$1.9 billion of which are efficiencies driven by longer laterals, high-grading the drilling program to drill longer laterals first and lower surface costs, including fewer roads, pads, water pits and well lines*. *Those savings are in our control*, and we are forecasting $200 million in 2018 and $350 million per year for the following 9 years. The other $600 million is from a reduction of a $100 million of G&A per year discounted for 10 years. Given the overlap of the businesses and after careful evaluation, *we believe that $2.5 billion is a conservative estimate and are confident in our ability to achieve these targets*.

> In addition to the quantified synergies, there are significant synergies that are harder to quantify. We listed them in our presentation this morning, along with ranges of potential value. If you took the high end of the ranges of each category, the additional synergies are well in excess of the $2.5 billion that we've already quantified. A few examples are: *increasing well recoveries by combining EQT and Rice's best drilling and completion techniques is worth $500 million for every 1% increase in EUR [estimated ultimate recovery] per foot*; increased leverage in

acquiring drilling and fracking services is worth $300 million for every 1% improvement in service cost; and G&A savings beyond 10 years is worth approximately $500 million.

546.    On October 16, 2017, EQT publicly responded to JANA's criticisms of the Acquisition in a press release that EQT publicly filed with the SEC. In this press release, EQT "emphatically" denied JANA's points about the combined EQT and Rice acreage:

> JANA has suggested that EQT's presentation of the combined Rice-EQT acreage map is misleading, and that the existence of non-contiguous acreage contained within the pro-forma footprint of the combined Company implies that stated operational synergies from the transaction are not achievable. ***This is emphatically not the case***.
>
> EQT has been operating in the Appalachian Basin for nearly 130 years, has drilled more than 2,500 horizontal wells, and has drilled the longest lateral in the Marcellus (to-date) at 17,400 feet. It is standard industry practice to manage any non-contiguous acreage requirements through well path adjustments, smaller bolt-on acquisitions, and tactical fill-ins, all of which are part of our current development plan at an estimated cost of up to $200 million annually. In addition, there are often small-scale acreage trades between operators that are used to fill in gaps. Each of these methods are routinely employed by EQT and other Appalachian operators to build their respective development programs. Given the multitude of legacy natural gas leases across Appalachia, it is commonplace for small acreage plots to exist given the historical ownership of land in the region.
>
> The combined Rice-EQT acreage profile was evaluated thoroughly and carefully, and ***based on our development plan, which includes the cost of tactical fill-ins, the Company is confident it will achieve the $2.5 billion in synergies that it has identified***. For JANA to suggest that this acreage acquisition strategy, which is standard for Appalachian operators, is inconsistent with achieving the anticipated benefits of the transaction is highly misleading and inaccurate.

547.    On October 19, 2017, EQT issued proxy materials stating that "Rice has an outstanding footprint that is largely contiguous to our existing acreage position . . . . As a combined entity with Rice, we expect to be well-positioned to capture significant operating efficiencies, improve overall well economics, and deliver stronger returns to shareholders." The materials also said that the Acquisition offered "IMPROVED UPSTREAM RETURNS, DRIVEN BY THE CONSOLIDATION OF COMPLEMENTARY ACREAGE POSITIONS"; that "[d]evelopment of

adjacent acreage leads to longer laterals and improves overall economics"; that the Acquisition offered "[a]pplication of best-practice technologies from two leading operators in Appalachia"; and that "[e]nhanced scale and efficiencies will lower the procurement costs of goods and services." The materials further claimed "SIGNIFICANT SYNERGIES IDENTIFIED, ALONG WITH ADDITIONAL LONG-TERM OPPORTUNITIES"; "Expected expense synergies driven by capital efficiencies and reduction of G&A costs"; and that the Company was "Positioned to achieve additional synergies through improved well designs . . . ." The materials also claimed that "Overlapping acreage in core operating area drives synergies potential."

548.    On October 23, 2017, EQT again publicly responded to JANA's criticisms of the Acquisition. EQT gave an analyst presentation, which EQT publicly filed with the SEC, in which it reiterated its statement that the Acquisition would provide $2.5 billion of synergies, republished the map showing purportedly contiguous properties that it had issued on June 19, 2017, as discussed in ¶¶ 507 and 540, and stated that "Capital Efficiencies" would be achieved because "[c]ontiguous acreage leads to: longer laterals (12,000 feet) [and] fewer wells" and because of "[l]ower surface costs."

549.    On an investor and analyst conference call on October 23, 2017, Defendant Schlotterbeck also denied JANA's criticisms of the Acquisition:

> [S]ince we are now two weeks away from the vote deadline, I do want to emphasize once again the merits of the Rice transaction. The primary driver of success in our industry is being the low cost producer, and the most impactful way to drive per unit cost lower is through longer laterals.
>
> Establishing a dominant footprint of highly contiguous acreage that allows for sustained long lateral development is a real competitive advantage. This is what the Rice transaction creates for us. Our competitors may be able to replicate things, like new drilling technology or new drilling techniques, but ***they can't replicate an acreage position that supports 12,000 foot laterals in the core of the Marcellus***.

550.   In response to an analyst's question, Defendant Schlotterbeck said that EQT expected to do even better than the 12,000-foot lateral wells it had previously told investors it would achieve and would do so immediately after the Acquisition closed:

> In the acquisition area where we said we're going to average 12,000-foot laterals, **we expect to be able to come right out of the gate in 2018 and average at least 12,700 feet in that area. So in terms of delivering on the synergies, we're going to be able to start demonstrating that from day one.** So we're pretty excited that the more we work the maps and get the data incorporated as we plan for the integration, our ability to deliver on that, our confidence in that, keeps going up. **So we're going to come out of gate at 12,700 at least and probably go up from there.**

551.   In response to another analyst's question about "your confidence around the 12,000 number on a pro forma basis," Schlotterbeck said: "Well, extremely confident." He reiterated that EQT was "going to come out of the gate above the average" and further stated that "there is lots of remaining inventory acreage, tremendous amount of resource in place, so **very, very confident in our ability to deliver on that synergy**."

552.   EQT's October 23, 2017 presentation further encouraged EQT and Rice stockholders to vote in favor of the Acquisition by quoting research analysts who accepted the truth of EQT's claims that the merger with Rice would yield significant benefits:



553.    The statements quoted in ¶¶ 545-52 were materially false and misleading because, as alleged in detail in ¶¶ 507-36, (i) achieving 1,200 drilling locations at an average lateral length of 12,000 feet was impossible based on the specific geography and prior drilling of EQT's and Rice's acreage; (ii) the asserted $2.5 billion in synergies were based on impossible assumptions that lacked any basis in fact given Rice's prior optimization of the number of wells per pad; (iii) EQT's claimed synergies were unachievable because the Company lacked the necessary expertise to drill extra-long laterals and repeatedly experienced well collapses at ultra-long lateral lengths before the Acquisition; and (iv) EQT was unable to achieve the claimed synergies because it failed to follow industry best practices.

### F.    Post-Acquisition Revelations

554.    EQT's and Rice's stockholders approved the Acquisition at special meetings on November 9, 2017, and the Acquisition closed on November 13, 2017.

555.    On October 25, 2018, the Company reported that third-quarter total costs were $586.2 million higher than in the same period of the prior year. The Company also disclosed that its estimated capital expenditures for well development in 2018 would increase by $300 million, to $2.5 billion, as a result of "inefficiencies resulting from higher activity levels, the learning curve on ultra-long horizontal wells, and service cost increases."

556.    On February 5, 2019, Toby Rice, Derek Rice, and their team of other former Rice Energy executives (the "Rice Team") released a presentation stating that EQT's average Marcellus well cost for a 12,000-foot lateral was $1,250 per foot in 2018, while Rice, before its merger with EQT, averaged $790 per foot for wells with laterals reaching 8,800 in the same region. The Rice Team also stated that EQT had "***erroneously adjusted***" its well costs "downwards" in an attempt to "normalize costs" and that "EQT costs could be $125-$250/ft higher when including capitalized costs, pad and facilities, etc." Then, on June 17, 2019 after the market closed, the Rice Team filed

lengthy and detailed proxy materials with the SEC that included a presentation that one press report described as "***the investor relations equivalent of a cluster bomb***." The Rice Team's presentation disclosed that (i) EQT failed to achieve the benefits of the Acquisition; (ii) EQT did not seek and had not achieved the synergies and cost savings that were the purported rationale of the Acquisition; (iii) EQT terminated nearly every Rice executive and leader after telling the market that EQT would seek to retain key Rice executives; (iv) EQT was excluding more than $300 million in costs it capitalized from its well costs; and (v) EQT leadership "lacks credibility and has misled shareholders."

      **G.**    **Loss Causation Under Section 14(a) of the Exchange Act**

557.    Defendants' wrongful conduct, as alleged in this Section VI of the Complaint, directly and proximately caused the economic loss suffered by Plaintiffs Northeast Carpenters and Cambridge and the Class of EQT and Rice shareholders entitled to vote on the Acquisition. As a result of the misrepresentations and omissions alleged in ¶¶ 497-553, EQT's common stock price was artificially inflated. The artificial inflation in EQT's stock price was removed when Defendants' misrepresentations and omissions made in the Joint Proxy were revealed, causing Plaintiffs' losses.

558.    A partial disclosure on October 25, 2018, partially revealed Defendants' false statements and omissions in the Registration Statement and the artificial inflation in EQT's stock to the market, when the Company disclosed unexpectedly high third-quarter costs, as discussed in ¶ 555.

559.    On this news, shares of EQT fell $5.12 per share, or 13%, to close at $35.34 on October 25, 2018, on unusually heavy trading volume.

560.    The next corrective disclosure on February 5, 2019, further partly revealed Defendants' misstatements and omissions in the Joint Proxy and the artificial inflation in EQT's

stock price to the market when the Rice Team disclosed that EQT's well costs greatly exceeded pre-Acquisition Rice's costs and that EQT had been understating its costs, as discussed in ¶ 556.

561.    On this news, shares of EQT fell $0.69 per share, or 3.5%, to close at $19.09 on February 5, 2019, on unusually heavy trading volume.

562.    The final corrective disclosure on June 17–18, 2019 revealed Defendants' misstatements and omissions in the Joint Proxy and the artificial inflation in EQT's stock price to the market, when the Rice Team disclosed detailed information about EQT's understatement of well costs and failure to achieve synergies from the Acquisition, as discussed in ¶ 354-65.

563.    On this news, shares of EQT fell during the day on June 18, 2019 and continued to decline by $0.90 per share, or 5%, to close at $15.06 on June 19, 2019, on unusually heavy trading volume.

564.    As a result of their acquisition of EQT common stock in the Acquisition in exchange for their Rice common stock, at an artificially inflated price, and the corrections removing the artificial inflation in the price of those EQT shares, Plaintiffs Northeast Carpenters and Cambridge and the Class suffered economic harm under Section 14(a) of the Exchange Act. Alternatively, Plaintiffs Northeast Carpenters and Cambridge and the Class of Rice shareholders entitled to vote on the Acquisition who received EQT shares are entitled to a rescissory measure of damages sufficient to return them to the economic position they were in before the consummation of the Acquisition.

## COUNT IV

### For Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9
### Against EQT, the Officer Defendants, and the Signer Defendants
### (together, the "Proxy Defendants") on Behalf of EQT Shareholders
### Who Were Entitled to Vote on the Acquisition

565.     Plaintiffs Northeast Carpenters and Cambridge repeat, incorporate, and reallege every allegation in ¶¶ 25-49 and 476-564 above as if fully alleged in this Count and only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiffs or members of the Class. Section 14(a) of the Exchange Act and SEC Rule 14a-9 prohibit making material misstatements and omissions in soliciting any proxy. For the purposes of this Section 14(a) claim, Plaintiffs do not allege that any Defendant acted with fraudulent intent, which is not an element of a claim under Section 14(a) of the Exchange Act. This Count is predicated upon the Proxy Defendants' liability for making false and materially misleading statements in connection with soliciting EQT shareholders' approval of the Acquisition.

566.     The misstatements and omissions alleged in ¶¶ 499-505, 537-43, and 545-52 above were material. The Proxy Defendants made or were responsible for making the misstatements and omissions. Through their negligence in issuing the Proxy containing material misstatements and omissions, the Proxy Defendants failed to disclose to EQT shareholders who held shares as of the record date of September 25, 2017, and were entitled to vote with respect to the Acquisition at the November 9, 2017 special meeting of EQT shareholders, all material facts necessary for shareholders to cast a fully informed vote with respect to the Acquisition.

567.     Plaintiffs and other EQT shareholders have been injured by the material misstatements and omissions contained in the Proxy.

568.   Plaintiffs and other members of the Class are entitled to recover damages to compensate them for all damages resulting from the acts and omissions of the Proxy Defendants in violation of Section 14(a) of the Exchange Act.

569.   Less than one year has elapsed from the time Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time this claim was first filed, and less than three years have elapsed from Defendants' last culpable act or omission.

**COUNT V**

**For Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9
Against the Proxy Defendants on Behalf of Rice Shareholders
Who Were Entitled to Vote on the Acquisition**

570.   Plaintiff Cambridge repeats, incorporates, and realleges every allegation in ¶¶ 25-49 and 476-569 above as if fully alleged in this Count and only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiff Cambridge or members of the Class. Section 14(a) of the Exchange Act and SEC Rule 14a-9 prohibit making material misstatements and omissions in soliciting any proxy. For the purposes of this Section 14(a) claim, Plaintiff Cambridge does not allege that any Defendant acted with fraudulent intent, which is not an element of a claim under Section 14(a) of the Exchange Act. This count is predicated upon the Proxy Defendants' liability for making false and materially misleading statements in connection with soliciting Rice shareholders' approval of the Acquisition.

571.   The misstatements and omissions alleged in ¶¶ 499-505, 537-43, and 545-52 above were material. The Proxy Defendants made or were responsible for making the misstatements and omissions. Through their negligence in issuing the Proxy containing material misstatements and omissions, the Proxy Defendants failed to disclose to Rice shareholders who held shares as of the record date of September 21, 2017, and were entitled to vote with respect to the Acquisition at the

November 9, 2017 special meeting of Rice shareholders all material facts necessary for shareholders to cast a fully informed vote with respect to the Acquisition.

572.    Plaintiff Cambridge and other Rice shareholders have been injured by the material misstatements and omissions contained in the Proxy.

573.    Plaintiff Cambridge and other members of the Class are entitled to recover damages to compensate them for all damages resulting from the acts and omissions of the Proxy Defendants in violation of Section 14(a) of the Exchange Act.

574.    Less than one year has elapsed from the time Plaintiff Cambridge discovered or reasonably could have discovered the facts upon which this complaint is based to the time this claim was first filed, and less than three years have elapsed from Defendants' last culpable act or omission.

## COUNT VI

### For Violations of Section 20(a) of the Exchange Act
### Against the Officer Defendants

575.    Plaintiffs Northeast Carpenters and Cambridge repeat, incorporate, and reallege every allegation in ¶¶ 25-49 and 476-574 above as if fully alleged in this Count and only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiffs or members of the Class.

576.    As alleged above, EQT violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by its acts and omissions as alleged in this complaint.

577.    The Officer Defendants acted as controlling persons of EQT within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). By virtue of their high-level positions, participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and intimate knowledge of the Company's actual performance, and

power to control public statements about EQT, the Officer Defendants had the power and ability to control the actions of EQT and its employees. By reason of this conduct, the Officer Defendants are liable under Section 20(a) of the Exchange Act.

## COUNT VII

**For Violations of Section 11 of the Securities Act
Against EQT, the Officer Defendants,
and the Signer Defendants**

578.    This claim is brought by Plaintiff Cambridge under Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all persons who acquired the common stock of EQT in exchange for their shares of the common stock of Rice pursuant to the Registration Statement.

579.    Plaintiff Cambridge repeats, incorporates, and realleges every allegation in ¶¶ 25-49 and 476-577 above as if fully alleged in this Count and only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiff Cambridge or members of the Class. For the purposes of this Section 11 claim, Plaintiff Cambridge does not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a claim under Section 11 of the Securities Act. This claim is predicated upon Defendants' liability for making false and materially misleading statements in the Registration Statement.

580.    The Registration Statement was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated in it.

581.    EQT is the registrant for the shares issued and distributed to the Class members in the Acquisition. The Defendants named in this Count were responsible for the contents and dissemination of the Registration Statement.

582.    At a minimum, as the issuer of the shares, EQT is strictly liable to Plaintiff Cambridge and the Class for the Registration Statement's material misstatements and omissions.

583.     None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

584.     By reason of the conduct alleged in this Count, each of these Defendants violated Section 11 of the Securities Act.

585.     Plaintiff Cambridge and the Class exchanged their shares of Rice common stock for EQT common stock in the Acquisition and pursuant to the Registration Statement.

586.     Plaintiff Cambridge and the Class have sustained damages. The value of EQT common stock has declined substantially after the Acquisition and after the issuance and dissemination of the materially misleading Registration Statement.

587.     At the time of their acquisition of EQT common stock, Plaintiff Cambridge and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged in this Count.

588.     Less than one year elapsed from the time that Plaintiff Cambridge discovered, or reasonably could have discovered, the facts upon which this claim is based to the time that Plaintiff Cambridge filed this action. Less than three years has elapsed between the time that the securities upon which this count is brought were offered to the public and the time Plaintiff Cambridge filed this action.

## COUNT VIII

### For Violations of Section 12(a)(2) of the Securities Act
### Against EQT

589.     Plaintiff Cambridge repeats, incorporates, and realleges every allegation in ¶¶ 25-49 and 476-588 above as if fully alleged in this Count and only to the extent, however, that the

allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiff Cambridge or members of the Class.

590.    This Count is brought under Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2). By means of the defective Prospectus and as otherwise detailed in this complaint, EQT promoted and sold, for the benefit of itself and its associates, EQT common stock to Plaintiff Cambridge and other members of the Class.

591.    The Prospectus contained untrue statements of material fact and concealed and failed to disclose material facts, as detailed above. EQT owed Plaintiff Cambridge and other members of the Class who acquired EQT common stock pursuant to the Prospectus a duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that the statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained in the Prospectus not misleading. EQT, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as alleged above. Plaintiff Cambridge and the other members of the Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time they purchased or acquired EQT common stock.

592.    By reason of the conduct alleged in this Count, EQT violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of this violation, Plaintiff Cambridge and the other members of the Class who exchanged Rice common stock for EQT common stock in the Acquisition pursuant to the Prospectus sustained substantial damages in connection with those acquisitions. Accordingly, Cambridge and the other members of the Class who hold the common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid

for their shares, and hereby tender their shares to EQT. Class members who have sold their EQT common stock acquired by them in the Acquisition seek damages to the extent permitted by law.

593.   Less than one year elapsed from the time that Plaintiff Cambridge discovered, or reasonably could have discovered, the facts upon which this count is based to the time that Plaintiff Cambridge filed this action. Less than three years has elapsed between the time that the securities upon which this count is brought were acquired by members of the Class and the time Plaintiff Cambridge filed this action.

## COUNT IX

### For Violations of Section 15 of the Securities Act
### Against the Officer Defendants

594.   Plaintiff Cambridge repeats, incorporates, and realleges every allegation in ¶¶ 25-49 and 476-593 above as if fully alleged in this Count and only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiff Cambridge or members of the Class.

595.   This Count is brought under Section 15 of the Securities Act, 15 U.S.C. § 77o, against the Officer Defendants. This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 15, and any implication of fraud or fraudulent intent is expressly disclaimed.

596.   The Officer Defendants each were control persons of EQT by virtue of their positions as senior executive officers of EQT at the time of the Acquisition. The Officer Defendants each had a series of direct and indirect business and personal relationships with other directors and officers and major shareholders of EQT.

597.     By reason of the conduct alleged in this Count, these Defendants violated Section 15 of the Securities Act, and Plaintiff Cambridge and the other members of the Class have suffered harm as a result.

## VII.    CLASS-ACTION ALLEGATIONS

598.     Plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of (i) all persons who purchased the common stock of EQT during the Class Period and were damaged thereby; (ii) all EQT shareholders who held EQT shares as of the record date of September 25, 2017 and were entitled to vote with respect to the Acquisition at the November 9, 2017 special meeting of EQT shareholders and were damaged thereby; (iii) all Rice shareholders who held Rice shares as of the record date of September 21, 2017 and were entitled to vote with respect to the Acquisition at the November 9, 2017 special meeting of Rice shareholders and were damaged thereby; and (iv) all persons who acquired the common stock of EQT in exchange for their shares of Rice common stock in connection with the Acquisition and were damaged thereby (the "Class"). Excluded from the Class are Defendants, directors and officers of EQT, and their families and affiliates.

599.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of approximately halfway through the Class Period, on July 26, 2018, EQT had more than 264 million shares of stock outstanding, owned by many thousands of investors. Rice likewise had several million shares of stock outstanding at the time of the Acquisition, owned by many thousands of investors.

600.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions that may affect individual Class members include:

(a)    whether Defendants violated the Securities Act and the Exchange Act;

(b)    whether Defendants omitted and misrepresented material facts;

(c)    whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether Defendants knew or recklessly disregarded that their statements and omissions were false and misleading;

(e)    whether the price of EQT common stock was artificially inflated;

(f)    whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)    the extent of damages sustained by Class members and the appropriate measure of damages.

601.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

602.    Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class-action securities litigation. Plaintiffs have no interests that conflict with those of the Class.

603.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      awarding compensatory or rescissory damages in favor of Plaintiffs and other

Class members against all Defendants, jointly and severally, for all damages

sustained as a result of Defendants' wrongdoing, in an amount to be proven at

trial, including interest;

C.      awarding Plaintiffs and the Class their reasonable costs and expenses incurred in

this action, including attorneys' fees and expert fees; and

D.      awarding any equitable, injunctive, or other further relief that the Court may deem

just and proper.

## IX.    **JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: December 6, 2019

**WEISS BURKARDT KRAMER LLC**

/s/ Janet Burkardt
M. Janet Burkardt (PA I.D. #85582)
Jocelyn P. Kramer (PA I.D. #93153)
Victor Kustra (PA I.D. #324934)
445 Fort Pitt Boulevard, Suite 503
Pittsburgh, PA 15219
Tel:  (412) 391-9890
Fax:  (412) 391-9685
jburkardt@wbklegal.com
jkramer@wbklegal.com
vkustra@wbklegal.com
*Liaison Counsel for Lead Plaintiffs and the Class*

**BERNSTEIN LITOWITZ BERGER**
   **& GROSSMANN LLP**
Salvatore J. Graziano (admitted *pro hac vice*)
Adam H. Wierzbowski (admitted *pro hac vice*)
Jai K. Chandrasekhar (admitted *pro hac vice*)
Brenna Nelinson (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Tel:  (212) 554-1400
Fax:  (212) 554-1444
sgraziano@blbglaw.com
adam@blbglaw.com
jai@blbglaw.com
brenna.nelinson@blbglaw.com

**COHEN MILSTEIN SELLERS**
   **& TOLL PLLC**
Steven J. Toll (admitted *pro hac vice*)
S. Douglas Bunch (admitted *pro hac vice*)
Susan G. Taylor (admitted *pro hac vice*)
Megan K. Kistler (admitted *pro hac vice*)
1100 New York Avenue, N.W. Suite 500
Washington, D.C. 20005
Tel:  (202) 408-4600
Fax:  (202) 408-4699
stoll@cohenmilstein.com
dbunch@cohenmilstein.com

Christina D. Saler
Three Logan Square, 1717 Arch St.
Suite 3610
Philadelphia, PA 19103
Tel:  (267) 479-5700
Fax:  (267) 479-5701
csaler@cohenmilstein.com

Jessica (Ji Eun) Kim
88 Pine St., 14th Floor
New York, NY 10005
Tel: (212) 838-7797
Fax: (212) 838-7745
jekim@cohenmilstein.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*