**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| *In re EQT Corporation Securities Litigation* | ) |
| | ) |
| | ) 2:19-cv-00754-RJC |
| | ) |
| | ) |
| | ) Judge Robert J. Colville |
| | ) |
| | ) |

**OPINION**

Robert J. Colville, United States District Judge

      Before the Court is the Motion to Dismiss the First Amended Class Action Complaint (ECF No. 95) filed by Defendants EQT Corporation ("EQT"), Steven T. Schlotterbeck ("Schlotterbeck"), Robert J. McNally ("McNally"), David L. Porges ("Porges"), David E. Schlosser, Jr. ("Schlosser") (collectively, the "Officer Defendants"), and Jimmi Sue Smith ("Smith"), James E. Rohr ("Rohr"), Vicky A. Bailey ("Baily"), Philip G. Behrman ("Behrman"), Kenneth M. Burke ("Burke"), A. Bray Cary, Jr. ("Cary"), Margaret K. Dorman ("Dorman"), Stephen A. Thorington ("Thorington"), Lee T. Todd, Jr. ("Todd"), Christine J. Toretti ("Toretti"), Daniel J. Rice IV ("Rice"), and Robert F. Vagt ("Vagt") (collectively, the "Signer Defendants").[1] Defendants assert that each of the nine Counts set forth in the First Amended Complaint (the "Complaint") (ECF No. 85) filed by Lead Plaintiffs the Government of Guam Retirement Fund ("Guam"), the Northeast Carpenters Annuity Fund, and the Northeast Carpenters Pension Fund (collectively, "Northeast Carpenters")[2] and Plaintiff Cambridge Retirement System ("Cambridge") (collectively, "Plaintiffs") should be dismissed with prejudice. This Court has

---

[1] The Court shall refer to EQT, the Officer Defendants, and the Signer Defendants collectively as "Defendants."
[2] The Court shall refer to Guam and Northeast Carpenters collectively as "Lead Plaintiffs."

jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1337.  Defendants' Motion has been fully briefed, and is ripe for disposition.

## I.      Factual Background & Procedural History

In this putative class action, Plaintiffs' Complaint sets forth the following allegations relevant to Defendants' Motion to Dismiss:

EQT is a natural-gas-production company whose primary operations are in the Appalachian Basin and throughout Pennsylvania, West Virginia, and Ohio.  Compl. ¶ 2, ECF No. 85.  EQT claims to be the largest producer of natural gas in the United States based on average daily sales volume.  *Id*.  In Western Pennsylvania, EQT drills and completes natural-gas wells through the process of hydraulic fracturing in the Marcellus Shale deposit.  *Id.* at ¶ 39.  The Officer Defendants occupied positions within EQT which provided them with "the power and authority to control the contents of EQT's reports to the SEC and investors, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors."[3]  *Id.* at ¶ 38. Each of the Signer Defendants either: (1) was the Chief Accounting Officer or a director of EQT, signed the Registration Statement (defined below) and permitted his or her name to be used in solicitations contained in the Registration Statement; or (2) was the CEO of Rice Energy Inc. ("Rice") or a director of Rice who "was named in the Registration Statement, with his written consent, as a person who would become a director of EQT upon the closing of the Acquisition," and who "permitted his name to be used in solicitations contained in the Registration Statement." *Id.* at ¶¶480-491.

---

[3] More specifically: (1) Schlotterbeck was EQT's President and CEO from March 1, 2017, until March 14, 2018, Compl. ¶ 34, ECF No. 85; (2) McNally was EQT's Senior Vice President and CFO from March 2016 to November 2018 and became EQT's President and CEO on November 12, 2018, *id.* at ¶ 35; (3) Porges was EQT's Chairman and CEO from 2011 through February 2017, its Executive Chairman from March 2017 through February 2018, and its Chairman from March 1, 2018, to March 14, 2018, when he replaced Schlotterbeck as Interim President and CEO until November 12, 2018, *id.* at ¶ 36; and (4) Schlosser was EQT's Senior Vice President and President, Exploration and Production, from March 2017 through October 24, 2018, *id.* at ¶ 37.

Guam is a defined benefit pension plan that purchased shares of EQT common stock during the relevant Class Period (defined below). Compl. ¶ 29, ECF No. 85. Northeast Carpenters are pension and benefit funds that purchased shares of EQT common stock during the Class Period and held shares of EQT stock on September 25, 2017, the record date for EQT shareholders to vote on the Acquisition (defined below). *Id.* at ¶ 30. Cambridge is a contributory retirement system which:

> [P]urchased shares of EQT stock during the Class Period; held shares of EQT stock on September 25, 2017, the record date for EQT shareholders to vote on the Acquisition; held shares of Rice stock on September 21, 2017, the record date for Rice shareholders to vote on the Acquisition; held Rice stock on November 13, 2017, the closing date of the Acquisition[;] and acquired EQT stock in exchange for its Rice stock in the Acquisition[.]

*Id.* at ¶ 31.

On June 19, 2017, EQT announced that it had entered into an agreement to acquire rival gas producer Rice for $6.7 billion[4] (the "Acquisition"). *Id.* at ¶ 3. Schlotterbeck, EQT's then-President and CEO, cited substantial synergies, defined by Plaintiffs as "the benefit derived from the combined value and performance of two companies exceeding the sum of the separate individual parts," *id.* at ¶ 3 n.1, that the Acquisition would purportedly generate as justification for the proposed merger, *id.* at ¶ 3. More specifically, EQT issued a press release on June 19, 2017 asserting that, "by combining EQT's and Rice's contiguous acreage, EQT could drill natural-gas

---

[4] Plaintiffs describe the consideration exchanged in the Acquisition as follows:

> Rice shareholders would receive 0.37 of a share of EQT common stock and $5.30 in cash in exchange for each share of Rice common stock they held (other than shares of Rice common stock held by EQT or certain of its subsidiaries, shares held by Rice in treasury, or shares for which appraisal was properly demanded under Delaware law). The Acquisition consideration amounted to $5.4 billion in EQT stock and $1.3 billion in cash.

Compl. ¶ 55, ECF No. 85.

wells with longer laterals,"[5] which EQT claimed would "generate cost savings and synergies amounting to at least $2.5 billion from the economies of scale that would result from drilling longer wells from the same well pads."[6]   Compl. ¶ 57, ECF No. 85.   Defendants asserted that these synergies and costs savings would be attained by drilling 1,200 wells at an average lateral length of 12,000 feet, and further by reducing its total number of well pads from 199 to 99.   *Id*. at ¶ 66. EQT also held an investor conference call and presentation on June 19, 2017, and Schlotterbeck sent an email to all EQT employees, further touting the same purported benefits of EQT's potential acquisition of Rice.   *Id.* at ¶¶ 60-65.

On July 3, 2017, investor JANA Partners LLC ("JANA") disclosed that it had acquired a nearly 6% equity stake in EQT, and further stated that it opposed the Acquisition and disputed EQT's proffered bases supporting the Acquisition.   Compl. ¶ 8, ECF No. 85.   More specifically, JANA asserted that the potential synergies cited by EQT were "grossly exaggerated," and that EQT's purported drilling plan was unattainable because EQT and Rice did not possess enough contiguous undrilled acreage to allow for the increase in lateral length cited by Defendants as a basis for the Acquisition.   *Id.* at ¶ 121.   On July 5, 2017, JANA sent a letter to EQT's Board which set forth materially similar opposition to the Acquisition, and also filed this letter with SEC.   *Id.* at ¶ 122.   On July 27, 2017, Defendants filed a combined registration statement on Form S-4,

---

[5] In Defendants' Brief in Support of their Motion to Dismiss, Defendants define lateral wells and describe the benefit of drilling longer lateral wells as follows:

> Lateral wells, which run parallel to the ground as deep as 10,000 feet below the surface, are the only way to produce natural gas efficiently from shale formations such as the Marcellus.  Longer laterals allow for greater efficiency, because they allow more natural gas to be extracted from the same well, reducing the cost per unit of natural gas.

Br. in Supp. 1 n. 2 (internal citations to the Complaint omitted).

[6] Planning and drilling multiple wells on a single well pad, "which is the area cleared for a drilling rig to work on a plot of land designated for natural-gas extraction," is a way in which gas companies attempt to achieve economies of scale.  Compl. ¶ 49, ECF No. 85.

4

prospectus, and joint proxy statement/prospectus (together, the "Registration Statement") with the SEC in connection with the Acquisition.  *Id.* at ¶ 67.  The Registration Statement set forth several representations respecting the potential benefits of the Acquisition that were consistent with EQT's June 19, 2017 representations discussed above, and effectively denied JANA's objections to the Acquisition.[7]  *Id.* at ¶¶ 69-71; 216-223.

JANA continued to publicly oppose the Acquisition through the sending and filing of letters, as well as the filing of proxy materials in opposition to the Acquisition with the SEC,[8] consistently citing the impossibility of EQT's claimed synergy drilling plan of 1,200 wells with 12,000 feet in average lateral length, and EQT consistently and repeatedly publicly denied any of the criticisms raised by JANA.  *Id.* at ¶¶ 124-47; 237.  Prior to the Acquisition, Rice and EQT formed an integration team that ultimately dissolved in July or August 2017 over disagreements regarding the attainability of EQT's projected synergies and future operations plans.  *Id.* at ¶¶ 92-93.  Also prior to the Acquisition, EQT experienced operational difficulties in drilling ultra-long laterals, including the allegedly undisclosed collapse of two 18,000 foot-plus lateral wells.  *Id.* at ¶¶ 95-99, 279.  On November 9, 2017, majorities of EQT and Rice shareholders ultimately voted in favor of the Acquisition, and the Acquisition closed on November 13, 2017.  *Id.* at ¶ 152.

---

[7] EQT amended the Registration Statement on September 8, 2017 and September 29, 2017, and the SEC declared the Registration Statement effective on October 12, 2017.  Compl. ¶ 67, ECF No. 85.

[8] Part of JANA's objection to the Acquisition dealt with EQT's management compensation scheme, specifically that:

> EQT's management had an inappropriate incentive to push the Acquisition regardless of whether it was beneficial to EQT shareholders because management's incentive compensation was based in large part on natural-gas production growth, which could be achieved by any means including acquisitions and was not measured on a per-share basis, so that stock-for-stock acquisitions like the Acquisition of Rice would increase management's compensation regardless of whether they benefited shareholders on a per-share basis.

Compl. ¶ 128, ECF No. 85.  JANA ultimately withdrew its proxy-solicitation materials after "EQT agreed to revise the management-compensation scheme that JANA had criticized as providing inappropriate incentives for management based on the Acquisition, and to accelerate consideration of possible transactions to address the 'sum-of-the-parts' undervaluation that JANA argued affected the Company's stock price."  *Id.* at ¶ 148.

Plaintiffs assert that, following the Acquisition, EQT was unable to drill longer laterals in a cost-efficient manner and that it did not achieve the claimed synergies cited as a basis for the Acquisition.  Compl. ¶ 153, ECF No. 85.  Despite this, EQT and the Officer Defendants stated that the Acquisition was exceeding expectations, and expressed confidence that EQT was "on track" to achieve and exceed the synergies described as a basis for the Acquisition.  *Id.* at ¶ 156.  EQT continued to experience increased costs and difficulties in its lateral drilling operations, and refused to incorporate Rice's proffered best practices, instead opting to utilize its own purportedly outdated and ineffective methods.  *Id.* at ¶¶ 157-63.  Following the Acquisition and up until mid-to late 2018, EQT did not publicly reveal these increased costs and operational issues, and instead: (1) portrayed the Acquisition and EQT's ongoing operations and financial results as successful; (2) understated and hid increased operating and development costs from investors; and (3) capitalized rather than expensed the cost of treatment and disposal of all of its produced water.[9] *Id.* at ¶¶ 164-94.

On October 25, 2018, EQT held an investor and analyst conference call, wherein EQT disclosed negative financial results for EQT's third quarter.  Compl. ¶ 332, ECF No. 85. Specifically, EQT revealed that: (1) EQT " was increasing well-development capital expenditures for 2018 by $300 million, or 14%, based on costs that 'represent primarily onetime events that were driven by pace of activity, ultra-long lateral learning curve[,] and some service cost

---

[9] Plaintiffs explain:

> [P]roduced water is the water that comes back out of the well along with the natural gas.  The treatment and disposal of produced water is a material cost for well development and operations. The produced water is contaminated both by the chemicals the drilling company used to hydraulically fracture the shale and by the chemical properties of the formation underground.  This produced water is expensive for the operator to treat and dispose of.

Compl. ¶ 185, ECF No. 85.  Plaintiffs assert that "[d]isposed produced water should not be capitalized as an asset." *Id.* at ¶ 186.

increases[;]'" (2) EQT had reported a quarterly net loss attributable to EQT of $40 million; (3) EQT's 2018 costs were higher than had been initially anticipated.  *Id.* at ¶¶ 332-37.  Following this news, EQT's shares fell from a close of $40.46 per share on October 24, 2018 to $35.34 on October 25, 2018, and eventually fell to as low as $31.00 per share over the next several days.  *Id.* at ¶ 338.

On December 10, 2018, Toby and Derek Rice, two of the founders of Rice, and their executive team (collectively, the "Rice Team") sent a letter to the EQT Board and released a presentation which took issue with EQT's stock-price performance and set forth "the Rice Team's plan for improving EQT's operations and generating free cash flow per year above EQT's then-current plan."  Compl. ¶ 341, ECF No. 85.  In response to the Rice Team's representations in this letter and presentation, EQT asserted that the Rice Team's plan for more efficient operations and well drillings, which were based in part on Rice's costs before the Acquisition, *see id.* at ¶ 18, were not applicable to EQT or repeatable because EQT had a much larger asset base and geographical footprint than Rice at the time of the Acquisition.  *Id.* at ¶¶ 342-43.  On February 5, 2019, the Rice Team released another public presentation and hosted an investor call which set forth a plan for revamping EQT by appointing Toby Rice as EQT's new chief executive and implementing Rice's strategies and best practices to improve operations, and further disclosed that EQT had repeatedly refused to adopt Rice's best practices when approached by Rice employees and that EQT had understated and erroneously adjusted well costs.  *Id.* at ¶¶ 344-48.  That same day, EQT issued a statement generally denying the Rice Team's analysis.  *Id.* at ¶ 351.  Following the February 5, 2019 disclosures, EQT's stock price fell 3.5%.  *Id.* at ¶ 349.

On June 17, 2019, the Rice Team filed proxy materials, including a presentation, with the SEC which asserted that:

> (i) EQT failed to achieve the benefits of the Acquisition; (ii) EQT did not seek and had not achieved the synergies and cost savings that were the purported rationale

7

of the Acquisition; (iii) EQT failed to adopt Rice's best practices; (iv) EQT was excluding more than $300 million in costs it capitalized from its well costs; and (v) EQT leadership "lacks credibility and has misled shareholders."

Compl. ¶ 354, ECF No. 85.  More specifically, Plaintiffs assert that the presentation disclosed:

> (i) "EQT [] failed to acknowledge its inability to achieve 90%+ of the merger synergies"; (ii) EQT use[d] "Misleading math" to exclude "more than $300 million in costs it capitalizes from its well costs"; (iii) the EQT leadership "lacks credibility and has misled shareholders"; and (iv) EQT "consistently misled shareholders," including through EQT's claim during the second quarter of 2018 that EQT was achieving the synergies from the Acquisition when, in fact, in the third quarter of 2018, EQT disclosed the $300 million capital expense miss and 5% production volume miss.

*Id.* at ¶ 22 (emphasis omitted).  On June 18, 2019, the Rice Team issued a press release concerning its June 17 investor presentation, and EQT issued a statement denying the claims set forth in the presentation.  *Id.* at ¶ 367-68.  On June 19, 2019, EQT's stock price fell 5% from $15.96 to $15.06. *Id.* at ¶ 369.  On July 9 and 10, 2019, investors voted to give Board and executive control of EQT to the Rice Team.  *Id.* at ¶ 371.

The timeframe at issue in this case (the "Class Period") is June 19, 2017, the date that EQT announced the Acquisition, through June 17, 2019, the date that the Rice Team filed proxy materials with the SEC.  Compl. ¶1, ECF No. 85.  Plaintiffs bring this action on behalf of themselves and on behalf of:

> (i) all persons who purchased the common stock of EQT during the Class Period and were damaged thereby; (ii) all EQT shareholders who held EQT shares as of the record date of September 25, 2017 and were entitled to vote with respect to the Acquisition at the November 9, 2017 special meeting of EQT shareholders and were damaged thereby; (iii) all Rice shareholders who held Rice shares as of the record date of September 21, 2017 and were entitled to vote with respect to the Acquisition at the November 9, 2017 special meeting of Rice shareholders and were damaged thereby; and (iv) all persons who acquired the common stock of EQT in exchange for their shares of Rice common stock in connection with the Acquisition and were damaged thereby (the "Class").

*Id.* at ¶ 598.  Plaintiffs assert that Plaintiffs and other members of the class suffered economic loss under the federal securities laws as a result of Defendants' purported material misrepresentations and omissions in connection with the Acquisition because they purchased EQT stock, which Plaintiffs allege had its value artificially inflated by said misrepresentations and omissions and then experienced a precipitous drop in value following disclosure of Defendants' purported material misrepresentations and omissions, during the Class Period.  *Id.* at ¶ 372.

Generally, Plaintiffs' assertions of materially false and misleading statements and/or omissions made by Defendants can be broken down as follows: (1) statements and omissions at the time of the announcement of the Acquisition, *see* Compl. ¶¶ 196-213, ECF No. 85; (2) statements and omissions in the Registration Statement, *see id.* at ¶¶ 214-24; (3) statements and omissions that occurred in the timeframe between the initial filing of the Registration Statement and the November 13, 2017 closing on the Acquisition, *see id.* at ¶¶ 225-63; (4) statements and omissions made following the Acquisition respecting EQT's post-Acquisition operations and costs and EQT's purported realization of the synergies and benefits that served as the basis for the Acquisition, *see id.* at ¶¶ 264-307; and (5) statements and omissions following the Acquisition with respect to EQT's financial performance/condition, *see id.* at ¶¶ 308-30.

Plaintiffs argue that, in making the statements discussed above, Defendants knowingly or recklessly made materially false and misleading statements and/or omitted material facts because the synergies cited as a basis for the Acquisition were impossible to achieve due to the fact that EQT and Rice lacked the combined undrilled acreage, and the capability, to achieve these synergies.  Br. in Opp'n 1, ECF No. 102.  Plaintiffs further argue that  Defendants knowingly or recklessly made materially false and misleading statements and/or omitted material facts when, following the Acquisition, Defendants hid operational issues and rising costs from investors and

instead incorrectly informed shareholders that EQT was "combining best practices," "ahead of schedule for achieving our capital synergies," and "well on track to deliver and exceed" the $2.5 billion of "base" synergies. *Id.*

On September 19, 2019, the Honorable Maureen P. Kelly, to whom this case was originally assigned, entered an Order: (i) appointing Guam and Northeast Carpenters as Lead Plaintiffs; (ii) appointing Bernstein Litowitz Berger & Grossmann LLP and Cohen Milstein Sellers & Toll PLLC as Lead Counsel; (iii) ordering that, pursuant to Rule 42(a), any subsequently filed, removed, or transferred actions that are related to the claims asserted in this action are consolidated for all purposes; and (iv) ordering that this action be captioned *In re EQT Corporation Securities Litigation* and maintained under Master File No. 2:-19-cv-00754-MPK.[10]  Order 2, ECF No. 35. Plaintiffs filed the Complaint on December 6, 2019, setting forth claims for violations of federal securities laws, and specifically violations of: Sections 10(b), 14(a), 20A, and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b), 78t-1, 78n(a), and 78t(a)), SEC Rules 10b-5 and 14a-9 (17 C.F.R. §§ 240.10b-5 and 240.14a-9), and Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. §§ 77k, 77l, and 77o).  Compl. ¶ 25, ECF No. 85.  Defendants filed their Motion to Dismiss, along with a Brief in Support (ECF No. 96) and a Declaration in Support (ECF No. 97), on January 21, 2020.  This matter was reassigned to the undersigned on February 21, 2020.  On March 6, 2020, Plaintiffs filed a Brief in Opposition (ECF No. 102) to Defendants' Motion and a Declaration in Support of Plaintiffs' Opposition (ECF No. 103).  Defendants filed a Reply (ECF No. 108) on March 26, 2020.

---

[10] Following reassignment to the undersigned, this case is now maintained under Master File No. 2:19-cv-00754-RJC.

## II.      Legal Standard

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint.  *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  In deciding a motion to dismiss, the court is not opining on whether the plaintiff will likely prevail on the merits; rather, when considering a motion to dismiss, the court accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff.  *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002).  While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A "formulaic recitation of the elements of a cause of action will not do."  *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  The Supreme Court of the United States has explained:

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.*  (quoting *Twombly*, 550 U.S. at 556) (internal citations omitted).

11

The United States Court of Appeals for the Third Circuit instructs that "a court reviewing the sufficiency of a complaint must take three steps." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). The court explained:

> First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Iqbal*, 556 U.S. at 675. Second, it should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679; *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth." Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

*Connelly*, 809 F.3d at 787. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (internal citations omitted).

In addition to reviewing the facts contained in the complaint, a court may consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994). When a document integral to or relied upon in the complaint is included, the court may also consider that document. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The United States Court of Appeals for the Third Circuit has explained:

> Pursuant to Rule 9(b), a plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the "precise misconduct with which [it is] charged." *Lum v. Bank of America*, 361 F.3d 217, 223–224 (3d Cir.2004). To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation.

*Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007).

## III.    Discussion

In the Complaint, Plaintiffs assert the following claims: (1) Count I asserts claims for violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 against EQT and the Officer Defendants; (2) Count II asserts a claim for violation of Section 20A of the Exchange Act against Porges; (3) Count III asserts claims for violations of Section 20(a) of the Exchange Act against the Officer Defendants; (4) Count IV asserts claims for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 against EQT, the Officer Defendants, and the Signer Defendants on behalf of EQT shareholders who were entitled to vote on the Acquisition; (5) Count V asserts claims for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 against EQT, the Officer Defendants, and the Signer Defendants on behalf of Rice shareholders who were entitled to vote on the Acquisition; (6) Count VI asserts claims for violations of Section 20(a) of the Exchange Act against the Officer Defendants; (7) Count VII asserts claims for violations of Section 11 of the Securities Act against EQT, the Officer Defendants, and the Signer Defendants; (8) Count VIII asserts a claim for violations of Section 12(a)(2) of the Securities Act against EQT; (9) Count IX asserts claims for violations of Section 15 of the Securities Act against the Officer Defendants.[11]
Plaintiffs describe their claims as follows:

> Plaintiffs bring two different sets of claims on behalf of purchasers of EQT's and Rice's securities during the Class Period. Counts I, II, and III assert securities-fraud and insider-trading and related control-person claims under Sections 10(b), 20A, and 20(a) of the Exchange Act and SEC Rule 10b-5 against EQT and the Officer Defendants (defined below).  Counts IV, V, and VI assert proxy

---

[11] Counts I and III are brought by all Plaintiffs.  Count II is seemingly brought by only Northeast Carpenters.  *See* Compl. ¶¶ 467, 471-72, ECF No. 85.  Counts IV, V, and VI are brought by Cambridge "on behalf of shareholders of EQT and Rice who held EQT or Rice shares as of the record dates of September 25, 2017, and September 21, 2017, respectively, and were entitled to vote at an EQT or Rice special meeting on November 9, 2017 with respect to EQT's acquisition of Rice, which closed on November 13, 2017."  *Id.* at ¶ 1.  Counts IV and VI are also brought by Northeast Carpenters on behalf of the relevant shareholders of EQT.  *Id.*  Counts VII, VIII, and IX are brought by Cambridge on behalf of all persons who acquired EQT common stock in exchange for their shares of Rice common stock in EQT's acquisition of Rice.  *Id.*

misstatement and related control-person claims under Sections 14(a) and 20(a) of
the Exchange Act.  Counts VII, VIII, and IX assert strict liability, negligence, and
control-person causes of action against those Defendants who are statutorily
responsible under Sections 11, 12(a)(2) and 15 of the Securities Act for materially
untrue statements and misleading omissions in the prospectus and registration
statement (and documents incorporated by reference in the registration statement)
for the Acquisition.

Compl. ¶ 24, ECF No. 85.

Defendants argue that each of these claims should be dismissed with prejudice.  Defendants

assert that Count I, which asserts violations of Section 10(b) of the Exchange Act, should be

dismissed because: (1) Plaintiffs' claims do not meet the exacting pleading standards of the Private

Securities Litigation Reform Act ("PSLRA"), Br. in Supp. 2, ECF No. 96; (2) Plaintiffs do not

sufficiently allege that any of the purported misrepresentations at issue, both pre- and post-

Acquisition, were false or misleading when made, *id.*;[12] (3) Plaintiffs have not adequately alleged

that EQT or the Officer Defendants acted with scienter, *id.* at 3; and (4) Plaintiffs do not

sufficiently allege loss causation, *id.*

Defendants further argue that Counts IV, V, VII, and VIII, which arise under Sections 11

and 12(a)(2) of the Securities Act and Section 14(a) of the Exchange Act, should be dismissed

because: (1) the allegedly false or misleading statements set forth in Registration Materials filed

in connection with the Acquisition were not false or misleading at the time they were made, *id.*;

and (2) the claims set forth at these Counts are time-barred because "Plaintiffs should have known

about the facts giving rise to these claims no later than October 2017, when JANA publicly raised

the same concerns with the [Acquisition] that now form the basis of Plaintiffs' Complaint," *id.* at

---

[12] More specifically, Defendants aver that: (1) most of the alleged misstatements merely reflect disagreement with
EQT's pre-Acquisition synergy projections; (2) Plaintiffs fail to allege with sufficient particularity any erroneous
accounting or financial guidance, or any additional disclosures that Defendants were required to make; (3) the
purported misstatements are inactionable forward-looking statements, statements of opinion, or corporate optimism
that were made when all of the alleged facts that purportedly rendered these statements false were known to the market;
and (4) some of the alleged misstatements were not made by Defendants.  Br. in Supp. 2-3, ECF No. 96.

4.  Defendants argue that Counts III, VI, and IX, which assert that the Officer Defendants violated Section 20(a) of the Exchange Act and Section 15 of the Securities Act, and Count II, which asserts that Porges violated Section 20A of the Exchange Act, should be dismissed because they are based on the same primary violations of Sections 11 and 12(a)(2) of the Securities Act and Sections 10(b) and 14(a) of the Exchange Act that Defendants argue should be dismissed for the reasons set forth above.  *Id.*

### A.  Plaintiffs' Claims for Violations of Section 10(b) of the Exchange Act (Count I)

The Supreme Court of the United States has explained that Section 10(b) of the Exchange Act makes it:

> "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ..... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 156 (2008) (quoting 15 U.S.C. § 78j). Securities and Exchange Commission Rule 10b-5 further provides that it is unlawful for any person, directly or indirectly:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  To state a claim for private securities fraud pursuant to Section 10(b), a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter;

(3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge*, 552 U.S. at 157.

"[P]laintiffs alleging securities fraud pursuant to the [the Exchange Act] must also comply with the heightened pleading requirements of the PSLRA." *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004). Under the PSLRA, a securities fraud claim brought pursuant to the Exchange Act must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). In enacting the PSLRA, Congress intended to "substantially heighten" the existing pleading requirements, and the "particularity described in § 78u–4(b)(1) extends that of Rule 9(b) and requires plaintiffs to set forth the details of allegedly fraudulent statements or omissions, including who was involved, where the events took place, when the events took place, and why any statements were misleading." *In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002).

In the present case, Defendants argue that Plaintiffs fail to sufficiently allege facts supporting: (1) any material misrepresentation or omission; (2) scienter; or (3) loss causation. Br. in Supp. 11, ECF No. 96.

### 1. Misrepresentations or Omissions

Defendants argue that Plaintiffs' Section 10(b) claims should be dismissed for a failure to allege a misrepresentation or omission for the following reasons: (1) Plaintiffs fail to allege how any of the purported misrepresentations at issue were false or misleading when made; (2) most of the challenged statements constitute inactionable forward-looking statements, corporate optimism,

or statements of opinion; (3) the alleged misrepresentations were made when all of the alleged facts that purportedly rendered these statements false were known to the market; (4) the Complaint does not allege sufficient facts to support a finding of an omission; and (5) some the challenged statements were not made by Defendants.  Br. in Supp. 11, ECF No. 96.

Plaintiffs argue that Defendants knowingly or recklessly made materially false and misleading statements and/or omitted material facts in advance of the Acquisition because EQT and Rice lacked the combined undrilled acreage, and the capability, to achieve the synergies cited as a basis for the Acquisition through the drilling of 1,200 wells at an average length of 12,000 feet and a reduction of its well pads from 199 to 99.  Br. in Opp'n 1; 3-4, ECF No. 102.  Plaintiffs further argue that EQT and the Officer Defendants knowingly or recklessly made materially false and misleading statements and/or omitted material facts when, following the Acquisition, EQT and the Officer Defendants hid operational issues and rising costs from investors and instead incorrectly informed shareholders that EQT was "combining best practices," "ahead of schedule for achieving our capital synergies," and "well on track to deliver and exceed" the $2.5 billion of "base" synergies.  *Id*.  Plaintiffs also assert a Section 10(b) claim for accounting fraud based upon EQT's statements respecting its financial results and guidance following the Acquisition.  *Id.* at 20.

### a.  Pre-Acquisition Representations Respecting EQT's Ability to Drill 1,200 Wells at an Average Length of 12,000 Feet

Plaintiffs' assertions of false statements made pre-Acquisition rely on EQT's and the Officer Defendants' repeated assertions that the Acquisition would enable EQT to drill approximately 1,200 wells at an average lateral length of 12,000 feet.  Br. in Opp'n 11, ECF No. 102.  Plaintiffs assert that these statements were false and misleading statements of *present* fact

because it was impossible to drill 1,200 wells of 12,000 average lateral feet as there was not enough combined, previously undrilled EQT and Rice acreage to support EQT's claims. *Id.* EQT and the Officer Defendants repeatedly made assertions respecting EQT's ability to drill approximately 1,200 wells at an average length of 12,000 feet should the Acquisition occur, including: (1) in citing the drilling of such wells as a fundamental basis for the potential synergies that could be generated as a result of the Acquisition at the time of announcing the Acquisition, Compl. ¶ 66, ECF No. 85; (2) in the Registration Statement, *id.* at ¶ 219; and (3) in emphatically denying JANA's assertions that the drilling of such wells would be impossible given the amount of undrilled, contiguous acreage possessed by EQT and Rice, *id.* at ¶¶ 226-30; 237; 251-54.

Defendants assert that Plaintiffs cannot state a Section 10(b) claim which relies on EQT's or the Officer Defendants' statements regarding EQT's plan of drilling 1,200 wells at an average length of 12,000 feet because any such statements were forward-looking due to the fact that the wells had not been drilled yet, and because these statements relied on EQT's assumption that it could address the issue of any non-contiguous acreage with "well-path adjustments, smaller bolt-on acquisitions, and tactical fill-ins." Reply 6, ECF No. 108 (quoting Compl. ¶ 237, ECF No. 85). Defendants further argue that Plaintiffs' Section 10(b) claims cannot rely on statements that EQT would be able to drill 1,200 wells at an average length of 12,000 feet following the Acquisition because JANA repeatedly publicly stated that the drilling of such wells would be impossible, and that such information was known to the market and thus cannot form the basis of a Section 10(b) claim. Br. in Opp'n 27, ECF No. 96.

With respect to "forward-looking statements," the United States Court of Appeals for the Third Circuit has explained:

> The term "forward-looking statement" is broadly defined in the statute to include statements "containing a projection of revenues, income (including income loss),

earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items"; statements of "the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer"; or statements of "future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission." 15 U.S.C. § 78u–5(i)(1)(A)–(C). Further, forward-looking statements include "any statement of the assumptions underlying or relating to any statement described" in the definition. § 78u–5(i)(1)(D).

*Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009).  With respect to falsity of forward-looking statements, the Third Circuit has explained:

To adequately state a claim under the federal securities laws, it is not enough merely to identify a forward-looking statement and assert as a general matter that the statement was made without a reasonable basis.  Instead, plaintiffs bear the burden of "plead[ing] factual allegations, not hypotheticals, sufficient to reasonably allow the inference" that the forecast was made with either (1) an inadequate consideration of the available data or (2) the use of unsound forecasting methodology.

*Burlington*, 114 F.3d at 1429 (quoting *Glassman v. Computervision Corp.*, 90 F.3d 617, 628-29 (1st Cir.1996)).

"In addition to establishing a heightened pleading standard, the PSLRA provides a so-called 'safe harbor' that immunizes certain 'forward-looking' statements from § 10(b) liability." *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490 (3d Cir. 2016).  "[A]ny forward-looking statement is protected if it is either accompanied by 'substantive and tailored' cautionary statements or if the plaintiff fails to show 'actual knowledge of falsehood.'"  *OFI*, 834 F.3d at 491. A cautionary statement must be "'extensive yet specific' to prevent a reasonable investor from relying on specific projections."  *Howard v. Arconic Inc.*, 395 F. Supp. 3d 516, 554 (W.D. Pa. 2019) (quoting *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000)).  Further:

The bespeaks caution doctrine, which overlaps with, but is not supplanted by, the PSLRA safe harbor, provides that when:

19

> [F]orecasts, opinions or projections are accompanied by
> meaningful cautionary statements, the forward-looking statements
> will not form the basis for a securities fraud claim if those statements
> did not affect the 'total mix' of information ... provided investors.
> In other words, cautionary language, if sufficient, renders the
> alleged omissions or misrepresentations immaterial as a matter of
> law.

*Howard v. Arconic Inc.*, 395 F. Supp. 3d 516, 554 (W.D. Pa. 2019) (quoting *In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 369 n.11 (3d Cir. 1993)).

A mixed statement of present fact and future projection, however, is not entitled to the PSLRA safe harbor. *Avaya*, 564 F.3d at 255. In describing this principle, the Third Circuit in *Avaya* discussed relevant caselaw from other Circuits:

> In [*Makor Issues & Rights, Ltd. v. Tellabs Inc. (Tellabs II)*, 513 F.3d 702 (7th Cir.2008)], defendants stated that sales of their product were "still going strong." 513 F.3d at 705. The Seventh Circuit interpreted the communication as "saying both that current sales were strong and that they would continue to be so, at least for a time, since the statement would be misleading if Tellabs knew that its sales were about to collapse." *Id.* Accordingly, defendants were not entitled to "a safe harbor with regard to the statement's representation concerning current sales." *Id.* In [*In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 213 (1st Cir.2005)], defendants had asserted that the company "has on hand and has access to sufficient sources of funds to meet its anticipated ... needs." 414 F.3d at 207. Even though "the statement includes a reference to anticipated future needs for funds," the First Circuit found a portion of defendants' assertion to be a statement of present fact ineligible for the Safe Harbor provision. *Id.* at 212. "[T]he alleged falsehood was in the fact that the statement claimed that the Company had access to ample cash at a time when the Company was suffering a dire cash shortage. The claim was not that the Company was understating its future cash needs." *Id.* at 213.

*Id.* The Third Circuit distinguished these cases from the situation presented in *Avaya*, finding that the statements that "[Avaya's] first quarter results position us to meet our goals for the year" and that "we are on track to meet our goals for the year, even though there were some aspects to our performance that are below our expectations and that we are working on to improve," *id.* at 254, could not "meaningfully be distinguished from the future projection of which they are a part," *id.* at 255. The Third Circuit explained:

> Here, however, the assertions of current fact are too vague to be actionable. These statements do not justify the financial projections in terms of any particular aspect of the company's current situation; they say only that, whatever that situation is, it makes the future projection attainable. Such an assertion is necessarily implicit in every future projection.

*Id.* The Third Circuit further explained that "[t]he 'on track' and 'position us' language here, however, does not advert to a particular current fact such as cash on hand, but expresses only defendants' continuing comfort with the earlier, October annual projection, which they were then reiterating; that is, it amounts in essence to a reaffirmation of that projection." *Id.* at 256.

Plaintiffs have identified several statements by Defendants, most notably in the Registration Statement, representing that the Acquisition would enable EQT to achieve synergies by increasing its inventory in Washington and Greene Counties from "approximately 775 undeveloped locations with an average of 8,000' lateral to approximately 1,200 undeveloped drilling locations with an average of 12,000' lateral." Compl. ¶¶ 70-71, ECF No. 85. Plaintiffs challenge the assertion of present fact that EQT and Rice possessed enough undrilled, contiguous acreage that, when combined with undrilled acreage available for well-path adjustments, smaller bolt-on acquisitions, and tactical fill-ins, would allow for the drilling of 1,200 wells at an average length of 12,000 feet. *Id.* at ¶ 77-84. Plaintiffs assert that there was simply not enough available, contiguous, undrilled acreage, even taking into account tactical fill-ins, to allow Defendants to make such a claim. *Id.* at ¶ 238. Plaintiffs assert that Defendants knew or recklessly disregarded the fact that it was impossible, based on the then-known geography and drilling history of the combined acreage, for EQT to deliver 1,200 wells at an average length of 12,000 feet. *Id.* at ¶ 233.[13]

---

[13] *See also* Compl. ¶ 81 ("Plaintiffs, in consultation with an oil and gas industry expert, calculated that only *519 wells* with lateral lengths ranging from 6,064 feet to 16,000 feet, an average lateral length of 11,465 feet, . . . were feasible.").

While the plan to drill additional wells at longer lengths and the synergies that such wells would purportedly generate are clearly forward-looking operational plans and financial projections, the Court finds that the amount of acreage possessed by EQT and Rice, as well as the amount of available, undrilled acreage that could be used for "well-path adjustments, smaller bolt-on acquisitions, and tactical fill-ins" possessed by third-parties, were knowable, quantifiable facts at the time Defendants made their representations respecting the fact that the combination of EQT's and Rice's acreage would result in EQT's ability to drill approximately 1,200 wells at an average length of 12,000 feet.  In this case, Plaintiffs allege that Defendants justified their future projected operations of drilling 1,200 wells at an average length of 12,000 feet in terms of a specific and particular aspect of EQT's (and Rice's) current situation, i.e. the amount of undrilled acreage they possessed and the availability of undrilled "tactical fill-ins."   Defendants clearly disagree with Plaintiffs' assertion that it was impossible to drill 1,200 wells at an average length of 12,000 feet based upon then-known geography and drilling history, but whether there existed sufficient acreage to support Defendants' representations at the time Defendants made these representations results in a genuine issue of material, present fact that will ultimately be resolved through discovery.

Defendants also assert a truth-on-the-market defense in arguing that JANA's public challenges to EQT's representations informed the market of the exact misrepresentations Plaintiffs now assert in support of their Section 10(b) claim, and that such representations thus do not constitute misrepresentations.  "A motion to dismiss may be granted if 'the company's SEC filings or other documents disclose the very information necessary to make their public statements not misleading.'"  *In re Discovery Labs. Sec. Litig.*, No. 06-1820, 2006 WL 3227767, at *11 (E.D. Pa. Nov. 1, 2006) (quoting *Winer Family Trust v. Queen*, 2004 WL 2203709 at *4 (E.D.Pa. Sept. 27,

2004)).  The Court notes, however, that "[t]ruth-on-the-market analysis is intensely fact specific and thus seldom appropriate at the pleading stage." *Payne v. DeLuca*, 433 F. Supp. 2d 547, 559 (W.D. Pa. 2006) (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000)); *see also Berry v. Valence Tech., Inc.*, 175 F.3d 699, 704 (9th Cir. 1999) (in addressing a motion for summary judgment and determining whether a negative article would have led a reasonable investor to investigate the possibility of fraud, thus triggering the running of the statute of limitations on a Section 10(b) claim, the Ninth Circuit considered the nature and specificity of the article, the market reaction to the article, other press coverage following the article's publication, and the nature and degree of denials issued by the defendants).

The Court cannot resolve Defendants' intensely fact-specific truth-on-the-market defense at this juncture.  As will be discussed in further detail below, the Court finds that JANA's assertions respecting the impossibility of the drilling of 1,200 wells at an average length of 12,000 feet, and EQT's and the Officer Defendants' consistent assertions to the contrary, create an issue of fact as to EQT's and the Officer Defendants' knowledge respecting the amount of available, undrilled acreage when they repeatedly stated that EQT's and Rice's combined acreage would allow for the drilling of 1,200 wells at an average length of 12,000 feet.  The Court notes that JANA's specific and pointed public statements regarding the impossibility of this drilling plan, i.e. the exact fact that allegedly renders Defendants' statements with respect to the same false, also tend to establish that some information regarding the purported impossibility of EQT's drilling plan was publicly available and accessible to investors.

Plaintiffs have, however, also alleged that, following JANA's publication of its opposition to the Acquisition: (1) EQT's stock price actually increased, Compl. ¶ 140, ECF No. 84; (2) analysts and proxy advisory firms expressed confidence in EQT's representations and skepticism

with respect to JANA's criticisms, *id.* at ¶¶ 123; 125-26; 129; 13; 139; 149-51; and (3) EQT and the Officer Defendants emphatically denied JANA's assertions, *id.* at ¶¶ 226-30; 237; 251-54. The Court finds that the above allegations create a genuine issue of material fact as to the market's knowledge respecting the assertions set forth in JANA's opposition to the Acquisition, and whether "such corrective information had been conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements." *In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*, No. CIV.A. 05-1151 SRC, 2011 WL 3444199, at *35 (D.N.J. Aug. 8, 2011) (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir.1989)).

The Court further notes that Plaintiffs have also sufficiently alleged that the Officer Defendants and Signer Defendants, each of whom is alleged to have signed the Registration Statement and/or permitted their names to be used in solicitations contained in the Registration Statement, *see* Compl. ¶¶ 34-36; 480-91, ECF No. 85, with the exception of Schlosser, who is alleged to have made statements respecting EQT's ability to drill laterals which would average 12,000 feet, *see id.* at ¶ 227, made the pre-Acquisition statements discussed above.

### b. Post-Acquisition Representations Respecting EQT's Drilling Operations and Captured Synergies

Defendants further assert that Plaintiffs' Section 10(b) claims should be dismissed to the extent that they rely on statements respecting EQT's post-Acquisition drilling operations and captured synergies, arguing that such statements were not false or misleading when made, and that any such statements constitute inactionable forward-looking statements, corporate optimism, or statements of opinion. Br. in Supp. 11, ECF No. 96. Plaintiffs assert that EQT and the Officer Defendants consistently represented publicly that post-Acquisition drilling operations were

proving exceptionally successful and that EQT was achieving the synergies cited as a basis for the Acquisition, but that EQT had, in actuality, experienced numerous well collapses and rising costs that rendered any such representations false and misleading.  Br. in Opp'n 18, ECF No. 102.

Vague and non-specific statements of corporate optimism have been held to be not actionable because they constitute mere puffery "on which reasonable investors would not have relied."  *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 284 (3d Cir. 2010); *see also Burlington*, 114 F.3d at 1428 n.14.  "Opinions are only actionable under the securities laws if they are not honestly believed and lack a reasonable basis."  *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014) (citing *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 543 F.3d 150, 166 (3d Cir.2008); *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir.2013)).

To the extent Plaintiffs' Section 10(b) claims rely on post-Acquisition statements respecting the ongoing success of drilling operations and the synergies that EQT had captured following the Acquisition, the Court finds that the statements relied upon by Plaintiff, while often surrounded by statements of puffery, corporate optimism, opinions, and forward-looking statements, also contain several assertions of present, material fact, and further finds that Plaintiffs have adequately pled that such statements were false and misleading when made.  Specifically, following the Acquisition, Schlosser represented during  EQT's February 15, 2018 earnings call that EQT had "hit the ground running with our increased lateral lengths," that "we are combining best practices and have already captured value," and that "development cost continued to improve as we lengthened laterals."  Compl. ¶ 269, ECF No. 85.  On that same call, Schlosser further represented that "we've hit the ground running and have started capturing the various synergies related to the [Acquisition]" and that EQT was "ahead of schedule for achieving our capital synergies."  *Id.* at ¶ 272.  These clear and specific statements set forth matters of present fact,

specifically that EQT was successfully drilling longer lateral wells, that EQT had worked with Rice to combine the companies' best practices, that EQT had captured some of the value and synergies that had been cited as a basis for Acquisition, and that the drilling of longer laterals had already resulted in decreased costs. During that same call, Schlotterbeck stated, and McNally confirmed, that EQT was "at or a little bit ahead of the plan that delivered on" the General and Administrative synergy cited as one of the two primary bases for the Acquisition. *Id.* at ¶ 275.

Defendant Schlosser made similar statements respecting EQT's successful drilling efforts during EQT's April 26, 2018 first-quarter earnings conference call, and stated that a drilling process was "already showing significant returns." Compl. ¶ 284, ECF No. 85. During a July 26, 2018 second-quarter 2018 earnings conference call, Schlosser represented that EQT "[continues] to realize capital synergies from the Rice acquisition as we develop our large contiguous acreage position," "[o]n an activity level, the second quarter was the highest in EQT history, with the company operating as many as 15 rigs and 12 frac crews," and that EQT "[expects] Q2 to be the high point for CapEx this year and reiterate our full year guidance of $2.2 billion for well development." *Id.* at ¶ 293. These are, similarly, statements of present fact regarding EQT's purportedly successful drilling operations and EQT's realization of synergies.

Further, Plaintiffs have set forth allegations which tend to contradict EQT's and the Officer Defendants' statements regarding synergies captured following the Acquisition, as well as their statements portraying EQT's post-Acquisition drilling operations as successful. Plaintiffs assert that, after the Acquisition, EQT experienced significant cost overruns and problems in drilling ultra-long laterals, and that it refused to incorporate the best practices of Rice. Compl. ¶ 157, ECF No. 85. [14]

---

[14] The Court notes that Plaintiffs cite to several statements from confidential sources in alleging the difficulties experienced by EQT with respect to its drilling operations and increased costs. *See* Compl. ¶¶ 158-63; 169-73, ECF

EQT submitted, in July of 2018, a non-public request for a proposal ("Request for Proposal") from a third-party operations-management consulting firm to "develop a plan for consistent and efficient supply chain and logistics management."  Compl. ¶ 166, ECF No. 85.  The Request for Proposal stated that EQT was currently operating in a "'siloed' fashion, with each operational group focused on their operations and logistics, with little consideration given to overall efficiency," and that EQT's then-model "caused significant nonproductive time and expense" and "increase[d] the likelihood of both safety and environmental incidents."  *Id*.  It further stated that EQT "may not currently have the right skill sets internally to effectuate this undertaking."  *Id*.  The Request for Proposal further notes that EQT's "ineffective structure was not as visible until the [Acquisition] concentrated our activity."  *Id*.

Further, during EQT's October 25, 2018 investor and analyst conference call, EQT disclosed that EQT " was increasing well-development capital expenditures for 2018 by $300 million, or 14%, based on costs that 'represent primarily onetime events that were driven by pace of activity, ultra-long lateral learning curve and some service cost increases'" and stated that EQT had yet "to drill longer laterals at the cost profile we originally anticipated."  Compl. ¶ 333, ECF No. 85.  With respect to this October 25, 2018 conference call, Plaintiffs further explain:

> As newly-appointed Executive Vice President of Production Erin Centofanti admitted during EQT's *third quarter* October 25, 2018 earnings call, purported "weather events" and "midstream delays" that occurred in the "*first quarter*" disrupted the Company's schedule and caused increased capital expenditures.  Centofanti also admitted, while failing to disclose that EQT had also lost several costly drilling assemblies, that "*[t]he first 6 months of 2018* represented a tight market for Appalachian frac crews, resulting in higher pricing" and "[t]he same phenomenon was present in our water hauling operations, where increased

No. 85.  Evaluating allegations derived from confidential sources requires "an examination of the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Chubb*, 394 F.3d at 147.  Even without consideration of these statements, some of which meet the threshold set forth in *Chubb*, the Court would find that Plaintiffs have sufficiently pled that the above statements regarding post-Acquisition drilling successes and captured synergies were false and misleading when made for the reasons discussed below.

27

demand for trucks, a shortage of qualified drivers and new safety requirements for all haulers increased water hauling costs." These increased costs were present "*the first 6 months of 2018*," but EQT only disclosed them in the third quarter of 2018, at the same time EQT belatedly raised its 2018 well development capital expenditure amount by *$300 million*.

*Id.* at ¶ 174.

The Rice Team's February 5, 2019 public presentation and investor call further asserted that EQT had repeatedly refused to adopt Rice's best practices when approached by Rice employees, and that EQT had previously understated and erroneously adjusted well costs downwards in attempt to normalize its costs. Compl. ¶¶ 344-48, ECF No. 85. The Rice Team's April 26, 2019 preliminary proxy statement to the SEC provided:

> In 2017, EQT justified the Merger based on delivering $1.9 billion in well cost synergies, $2.5 billion of base synergies and $7.5 billion of potential all-in synergies. The key thesis underpinning the cost synergies possible through the Merger was the opportunity to develop longer laterals, as combining EQT's and Rice Energy's acreage positions would enable longer lateral development that, if done effectively, would result in lower well costs on a per foot basis. *EQT's 2018 guidance suggested budgeted well costs of $900 per foot, yet EQT's actual results not only failed to achieve their conservative guidance and begin to take advantage of the promised Merger synergies through longer lateral development, but instead produced disastrous results*, including (a) posting a loss of $2.4 billion in 2018, or $8.60 per share, (b) exceeding capital expenditure guidance by over $300 million, (c) falling short of production guidance and (d) repurchasing $500 million of shares of Common Stock less than two months before announcing its capital expenditure overrun and production miss.

*Id.* at ¶ 352. On June 17, 2019, the Rice Team filed detailed proxy materials with the SEC which stated that: (1) "EQT did not seek and ha[d] not achieved the synergies and cost savings that were the purported rationale of the Acquisition," *id.* at ¶ 355; (2) "EQT's drilling costs remain the worst in the basin," *id.*; (3) that EQT had utilized "misleading math" in "excluding more than $300 million in costs it capitalizes from its well costs," *id.* at ¶ 358; (4) that EQT did not incorporate Rice' well designs or planning into EQT's wells, *id.* at ¶ 361; (5) that EQT had put 2018's capital budget at risk by drilling as many 18,000-foot laterals "as possible with no experience," resulting

in "massive operational issues" and "cost overruns" and an estimated $500 million in misallocated capital, *id.* at ¶ 362; and (6) EQT had "not been transparent about its performance" and had "consistently misled shareholders" by, inter alia, stating that the synergies from the Acquisition were being achieved in the second quarter of 2018 and then disclosing a $300 million capital-expense miss, a 5% production-volume miss, and a $500 million stock buy-back in the third quarter, *id.* at ¶ 363.

The above allegations, if proven, tend to establish that, rather than enjoying successful drilling operations and achieving the synergies cited as the basis for the Acquisition at the time of EQT's statements in February, April, and July of 2018 discussed above, EQT was actually experiencing significantly increased costs and inefficiencies and significant operational issues. As such, the above statements tend to suggest that EQT's and the Officer Defendants' statements respecting its drilling successes and captured synergies were simply not true at the time they were made. Plaintiffs' allegations respecting EQT's Request for Proposal and the Rice Team's proxy materials, in particular, tend to suggest that EQT's operational, cost, and efficiency issues were pervasive and pronounced at the same time that EQT was touting the success of the Acquisition. Accordingly, the above allegations are sufficient to raise genuine issues of material fact as to whether EQT's and the Officer Defendants' statements respecting post-Acquisition drilling successes and achieved synergies were false and misleading at the time they were made.

### c. Accounting Fraud

Defendants also assert that Plaintiffs' accounting fraud claims, which rely on allegations that EQT's and the Officer Defendants' statements regarding EQT's financial results and guidance were false because EQT allegedly: "(1) 'improperly capitalized [] the cost of water used during operations;' and (2) 'understat[ed] its development-cost guidance through the omission of specific

29

costs from its [Authorizations for Expenditure]' and thereby violat[ed] GAAP," should be dismissed because Plaintiffs fail to set forth a misstatement or omission with the requisite particularity. Br. in Supp. 17, ECF No. 96 (quoting Compl. ¶¶ 309; 321). Plaintiffs assert that they have stated a Section 10(b) claim with respect to EQT's statements respecting its financial results and guidance because:

> Plaintiffs identified the approximate amount of the understatements of expenses in EQT's financial statements ($300 million), the approximate amount of understatements of guidance expenses and development costs ($2.4-$3 million per well), and the accounting principles Defendants violated by capitalizing produced water (FASCON No. 6, ASC 932, and the IRS's Oil and Gas Handbook), and provided context about drilling-industry accounting standards.

Br. in Opp'n 20, ECF No. 102.

The Court agrees that Plaintiffs have sufficiently pled what the unreasonable accounting processes were, specifically the capitalization, as opposed to expensing, of produced water, have further described why those processes were not consistent with generally accepted accounting principles ("GAAP"), and have identified the amount that the unreasonable processes distorted the data disclosed to the public, specifically by understating its development costs and overstating its financial prospects. Compl. ¶¶ 168-95, ECF No. 85. "As the Third Circuit has explained, 'where plaintiffs allege that defendants distorted certain data disclosed to the public by using unreasonable accounting practices, we have required plaintiffs to state what the unreasonable practices were and how they distorted the disclosed data.'" *In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 956 (E.D. Pa. 1999) (quoting *In re Burlington Coat Factory Securities Litig.*, 114 F.3d at 1417–18)). The Court finds that Plaintiffs have stated a Section 10(b) claim with respect to EQT's statements respecting its financial results and guidance.

### 2. Scienter

A complaint asserting a claim for violation of Section 10(b) must "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' U.S.C. § 78u–4(b)(2)(A), specifically 'scienter,' which is defined in this context as a 'knowing or reckless' mental state 'embracing intent to deceive, manipulate, or defraud.'" *OFI*, 834 F.3d at 490 (quoting *Avaya*, 564 F.3d at 252). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). The Third Circuit has explained:

> But the Supreme Court has made clear that plaintiffs' allegations of scienter "need not be irrefutable, i.e., of the 'smoking-gun' genre." *Tellabs*, 127 S.Ct. at 2510. Instead, our inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Id.* at 2509. Accordingly, as with all totality-of-the circumstances tests, our analysis will be case specific. It will ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter.

*Avaya*, 564 F.3d at 269.

Plaintiffs assert that several allegations collectively support a finding of scienter in the instant case. Br. in Opp'n 3, ECF No. 102. Specifically, Plaintiffs point to: (1) Schlotterbeck's resignation just months after the Acquisition, as well as after the changes made to EQT's the management-compensation scheme; (2) EQT's emphatic denial of JANA's assertions regarding the impossibility of the synergies cited by EQT as the basis for the Acquisition; (3) the Rice Team's assertions that EQT consistently misled shareholders and based its financial results on underreported costs and misleading math; and (4) EQT's purported violations of GAAP and IRS guidance by understating its expenses, capitalizing costs it needed to expense, and eliminating expenses from its reported cost guidance. *Id.*

31

a. **Pre-Acquisition Representations Respecting EQT's Ability to Drill 1,200 Wells at an Average Length of 12,000 Feet**

The Court finds that Plaintiffs have sufficiently alleged scienter with respect to EQT's and the Officer Defendants' pre-Acquisition statements that the amount of undrilled acreage acquired in the Acquisition would enable EQT to drill approximately 1,200 wells at an average lateral length of 12,000 feet. A plaintiff can plead a strong inference of scienter where the complaint sufficiently alleges that the defendants "knew facts or had access to information suggesting that their public statements were not accurate." *McCullough v. Advest, Inc.*, 754 F. App'x 109, 113 (3d Cir. 2018) (quoting *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000)). As discussed above, JANA raised consistent opposition to the Acquisition on the basis that the potential synergies cited by EQT were "grossly exaggerated," and that EQT's purported drilling plan was impossible because EQT and Rice did not possess enough contiguous undrilled acreage to allow for the increase in lateral length cited by Defendants as a basis for the Acquisition. Compl. ¶¶ 121-48, ECF No. 85. EQT and the Officer Defendants emphatically denied each of JANA's assertions, *id.* at ¶¶ 226-30; 237; 251-54.

The Court finds that JANA's opposition to the Acquisition, and EQT's consistent and specific assertions refuting JANA's opposition, including in the Registration Statement, provide a strong inference that EQT and the Officer Defendants were, at least, aware that their statements respecting the amount of available, undrilled acreage, and whether the same could support the drilling of 1,200 wells at an average length of 12,000 feet, could potentially be false. *See Avaya*, 564 F.3d at 269 ("Among the facts alleged by Shareholders, *the most powerful evidence of scienter is the content and context of McGuire's statements themselves*. McGuire did not simply make statements inconsistent with the existence of widespread and unusual discounting; *he explicitly denied the existence of such discounting in response to repeated questions about pricing by*

*analysts.*" (emphasis added)); *see also id.* at 270 ("Because of the context (specific analyst queries) and content (consistent denials of unusual discounting) of McGuire's statements, the possibility that McGuire was ignorant is not necessarily exculpatory.  Even if McGuire were not aware of the full extent of the unusual discounting, or the entirety of the other circumstances alleged by Shareholders, he might be culpable as long as what he knew made obvious the risk that his confident, unhedged denials of unusual discounting would mislead investors.").

The Court again notes that Plaintiffs assert that there was simply not enough available, contiguous, undrilled acreage, even taking into account tactical fill-ins, to support the drilling of 1,200 wells at an average length of 12,000 feet, Compl. ¶ 238, ECF No. 85, and the same will ultimately be a subject for discovery in this matter.  EQT was repeatedly challenged by JANA as to the feasibility of the drilling of 1,200 wells at an average length of 12,000 feet given the contiguous undrilled acreage possessed by EQT and Rice, and consistently represented, including in the Registration Statement filed with the SEC, that it was, in fact, possible to drill such wells. The synergies cited by EQT as a result of the drilling such wells were a driving motivation for the Acquisition, and it is clear that EQT's and the Officer Defendants' consistent assertions that the drilling of such wells was possible could mislead investors if such drilling was, in fact, impossible. This is at least sufficient to plead that EQT and the Officer Defendants knowingly disregarded the risk that their allegedly false representations respecting the ability to drill 1,200 wells at an average length of 12,000 feet could mislead investors as to the benefits that would be achieved by way of the Acquisition.

The Court further notes that natural gas production was EQT's core business, and EQT's and the individual Officer Defendants' direct and specific responses to the assertions set forth in JANA's statements opposing the Acquisition, which were clearly communicated to EQT and the

Officer Defendants given their responses to the same, support application of the core operation doctrine with respect to the pre-Acquisition statements discussed above. *See In re Loewen Grp. Inc.*, No. CIV.A. 98-6740, 2004 WL 1853137, at *22 (E.D. Pa. Aug. 18, 2004) "([I]f a plaintiff pleads alleged fraud concerning the corporation's core business and the defendant held a position from which he would have been aware of the true facts and misleading disclosures, scienter is pleaded sufficiently."); *see also Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 246-47 (3d Cir. 2013) (discussing the Third Circuit's recognition of the core operations doctrine in *Avaya*, and pointing to the *Avaya* court's citation to *Metzler Investment GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1068 (9th Cir.2008), which held that "corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter-at least absent some additional allegations of specific information conveyed to management and related to fraud." (quoting *Avaya*, 564 F.3d at 270)).

For the reasons discussed above, the Court finds that Plaintiffs have pled scienter respecting EQT's and the Officer Defendants' allegedly false pre-Acquisition statements that the amount of undrilled acreage acquired in the Acquisition would enable EQT to drill approximately 1,200 wells at an average lateral length of 12,000 feet.

### b. Post-Acquisition Representations Respecting EQT's Drilling Operations and Captured Synergies

With respect to representations made following the Acquisition respecting EQT's drilling operations and capturing of synergies, the Court finds that Plaintiffs have adequately alleged scienter. As noted above, a plaintiff can plead a strong inference of scienter where the complaint sufficiently alleges that the defendants "knew facts or had access to information suggesting that their public statements were not accurate." *McCullough v. Advest, Inc.*, 754 F. App'x 109, 113

(3d Cir. 2018) (quoting *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000)).  Plaintiffs allegations respecting EQT's own statements, specifically in EQT's Request for Proposal which was submitted to a third-party consulting firm, provide the Court with a sufficient basis to find that Plaintiffs have alleged a strong inference of scienter.

As set forth above, EQT submitted, in July of 2018, a non-public Request for Proposal from a third-party operations-management consulting firm to "develop a plan for consistent and efficient supply chain and logistics management."  Compl. ¶ 166, ECF No. 85.  The Request for Proposal stated that EQT was currently operating in a "'siloed' fashion, with each operational group focused on their operations and logistics, with little consideration given to overall efficiency," and that EQT's then-model "caused significant nonproductive time and expense" and "increase[d] the likelihood of both safety and environmental incidents."  *Id*.  It further stated that EQT "may not currently have the right skill sets internally to effectuate this undertaking."  *Id*.  The Request for Proposal further notes that EQT's "ineffective structure was not as visible until the [Acquisition] concentrated our activity."  *Id*.

During EQT's February 15, 2018 earnings call, Schlosser represented that EQT had "hit the ground running with our increased lateral lengths," that "we are combining best practices and have already captured value," and that "development cost continued to improve as we lengthened laterals."  Compl. ¶ 269, ECF No. 85.  On that same call, Schlosser further represented that "we've hit the ground running and have started capturing the various synergies related to the [Acquisition]" and that EQT was "ahead of schedule for achieving our capital synergies."  *Id*. at ¶ 272.  During that same call, Schlotterbeck stated, and McNally confirmed, that EQT was "at or a little bit ahead of the plan that delivered on" the General and Administrative synergy cited as one of the two primary bases for the Acquisition.  *Id*. at ¶ 275.  Defendant Schlosser made similar

statements respecting EQT's successful drilling efforts during EQT's April 26, 2018 first-quarter earnings conference call, and stated that a drilling process was "already showing significant returns."  Compl. ¶ 284, ECF No. 85.  During a July 26, 2018 second-quarter 2018 earnings conference call, Schlosser represented that EQT "[continues] to realize capital synergies from the Rice acquisition as we develop our large contiguous acreage position," that "[o]n an activity level, the second quarter was the highest in EQT history, with the company operating as many as 15 rigs and 12 frac crews," and that EQT "[expects] Q2 to be the high point for CapEx this year and reiterate our full year guidance of $2.2 billion for well development."  *Id.* at ¶ 293.

While EQT's Request for Proposal does not definitively establish that EQT had not achieved synergies to date, it does tend to indicate that EQT was experiencing significant difficulties with respect to efficiency and expenses, and that it was also experiencing significant operational issues.  EQT's non-public Request for Proposal was submitted in July, 2018, meaning that it was submitted nearly contemporaneously with the July 26, 2018 second-quarter 2018 earnings conference call wherein Schlosser represented that EQT "[continues] to realize capital synergies from the Rice acquisition as we develop our large contiguous acreage position," that "[o]n an activity level, the second quarter was the highest in EQT history, with the company operating as many as 15 rigs and 12 frac crews," and that EQT "[expects] Q2 to be the high point for CapEx this year and reiterate our full year guidance of $2.2 billion for well development." Compl. ¶ 293, ECF No. 85.  Further, the Request for Proposal does not indicate exactly how long EQT had been experiencing the issues outlined in the Request, but does state that EQT's "ineffective structure was not as visible until the [Acquisition] concentrated our activity."  *Id.* at ¶ 166.  It is clear that information respecting the operational and efficiency issues cited in the Request for Proposal would be available at the time of the July 26, 2018 earnings call, but the

Court also notes that, given the statement that the issues became visible after the Acquisition closed on November 13, 2017, it is also entirely possible, and adequately alleged, that EQT knew of the issues cited in the Request for Proposal in advance of the February and April statements.

Plaintiffs' allegations with respect to the Request for Proposal tend to show that while EQT and the Officer Defendants were publicly touting the successes of the Acquisition, EQT was actually keenly aware that it was experiencing significant operational and financial issues associated with the Acquisition.[15]  These are not allegations of "fraud by hindsight," in that they do not merely claim that EQT's and the Officer Defendants' "statements turned out to be wrong, and therefore must have been fraudulent." *Avaya*, 564 F.3d at 269.  Rather, Plaintiffs' allegations respecting the statements in EQT's Request for Proposal tend to suggest that EQT knew of its substantial operational and financial issues, and that EQT's and the Officer Defendants' statements respecting its drilling successes and captured synergies were knowingly or recklessly false.  As such, the Court finds that EQT's Request for Proposal, and the statements and information contained therein respecting the difficulties EQT was experiencing in terms or efficiencies, costs, and operations, is sufficient to create a strong inference that EQT and the Officer Defendants knew or recklessly disregarded the risk that their statements regarding operational successes and captured synergies discussed above were false and/or misleading to investors when made.

### c.  Accounting Fraud

---

[15] Defendants argue that EQT's Request for Proposal does not stand for the proposition for which Plaintiffs cite to it, and further argue that Plaintiffs do not plead that any individual Defendant saw the document. Reply 9 n.23, ECF No. 108.  Defendants' first argument presents a factual issue that cannot be resolved at this juncture.  Defendants' argument that Plaintiffs fail to plead that any Defendant saw the actual Request for Proposal ignores that it is not the document itself, but rather what it seemingly represents, i.e. pervasive and company-wide efficiency, cost, and operational issues that would "require a change in mindset and culture," Compl. ¶ 166, ECF No. 85, and acknowledgement and knowledge of the same on EQT's part such that it privately recognized the need for assistance from a third-party, that is what supports a strong inference of knowledge or recklessness on the part of EQT and the Officer Defendants.

For the same reasons discussed above with respect to post-Acquisition statements respecting the success of EQT's drilling operations and capturing of synergies, the Court finds that Plaintiffs have sufficiently pled scienter with respect to EQT's financial results and guidance. Plaintiffs assert allegations that EQT improperly capitalized, as opposed to expensed, produced water from April 2018 through October 2018, that it capitalized at least $300 million of operating costs from April 2018 through April 2019, and that, as a result, EQT's public filings during this period understated EQT's operating expenses, overstated its income, and overstated the value of its producing properties and its "property, plant, and equipment." Compl. ¶¶ 308-30, ECF No. 85. Plaintiffs also allege that EQT was experiencing significantly increased costs and inefficiencies and significant operational issues as early as the first quarter of 2018. *See* Compl. ¶¶ 174; 365, ECF No. 85. Plaintiffs' allegations respecting EQT's non-public Request for Proposal tend to indicate that EQT was aware of rising costs and inefficiencies within EQT which would cast doubt on the costs, which Plaintiffs assert EQT significantly understated, and financial prospects, which Plaintiffs assert EQT overstated, reported by EQT. As alleged, this non-public Request for Proposal seemingly directly contradicts EQT's statements of encouraging financial results. The Court finds that the above is sufficient to allege, at least, that EQT's statements respecting its financial results and guidance, which allegedly excluded at least $300 million in costs, were made with knowing disregard for the risk that these statements were false. Accordingly, Plaintiffs have sufficiently alleged scienter with respect to such statements.

### 3.  Loss Causation

Loss causation requires "a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342, 346 (2005). "[I]n order [t]o establish loss causation, a plaintiff must allege ... that the subject of the fraudulent statement or omission

was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc*., 720 F. Supp. 2d 517, 559 (D.N.J. 2010) (quoting *In re Intelligroup Securities Litigation*, 527 F.Supp.2d 262, 275 (D.N.J. 2007)).

With respect to EQT's and the Officer Defendants' pre-Acquisition statements respecting the feasibility of the drilling of 1,200 wells at an average length of 12,000 feet, the Court finds that Plaintiffs have alleged loss causation. These additional and longer laterals were the primary basis for the synergies and efficiencies cited as motive for the Acquisition. On October 25, 2018, EQT disclosed negative financial results for the three months ending on September 30, 2018, and explained that EQT was experiencing difficulty drilling the longer laterals that would allow for its wells to average 12,000 feet. Compl. ¶¶ 332-37. Following these disclosures, EQT's stock dropped in value by 13%. *Id.* at ¶ 338. While EQT did not disclose that it was unequivocally impossible to drill 1,200 wells at an average length of 12,000 feet, it did disclose that it had not achieved the same to date and that it was experiencing legitimate difficulty in attempting to drill such wells, thus casting doubt on the feasibility of the drilling of 1,200 wells at an average length of 12,000 feet. Following this new, EQT's stock dropped in value. Accordingly, the Court finds that Plaintiffs have sufficiently set forth facts which support a disclosure of misstatement which negatively affected the value of a security with respect to Defendants' pre-Acquisition statements.

With respect to EQT's representations as to post-Acquisition drilling successes and captured synergies and alleged accounting fraud, the Court finds that Plaintiffs have adequately pled loss causation with respect to the three alleged corrective disclosures (EQT's October 25, 2018 investor and analyst conference call, the Rice Team's February 5, 2019 public presentation and investor call, and the Rice Team's June 17, 2019 proxy materials) at issue. Plaintiffs have

alleged that EQT's October 25, 2018 investor and analyst conference call revealed previously undisclosed increased costs, inefficiencies, and operational issues that were present as early as the first quarter of 2018, *see* Compl. ¶¶ 174; 333, ECF No. 85, and have further alleged a drop in EQT's stock value by 13%, *id.* at ¶ 338.  These disclosures tend to contradict EQT's statements discussed above respecting post-Acquisition drilling successes and captured synergies, and Plaintiffs have thus pled loss causation with respect to their Section 10(b) claim for post-Acquisition statements respecting drilling successes and captured synergies.

Further, the Rice Team's February 5, 2019 public presentation and investor call and the Rice Team's June 17, 2019 proxy materials filed with the SEC asserted that EQT had previously understated and erroneously adjusted well costs downwards in an attempt to normalize its costs, *id.* at ¶¶ 344-48, and that EQT had utilized "misleading math" in "excluding more than $300 million in costs it capitalizes from its well costs," *id.* at ¶ 358.  Plaintiffs have alleged that EQT's stock price fell 3.5% following the February 5, 2019 disclosure, *id.* at ¶ 349, and that EQT's stock price fell by 5% by June 19, 2019 following the filing of the Rice Team's proxy materials after the market closed on June 17, 2019, *id.* at ¶ 387.[16]  Plaintiffs have thus sufficiently alleged that the disclosure of EQT's allegedly improper accounting practices negatively impacted EQT's stock value.  The Court further notes that the Rice Team's June 17, 2019 proxy materials also asserted that "EQT did not seek and ha[d] not achieved the synergies and cost savings that were the purported rationale of the Acquisition," *id.* at ¶ 355, and that EQT had put 2018's capital budget at risk by drilling as many 18,000-foot laterals "as possible with no experience," resulting in

---

[16] While the Court acknowledges Defendants' argument that EQT's stock price actually increased by approximately 0.7% from June 17, 2019 to June 18, 2019, *see* Br. in Supp. 43-44, ECF No. 96, the Court agrees with Plaintiffs that the subsequent and immediate significant drop of 5% just a day later on June 19, 2019 raises factual issues as to whether this drop was caused by some other cause or is merely reflective of the market taking time to digest the voluminous proxy materials filed by Rice, *see* Br. in Opp'n 44 n.59, ECF No. 102.

"massive operational issues" and "cost overruns" and an estimated $500 million in misallocated capital, *id.* at ¶ 362. Thus, Plaintiffs' allegations respecting the Rice Team's June 17, 2019 proxy materials also set forth loss causation with respect to EQT's post-Acquisition statements as to drilling successes and captured synergies. For all of the reasons discussed above, the Court finds that Plaintiffs have pled loss causation as to the three alleged corrective disclosures.

**B. Plaintiffs' Claims for Violations of Sections 11 and 12(a)(2) of the Securities Act and Section 14(a) of the Exchange Act**

Defendants assert that Plaintiffs' claims for violations of Sections 11 and 12(a)(2) of the Securities Act (Counts VII and VIII, respectively) and Section 14(a) of the Exchange Act (Counts IV and V), which are predicated on alleged material misrepresentations set forth in the Registration Statement that was filed with the SEC in connection with the Acquisition, fail for the same reasons discussed above with respect to Count I, and further because they are time-barred. Br. in Supp. 3-4, ECF No. 96.

For the same reasons the Court found that Plaintiffs have sufficiently set forth a Section 10(b) claim based upon EQT's and the Officer Defendants' allegedly false pre-Acquisition statements, including in the Registration Statement, Compl. ¶ 70, ECF No. 85, the Court finds that Plaintiffs have sufficiently set forth claims under Sections 11 and 12(a)(2) of the Securities Act and Section 14(a) of the Exchange Act. Defendants' arguments respecting the viability of these claims are materially identical to those raised as to Count I, *see* Br. in Supp. 44-48, ECF No. 96, and the Court thus rejects those arguments for the same reasons discussed above. The Court further rejects, at this juncture, Defendants' argument that Plaintiffs' Sections 11 and 12(a)(2) of the Securities Act and Section 14(a) of the Exchange Act claims are time-barred for the same reasons

that this Court rejected Defendants' arguments respecting their truth-on-the-market defense, as set forth above.

### C.  Plaintiffs' Claims for Violations of § 15 of the Securities Act and §§ 20(a) and 20A of the Exchange Act

Defendants argue that Plaintiffs' claims under Section 15 of the Securities Act (Count IX) and Sections 20(a) and 20A of the Exchange Act (Counts II, III, and VI) should be dismissed because they are based on the primary violations of Sections 11 and 12(a)(2) of the Securities Act and Sections 10(b) and 14(a) of the Exchange Act discussed above, and because Plaintiffs fail to adequately plead any primary violation of federal securities law.  Br. in Supp. 50, ECF No. 96. Because this Court found that Plaintiffs have stated claims under both the Exchange Act and the Securities Act for the reasons discussed above, the Court summarily rejects Defendants' arguments respecting Plaintiffs' claims under Section 15 of the Securities Act (Count IX) and Sections 20(a) and 20A of the Exchange Act (Counts II, III, and VI).

### IV.    Conclusion

For the reasons discussed above, Defendants' Motion to Dismiss the First Amended Class Action Complaint is denied.  An appropriate Order of Court follows.

BY THE COURT:

s/*Robert J. Colville*_____
Robert J. Colville
United States District Judge

DATED: December 2, 2020
cc/ecf: All counsel of record