**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
|  | ) |  |
|  | ) |  |
| *In re EQT Corporation Securities Litigation* | ) | 2:19-cv-00754-RJC |
|  | ) |  |
|  | ) |  |
|  | ) | Judge Robert J. Colville |
|  | ) |  |
|  | ) |  |

**MEMORANDUM OPINION**

Robert J. Colville, United States District Judge

Before the Court is the Motion for Class Certification ("Certification Motion") (ECF No. 139) filed by Lead Plaintiffs Government of Guam Retirement Fund ("Guam") and the Northeast Carpenters Annuity Fund and the Northeast Carpenters Pension Fund (collectively, "Northeast Carpenters") and additional Plaintiff Cambridge Retirement System ("Cambridge") (collectively, "Plaintiffs"). Defendants EQT Corporation ("EQT"), Steven T. Schlotterbeck ("Schlotterbeck"), Robert J. McNally ("McNally"), David L. Porges ("Porges"), David E. Schlosser, Jr. ("Schlosser") (collectively, the "Officer Defendants"), and Jimmi Sue Smith ("Smith"), James E. Rohr ("Rohr"), Vicky A. Bailey ("Baily"), Philip G. Behrman ("Behrman"), Kenneth M. Burke ("Burke"), A. Bray Cary, Jr. ("Cary"), Margaret K. Dorman ("Dorman"), Lee T. Todd, Jr. ("Todd"), Christine J. Toretti ("Toretti"), Daniel J. Rice IV ("Rice"), and Robert F. Vagt ("Vagt") (collectively, the "Signer Defendants") oppose the Motion.[1] Defendants have also filed a Motion to Exclude the Rebuttal Report and Testimony of Dr. Steven Feinstein (ECF No. 183), and Plaintiffs have filed Motion to Exclude the Report and Testimony of Dr. Kenneth M. Lehn (ECF No. 203). This Court

---

[1] The Court shall refer to EQT, the Officer Defendants, and the Signer Defendants collectively as "Defendants."

has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1337.  The pending Motions have been fully briefed, and are ripe for disposition.

## I.      Factual Background & Procedural History

In the interest of efficiency, the Court borrows its description of the facts set forth in the operative First Amended Complaint ("Complaint") (ECF No. 85) from the Court's December 2, 2020 Opinion (ECF No. 109) denying Defendants' Motion to Dismiss (ECF No. 95):

EQT is a natural-gas-production company whose primary operations are in the Appalachian Basin and throughout Pennsylvania, West Virginia, and Ohio.  Compl. ¶ 2, ECF No. 85.  EQT claims to be the largest producer of natural gas in the United States based on average daily sales volume.  *Id*.  In Western Pennsylvania, EQT drills and completes natural-gas wells through the process of hydraulic fracturing in the Marcellus Shale deposit.  *Id.* at ¶ 39.  The Officer Defendants occupied positions within EQT which provided them with "the power and authority to control the contents of EQT's reports to the SEC and investors, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors."[2]  *Id.* at ¶ 38. Each of the Signer Defendants either: (1) was the Chief Accounting Officer or a director of EQT, signed the Registration Statement (defined below) and permitted his or her name to be used in solicitations contained in the Registration Statement; or (2) was the CEO of Rice Energy Inc. ("Rice") or a director of Rice who "was named in the Registration Statement, with his written consent, as a person who would become a director of EQT upon the closing of the Acquisition,"

---

[2] More specifically: (1) Schlotterbeck was EQT's President and CEO from March 1, 2017, until March 14, 2018, Compl. ¶ 34, ECF No. 85; (2) McNally was EQT's Senior Vice President and CFO from March 2016 to November 2018 and became EQT's President and CEO on November 12, 2018, *id.* at ¶ 35; (3) Porges was EQT's Chairman and CEO from 2011 through February 2017, its Executive Chairman from March 2017 through February 2018, and its Chairman from March 1, 2018, to March 14, 2018, when he replaced Schlotterbeck as Interim President and CEO until November 12, 2018, *id.* at ¶ 36; and (4) Schlosser was EQT's Senior Vice President and President, Exploration and Production, from March 2017 through October 24, 2018, *id.* at ¶ 37.

and who "permitted his name to be used in solicitations contained in the Registration Statement." *Id.* at ¶¶ 480-491.

Guam is a defined benefit pension plan that purchased shares of EQT common stock during the relevant Class Period (defined below).  Compl. ¶ 29, ECF No. 85.  Northeast Carpenters are pension and benefit funds that purchased shares of EQT common stock during the Class Period and held shares of EQT stock on September 25, 2017, the record date for EQT shareholders to vote on the Acquisition (defined below).  *Id.* at ¶ 30.  Cambridge is a contributory retirement system which:

> [P]urchased shares of EQT stock during the Class Period; held shares of EQT stock on September 25, 2017, the record date for EQT shareholders to vote on the Acquisition; held shares of Rice stock on September 21, 2017, the record date for Rice shareholders to vote on the Acquisition; held Rice stock on November 13, 2017, the closing date of the Acquisition[;] and acquired EQT stock in exchange for its Rice stock in the Acquisition[.]

*Id.* at ¶ 31.

On June 19, 2017, EQT announced that it had entered into an agreement to acquire rival gas producer Rice for $6.7 billion[3] (the "Acquisition").  Compl. ¶ 3, ECF No. 85.  Schlotterbeck, EQT's then-President and CEO, cited substantial synergies, defined by Plaintiffs as "the benefit derived from the combined value and performance of two companies exceeding the sum of the separate individual parts," *id.* at ¶ 3 n.1, that the Acquisition would purportedly generate as justification for the proposed merger, *id.* at ¶ 3.  More specifically, EQT issued a press release on

---

[3] Plaintiffs describe the consideration exchanged in the Acquisition as follows:

> Rice shareholders would receive 0.37 of a share of EQT common stock and $5.30 in cash in exchange for each share of Rice common stock they held (other than shares of Rice common stock held by EQT or certain of its subsidiaries, shares held by Rice in treasury, or shares for which appraisal was properly demanded under Delaware law).  The Acquisition consideration amounted to $5.4 billion in EQT stock and $1.3 billion in cash.

Compl. ¶ 55, ECF No. 85.

June 19, 2017 asserting that, "by combining EQT's and Rice's contiguous acreage, EQT could drill natural-gas wells with longer laterals,"[4] which EQT claimed would "generate cost savings and synergies amounting to at least $2.5 billion from the economies of scale that would result from drilling longer wells from the same well pads."[5]  Compl. ¶ 57, ECF No. 85.  Defendants asserted that these synergies and costs savings would be attained by drilling 1,200 wells at an average lateral length of 12,000 feet, and further by reducing its total number of well pads from 199 to 99.  *Id.* at ¶ 66.  EQT also held an investor conference call and presentation on June 19, 2017, and Schlotterbeck sent an email to all EQT employees, further touting the same purported benefits of EQT's potential acquisition of Rice.  *Id.* at ¶¶ 60-65.

On July 3, 2017, investor JANA Partners LLC ("JANA") disclosed that it had acquired a nearly 6% equity stake in EQT, and further stated that it opposed the Acquisition and disputed EQT's proffered bases supporting the Acquisition.  Compl. ¶ 8, ECF No. 85.  More specifically, JANA asserted that the potential synergies cited by EQT were "grossly exaggerated," and that EQT's purported drilling plan was unattainable because EQT and Rice did not possess enough contiguous undrilled acreage to allow for the increase in lateral length cited by Defendants as a basis for the Acquisition.  *Id.* at ¶ 121.  On July 5, 2017, JANA sent a letter to EQT's Board which set forth materially similar opposition to the Acquisition, and also filed this letter with SEC.  *Id.* at

---

[4] In Defendants' Brief in Support of their Motion to Dismiss, Defendants define lateral wells and describe the benefit of drilling longer lateral wells as follows:

> Lateral wells, which run parallel to the ground as deep as 10,000 feet below the surface, are the only way to produce natural gas efficiently from shale formations such as the Marcellus.  Longer laterals allow for greater efficiency, because they allow more natural gas to be extracted from the same well, reducing the cost per unit of natural gas.

Br. in Supp. of Mot. to Dismiss 1 n. 2, ECF No. 96 (internal citations to the Complaint omitted).

[5] Planning and drilling multiple wells on a single well pad, "which is the area cleared for a drilling rig to work on a plot of land designated for natural-gas extraction," is a way in which gas companies attempt to achieve economies of scale.  Compl. ¶ 49, ECF No. 85.

¶ 122.   On July 27, 2017, Defendants filed a combined registration statement on Form S-4, prospectus, and joint proxy statement/prospectus (together, the "Registration Statement") with the SEC in connection with the Acquisition.  *Id.* at ¶ 67.  The Registration Statement set forth several representations respecting the potential benefits of the Acquisition that were consistent with EQT's June 19, 2017 representations discussed above, and effectively denied JANA's objections to the Acquisition.[6]  *Id.* at ¶¶ 69-71; 216-223.

JANA continued to publicly oppose the Acquisition through the sending and filing of letters, as well as the filing of proxy materials in opposition to the Acquisition with the SEC,[7] consistently citing the impossibility of EQT's claimed synergy drilling plan of 1,200 wells with 12,000 feet in average lateral length, and EQT consistently and repeatedly publicly denied any of the criticisms raised by JANA.  *Id.* at ¶¶ 124-47; 237.  Prior to the Acquisition, Rice and EQT formed an integration team that ultimately dissolved in July or August 2017 over disagreements regarding the attainability of EQT's projected synergies and future operations plans.  *Id.* at ¶¶ 92-93.  Also prior to the Acquisition, EQT experienced operational difficulties in drilling ultra-long laterals, including the allegedly undisclosed collapse of two 18,000 foot-plus lateral wells.  *Id.* at

---

[6] EQT amended the Registration Statement on September 8, 2017 and September 29, 2017, and the SEC declared the Registration Statement effective on October 12, 2017.  Compl. ¶ 67, ECF No. 85.

[7] Part of JANA's objection to the Acquisition dealt with EQT's management compensation scheme, specifically that:

> EQT's management had an inappropriate incentive to push the Acquisition regardless of whether it was beneficial to EQT shareholders because management's incentive compensation was based in large part on natural-gas production growth, which could be achieved by any means including acquisitions and was not measured on a per-share basis, so that stock-for-stock acquisitions like the Acquisition of Rice would increase management's compensation regardless of whether they benefited shareholders on a per-share basis.

Compl. ¶ 128, ECF No. 85.  JANA ultimately withdrew its proxy-solicitation materials after "EQT agreed to revise the management-compensation scheme that JANA had criticized as providing inappropriate incentives for management based on the Acquisition, and to accelerate consideration of possible transactions to address the 'sum-of-the-parts' undervaluation that JANA argued affected the Company's stock price."  *Id.* at ¶ 148.

¶¶ 95-99, 279.  On November 9, 2017, majorities of EQT and Rice shareholders ultimately voted in favor of the Acquisition, and the Acquisition closed on November 13, 2017.  *Id.* at ¶ 152.

Plaintiffs assert that, following the Acquisition, EQT was unable to drill longer laterals in a cost-efficient manner and that it did not achieve the claimed synergies cited as a basis for the Acquisition.  Compl. ¶ 153, ECF No. 85.  Despite this, EQT and the Officer Defendants stated that the Acquisition was exceeding expectations, and expressed confidence that EQT was "on track" to achieve and exceed the synergies described as a basis for the Acquisition.  *Id.* at ¶ 156.  EQT continued to experience increased costs and difficulties in its lateral drilling operations, and refused to incorporate Rice's proffered best practices, instead opting to utilize its own purportedly outdated and ineffective methods.  *Id.* at ¶¶ 157-63.  Following the Acquisition and up until mid-to late 2018, EQT did not publicly reveal these increased costs and operational issues, and instead: (1) portrayed the Acquisition and EQT's ongoing operations and financial results as successful; (2) understated and hid increased operating and development costs from investors; and (3) capitalized rather than expensed the cost of treatment and disposal of all of its produced water.[8] *Id.* at ¶¶ 164-94.

On October 25, 2018, EQT held an investor and analyst conference call, wherein EQT disclosed negative financial results for EQT's third quarter.  Compl. ¶ 332, ECF No. 85. Specifically, EQT revealed that: (1) EQT " was increasing well-development capital expenditures

---

[8] Plaintiffs explain:

> [P]roduced water is the water that comes back out of the well along with the natural gas.  The treatment and disposal of produced water is a material cost for well development and operations. The produced water is contaminated both by the chemicals the drilling company used to hydraulically fracture the shale and by the chemical properties of the formation underground.  This produced water is expensive for the operator to treat and dispose of.

Compl. ¶ 185, ECF No. 85.  Plaintiffs assert that "[d]isposed produced water should not be capitalized as an asset." *Id.* at ¶ 186.

for 2018 by $300 million, or 14%, based on costs that 'represent primarily onetime events that were driven by pace of activity, ultra-long lateral learning curve[,] and some service cost increases[;]'" (2) EQT had reported a quarterly net loss attributable to EQT of $40 million; (3) EQT's 2018 costs were higher than had been initially anticipated.  *Id.* at ¶¶ 332-37.  Following this news, EQT's shares fell from a close of $40.46 per share on October 24, 2018 to $35.34 on October 25, 2018, and eventually fell to as low as $31.00 per share over the next several days.  *Id.* at ¶ 338.

On December 10, 2018, Toby and Derek Rice, two of the founders of Rice, and their executive team (collectively, the "Rice Team") sent a letter to the EQT Board and released a presentation which took issue with EQT's stock-price performance and set forth "the Rice Team's plan for improving EQT's operations and generating free cash flow per year above EQT's then-current plan."  Compl. ¶ 341, ECF No. 85.  In response to the Rice Team's representations in this letter and presentation, EQT asserted that the Rice Team's plan for more efficient operations and well drillings, which were based in part on Rice's costs before the Acquisition, *see id.* at ¶ 18, were not applicable to EQT or repeatable because EQT had a much larger asset base and geographical footprint than Rice at the time of the Acquisition.  *Id.* at ¶¶ 342-43.  On February 5, 2019, the Rice Team released another public presentation and hosted an investor call which set forth a plan for revamping EQT by appointing Toby Rice as EQT's new chief executive and implementing Rice's strategies and best practices to improve operations, and further disclosed that EQT had repeatedly refused to adopt Rice's best practices when approached by Rice employees and that EQT had understated and erroneously adjusted well costs.  *Id.* at ¶¶ 344-48.  That same day, EQT issued a statement generally denying the Rice Team's analysis.  *Id.* at ¶ 351.  Following the February 5, 2019 disclosures, EQT's stock price fell 3.5%.  *Id.* at ¶ 349.

On June 17, 2019, the Rice Team filed proxy materials, including a presentation, with the SEC which asserted that:

> (i) EQT failed to achieve the benefits of the Acquisition; (ii) EQT did not seek and had not achieved the synergies and cost savings that were the purported rationale of the Acquisition; (iii) EQT failed to adopt Rice's best practices; (iv) EQT was excluding more than $300 million in costs it capitalized from its well costs; and (v) EQT leadership "lacks credibility and has misled shareholders."

Compl. ¶ 354, ECF No. 85. More specifically, Plaintiffs assert that the presentation disclosed:

> (i) "EQT [] failed to acknowledge its inability to achieve 90%+ of the merger synergies"; (ii) EQT use[d] "Misleading math" to exclude "more than $300 million in costs it capitalizes from its well costs"; (iii) the EQT leadership "lacks credibility and has misled shareholders"; and (iv) EQT "consistently misled shareholders," including through EQT's claim during the second quarter of 2018 that EQT was achieving the synergies from the Acquisition when, in fact, in the third quarter of 2018, EQT disclosed the $300 million capital expense miss and 5% production volume miss.

*Id.* at ¶ 22 (emphasis omitted). On June 18, 2019, the Rice Team issued a press release concerning its June 17 investor presentation, and EQT issued a statement denying the claims set forth in the presentation. *Id.* at ¶ 367-68. On June 19, 2019, EQT's stock price fell 5% from $15.96 to $15.06. *Id.* at ¶ 369. On July 9 and 10, 2019, investors voted to give Board and executive control of EQT to the Rice Team. *Id.* at ¶ 371.

The timeframe at issue in this case (the "Class Period") is June 19, 2017, the date that EQT announced the Acquisition, through June 17, 2019, the date that the Rice Team filed proxy materials with the SEC. Compl. ¶1, ECF No. 85. Plaintiffs bring this action on behalf of themselves and on behalf of:

> (i) all persons who purchased the common stock of EQT during the Class Period and were damaged thereby; (ii) all EQT shareholders who held EQT shares as of the record date of September 25, 2017 and were entitled to vote with respect to the Acquisition at the November 9, 2017 special meeting of EQT shareholders and were damaged thereby; (iii) all Rice shareholders who held Rice shares as of the record date of September 21, 2017 and were entitled to vote with respect to the Acquisition at the November 9, 2017 special meeting of Rice shareholders and were

damaged thereby; and (iv) all persons who acquired the common stock of EQT in exchange for their shares of Rice common stock in connection with the Acquisition and were damaged thereby (the "Class").

*Id.* at ¶ 598.  Plaintiffs assert that Plaintiffs and other members of the class suffered economic loss under the federal securities laws as a result of Defendants' purported material misrepresentations and omissions in connection with the Acquisition because they purchased EQT stock, which Plaintiffs allege had its value artificially inflated by said misrepresentations and omissions and then experienced a precipitous drop in value following disclosure of Defendants' purported material misrepresentations and omissions, during the Class Period.[9]  *Id.* at ¶ 372.

Generally, Plaintiffs' assertions of materially false and misleading statements and/or omissions made by Defendants can be broken down as follows: (1) statements and omissions at the time of the announcement of the Acquisition, *see* Compl. ¶¶ 196-213, ECF No. 85; (2) statements and omissions in the Registration Statement, *see id.* at ¶¶ 214-24; (3) statements and omissions that occurred in the timeframe between the initial filing of the Registration Statement and the November 13, 2017 closing on the Acquisition, *see id.*at ¶¶ 225-63; (4) statements and omissions made following the Acquisition as to EQT's post-Acquisition operations and costs and EQT's purported realization of the synergies and benefits that served as the basis for the Acquisition, *see id.* at ¶¶ 264-307; and (5) statements and omissions following the Acquisition with respect to EQT's financial performance/condition, *see id.* at ¶¶ 308-30.

Plaintiffs argue that, in making the statements discussed above, Defendants knowingly or recklessly made materially false and misleading statements and/or omitted material facts because the synergies cited as a basis for the Acquisition were impossible to achieve due to the fact that

---

[9] The three alleged corrective disclosure dates at issue herein are: (1) October 25, 2018 (EQT's investor and analyst conference call, wherein EQT disclosed negative financial results for EQT's third quarter); (2) February 5, 2019 (Rice Team's public presentation and investor call); and (3) June 17, 2019 (filing of the Rice Team filed proxy materials).

EQT and Rice lacked the combined undrilled acreage, and the capability, to achieve these synergies.  Br. in Opp'n to Mot. to Dismiss 1, ECF No. 102.  Plaintiffs further argue that Defendants knowingly or recklessly made materially false and misleading statements and/or omitted material facts when, following the Acquisition, Defendants hid operational issues and rising costs from investors and instead incorrectly informed shareholders that EQT was "combining best practices," "ahead of schedule for achieving our capital synergies," and "well on track to deliver and exceed" the $2.5 billion of "base" synergies.  *Id.*

On September 19, 2019, the Honorable Maureen P. Kelly, to whom this case was originally assigned, entered an Order: (i) appointing Guam and Northeast Carpenters as Lead Plaintiffs; (ii) appointing Bernstein Litowitz Berger & Grossmann LLP and Cohen Milstein Sellers & Toll PLLC as Lead Counsel; (iii) ordering that, pursuant to Rule 42(a), any subsequently filed, removed, or transferred actions that are related to the claims asserted in this action are consolidated for all purposes; and (iv) ordering that this action be captioned *In re EQT Corporation Securities Litigation* and maintained under Master File No. 2:-19-cv-00754-MPK.[10]  Order 2, ECF No. 35. Plaintiffs filed the Complaint on December 6, 2019, setting forth claims for violations of federal securities laws, and specifically explain:

> Plaintiffs assert four sets of claims: (i) Plaintiffs bring Exchange Act Sections 10(b) and 20(a) claims on behalf of all purchasers of EQT stock during the Class Period of June 19, 2017 through June 17, 2019; (ii) Cambridge brings Securities Act Sections 11, 12(a)(2), and 15 claims on behalf of all persons who acquired EQT stock in exchange for Rice stock in the Acquisition; (iii) Cambridge brings Exchange Act Section 14(a) claims on behalf of shareholders who held EQT or Rice shares as of the record dates of September 25, 2017, and September 21, 2017, respectively, and were thus entitled to vote on the Acquisition. Northeast Carpenters also asserts these Section 14(a) claims on behalf of these EQT shareholders; and (iv) Northeast Carpenters brings an Exchange Act Section 20A claim against Defendant Porges.

---

[10] Following reassignment to the undersigned, this case is now maintained under Master File No. 2:19-cv-00754-RJC.

Br. in Supp. of Certification Mot. 4 n.3, ECF No. 140.  Defendants filed their Motion to Dismiss on January 21, 2020.  This matter was reassigned to the undersigned on February 21, 2020.  This Court denied the Motion to Dismiss on December 2, 2020.

On January 11, 2021, Defendants filed their Answer (ECF No. 113) to the Complaint.  On February 10, 2021, the Court entered a Case Management Order (ECF No. 126) setting deadlines for class certification discovery, as well as the filing of a motion for class certification, briefing, and supporting evidence.  Plaintiffs filed their Certification Motion on April 2, 2021, along with a Brief in Support (ECF No. 140) and Exhibits (ECF Nos. 141-142).  On June 21, 2021, Defendants filed a Brief in Opposition (ECF No. 157) to the Certification Motion, along with attached Exhibits.  Defendants then filed a Notice of Supplemental Authority (ECF No. 158) on June 24, 2021.  On June 25, 2021, Plaintiffs filed a Motion for Leave to File a Rebuttal Expert Report (ECF No. 159), which this Court granted on July 7, 2021, ECF No. 165.  Plaintiffs filed their Rebuttal Report (ECF No. 169-1) on July 20, 2021.  Plaintiffs filed a Reply Brief (ECF No. 176) on August 6, 2021, along with Exhibits (ECF No. 177).  With leave of Court, Defendants filed a Surreply Brief (ECF No. 191), along with Exhibits (ECF No. 192), on August 13, 2021.  On May 16, 2022, Plaintiffs filed a Notice of Supplemental Authority (ECF No. 247).  Defendants filed a Response (ECF No. 248) to Plaintiffs' Notice of Supplemental Authority on May 20, 2022.

Defendants filed their Motion to Exclude on August 13, 2021, along with a Brief in Support (ECF No. 189) and Exhibits (ECF No. 190).  On August 23, 2021, Plaintiffs filed a Brief in Opposition (ECF No. 206) to Defendants' Motion to Exclude, along with Exhibits (ECF No. 201).  Defendants filed a Reply Brief (ECF No. 217) on September 1, 2021. On January 21, 2022, Defendants filed a Notice of Supplemental Authority (ECF No. 233), and Plaintiffs filed a Response (ECF No. 234) to the same on January 28, 2022.

Plaintiffs filed their Motion to Exclude, along with a Brief in Support (ECF No. 207) and Exhibits (ECF Nos. 205 and 208) on August 23, 2021.  On September 2, 2021, Defendants filed a Brief in Opposition (ECF No. 220) and Exhibits (ECF No. 221).  On September 9, 2021, Plaintiffs filed a Reply Brief with attached Exhibits (ECF No. 227).

## II.   Legal Standards

### A. Class Certification

Federal Rule of Civil Procedure 23 provides the applicable requirements for class certification.  The Supreme Court of the United States has explained:

> Rule 23(a) states four threshold requirements applicable to all class actions: (1) numerosity (a "class [so large] that joinder of all members is impracticable"); (2) commonality ("questions of law or fact common to the class"); (3) typicality (named parties' claims or defenses "are typical ... of the class"); and (4) adequacy of representation (representatives "will fairly and adequately protect the interests of the class").

*Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (quoting Kaplan, Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I), 81 Harv. L.Rev. 356, 375–400 (1967)).  "In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)."[11] *Amchem Prod., Inc.*, 521 U.S. at 614.

"To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: Common questions must 'predominate over any questions affecting only individual members'; and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'"  *Amchem Prod., Inc.*, 521 U.S. at 615 (quoting Fed. R. Civ. P. 23(b)(3)). "In adding 'predominance' and 'superiority' to the qualification-for-certification list, the Advisory Committee sought to cover cases 'in which a class

---

[11] In the present case, Plaintiffs rely on Rule 23(b)(3) in seeking certification.

action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'"   *Id.* (quoting Adv. Comm. Notes, 28 U.S.C.App., p. 697).   Rule 23(b)(3) lists the following non-exhaustive factors to be considered in determining whether the proposed class meets the predominance and superiority requirements:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).   The Third Circuit further "requires that a Rule 23(b)(3) class also be 'currently and readily ascertainable.'"   *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 469 (3d Cir. 2020) (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012)).   Plaintiffs must show that "(1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Hargrove*, 974 F.3d at 469–70 (quoting *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015)).

Each of the requirements of Rule 23 must be met for class certification to be granted, and factual determinations must be made by a preponderance of the evidence.   *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015) (quoting *In re Hydrogen Peroxide Antitrust Litigation*, 552 F.3d 305, 307 (3d Cir. 2008)).   "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage[,]" and "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23

prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

The United States Court of Appeals for the Third Circuit has held "that a plaintiff cannot rely on challenged expert testimony, when critical to class certification, to demonstrate conformity with Rule 23 unless the plaintiff also demonstrates, and the trial court finds, that the expert testimony satisfies the standard set out in [*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)]." *In re Blood Reagents Antitrust Litig.*, 783 F.3d at 187. "Expert testimony that is insufficiently reliable to satisfy the *Daubert* standard cannot 'prove' that the Rule 23(a) prerequisites have been met 'in fact,' nor can it establish 'through evidentiary proof' that Rule 23(b) is satisfied." *Id.* Class certification analysis must be "rigorous," and "this 'rigorous analysis' applies to expert testimony critical to proving class certification requirements." *Id.* (citations omitted). Further:

> [O]pinion testimony should not be uncritically accepted as establishing a Rule 23 requirement merely because the court holds the testimony should not be excluded, under *Daubert* or for any other reason. Under Rule 23 the district court must be "satisfied," [*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)], or "persuaded," [*In re Initial Pub. Offerings Sec. Litig.*], 471 F.3d 24, 41 [ (2d Cir. 2006)], that each requirement is met before certifying a class. Like any evidence, admissible expert opinion may persuade its audience, or it may not. This point is especially important to bear in mind when a party opposing certification offers expert opinion. The district court may be persuaded by the testimony of either (or neither) party's expert with respect to whether a certification requirement is met. Weighing conflicting expert testimony at the certification stage is not only permissible; it may be integral to the rigorous analysis Rule 23 demands.

*Id.* at 188 n.10 (quoting *Hydrogen Peroxide*, 552 F.3d at 323).

### B. Motions to Exclude Expert Evidence

Federal Rule of Evidence 704 provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue." However, expert testimony must still meet the requirements of Federal Rule of Evidence 702, which provides:

A witness who is qualified as an expert by knowledge, skill experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. Rule Evid. 702.

"In deciding whether to admit expert testimony, the trial court serves as a 'gatekeeper' tasked with 'ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *City of Sterling Heights Gen. Employees' Ret. Sys. v. Prudential Fin., Inc.*, 2015 WL 5097883, at *4 (D. N.J. 2015) (quoting *Daubert*, 509 U.S. at 597). "The Court considers whether: (1) the expert is qualified; (2) the expert's testimony is reliable; and (3) the expert's testimony is helpful to the trier of fact, *i.e.*, it must 'fit' the facts of the case." *Id*. "The proponent of the expert testimony must prove these three requirements by a preponderance of the evidence." *Id*.

As to the first requirement, to be "qualified" to render expert testimony under *Daubert*, the proposed expert must "possess specialized expertise," and this requirement is interpreted "liberally." *Pineda v. Ford Motor Co*., 520 F.3d 237, 244 (3d Cir. 2008) (citation omitted). The expert need not "be the best qualified or ... have the specialization that the court considers most appropriate," *id.*, and "[i]f the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility," *Kannankeril v. Terminix Int'l, Inc.,* 128 F.3d 802, 809 (3d Cir. 1997) (citation omitted).

Secondly, in determining whether proposed expert testimony is reliable, the trial court should examine the following nonexclusive factors:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Kannankeril*, 128 F.3d at 807 n.6 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n. 8 (3d Cir. 1994)).  "Each step of the expert's analysis must be reliable, including 'the methodology, the facts underlying the expert's opinion, and the link between the facts and the conclusion.'" *Sterling Heights*, 2015 WL 5097883, at *4 (quoting *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012)).  "But proponents of expert testimony need not 'prove their case twice-- they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable.'" *Id.* (quoting *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000)).  However, there is "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable," and the "reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 153, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (citation omitted).

The final requirement of Rule 702 demands that "expert testimony ... fit the issues in the case."  *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).  "In assessing whether an expert's proposed testimony fits, we are asking whether the expert testimony proffered is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."

*United States v. Schiff,* 602 F.3d 152, 173 (3d Cir. 2010) (quotation marks, ellipses, and citation omitted).  "[T]his is a question of relevance, and Rule 702, which governs the admissibility of expert testimony, has a liberal policy of admissibility if it has the potential for assisting the trier of fact."  *Id.*  (quotation marks and citations omitted).  "The standard is not that high, but is higher than bare relevance."  *Id.* (internal quotation marks and citation omitted).  However, "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Daubert*, 509 U.S. at 591 (quotation marks and citations omitted).

In addition, "expert testimony that usurps the role of either the jury or the courts is not admissible."  *Romero v. Allstate Ins. Co.*, 52 F. Supp. 3d 715, 720-24 (E.D. Pa. 2014); *see also Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) ("[A]n expert witness is prohibited from rendering a legal opinion.  Such testimony is prohibited because it would usurp the District Court's pivotal role in explaining the law to the jury." (citation omitted)).

## III.   Discussion

Plaintiffs move the Court to certify this case as a class action, to appoint Plaintiffs as Class Representatives under Federal Rule of Civil Procedure 23(a) and (b)(3), and to appoint Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") and Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") as Class Counsel under Rule 23(g).  Mot. 1, ECF No. 139.  Plaintiffs seek certification of the following class:

> (i) all persons who purchased the common stock of EQT during the Class Period and were damaged thereby; (ii) all EQT shareholders who held EQT shares as of the record date of September 25, 2017 and were entitled to vote with respect to the Acquisition at the November 9, 2017 special meeting of EQT shareholders and were damaged thereby; (iii) all Rice shareholders who held Rice shares as of the record date of September 21, 2017 and were entitled to vote with respect to the Acquisition at the November 9, 2017 special meeting of Rice shareholders and were damaged thereby; and (iv) all persons who acquired the common stock of EQT in exchange for their shares of Rice common stock in connection with the Acquisition

and were damaged thereby (the "Class").  Excluded from the Class are Defendants, directors and officers of EQT, and their families and affiliates.

Br. in Supp. of Certification Mot. 1 n.2, ECF No. 140.   In requesting that the Court appoint Plaintiffs as class representatives, Plaintiffs assert that each is a defined benefit pension plan that provides retirement income benefits to their participants, and that, collectively, Plaintiffs purchased or acquired more than 200,000 shares of EQT stock and 3,300 shares of Rice stock during the Class Period and suffered $2 million in losses.  *Id.* at 4-5 (citations omitted).

In support of their Certification Motion, Plaintiffs aver as follows with respect to Rule 23(a)'s requirements:

> • **Numerosity**: Thousands of investors acquired millions of nationally traded shares of EQT stock during the Class Period or held shares of EQT or Rice stock on the relevant record dates.

> • **Commonality and Typicality**: Defendants made the same false and misleading statements and omitted the same material facts when speaking to all of EQT's and Rice's investors.

> • **Adequacy**: Plaintiffs are substantial institutional investors that have demonstrated their commitment to zealous advocacy on behalf of the Class in this action and will continue to do so.

Br. in Supp. of Certification Mot. 2, ECF No. 140.  With respect to Rule 23(b)(3)'s requirements, Plaintiffs aver:

> • **Predominance**: The core elements of the claims here, including falsity and materiality, are susceptible to common proof.  Further, reliance will be presumed for Plaintiffs' Section 10(b) claim (and the related Section 20A and 20(a) claims).

> • **Superiority**: Defendants' conduct damaged thousands of geographically dispersed investors, making a class action the clearly superior method for adjudicating the claims and defenses here in a judicially efficient manner.

*Id.*

Defendants assert that the Certification Motion should be denied because Plaintiffs fail to establish predominance under Rule 23(b)(3), typicality under Rule 23(a)(3), adequacy under Rule

23(a)(4), or ascertainability under controlling Third Circuit precedent.   Br. in Opp'n to Certification Mot. 5, ECF No. 157.   In opposing the Certification Motion, Defendants rely primarily on arguments that: (1) Defendants have rebutted the presumption of class-wide reliance set forth in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988), and, absent the *Basic* presumption, each member of the proposed class in this case will need to prove individualized reliance, precluding class treatment for Plaintiffs' reliance-based claims, *id.* at 1; (2) Plaintiffs fail to establish that damages can be proven on a class-wide basis because Plaintiffs' proposed damages methodology fails to match Plaintiffs' theory of liability, *id*; and (3) the proposed class representatives are atypical and inadequate because Plaintiffs are subject to unique knowledge-based defenses due to their reliance on investment advisors who knew of, and were entirely indifferent to, the alleged fraud, and further because Plaintiffs cannot show that they will adequately protect the interests of the proposed class, *id.* at 2.

To a certain extent, Defendants' arguments are intertwined with their Motion to Exclude Dr. Feinstein's Rebuttal Report, as well as Plaintiffs' Motion to Exclude the Report of Dr. Lehn, as Defendants argue that Dr. Lehn's Report serves as the evidence that rebuts the *Basic* presumption in this case.   Accordingly, the Court will first address the pending Motions to Exclude before turning to the issue of class certification, as the Court's decision on either Motion to Exclude could materially impact the Court's analysis with respect to class certification.

### A.  Motions to Exclude

Both Plaintiffs and Defendants seek to exclude a report authored by the other's price impact expert, and further assert that such exclusion establishes that the other cannot succeed in either achieving or opposing class certification, respectively.   Each party asserts that the other's expert evidence as to the price impact (or lack thereof) of the alleged February 5, 2019 and June 17, 2019

alleged corrective disclosures on EQT's stock price during the Class Period is unreliable and/or irrelevant.[12]  "Price impact asks 'whether the alleged misrepresentations affected the market price' of the stock."  *Sterling Heights*, 2015 WL 5097883, at *11 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 814 (2011)).

Defendants move to exclude Dr. Steven Feinstein's testimony and his price impact opinions in his Rebuttal Report under *Daubert* on the basis that Dr. Feinstein purportedly failed to use reliable methodologies in reaching his price impact opinions and failed to apply these purportedly flawed methodologies to the facts of this case, and further because his conclusions are purportedly speculative, not based on facts, and contradicted by the evidence of record.  Defs.' Br. in Supp. of Mot. to Exclude 1-2, ECF No. 189.  Plaintiffs move to exclude Dr. Kenneth M. Lehn's Report (156-1) and testimony because "he offers opinions that are unreliable or irrelevant and that would be unfairly prejudicial to Plaintiffs and the Class."  Pls.' Br. in Supp. of Mot. to Exclude 1, ECF No. 207.  The Court shall consider each Motion to Exclude in turn.

It bears noting that the rule regarding reliability under *Daubert* does not require the party proffering the expert to demonstrate the "correctness" of the expert's opinion.  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994) (concluding that the "evidentiary requirement of reliability" amounts to a lower burden "than the merits standard of correctness").  Rather, the party need only demonstrate "by a preponderance of the evidence" that the expert's opinion bears adequate indicia of reliability.  *Id*.  Indeed, "[a] judge will often think that an expert has good grounds to hold the opinion . . . even though the judge thinks the opinion otherwise incorrect."  *Id*. Therefore, "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate."  *Daubert,* 509 U.S. at 595.  "When the methodology is sound, and the evidence

---

[12] Defendants do not challenge the price impact of the October 25, 2018 disclosure at this time.

relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010), *aff'd,* 564 U.S. 91 (2011).  "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Chill v. Calamos Advisors LLC,* No. 15-cv-1014, 2019 WL 5067746, at *25 (S.D.N.Y. Oct. 9, 2019).

### 1. Defendants' Motion to Exclude

Defendants do not challenge Dr. Feinstein's qualifications, and, based upon a review of the record, the Court finds that he is qualified.  Defendants do object to Dr. Feinstein's methodologies, his application of those methodologies to the facts of this case, and his purportedly speculative and unsupported conclusions.

In support of their Certification Motion, Plaintiffs rely on the opinions expressed by Dr. Feinstein's initial report for the propositions that EQT stock traded in an efficient market during the Class Period and that damages in this matter can be computed for all Class Members using a common methodology.  Br. in Opp'n to Defs.' Mot to Exclude 3, ECF No. 206.  Defendants assert that their expert, Dr. Lehn, conducted 479 event studies[13] in this matter, and also analyzed the

---

[13] Defendants explain:

> An event study uses "regression analysis to estimate the historical relation between a company's stock returns and the corresponding returns on the market." Lehn Rpt. ¶ 21.  In other words, a regression analysis compares how a company's stock performs compared to the market.  The regression model is used along with the actual performance of the market on the day in question to estimate an "expected return." *Id.* "The expected return is then subtracted from the actual return to estimate a 'residual return' on the relevant date." *Id.* The residual return is sometimes called the company-specific return—that is, company stock movement that is out of line with expected stock performance based on the overall market movement on the day in question.

Defs.' Br. in Supp. of Mot. to Exclude 3 n.2, ECF No. 189.

event studies conducted by Dr. Feinstein, and subsequently concluded that neither Dr. Lehn's nor Dr. Feinstein's studies showed a statistically significant negative residual return on the trading day following either the February 5, 2019 or the June 17, 2019 alleged corrective disclosures. Defs.' Br. in Supp. of Mot. to Exclude 3, ECF No. 189. Defendants further assert that Dr. Lehn has explained that, in the absence of a statistically significant residual return, it is not possible to conclude that the allegedly corrective disclosures impacted EQT's stock price. *Id.* In response to Dr. Lehn's Report and conclusions, Plaintiffs submitted Dr. Feinstein's Rebuttal Report, as well as Dr. Feinstein's deposition testimony that the alleged February 5, 2019 and June 17, 2019 corrective disclosures and purportedly resultant residual stock price declines following these disclosures provide evidence of price impact, in arguing that the Court should not exclude Dr. Feinstein's testimony and should instead grant Plaintiffs' Certification Motion.

In moving for class certification on their reliance-based claims, Plaintiffs have invoked the rebuttable presumption of reliance set forth in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988), which is based on the "fraud-on-the-market" theory of reliance. "This theory 'accords plaintiffs in Rule 10b-5 class actions a rebuttable presumption of reliance if plaintiffs bought or sold their securities in an efficient market.'" *Vizirgianakis v. Aeterna Zentaris, Inc.,* 775 F. App'x 51, 53 (3d Cir. 2019) (quoting *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1419 n.8 (3d Cir. 1997)). In *Basic*, the Supreme Court explained:

> "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations."

*Basic*, 485 U.S. at 241–42 (quoting *Peil v. Speiser,* 806 F.2d 1154, 1160–1161 (CA3 1986)).

The Court notes that Defendants do not challenge the assertion that EQT stock traded in an efficient market during the Class Period.  Defendants' expert, Dr. Lehn, has stated: "I see no reason to believe that the market for EQT stock was not efficient during the Class Period."  Lehn Report ¶ 24 n.53, ECF No. 156-1 (footnote citations omitted).  Accordingly, the Court treats the issue of whether EQT traded in an efficient market as uncontested, and finds that EQT stock did trade in an efficient market for the reasons discussed by Dr. Feinstein in his initial Report.  While Defendants concede that Plaintiffs may invoke the *Basic* presumption of reliance at this juncture, Defendants argue that they have rebutted that presumption and that the Certification Motion should thus be denied.

As will be addressed below with respect to the issue of predominance, Defendants argue strenuously that class certification should be denied as to Plaintiffs' reliance-based securities fraud claims because Plaintiffs cannot prove class-wide reliance using common proof.  Defendants argue that they have rebutted the *Basic* presumption with evidence that it is more likely than not that the asserted February 5, 2019 and June 17, 2019 corrective disclosures in this case did not impact the market price of EQT stock, and that class certification should be denied.  Br. in Opp'n to Certification Mot. 5-7, ECF No. 157.  Defendants rely on Dr. Lehn's Report in their effort to rebut the *Basic* presumption.  More specifically, Defendants assert that "event studies submitted by both parties' experts show the lack of statistically significant price movement following the alleged corrective disclosures on February 5[, 2019] and June 17, 2019."  *Id.* at 7 (emphasis omitted).  Defendants aver that "the lack of price impact for the February 5, 2019 and June 17, 2019 alleged corrective disclosures 'severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price,' and rebuts the fraud-on-the-market presumption."  *Id.* at 7-8 (quoting *Basic*, 485 U.S. at 248).  Defendants further

argue that, at a minimum, the Court should tailor the proposed class period to end on October 25, 2018, as the class period should include only those dates where the *Basic* presumption applies.  *Id.* at 8.

With respect to the *Basic* presumption, the Supreme Court has explained:

Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b–5 prohibit making any material misstatement or omission in connection with the purchase or sale of any security.  Although section 10(b) does not create an express private cause of action, we have long recognized an implied private cause of action to enforce the provision and its implementing regulation.  *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).  To recover damages for violations of section 10(b) and Rule 10b–5, a plaintiff must prove "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"  *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. ——, —— ––, 133 S.Ct. 1184, 1192, 185 L.Ed.2d 308 (2013) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. ——, ——, 131 S.Ct. 1309, 1317–1318, 179 L.Ed.2d 398 (2011)).

The reliance element "'ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury.'" 568 U.S., at ——, 133 S.Ct., at 1192 (quoting [*Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810, 131 S. Ct. 2179, 2184–85, 180 L. Ed. 2d 24 (2011)]).  "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—e.g., purchasing common stock—based on that specific misrepresentation." *Id.*, at —— ––, 133 S.Ct., at 1192.

In *Basic*, however, we recognized that requiring such direct proof of reliance "would place an unnecessarily unrealistic evidentiary burden on the Rule 10b–5 plaintiff who has traded on an impersonal market." 485 U.S., at 245, 108 S.Ct. 978. That is because, even assuming an investor could prove that he was aware of the misrepresentation, he would still have to "show a speculative state of facts, i.e., how he would have acted . . . if the misrepresentation had not been made." *Ibid.* We also noted that "[r]equiring proof of individualized reliance" from every securities fraud plaintiff "effectively would . . . prevent [ ] [plaintiffs] from proceeding with a class action" in Rule 10b–5 suits. *Id.*, at 242, 108 S.Ct. 978. If every plaintiff had to prove direct reliance on the defendant's misrepresentation, "individual issues then would . . . overwhelm[ ] the common ones," making certification under Rule 23(b)(3) inappropriate. *Ibid.*

To address these concerns, *Basic* held that securities fraud plaintiffs can in certain circumstances satisfy the reliance element of a Rule 10b–5 action by invoking a rebuttable presumption of reliance, rather than proving direct reliance on a misrepresentation.  The Court based that presumption on what is known as the "fraud-on-the-market" theory, which holds that "the market price of shares traded on well-developed markets reflects all publicly available information, and hence, any material misrepresentations." *Id.*, at 246, 108 S.Ct. 978.  The Court also noted that, rather than scrutinize every piece of public information about a company for himself, the typical "investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price"—the belief that it reflects all public, material information. *Id.*, at 247, 108 S.Ct. 978.  As a result, whenever the investor buys or sells stock at the market price, his "reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b–5 action." *Ibid*.

Based on this theory, a plaintiff must make the following showings to demonstrate that the presumption of reliance applies in a given case: (1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed. *See id.*, at 248, n. 27, 108 S.Ct. 978; *Halliburton I, supra*, at ——, 131 S.Ct., at 2185–2186.

At the same time, *Basic* emphasized that the presumption of reliance was rebuttable rather than conclusive.  Specifically, "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." 485 U.S., at 248, 108 S.Ct. 978.  So for example, if a defendant could show that the alleged misrepresentation did not, for whatever reason, actually affect the market price, or that a plaintiff would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud, then the presumption of reliance would not apply. *Id.*, at 248–249, 108 S.Ct. 978.  In either of those cases, a plaintiff would have to prove that he directly relied on the defendant's misrepresentation in buying or selling the stock.

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267–69 (2014).

In attempting to rebut the *Basic* presumption, the defendant "bear[s] the burden of persuasion to prove a lack of price impact by a preponderance of the evidence," though "the burden of persuasion should rarely be outcome determinative." *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1958 (2021); *see also Sterling Heights*, 2015 WL 5097883, at *5 ("The defendant may rebut the presumption by proving that the alleged misrepresentation(s) had

no impact on the stock price, thereby precluding class certification under Rule 23(b)(3)." (citing

*Halliburton*, 573 U.S. at 278)).  The Supreme Court has explained:

> Although the defendant bears the burden of persuasion, the allocation of the burden is unlikely to make much difference on the ground.  In most securities-fraud class actions, as in this one, the plaintiffs and defendants submit competing expert evidence on price impact.  The district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact.  The defendant's burden of persuasion will have bite only when the court finds the evidence in equipoise—a situation that should rarely arise.

*Goldman Sachs*, 141 S. Ct. at 1963 (2021).

In moving to exclude Dr. Feinstein's Rebuttal Report and testimony, Defendants assert that

Dr. Feinstein fails to provide a basis for his conclusions that the February 5, 2019 and June 17,

2019 alleged corrective disclosures caused price impact.  Defendants' primary bases for

challenging Dr. Feinstein's Rebuttal Report are: (1) his failure to indicate a statistically significant

negative market reaction at a 95% confidence interval following the February and June 2019

disclosures; and (2) Dr. Feinstein's purported use of a "second-day" event window, as opposed to

a one-day window or a true two-day window, in evaluating the market reaction to the June 17,

2019 disclosure, which occurred after the market closed that day (that is, looking to the decrease

in value that occurred on *only* June 19, 2019 (as opposed to either only June 18, 2019 or the

cumulative decrease from June 18, 2019 to June 19, 2019)).  Defendants also argue that the use of

a two-day window in this matter, in general, is inappropriate.  The Court will not exclude Dr.

Feinstein's Rebuttal Report or his testimony on these bases.

Initially, Plaintiffs need not directly prove price impact at the class certification stage.

*Halliburton*, 573 U.S. at 279.  Further, the failure of both Dr. Feinstein's and Dr. Lehn's events

studies to show price impact at a 95% confidence interval at this stage does not establish that there

was, in fact, no price impact.  *See Vizirgianakis*, 775 F. App'x at 53 ("It aptly noted that plaintiffs

do not have the burden to prove price impact (or lack thereof), so it was not surprising that their expert's report did no such thing. *And even were plaintiffs' study attempting to demonstrate a price impact, the district court reasoned that its failure to do so is not necessarily proof of the opposite.* This conclusion is consistent with the opinion of Dr. Werner and other district courts weighing similar event studies, including two in this circuit.") (emphasis added) (citing *West Palm Beach Police Pension Fund v. DFC Global Corp.*, No. 13-6731, 2016 WL 4138613, *14 (E.D. Pa. Aug. 4, 2016); *Sterling Heights*, 2015 WL 5097883, *12)); *see also Sterling Heights*, 2015 WL 5097883, *12) ("Also, it also does not necessarily follow from the mere absence of a statistically significant change in the stock price that there was no price impact."); *West Palm Beach Police Pension Fund*, 2016 WL 4138613, *14 (same); *Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 450 (W.D. Tex. 2019) ("These p-values suggest there is a 77 percent chance the corrective disclosures identified by Plaintiff negatively impacted EZCORP's stock price on these dates. What they do not suggest is that the misrepresentation 'did not affect the stock price.'" (citation omitted)); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 95 (S.D.N.Y. 2015) ("[T]he failure of an event study to disprove the null hypothesis with respect to an event does not prove that the event had no impact on the stock price.").

In *Monroe Cnty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 370 (N.D. Ga. 2019), the United States District Court for the Northern District of Georgia explained that "courts routinely reject the argument that a non-statistically significant stock price decline proves an absence of price impact." *Monroe Cnty. Employees' Ret. Sys.*, 332 F.R.D. at 394; *see also id.* at 393 ("Moreover, even if the Court were to rely on Professor Gompers' model, Defendants still have not rebutted the presumption because their price impact arguments rely on a statistical fallacy. Contrary to Defendants' argument, the existence of non-statistically-significant stock price declines does not

prove the absence of price impact."); *id.* at 394 ("An event study tests whether one can reject a null hypothesis. For price impact purposes, the null hypothesis under examination is that the stock price of the subject company was not impacted by the alleged misrepresentations. It is axiomatic that 'failure to rebut the null hypothesis does not necessarily mean that a misrepresentation had no price impact.'" (quoting Jill E. Fisch et al., The Logic and Limits of Event Studies in Securities Fraud Litigation, 96 Tex. L. Rev. 553, 611 (2018)).[14]   In addressing a similar argument to that currently before this Court, the United States District Court for the Western District of Texas held:

> Defendants' attempt to rebut the *Basic* presumption is also flawed from a statistical perspective. Defendants suggest the lack of a statistically significant price adjustment following a corrective disclosure shows that whatever price adjustment has occurred must be due to "random chance" rather than a predicate misrepresentation. But that is not how hypothesis testing works. A statistically significant price adjustment following a corrective disclosure is evidence the original misrepresentation did, in fact, affect the stock price. The converse, however, is not true—the absence of a statistically significant price adjustment does not show the stock price was unaffected by the misrepresentation. Nor does it indicate that what price adjustment did occur must be attributed to "random chance."

*Rooney*, 330 F.R.D. at 450 (citations omitted) (footnote omitted).

---

[14] In his Report, Dr. Lehn explained:

> Conventional event study analysis tests the "null hypothesis" that the residual return on the event date is zero against the alternative hypothesis that the residual return is different from zero. Put differently, the analysis tests the null hypothesis that the event at hand had no impact on the relevant company's stock price against the alternative hypothesis that the event at hand is associated with a change in the company's stock price. If the null hypothesis cannot be rejected at conventional levels of significance, then the residual return is not considered to be statistically significant, i.e., it is not considered to be significantly different from zero. Under these circumstances, one cannot conclude that the event at hand had an impact on the relevant company's stock price.

> The statistical significance of residual returns is assessed by calculating a standardized measure of the size of the residual return known as a "t-statistic." A t-statistic with an absolute value of 1.96 or greater denotes statistical significance at the five percent level (a conventional level at which such assessments are made) in a "two-tailed" test of statistical significance. In a two-tailed test, the null hypothesis is that the residual return is zero, and the alternative hypothesis is that the residual return is different from zero (i.e., either positive or negative)

Lehn Report ¶¶ 22-23, ECF No. 156-1 (footnote citations omitted).

In light of the above authority, Defendants' reliance on arguments that both Plaintiffs' and Defendants' experts failed to reach a statistically significant conclusion as to price impact is not a basis to deny class certification, let alone to exclude Dr. Feinstein's Rebuttal Report.  It is undisputed that EQT stock dropped in price following both the February 5, 2019 disclosure and the June 17, 2019 disclosure.[15]  While Dr. Lehn opines that both his and Dr. Feinstein's event analyses failed to return a statistically significant result as to price impact, that does not, necessarily, mean that Dr. Lehn has established the absence of price impact by a preponderance of the evidence.  While relevant, Dr. Lehn's testimony and Report are not sufficient to sever the link between the corrective disclosures and the purportedly corresponding drops in EQT stock price, and, accordingly, Defendants have not rebutted the *Basic* presumption for that reason.  In *Goldman Sachs*, the majority rejected the dissent's reading of *Basic* and *Halliburton II*, and explained:

> On this reading, *Basic* and *Halliburton II* require a defendant merely to offer "evidence that, if believed, would support a finding" of a lack of price impact.  *But Basic and Halliburton II plainly require more: The defendant must "in fact" "seve[r] the link" between a misrepresentation and the price paid by the plaintiff— and a defendant's mere production of some evidence relevant to price impact would rarely accomplish that feat.*
>
> Accepting Goldman and the dissent's argument would also effectively negate *Halliburton II 's* holding that plaintiffs need not directly prove price impact in order to invoke the *Basic* presumption.  If, as they urge, the defendant could defeat Basic's presumption by introducing any competent evidence of a lack of price impact—including, for example, the generic nature of the alleged

---

[15] Per the Feinstein Report, EQT stock declined by 3.55% on a logarithmic basis and displayed a negative residual return of -2.17% for February 5, 2019.  Rebuttal Report ¶ 48, ECF No. 169-1.  Dr. Lehn also found the residual return to be -2.17% for February 5, 2019.  *Id.*  The confidence interval calculated by Dr. Lehn was 71% for February 5, 2019, ECF No. 177-1 at 63:11-23, which is below the 95% confidence interval Defendants argue is required.

The Feinstein Report indicates that the residual return of EQT stock on June 18, 2019 was -0.88%.  Dr. Lehn found that the EQT stock residual price return on June 18, 2019 was -0.30%.  *Id.* at ¶ 56.  On June 19, 2019, EQT stock declined an additional 5.14% on a logarithmic basis and, after adjusting for market and sector factors, the residual return of EQT stock on June 19, 2019 was -4.49%.  *Id.* at ¶ 57.  While the residual stock price decline on June 19, 2019, when looking only to that date, is statistically significant at the 95% confidence level, Dr. Feinstein found that the negative residual return during the June 18-19 two-day window was significant at a 93.7% confidence interval, Br. in Opp'n 7, ECF No. 206, and Dr. Lehn calculated the negative residual return to be significant at the 89% confidence interval, ECF No. 177-1 at 81:18-82:7; Reply in Supp. of Class Cert. 6, ECF No. 176.

misrepresentations—then the plaintiff would end up with the burden of directly proving price impact in almost every case. And that would be nearly indistinguishable from the regime that *Halliburton II* rejected.

*Goldman Sachs*, 141 S. Ct. at 1962–63 (citations omitted) (footnote omitted) (emphasis added).[16]

Consistent with the authority cited above, the Court finds that Dr. Lehn's conclusion that one cannot definitively conclude, based upon either his or Dr. Feinstein's analyses, that there *was* price impact at this juncture does not establish that there *was, in fact, no price impact*. As discussed below, Dr. Lehn's methods are sound, and his opinions may carry weight with the factfinder. That said, it is Defendants' burden to establish lack of price impact and to sever the link between a disclosure and a drop in market price at the class certification stage. Merely attempting to poke holes in Plaintiffs' failure to definitively establish price impact at the class certification stage is not sufficient to meet this burden, and Defendants have thus not rebutted the *Basic* presumption by a preponderance of the evidence. *See In re Allstate Corp. Sec. Litig.*, No. 16 C 10510, 2020 WL 7490280, at *5 (N.D. Ill. Dec. 21, 2020) ("At this stage, it is defendants' burden to demonstrate a lack of price impact. This is difficult to do in the face of allegations that the stock price dropped following a corrective disclosure."). Accordingly, the Court further finds that the failure to indicate a statistically significant negative market reaction is not a sufficient ground to exclude Dr. Feinstein's Rebuttal Report or his testimony as to price impact.

---

[16] Defendants argue that, because Plaintiffs have not established price impact to a certain statistical certainty at this time, that the Court should find that Defendants have established that the drop in EQT stock price following the alleged corrective disclosures at issue resulted from something other than the corrective disclosures, without explaining what that may be (other than random volatility). Were the Court to accept Defendants' arguments in this case, it would effectively place the burden on Plaintiff to directly prove price impact and/or loss causation at this juncture. *See Rooney*, 330 F.R.D. at 450 ("Defendants suggest that even though there is a 77 percent chance the corrective disclosures negatively impacted EZCORP'S stock price, they should nevertheless be allowed to rebut the *Basic* presumption by pointing to the absence of a statistically significant price impact at a 95-percent confidence interval. But the practical effect of such a maneuver would be to require plaintiffs to show loss causation at the class certification stage, and *Halliburton I* held that plaintiffs need only make such a showing after class certification." (citations omitted)); *see also Monroe Cnty. Employees' Ret. Sys.*, 332 F.R.D. at 397. ("The remaining questions – what caused Southern Company's stock price to decline following each of the corrective disclosures (i.e., loss causation) and how much inflation was dissipated as a result of those disclosures (i.e., damages) – are ultimate questions for the trier of fact on the merits.").

Further, the use of a two-day window in determining the price impact of the June 17, 2019 disclosure is not alone sufficient to conclude that Dr. Feinstein failed to use reliable methodologies in reaching his conclusion as to price impact. *See Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 486 (E.D. Pa. 2021) ("There is no per se rule against considering a two-day period in assessing whether a disclosure had a price impact; indeed the Third Circuit [in *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 635 (3d Cir. 2011)] has held that use of a two-day window is compatible with applying *Basic* . . . While most public information should be absorbed into an efficient market quickly, the related price impact may occur more slowly where clarifying or contextualizing information is disclosed later."); *see also Monroe Cnty. Employees' Ret. Sys.*, 332 F.R.D. at 390 ("[T]he Court declines to limit its consideration of the experts' event study results to one-day event windows only."); *Barclays PLC*, 310 F.R.D. at 96 ("A two-to three-day window is common in event studies. Because it is standard for experts to utilize an event window including both the day of the event and the day following an event, this event window was proper." (footnote omitted)).

Dr. Feinstein's determination that a one-day window was appropriate for the February 5, 2019 and a two-day window was appropriate for the June 17, 2019 disclosure is also insufficient to establish that Dr. Feinstein failed to use reliable methodologies in reaching his price impact conclusions. *See Monroe Cnty. Employees' Ret. Sys.*, 332 F.R.D. at 392 ("Finally, the Court rejects Defendants' suggestion that Professor Feinstein's analysis should be disregarded because he did not analyze only one-day windows or only two-day windows. The Court is unaware of any rule, and Defendants cite none, requiring that one must commit at the outset, before analyzing the data, to investigate only one-day or only two-day event windows.").

The Court finds that Dr. Feinstein's use of a two-day window for the June 17, 2019 disclosure, which involved the filing of voluminous proxy materials after the market closed on

31

June 17 and also an eventual press release from Rice and a denial by EQT on June 18, 2019, does not render Dr. Feinstein's methodologies unreliable, and the Court will not exclude Dr. Feinstein's price impact opinion as unreliable on that basis.  While the Court is inclined to agree with Defendants that the factfinder cannot look *only* to June 19, 2019 in analyzing price impact, a two-day window has been accepted by other courts, as noted above, and Dr. Feinstein has also provided analysis and conclusions that EQT stock had a negative residual price return on both June 18, 2019 and June 19, 2019 and, further, ultimately displayed a cumulative negative residual return over the two-day window from June 18, 2019 to June 19, 2019.  Rebuttal Report ¶¶ 56-57, ECF No. 169-1.  Statistical significance at the 95% confidence interval is not required at this juncture, and the Court will not exclude Dr. Feinstein's Rebuttal Report due to his analysis of the cumulative market reaction from June 18, 2019 and June 19, 2019.  That said, the Defendants' Motion to Exclude will be denied without prejudice to revisiting this specific issue at a later date to the extent that Plaintiffs attempt to rely on the statistically significant negative market reaction on *only* June 19, 2019, as Plaintiffs offer no authority for utilizing a one-day analysis for a date two days after a disclosure.[17]

The Court declines to exclude Dr. Feinstein's testimony or Rebuttal Report in this matter.  Dr. Feinstein is qualified and his opinions and testimony in this matter are reliable and fit the facts of the case.  Defendants' Motion to Exclude will be denied.  The Court will consider Dr. Feinstein's Rebuttal Report and testimony in considering the Certification Motion.

### 2.  Plaintiffs' Motion to Exclude

Plaintiffs do not challenge Dr. Lehn's qualifications, and the Court finds that he is qualified based upon a review of the record.  Plaintiffs argue, however, that Dr. Lehn's opinions about price

---

[17] The Court notes that it is not clear, at this time, that Plaintiffs will attempt to rely on the same moving forward.

impact are contrary to applicable law, as well as fundamental statistical and economic principles. More specifically, Plaintiffs assert that: (1) Dr. Lehn relied on statistical fallacies by: (a) failing to demonstrate that there was no price impact from Defendants' alleged February 5, 2019 and June 17, 2019 corrective disclosures and instead attempting to show only that the "null hypothesis" cannot be rejected at the 95% confidence level that there was no price impact;[18] and (b) relying on an assumption that statistical significance must be established at the 95% confidence level, Pls.' Br. in Supp. of Mot. to Exclude 1-2, ECF No. 207; (2) "Dr. Lehn did not disaggregate the confounding and countervailing price impact of the Rice Team's February 5 or June 17 corrective disclosures from the price impact of EQT's denials of the Rice Team's disclosures on both days or from the impact of EQT's positive operational announcement on June 17," *id.* at 2; (3) Dr. Lehn failed to analyze the powerful evidence of price impact based on the February 5 and June 17 corrective disclosures' economic materiality, *id.* at 2-3; (4) with respect to the stock-price drop on June 19, 2019, Dr. Lehn failed to follow his methodology of determining whether the negative price reaction on the date in question was statistically significant and failed to consider facts that undercut his hypothesis, *id.* at 3; and (5) Dr. Lehn relied on an erroneous assumption that all material information about EQT would be reflected in its stock price on the same day within minutes, *id.*

---

[18] Plaintiffs explain:

> This distinction is directly at odds with one of the fundamental tenets of elementary statistical analysis: failure to reject the null hypothesis does not prove that the null hypothesis is true. That is, Dr. Lehn's failure to reject that there was no price impact does not demonstrate that there was no price impact. It means only that the test is indeterminate and leaves open the possibility that there actually was price impact. This distinction also makes a fundamental difference under applicable legal principles: Dr. Lehn's lesser attempted showing, even if successful on its own terms, would not satisfy Defendants' burden of disproving price impact at class certification, and his opinion therefore lacks the required "fit" with the issues in the action.

Pls.' Br. in Supp. of Mot. to Exclude 1, ECF No. 207.

The Court finds no basis to exclude Dr. Lehn's Report.  Dr. Lehn has offered a contrary opinion to Dr. Feinstein as to the price impact (or lack thereof) of the February 5, 2019 and June 17, 2019 alleged corrective disclosures.  It cannot be said, however, that he used unreliable methodologies in reaching those conclusions, and the jury may ultimately agree with Dr. Lehn as to his price impact conclusions after considering all relevant evidence.  In the Third Circuit, "[t]he grounds for the expert's opinion merely have to be good, they do not have to be perfect."  *In re Paoli*, 35 F.3d at 744.  Dr. Lehn and Dr. Feinstein utilized materially similar methodologies, but simply reach different conclusions based upon their analyses.  The rule regarding reliability under *Daubert* does not require the party proffering the expert to demonstrate the "correctness" of the expert's opinion.  *Id*.  It is not appropriate for this Court to exclude Dr. Lehn's report or testimony at this juncture, where he is qualified, and Plaintiffs will have the opportunity to test his opinions at trial.  As noted, Defendants have not sufficiently established a lack of price impact by a preponderance of the evidence at this time and have not severed the link between disclosure and a drop in market price at this juncture, but that does not render Dr. Lehn's Report unreliable.  Dr. Lehn has provided some evidence of lack of price impact, but simply not enough to rebut the *Basic* presumption.

In summary, the parties have each submitted a report from a qualified expert, and each has offered reliable testimony that will ultimately be helpful to the jury in reaching a determination on price impact.  That the experts disagree does not mean that one must be excluded under *Daubert*. For the reasons discussed above, the Court will also deny Plaintiffs' Motion to Exclude.

### B.  Class Certification

The Court having found that both Motions to Exclude should be denied, the Court summarily rejects any assertion that class certification should be denied due to the exclusion of

the Rebuttal Report authored by Dr. Feinstein or should be granted due to the exclusion of the Report authored by Dr. Lehn.

### 1. Numerosity

With respect to numerosity, Plaintiffs aver that "[t]housands of investors acquired millions of nationally traded shares of EQT stock during the Class Period or held shares of EQT or Rice stock on the relevant record dates," Br. in Supp. of Certification Mot. 2, ECF No. 140, and Defendants set forth no challenge to this assertion. The Court finds that the numerosity requirement has been established in this matter.

### 2. Commonality

With respect to commonality, the United States Court of Appeals for the Third Circuit has explained:

> Federal Rule of Civil Procedure 23(a)(2) merely requires that there be "questions of law or fact common to the class[.]" Commonality does not require perfect identity of questions of law or fact among all class members. Rather, "even a single common question will do." [*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011)] (quotation marks and alterations omitted); *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir.1994) (discussing how Rule 23(a)(2) "is easily met[ ]"). "A putative class satisfies Rule 23(a)'s commonality requirement if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir.2013) (internal quotation marks omitted). A court's focus must be "on whether the defendant's conduct [is] common as to all of the class members[.]" *Sullivan*, 667 F.3d at 298. "Again, th[e] bar is not a high one." *Rodriguez*, 726 F.3d at 382.

*Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015). Moreover, "[c]ourts in this circuit ... have recognized that securities fraud cases often present a 'paradigmatic common question of law or fact' of whether a company omitted material information or made misrepresentations that inflated the price of its stock." *Bing Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 339 (D.N.J. 2018), *aff'd sub nom. Vizirgianakis v. Aeterna Zentaris, Inc.*, 775 F. App'x 51 (3d Cir. 2019) (quoting *In re Corel Corp. Secs. Litig.*, 206 F.R.D. 533, 540 (E.D. Pa. 2002)).

In moving for certification, Plaintiffs assert that the questions common to the proposed class in this case include:

• whether Defendants violated the Securities Act and the Exchange Act;

• whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

• with respect to Plaintiffs' Exchange Act claims, whether Defendants knew or recklessly disregarded that their statements and omissions were false and misleading;

• whether the price of EQT common stock was artificially inflated; and

• whether Defendants' conduct caused the members of the Class to sustain damages and the extent of damages.

Br. in Supp. of Certification Mot. 7, ECF No. 140.  The Court agrees, and a review of the record confirms that Plaintiffs have established commonality.  While Defendants assert that individual issues will predominate over common issues in this case, and the Court will address the same below, Defendants do not dispute that there are issues common to the proposed class.  The Court finds that there exist common issues of law and fact to the proposed class, and Plaintiffs have satisfied the commonality requirement.

### 3.  Typicality

The Third Circuit has explained that the following "three distinct, though related, concerns" are relevant considerations in assessing typicality:

(1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class.

*In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009).  The first and third typicality considerations are not in dispute in this matter.  Rather, Defendants argue that Plaintiffs are atypical to the members of the proposed class because Plaintiffs, who delegated full investment authority for transactions in EQT stock to their investment advisors (WEDGE for Northeast Carpenters and Cambridge and Boston Partners for Guam), are subject to unique, knowledge-based defenses.  Br. in Opp'n to Certification Mot. 12, ECF No. 157.  Defendants assert that WEDGE and Boston Partners possessed knowledge and employed investment strategies that result in Plaintiffs being rendered atypical to the members of the class.  *Id*.

Defendants assert that WEDGE communicated with Defendants and JANA prior to the Acquisition and assessed the intrinsic value of EQT stock based upon WEDGE's detailed research and investment model, yet still invested in EQT despite being purportedly aware of Defendants' alleged fraud as to the merger's proposed synergies due to such communications and assessments. *Id.* at 13.  Defendants further assert that, after the Acquisition, WEDGE continued to invest in EQT, including a substantial EQT purchase on the same day of the first alleged corrective disclosure on October 25, 2018, because of a sum-of-the-parts discount attributable to EQT's not yet having separated out its midstream business.  *Id*.  With respect to Boston Partners, Defendants assert that: Boston Partners "(1) had regular communications directly with Defendants about synergies; (2) relied on its own valuation tools and price targets when transacting in EQT stock; and (3) did not rely on Defendants' statements about synergies." *Id.* at 13 n.15.  Defendants argue that, accordingly, Plaintiffs will be subject to unique defenses that will be a central focus of this litigation, and that class certification should be denied.  *Id.* at 14.

Defendants seemingly rely on the assertion that Plaintiffs will be subject to eventual rebuttal of the *Basic* presumption on the basis that they did not rely on the integrity of market price

in trading EQT stock, but rather relied on non-public information that caused Plaintiffs to become

aware of Defendants' alleged fraud.  *See In re Vivendi Universal, S.A. Sec. Litig.*, 123 F. Supp. 3d

424, 431 (S.D.N.Y. 2015) ("Another way to sever the link is to show that the investor did not 'rely

on the integrity of the market price in trading stock.'" (quoting *Halliburton*, 573 U.S. at 276)).

Under *Halliburton II*, such an assertion would not be sufficient to undermine the predominance

requirement.  In *Halliburton II*, the Supreme Court explained:

> *Basic* does afford defendants an opportunity to rebut the presumption of reliance
> with respect to an individual plaintiff by showing that he did not rely on the integrity
> of the market price in trading stock.  While this has the effect of "leav[ing]
> individualized questions of reliance in the case," there is no reason to think that
> these questions will overwhelm common ones and render class certification
> inappropriate under Rule 23(b)(3).  That the defendant might attempt to pick off
> the occasional class member here or there through individualized rebuttal does not
> cause individual questions to predominate.

*Halliburton*, 573 U.S. at 276 (citation omitted).[19]

That said, Defendants assert that, because Plaintiffs may be subject to a unique rebuttal

defense, they are atypical to the proposed class members, and class certification should be denied

on that basis.  Accordingly, the Court must consider whether Plaintiffs are "subject to a defense

that is both inapplicable to many members of the class and likely to become a major focus of the

litigation." *In re Schering Plough Corp.*, 589 F.3d at 599.  A defendant "bears the burden to 'show

some degree of likelihood a unique defense will play a significant role at trial[,]" and [s]peculative

---

[19] *See also In re Vivendi*, 123 F. Supp. 3d at 432 ("In so holding, the [*Halliburton II*] Court rejected one of Halliburton's main arguments for abandoning the presumption: that value investors are universally 'indifferent to the integrity of market prices.'  To the contrary, '*Basic* concluded only that it is reasonable to presume that *most* investors,' including value investors, 'will rely on the security's market price as an unbiased assessment of the security's value. . . . Chief Justice Roberts explained that 'value investors implicitly rel[y] on the fact that a stock's market price will eventually reflect material information—how else could the market correction on which his profit depends occur?  To be sure, the value investor "does not believe that the market price accurately reflects public information at the time he transacts."  But to indirectly rely on a misstatement in the sense relevant for the *Basic* presumption, he need only trade stock based on the belief that the market price will incorporate public information within a reasonable period.  The value investor also presumably tries to estimate how undervalued or overvalued a particular stock is, and such estimates can be skewed by a market price tainted by fraud.'") (citations omitted) (footnotes omitted)).

defenses will not suffice." *Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 75 (D.N.J. 2019)

(quoting *Beck v. Maximus, Inc.*, 457 F.3d 291, 300 (3d Cir. 2006)).

When confronted with a materially similar argument to that raised by Defendants, the

United States District Court for the Southern District of New York provided:

> The SSB Defendants contend that the claims of all of the named plaintiffs are
> atypical and subject to unique defenses because they did not rely, and cannot be
> presumed to have relied, on the market price for WorldCom securities.  The SSB
> Defendants argue that one or more of the named plaintiffs relied on the advice of
> highly sophisticated investment managers, relied on the assessment that the market
> price was not accurate but in fact understated WorldCom's value, relied on their
> own conversations with WorldCom management, relied on computer models that
> replicate the portfolio of the S & P 500 Index, or relied on factors such as yield and
> S & P bond ratings.
>
> This argument can be swiftly rejected.  Each of these methods of making
> investment decisions is representative of methods used by many other investors.
> Each of the methods reflects an evaluation of the publicly available information
> about WorldCom, whether by the named plaintiff, the advisor, or a computer
> model.  There is no suggestion that any of the named plaintiffs had access to non-
> public information and learned that there was a fraud afoot and decided nonetheless
> to invest in WorldCom.  None of the different strategies that these institutional
> plaintiffs, each of whom is a fiduciary, used to make investment decisions on behalf
> of their beneficiaries suggests that these plaintiffs will be vulnerable at trial to a
> unique defense that will defeat the presumption that they relied on the public
> statements about WorldCom that are at issue here, or that will threaten to become
> the focus of the litigation

*In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 281–82 (S.D.N.Y. 2003) (footnote omitted).[20]

---

[20] A case relied upon by Defendants in making their typicality argument, *GAMCO Invs., Inc. v. Vivendi, S.A.*, 927 F. Supp. 2d 88, 100 n.84 (S.D.N.Y. 2013), *aff'd sub nom. GAMCO Invs., Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214 (2d Cir. 2016), cited to the following holding in *In re WorldCom*: "rejecting argument that institutional investor named plaintiffs were atypical and subject to unique defenses, because '[m]aking careful investment decisions does not disqualify an investor from representing a class of defrauded investors or from relying on the presumption of reliance.'"  The citation was made in a footnote to the following sentence: "In short, a class may be certified despite the presence of members who allegedly did not rely on the integrity of the market."  *GAMCO*, 927 F. Supp. 2d at 100; *see also In re Vivendi*, 123 F. Supp. 3d at 438 ("This holding does not give blanket protection to securities fraud defendants against sophisticated investors.  It is easy to imagine a situation in which an institutional investor is legitimately duped by a fraud and loses a substantial sum of money as a result.").

District courts in the Third Circuit have likewise declined to find class representatives atypical when faced with arguments similar to the those advanced by Defendants in the instant action. *See Roofer's Pension Fund*, 333 F.R.D. at 75–76 ("Defendants['] unique-defense argument is speculative and therefore will not bar a finding of typicality. Courts in this District have held that evidence of private communications with corporate officers does not disqualify a named plaintiff from serving as a class representative; rather, there must be evidence that the named plaintiff received non-public information during those communications." (citations omitted)); *see also F.I.K. Holding SPRL v. Fass*, 216 F.R.D. 567, 576 (D.N.J. 2003) ("Thus, in several cases where the lead plaintiff had direct and personal contacts with an officer of the defendant, no disqualifying unique defense was found since no evidence was presented that the lead plaintiff had been privy to non-public information and there was no indication in the record that the lead plaintiff had purchased its shares in reliance upon anything other than public information." (collecting cases)); *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 202–03 (E.D. Pa. 2008), *aff'd sub nom. In re DVI, Inc. Sec. Litig.*, 639 F.3d 623 (3d Cir. 2011) (adopting the majority view "that mere communication with corporate insiders will not render a class representative atypical for class certification purposes absent the exchange of non-public information.").

Further, the purchase of stock following an alleged corrective disclosure does not necessarily render a proposed class representative atypical. *See In re DVI Inc.*, 249 F.R.D. at 203–04 ("This Court believes the correct approach, which the Fifth Circuit described as 'generally accepted,' *see Feder v. Electronic Data Sys. Corp.*, 429 F.3d 125, 137–38 & n. 9 (5th Cir.2005), is that post-disclosure purchases will not prevent an investor from relying on the integrity of the market for pre-disclosure purchases. The fraud on the market theory presumes that in efficient markets all material information, including disclosures of past frauds, will be reflected in the

security's price.  An investor who purchases a security after the disclosure of adverse information still relies on the fact that the newly released information will be absorbed by the market and therefore reflected in the post-disclosure price.  This later purchase does not undercut or diminish the argument that the same investor may have purchased the security pre-disclosure relying on the fact that all information available at the time was reflected in the then current price." (footnote omitted); *see also Roofer's Pension Fund*, 333 F.R.D. at 77 ("Defendants have failed to demonstrate that those post-disclosure purchases negate or even undermine Lead Plaintiff's allegations that its members relied on the relevant misrepresentations when they made stock-purchasing decisions during the Class Period."); *Dodge v. Cambrex Corp.*, No. CIVA 03-CV-4896 PGS, 2007 WL 608365, at *6 (D.N.J. Feb. 23, 2007) ("In addition, it has been held that proposed class representatives who purchased shares mid-stream, i.e. during the course of a series of disclosures may satisfy the typicality test." (citation omitted) (footnote omitted)).

Defendants' assertions respecting Plaintiffs' communications with Defendants are speculative, and Defendants do not point to any specific evidence of any exchange of non-public information.  Further, that WEDGE purchased EQT stock following an alleged corrective disclosure is not sufficient to bar a finding of typicality.  While Defendants may attempt to establish Plaintiffs' lack of reliance during the merits phase of this matter, the Court cannot conclude, at this juncture and on the record before the Court, that the purportedly unique defense raised by Defendants "will likely become a major focus of the litigation."  *See In re DVI Inc.*, 249 F.R.D. at 202.  The Court is satisfied that Plaintiffs have satisfied the typicality requirement.

### 4. Adequacy

The adequacy inquiry involves a determination as to: "(1) whether the representatives' interests conflict with those of the class and (2) whether the class attorney is capable of

representing the class." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 185 (3d Cir. 2001). The adequacy requirement "also functions as a catch-all requirement that 'tend[s] to merge with the commonality and typicality criteria of Rule 23(a)." *Newton*, 259 F.3d at 185 (quoting *Amchem*, 521 U.S. at 626 n.20).

Defendants argue that Plaintiffs' counsel, Bernstein Litowitz Berger & Grossmann LLP ("BLBG"), have a financial relationship that raises an appearance of impropriety, and that Plaintiffs fail to meet the adequacy requirement for this reason. Br. in Opp'n to Certification Mot. 14-15, ECF No. 157. Defendants explain that "[f]or at least the last five years, BLBG has been a primary financial sponsor of the flagship conference hosted by a Guam-based nonprofit, APAFS. APAFS was founded by, and remains directed by, [Guam] leadership." *Id.* at 15. For these reasons, Defendants argue that proposed class counsel are inadequate. *Id.* Defendants further argue that Plaintiffs are inadequate because "Cambridge views its role as secondary to [Guam] and is in no position to monitor its counsel." *Id.*

"A key element in the determination of whether a plaintiff's interests are antagonistic to those of other members of the class is the relationship between the class representative and class counsel." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 565 (S.D.N.Y. 2018) (quoting *In re IMAX Sec. Litig.*, 272 F.R.D. 138, 155 (S.D.N.Y. 2010)). That said, "[a]llegations of impropriety are not proof of wrongdoing. If they were, then any class member (or lawyer seeking to be appointed lead counsel) could disable any presumptive lead plaintiff by making unsupported allegations of impropriety." *In re Cendant Corp. Litig.*, 264 F.3d 201, 270 (3d Cir. 2001); *see also In re Advance Auto Parts, Inc., Sec. Litig.*, No. CV 18-212-RGA, 2020 WL 6544637, at *6 (D. Del. Nov. 6, 2020) ("But Defendants must do more than make speculative allegations of impropriety. Defendants must present actual evidence showing that the

contributions influenced the Lead Plaintiff's selection process. Here, Defendants have done no more than point to legal contributions to an election campaign and the Mississippi Attorney General's routine authority to accept his department's recommendation that a particular law firm be retained to pursue a particular claim. These facts do not by themselves show a conflict of interest." (citations omitted)); *Medoff v. CVS Caremark Corp.*, No. 09-CV-554-JNL, 2016 WL 632238, at *3 (D.R.I. Feb. 17, 2016) ("Though these donations appear troubling at first glance, there is no indication that the co-lead plaintiffs selected class counsel because of those donations— that is, there is no evidence that class counsel 'paid to play.'"); *id.* at *4 ("For the same reason, the fact that counsel brought the claims asserted here to the co-lead plaintiffs' attention under an agreement to monitor plaintiffs' investment portfolios for potential cases also does not in and of itself create a conflict." (footnote omitted)).

On the present record, the Court cannot conclude that BLBG's involvement with APAFS renders BLBG inadequate as class counsel. Defendants merely present speculative allegations of impropriety, and Defendants fail to present any actual evidence showing that the BLBG's involvement with APAFS influenced Plaintiffs' selection process. The Court cannot find, on this record, that BLBG is inadequate. Further, any assertion that Northeast Carpenters or Cambridge do not oversee proposed class counsel is belied by the record before the Court. The Court agrees that "each Plaintiff's declarations and testimony also confirms it has been actively overseeing counsel and the interests." Reply 10, ECF No. 176. Plaintiffs have established that they are adequate class representatives.

### 5. Predominance

"The predominance inquiry seeks to resolve whether there are 'reliable means of proving classwide injury[.]'" *Reyes*, 802 F.3d at 489 (quoting *In re Rail Freight Fuel Surcharge Antitrust*

*Litig.*, 725 F.3d 244, 252–53 (D.C. Cir. 2013)).  The United States District Court for the Eastern

District of Pennsylvania has explained:

> Class certification under Rule 23(b)(3) is appropriate only if "the court finds that
> the questions of law or fact common to class members predominate over any
> questions affecting only individual members."   Fed.R.Civ.P. 23(b)(3).    The
> predominance inquiry "tests whether proposed classes are sufficiently cohesive to
> warrant adjudication by representation."  *Amchem Prods., Inc. v. Windsor*, 521 U.S.
> 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).   This requirement is
> considerably more demanding than Rule 23(a)'s commonality prerequisite and
> "imposes a more rigorous obligation upon a reviewing court to ensure that issues
> common to the class predominate over those affecting only individual class
> members."  *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 297 (3d Cir. 2011).

*Sterling Heights*, 2015 WL 5097883, at *10.

### a.  Reliance

With respect to the predominance inquiry in this matter, the Court is primarily concerned

with the reliance element of Plaintiffs' reliance-based claims,[21] and, accordingly, the Court must

look to whether Plaintiffs have successfully invoked the *Basic* presumption of reliance and, if so,

whether Defendants have rebutted that presumption by showing a lack of price impact.

As discussed above, Defendants argue that class certification should be denied as to

Plaintiffs' reliance-based securities fraud claims because Plaintiffs cannot prove class-wide

reliance using common proof because Defendants have rebutted the *Basic* presumption with

evidence that it is more likely than not that the asserted February 5, 2019 and the June 17, 2019

corrective disclosures in this case did not impact the market price of EQT stock.  Br. in Opp'n to

Certification Mot. 5-7, ECF No. 157.  More specifically, Defendants assert that "event studies

submitted by both parties' experts show the lack of statistically significant price movement

following the alleged corrective disclosures on February 5 and June 17, 2019."  *Id.* at 7 (emphasis

---

[21] The three other elements are not in dispute with respect to predominance.  "Materiality will always rise or fall by
common evidence," *Sterling Heights*, 2015 WL 5097883, at *10, and Defendants do not challenge the timing or
publicity elements.  The predominance inquiry thus turns on reliance.

omitted).  Defendants aver that "the lack of price impact for the February 5, 2019 and the June 17, 2019 alleged corrective disclosures 'severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price,' and rebuts the fraud-on-the-market presumption."  *Id.* at 7-8 (quoting *Basic*, 485 U.S. at 248).  Defendants further argue that, at a minimum, the Court should tailor the proposed class period to end on October 25, 2018, as the class period should include only those dates where the *Basic* presumption applies.[22]  *Id.* at 8.

"In a securities fraud case, if individual issues of reliance predominate, class certification is unsuitable."  *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, No. CV 13-6731, 2016 WL 4138613, at *11 (E.D. Pa. Aug. 4, 2016).  "If the Court finds the *Basic* presumption does not apply, either because market efficiency was not established or because Defendants proved there was no price impact, then individual issues of reliance would predominate over common issues in this case, 'rendering class certification inappropriate.'"  *Sterling Heights*, 2015 WL 5097883, at *10 (citation omitted).  As discussed above, Plaintiffs have established that EQT stock traded in an efficient market, and have thus successfully invoked the *Basic* presumption of reliance.  Unless Defendants can prove a lack of price impact from the February 5, 2019 and June 17, 2019 corrective disclosures, "the Basic presumption affirms that the investors relied on the alleged misrepresentations[.]"  *Id*.

There is no dispute that EQT stock price dropped following both the purported February 5, 2019 corrective disclosure and the June 17, 2019 corrective disclosure.  As discussed above, Defendants rely primarily on an assertion that neither Dr. Feinstein nor Dr. Lehn found a

---

[22] It is undisputed that the drop in EQT stock price following the alleged October 25, 2018 corrective disclosure was statistically significant, and Defendants concede that the *Basic* presumption is properly invoked, and not rebutted, with respect to that disclosure.

statistically significant negative residual return following these purported corrective disclosures, and further rely on Dr. Feinstein's use of a two-day window in analyzing the price impact of the June 17, 2019 disclosure, in arguing that Plaintiffs cannot prove class-wide reliance using common proof. The Court has rejected these arguments as a basis to exclude Dr. Feinstein's Rebuttal Report and testimony, and further finds, for the reasons discussed above, that they are insufficient to rebut the *Basic* presumption. For the reasons discussed at length above, the Court finds that Defendants failed to rebut the *Basic* presumption at this juncture. Reliance can be proven in this matter through common evidence, and the Court rejects Defendants arguments to the contrary.

Defendants also argue that Plaintiffs' citation to the presumption of reliance discussed in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), which applies in § 10(b) and Rule 10b-5 actions involving primarily a failure to disclose, should be rejected because Plaintiffs' allegations overwhelmingly challenge affirmative statements, as opposed to omissions. Br. in Opp'n to Certification Mot. 8-9, ECF No. 157. Given the Court's holdings above with respect to the *Basic* presumption, this issue need not be resolved at this time.

### b. Damages

Defendants further assert that Plaintiffs cannot establish predominance because Plaintiffs' damages methodology does not align with their theory of liability. Br. in Opp'n to Certification Mot. 9-12, ECF No. 157. Defendants rely on the Supreme Court's decision in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) in arguing that injury to the class cannot be proven through common evidence. Defendants first argue that "former Rice shareholders are situated differently than other members of the proposed class because, according to Plaintiffs' theory of liability, many former Rice shareholders benefited from the alleged fraud." Br. in Opp'n to Certification Mot. 10, ECF No. 157. Defendants further argue that "Plaintiffs' damages model fails because it does not

account for the inflation in Rice stock from the alleged fraud or corresponding benefit to Rice shareholders." *Id.* at 11.

Defendants also argue that Plaintiffs' damages model is flawed because Plaintiffs have alleged two distinct sets of alleged misstatements, those that arose prior to and those that occurred after the Acquisition, and that Plaintiffs' "proposed model—which uses losses incurred following alleged corrective disclosures to measure the value of the alleged artificial inflation in the stock price—calculates damages as though inflation from all of the alleged misstatements were present as of the first day of the Proposed Class Period."  Id. at 11-12.  Defendants assert that this "mismatch" should result in the denial of Plaintiffs' Certification Motion.

In discussing *Comcast*, the Third Circuit explained:

> A close reading of the text above makes it clear that the predominance analysis was specific to the antitrust claim at issue.  That is eminently sensible.  Every question of class certification will depend on the nature of the claims and evidence presented by the plaintiffs.  What we know for sure is that whatever "*Comcast's* ramifications for antitrust damages models or proving antitrust impact," a trial court must "'consider carefully all relevant evidence and make a definitive determination that the requirements of Rule 23 have been met before certifying a class.'"  *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 186–87 (3d Cir. 2015) (quoting *Hydrogen Peroxide*, 552 F.3d at 320).

> Our reading of *Comcast* is consistent with decisions by several of our sister courts.  That is because "[r]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal."  *Comcast*, 133 S.Ct. at 1437 (Ginsburg, J. & Breyer, J., dissenting) (citing 2 William B. Rubenstein, Newberg on Class Actions § 4:54 (5th ed.2012)).  Had the District Court ruled as Volvo requested, denying certification on that basis alone would have amounted to an abuse of discretion.  *See* [*Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 402 (2d Cir.2015)].  In sum, and as explained by the Fifth Circuit, it is "a misreading of *Comcast*" to interpret it as "preclud[ing] certification under Rule 23(b)(3) in any case where the class members' damages are not susceptible to a formula for classwide measurement."  *In re Deepwater Horizon*, 739 F.3d at 815 & n. 104.

*Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 374-75 (3d Cir. 2015) (footnote omitted).

The Third Circuit has also explained that "it is important for the District Court to remember that an inability to calculate damages on a classwide basis will not, on its own, bar certification[,]" and that "[a] district court errs when it holds a plaintiff seeking class certification to a higher standard of proof than proof by a preponderance of the evidence . . . ." *Reyes*, F.3d at 485 (citing *Neale*, 794 F.3d at 374–75 n. 10); *see also W. Palm Beach Police Pension Fund*, 2016 WL 4138613, at *14 ("Subsequent to the decision in *Comcast*, it remains the law in the Third Circuit that the need to perform individual damages calculations does not foreclose class certification under Rule 23(b)(3)." (citations omitted); *Sterling Heights*, 2015 WL 5097883, at *13 ("Class certification will not necessarily be defeated where there are individual issues with respect to the calculation of damages. . . . Indeed, in securities cases such as this one where all other issues are provable by common evidence, denial of class certification solely on the basis of individual damages calculations would be 'an abuse of discretion.'" (internal citation omitted*); In re Novo Nordisk Sec. Litig.*, No. 3:17-cv-00209-BRM-LHG, 2020 WL 502176, at *9 (D.N.J. Jan. 31, 2020) (finding that "common issues predominate all other issues of law and fact in this case[,]" and holding: "Therefore, the Court 'need not assess the validity of Plaintiffs' damages model at this stage.'" (citations omitted)); *Pelletier*, 338 F.R.D. at 487 (holding that *Comcast* applies only to antitrust cases).

Prior to considering Defendants' arguments with respect to damages, the Court has already determined that common issues predominate all other issues of law and fact in this case. Accordingly, the Court need not assess the validity of Plaintiffs' damages model at this time. Further, "[a]t this stage of litigation, Plaintiffs are not required to produce a detailed damages model." *In re Novo Nordisk*, No2020 WL 502176, at *3 (citations omitted). In this matter, Dr. Feinstein has articulated a common damage methodology in his Report and Rebuttal Report, *see*

Feinstein Report ¶¶ 201-239, ECF No. 141-4; Rebuttal Report ¶¶ 72-95, ECF No. 169-1, and the out-of-pocket methodology described by Dr. Feinstein is the type of model that has been accepted by courts as a method of measuring damages in securities fraud actions, *see City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, No. 18-CV-04844-BLF, 2022 WL 1459567, at *7 (N.D. Cal. May 9, 2022) (finding expert's proposed out-of-pocket damages model sufficient to meet the Rule 23(b)(3) predominance requirement). Although "[w]eighing conflicting expert testimony at the certification stage . . . may be integral to the rigorous analysis Rule 23 demands," *Hydrogen Peroxide,* 552 F.3d at 323, "a court should not address merits-related issues beyond what is necessary to determine preliminarily whether certain elements will necessitate individual or common proof," *Harnish v. Widener Univ. Sch. of L.,* 833 F.3d 298, 305 (3d Cir. 2016) (quotation marks and citation omitted). At the merits stage of this litigation, the parties' experts may address the ultimate viability of Plaintiffs' damages model. The same is not, however, appropriately addressed at this juncture. *See, e.g., Amgen*, 568 U.S. at 466, 133 S.Ct. 1184 ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage").

### 6. Superiority

The superiority inquiry requires that the Court consider whether a class action "is superior to other available methods for fairly and efficiently adjudicating the controversy." Courts look to the following in making such a determination:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  With respect to superiority, Plaintiffs assert:

> First, Plaintiffs are unaware of any Class member who would prefer to prosecute
> her claims individually.  Second, Plaintiffs are aware of no individual litigation
> seeking the same redress as the Complaint.  Third, the geographical dispersion of
> Class members means that it is desirable for their claims to be litigated in a single
> forum to avoid inconsistent adjudications and promote fairness and efficiency.
> Finally, this case presents no unusual management difficulties.

Br. in Supp. of Certification Mot. 15, ECF No. 140.

"In assessing whether a class action is a superior method of adjudication, we must balance the fairness and efficiency of the class action against other alternative forms of resolution, such as individual lawsuits or consolidation."  *Bing Li*, 324 F.R.D. at 345 (quoting *In re Rent–Way Sec. Litig.*, 218 F.R.D. 101, 121 (W.D. Pa. 2003)).  Given the number of class members dispersed throughout the country, adjudication of this matter in a single forum is the superior method of adjudication, as it will avoid numerous forums being required to consider essentially the same legal and factual issues and will, accordingly, avoid the risk of inconsistent adjudications.  Further, a class action is more efficient, and will allow Plaintiffs and Defendants "to avoid duplicative expenses and take advantage of economies of scale which they would otherwise lack."  *Bing Li*, 324 F.R.D. at 346 (quoting *In re DVI Inc.*, 249 F.R.D. at 200).  Plaintiffs have satisfied the superiority requirement.

### 7.  Ascertainability

Defendants assert that Plaintiffs' Certification Motion should be denied because the Motion fails to address ascertainability.  In their Reply, Plaintiffs assert that "Defendants' contention that the motion does not address ascertainability is unavailing, because the 'class members will be readily ascertainable through their registered shares or from Defendants' books and records.'"  Reply in Support of Certification Mot. 10 n.14, ECF No.176 (quoting *Pope v. Navient Corp.*, 2021

WL 926611, at *S (D.N.J. Mar. 11, 2021)).  Defendants offer no challenge to this assertion in their Surreply, and the Court finds that Plaintiffs have satisfied the ascertainability requirement.

**IV.     Conclusion**

For the reasons discussed above, Defendants' Motion to Exclude the Rebuttal Report and Testimony of Dr. Steven Feinstein will be denied.  Plaintiffs' Motion to Exclude the Report and Testimony of Dr. Kenneth M. Lehn will be denied.  Plaintiffs' Motion for Class Certification will be granted.  An appropriate Order of Court follows.

BY THE COURT:

s/*Robert J. Colville*_____
Robert J. Colville
United States District Judge

DATED: August 11, 2022

cc: All counsel of record